**CHASAN & WALTON, LLC**
ANDREW M. CHASAN, ISB #2100
E-mail: andrew.chasan@chasanwalton.com
TIMOTHY C. WALTON, ISB #2170
E-mail: timwalton2000@hotmail.com
P.O. Box 1069
Boise, Idaho 83701
Phone: 208-345-3760
Fax: 208-345-0288

**DUMAS LAW GROUP, LLC**
GILION C. DUMAS, ISB #8176
E-mail: gilion@dumaslawgroup.com
ASHLEY L. VAUGHN, admitted *pro hac vice*
E-mail: ashley@dumaslawgroup.com
516 SE Morrison St., Suite 309
Portland, OR 97214
Phone: 503-952-6789

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN DOES I-XIX, and JOHN ELLIOTT, | Case No. 1:13-cv-00275-BLW |
| Plaintiffs, | |
| v. | **THIRD AMENDED COMPLAINT** |
| BOY SCOUTS OF AMERICA, a congressionally chartered corporation authorized to do business in Idaho; CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a foreign corporation sole registered to do business in Idaho; and CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS AND SUCCESSORS, a foreign corporation registered to do business in Idaho, | |
| Defendants. | |

Pursuant to Fed. R. of Civ. Proc. 15(a), Plaintiffs hereby amend their Complaint and allege:

**IDENTITY OF THE PARTIES**

1.

Plaintiffs JOHN DOES I-XIX's true names are not stated in this Complaint in order to protect them from further emotional harm because this Complaint makes allegations involving child sexual abuse.  Their true names will be provided to the Court as may be required by law.

2.

Plaintiff JOHN DOE I is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of each Defendant's wrongful conduct.  At all times relevant to this Complaint, Plaintiff JOHN DOE I was a resident of Idaho.  Plaintiff JOHN DOE I is now a resident of Washington.

3.

Plaintiff JOHN DOE II is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of each Defendant's wrongful conduct.  At all times relevant to this Complaint, Plaintiff JOHN DOE II was a resident of Idaho.  Plaintiff JOHN DOE II is now a resident of Idaho.

4.

Plaintiff JOHN DOE III is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of each Defendant's wrongful conduct.  At all times relevant to this

Complaint, Plaintiff JOHN DOE III was a resident of Idaho.  Plaintiff JOHN DOE III is now a resident of Idaho.

5.

Plaintiff JOHN DOE IV is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of Defendant BOY SCOUTS OF AMERICA's wrongful conduct.  At all times relevant to this Complaint, Plaintiff JOHN DOE IV was a resident of Idaho.  Plaintiff JOHN DOE IV is now a resident of Washington.

6.

Plaintiff JOHN DOE V is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of each Defendant's wrongful conduct.  At all times relevant to this Complaint, Plaintiff JOHN DOE V was a resident of Idaho.  Plaintiff JOHN DOE V is now a resident of Arizona.

7.

Plaintiff JOHN DOE VI is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of each Defendant's wrongful conduct.  At all times relevant to this Complaint, Plaintiff JOHN DOE VI was a resident of Idaho.  Plaintiff JOHN DOE VI is now a resident of Idaho.

/ / /

/ / /

8.

Plaintiff JOHN DOE VII is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of Defendant BOY SCOUTS OF AMERICA's wrongful conduct.  At all times relevant to this Complaint, Plaintiff JOHN DOE VII was a resident of Idaho.  Plaintiff JOHN DOE VII is now a resident of Idaho.

9.

Plaintiff JOHN DOE VIII is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of each Defendant's wrongful conduct.  At all times relevant to this Complaint, Plaintiff JOHN DOE VIII was a resident of Idaho.  Plaintiff JOHN DOE VIII is now a resident of Hawaii.

10.

Plaintiff JOHN DOE IX is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of Defendant BOY SCOUTS OF AMERICA's wrongful conduct.  At all times relevant to this Complaint, Plaintiff JOHN DOE IX was a resident of Idaho.  Plaintiff JOHN DOE IX is now a resident of Idaho.

11.

Plaintiff JOHN DOE X is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of Defendant BOY SCOUTS OF AMERICA's wrongful conduct.  At all times

relevant to this Complaint, Plaintiff JOHN DOE X was a resident of Idaho.  Plaintiff JOHN DOE

X is now a resident of Idaho.

12.

Plaintiff JOHN DOE XI is an adult who, at all times relevant to this Complaint, was

subjected to child sexual abuse and other physical and emotional harm as a direct and

proximate result of Defendant BOY SCOUTS OF AMERICA's wrongful conduct.  At all times

relevant to this Complaint, Plaintiff JOHN DOE XI was a resident of Idaho.  Plaintiff JOHN DOE

XI is now a resident of Idaho.

13.

Plaintiff JOHN DOE XII is an adult who, at all times relevant to this Complaint, was

subjected to child sexual abuse and other physical and emotional harm as a direct and

proximate result of each Defendant's wrongful conduct.  At all times relevant to this

Complaint, Plaintiff JOHN DOE XII was a resident of Idaho.  Plaintiff JOHN DOE XII is now a

resident of Idaho.

14.

Plaintiff JOHN DOE XIII is an adult who, at all times relevant to this Complaint, was

subjected to child sexual abuse and other physical and emotional harm as a direct and

proximate result of each Defendant's wrongful conduct.  At all times relevant to this

Complaint, Plaintiff JOHN DOE XIII was a resident of Idaho.  Plaintiff JOHN DOE XIII is now a

resident of South Dakota.

/ / /

/ / /

15.

Plaintiff JOHN DOE XIV is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of Defendant BOY SCOUTS OF AMERICA's wrongful conduct.  At all times relevant to this Complaint, Plaintiff JOHN DOE XIV was a resident of Idaho.  Plaintiff JOHN DOE XIV is now a resident of Idaho.

16.

Plaintiff JOHN DOE XV is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of Defendant BOY SCOUTS OF AMERICA's wrongful conduct.  At all times relevant to this Complaint, Plaintiff JOHN DOE XV was a resident of Idaho.  Plaintiff JOHN DOE XV is now a resident of Idaho.

17.

Plaintiff JOHN DOE XVI is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of Defendants' wrongful conduct.  At all times relevant to this Complaint, Plaintiff JOHN DOE XVI was a resident of Idaho.  Plaintiff JOHN DOE XVI is now a resident of Idaho.

18.

Plaintiff JOHN DOE XVII is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of Defendants' wrongful conduct.  At all times relevant to this Complaint,

Plaintiff JOHN DOE XVII was a resident of Idaho.  Plaintiff JOHN DOE XVII is now a resident of Florida.

19.

Plaintiff JOHN DOE XVIII is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of Defendant BOY SCOUTS OF AMERICA's wrongful conduct.  At all times relevant to this Complaint, Plaintiff JOHN DOE XVIII was a resident of Idaho.  Plaintiff JOHN DOE XVIII is now a resident of Idaho.

20.

Plaintiff JOHN DOE XIX is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of each Defendant's wrongful conduct.  At all times relevant to this Complaint, Plaintiff JOHN DOE VIII was a resident of Idaho.  Plaintiff JOHN DOE VIII is now a resident of Idaho.

21.

Plaintiff JOHN ELLIOTT is an adult who, at all times relevant to this Complaint, was subjected to child sexual abuse and other physical and emotional harm as a direct and proximate result of Defendant BOY SCOUTS OF AMERICA's wrongful conduct.  At all times relevant to this Complaint, Plaintiff JOHN ELLIOTT was a resident of Idaho.  Plaintiff JOHN ELLIOTT is now a resident of Idaho.

/ / /

/ / /

22.

At all times relevant to this Complaint, Defendant BOY SCOUTS OF AMERICA

("Defendant BSA") was a congressionally chartered foreign corporation incorporated and with

its principal place of business in Texas, and operating in Idaho.  At all times relevant to this

Complaint, Defendant BSA operated various outdoor, citizenship, service, and character

building training programs ("Scouting") for boys in Idaho, including Plaintiffs in this case.

23.

At all times relevant to this Complaint, Defendant CORPORATION OF THE PRESIDING

BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS was a foreign religious

corporation sole of the Church of Jesus Christ of Latter-Day Saints ("LDS Church") incorporated

and with its principal place of business in Utah, and operating in Idaho.

24.

At all times relevant to this Complaint, Defendant CORPORATION OF THE PRESIDENT

OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS AND SUCCESSORS was a foreign

religious corporation of the LDS Church incorporated and with its principal place of business

in Utah, and operating in Idaho.  The Defendant CORPORATION OF THE PRESIDING BISHOP

and Defendant CORPORATION OF THE PRESIDENT will be referred to collectively throughout

this Complaint as "LDS Defendants." Defendant BSA and LDS Defendants will be referred to

collectively throughout this Complaint as "Defendants."

25.

The amount in controversy exceeds $75,000 for each Plaintiff, with the exact

amounts to be determined by a jury at trial.

26.

At all times relevant to this Complaint, Scouting was an integral part of the LDS Defendants' program for raising, teaching, and guiding boys and men within the LDS Church. Scouting was the official program for boys in the LDS Church, and many boys growing up in the LDS Church were required or strongly encouraged to join Scouting.  On information and belief, Scouting was an official part of the Aaronic Priesthood for young men under 21 in the LDS Church.  Men within the LDS Church were also either required or strongly encouraged to be Scout leaders as part of their religious growth and experience in the LDS Church.  Wards were the basic ecclesiastical unit of the LDS Church, and each ward was presided over by a Bishop. The Bishop had many tasks including, on information and belief, selecting and supervising Scout leaders within the LDS Church.  On information and belief, every ward was supposed to maintain a Scout troop.

27.

At all material times to this Complaint, BSA was a vertically-integrated organization. The national BSA organization was at the top of the structure.  BSA national established goals, standards, and rules for leaders at the lower levels to follow, and BSA national relied upon local employees and volunteers to implement its goals, standards, and rules.  The lower levels of BSA included sponsoring organizations, local councils, troop committees, and troops. Defendant BSA and LDS Defendants jointly agreed to control and operate Scout troops, such as those troops Plaintiffs were members of, in Idaho.  Troops operated at the lowest level of Scouting, and many Scout troops were "sponsored" by the LDS Defendants through individual wards in the LDS Church.  Defendant BSA and LDS Defendants jointly selected, approved,

and/or retained adult volunteers to lead Scout troops, in positions such as Assistant

Scoutmasters or Scoutmasters ("Scout leaders").  Defendant BSA possessed the right of final

approval of adult volunteers as Scout leaders, including adult volunteers that were also

members of the LDS Church.  In the course of operating Scout troops, Defendants also had

the right to control the physical details of Scout leaders' performance of their duties on behalf

of Defendants.  In performing these duties for Defendants, Scout leaders were acting in the

time and space limits of their agency with Defendants, were motivated at least in part by a

desire to serve Defendants, and these actions were of a type that they were required to do

on behalf of the Defendants.

**FACTS SPECIFIC TO JOHN DOE I**

28.

Plaintiff JOHN DOE I realleges and incorporates by reference paragraphs 1-27.

29.

JOHN DOE I was born in 1973.

30.

At all times relevant to this Complaint, JOHN DOE I was a child involved in Scouting and

participated in a Scout troop that was sponsored by the LDS Defendants.  JOHN DOE I was under

the care, custody, protection, and/or responsibility of each Defendant during the time he was

involved in Scouting.

31.

When JOHN DOE I was approximately 9 years old, in or around the spring and summer

of 1982, JAMES SCHMIDT ("SCHMIDT"), a Scout leader, began sexually abusing him.  SCHMIDT'S

sexual abuse of JOHN DOE I included sodomy and other acts of physical, sexual, and emotional abuse.  SCHMIDT also abused JOHN DOE I's cousin, a member of SCHMIDT's Scout troop.  Their abuse occurred during a time when JOHN DOE I's parents were briefly living in Alaska, and JOHN DOE I was living with his cousin's family.  SCHMIDT forced JOHN DOE I to watch SCHMIDT's sexual abuse of JOHN DOE I's cousin, and SCHMIDT forced JOHN DOE I and his cousin to perform sexual acts on each other while SCHMIDT watched.   This abuse occurred multiple times and lasted for approximately 6 months.  The abuse occurred on BSA camping trips, at a ward building owned and operated by LDS Defendants, and in the attic of Defendant BSA's Council Headquarters, located in Boise, Idaho.

32.

All Defendants had notice beginning in 1979 that SCHMIDT—abuser of Plaintiffs JOHN DOES I, II, V, VII, IX, X, XI, and XV, and JOHN ELLIOTT was a pedophile and was abusing Scouts. In 1983 SCHMIDT was arrested by Caldwell, Idaho police after the police interviewed 16 Scouts and their parents who documented an undisclosed number of cases in which SCHMIDT had sexually abused minors.  After the investigation, he was court-ordered to complete treatment for "severe pedophilia" at John Hopkins Hospital in Baltimore, Maryland.

**FACTS SPECIFIC TO JOHN DOE II**

33.

Plaintiff JOHN DOE II realleges and incorporates by reference paragraphs 1-32.

34.

JOHN DOE II was born in 1970.

/ / /

35.

At all times relevant to this Complaint, JOHN DOE II was a child involved in Scouting, in the BSA Caldwell 5th Ward, that was sponsored by the LDS Defendants.  JOHN DOE II was under the care, custody, protection, and/or responsibility of each Defendant during the time he was involved in Scouting.

36.

JOHN DOE II's Scout leader, SCHMIDT, began abusing him when he was 12 years old, in or around 1982. SCHMIDT's sexual abuse included fondling of JOHN DOE II's penis, testicles, and anus, and other physical, sexual, and emotional abuse.  This abuse continued for approximately 2 years, until JOHN DOE II was 14 years old.  The abuse occurred on BSA camping trips.

**FACTS SPECIFIC TO JOHN DOE III**

37.

Plaintiff JOHN DOE III realleges and incorporates by reference paragraphs 1-36.

38.

JOHN DOE III was born in 1967.

39.

At all times relevant to this Complaint, JOHN DOE III was a child involved in Scouting in a Scout troop sponsored by LDS Defendants.  JOHN DOE III was under the care, custody, protection, and/or responsibility of each Defendant during the time he was involved in Scouting.

/ / /

40.

During the summer of 1981, when JOHN DOE III was approximately 14 years old, JOHN

DOE III's Scout troop went to Camp Morrison.  JOHN DOE III was sexually abused by DENNIS

EMPEY ("EMPEY") for a week at Camp Morrison, and the abuse occurred approximately 4 times.

The abuse included sexual fondling, and other types of physical, sexual, and emotional abuse.

41.

Defendant BSA placed EMPEY in its Ineligible Volunteer Files ("IV Files"), as described

in paragraph 72, for molesting Scouts in 1988.  Letters in EMPEY'S IV File document that one

of the victims—a member of the LDS Church—told his father in 1987 that Empey had

abused him in 1981 at an LDS Chapel in Idaho Falls.  No one from BSA reported this incident

to the police. In 1991, EMPEY was convicted for molesting children in Provo, Utah.  In 1991,

EMPEY moved back to Idaho and was hired by the Teton Council of BSA to do graphic design

work.  In association with another case in Idaho in 2005, a man filed an affidavit stating that

EMPEY had molested him in 1983 at the Island Park Scout Camp.

**FACTS SPECIFIC TO JOHN DOE IV**

42.

Plaintiff JOHN DOE IV realleges and incorporates by reference paragraphs 1-41.

43.

JOHN DOE IV was born in 1960.

44.

At all times relevant to this Complaint, JOHN DOE IV was a child involved in Scouting,

in Scout Troop 176 in Lewiston, Idaho, that met at the Orchards Baptist Church and, on

information and belief, was sponsored by the Elk Club.  JOHN DOE IV was under the care,

custody, protection, and/or responsibility of Defendant BSA during the time he was involved

in Scouting.

45.

When JOHN DOE IV was approximately 12 years old in or around 1972, his

Scoutmaster LAWRENCE LIBEY ("LIBEY") began sexually abusing him.  LIBEY'S sexual abuse of

JOHN DOE IV included fondling, oral sex, sodomy, forcing JOHN DOE IV to have sex with

another boy, and other acts of physical, sexual, and emotional abuse.  This abuse occurred

hundreds of times and lasted for approximately 6 years.

## FACTS SPECIFIC TO JOHN DOE V

46.

Plaintiff JOHN DOE V realleges and incorporates by reference paragraphs 1-45.

47.

Plaintiff JOHN DOE V was born in 1966.

48.

At all times relevant to this Complaint, JOHN DOE V was a child involved in Scouting

and participated in the BSA Nampa 9th Ward Troop that was sponsored by the LDS

Defendant. JOHN DOE V was under the care, custody, protection and/or responsibility of

each Defendant during the time he was involved in Scouting.

49.

When JOHN DOE V was approximately 13 years old, in or around the spring and

summer of 1979 or 1980, he was abused by SCHMIDT.  SCHMIDT took JOHN DOE V on several

outings with SCHMIDT as the only adult.  At the end of one particular Scout outing SCHMIDT, under the guise of giving him a "ride home," drove JOHN DOE V instead to SCHMIDT's house in Nampa, Idaho.  SCHMIDT took JOHN DOE V to SCHMIDT's bedroom, had him lie with SCHMIDT on SCHMIDT's bed.  SCHMIDT then grabbed JOHN DOE V's crotch.  JOHN DOE V pushed SCHMIDT's hand away and told him to stop; but SCHMIDT persisted, and grabbed JOHN DOE V's crotch at least several more times.  JOHN DOE V finally kneed SCHMIDT in the groin and told him to take him home, which SCHMIDT finally did.

### FACTS SPECIFIC TO JOHN DOE VI

50.

Plaintiff JOHN DOE VI realleges and incorporates by reference paragraphs 1-49.

51.

Plaintiff JOHN DOE VI was born in 1966.

52.

At all times relevant to this Complaint, JOHN DOE VI was a child involved in Scouting and participated in Scout Troup 33 that was sponsored by the Presbyterian Church.  JOHN DOE VI was under the care, custody, protection, and/or responsibility of Defendant BSA during all times relevant.

53.

When JOHN DOE VI was approximately 13 years old, during the summer of 1980, JOHN DOE VI was attending Camp Morrison in McCall, Idaho, as part of his involvement with the Order of the Arrow.  While at camp, JOHN DOE VI was sexually abused by LARREN ARNOLD ("ARNOLD").  The abuse included sexual fondling and other types of physical, sexual,

and emotional abuse.  Within a day or two of the abuse, JOHN DOE VI reported it to his Assistant Scout Master who was also attending Camp Morrison as part of the Order of the Arrow activity.

Later in 1980, JOHN DOE VI attended an Order of the Arrow conference in Boise, Idaho, and stayed in the barracks at Gowan Field.   ARNOLD had JOHN DOE VI sleep in bed with him where ARNOLD fondled and then sodomized JOHN DOE VI and otherwise abused JOHN DOE VI including other types of physical, sexual, and emotional abuse.

In 1982, while approximately 14 years old and attending Camp Tapawingo, JOHN DOE VI was abused by EMPEY, who was the waterfront director.  EMPEY chose JOHN DOE VI to room in his cabin where he sexually fondled, then raped and sodomized JOHN DOE VI during his stay. The abuse suffered by John Doe VI included other types of physical, sexual, and emotional abuse.

Each Defendant had been advised as early as 1964 that ARNOLD was a pedophile abusing boys.  Defendant BSA placed ARNOLD in its Ineligible Volunteer files as described in paragraph 72 for molesting Scouts in 1991.  He had been involved in Scouting from 1963-1989 and had been accused of molesting Scouts in the 1960's, the 1970's, and the 1980's.

**FACTS SPECIFIC TO JOHN DOE VII**

54.

Plaintiff JOHN DOE VII realleges and incorporates by reference paragraphs 1-53.

55.

JOHN DOE VII was born in 1964.

/ / /

56.

At all times relevant to this Complaint, JOHN DOE VII was a child involved in Scouting in Troop 99 sponsored by the Southminster Presbyterian Church, Boise, Idaho.  JOHN DOE VII was under the care, custody, protection and/or responsibility of Defendant BSA during the time he was involved in Scouting.

57.

When JOHN DOE VII was approximately 13 years old, during the summer of 1977, he attended Camp Tapawingo in McCall, Idaho.  While on an overnight hike, SCHMIDT had JOHN DOE VII sleep in his tent, where SCHMIDT had JOHN DOE VII undress in front of him, then put his hands down his underwear, then sexually touched and fondled JOHN DOE VII's penis, and otherwise physically, sexually, and emotionally abused JOHN DOE VII.   The next day JOHN DOE VII told his Scoutmaster, who said he would report the incident.

**FACTS SPECIFIC TO PLAINTIFF JOHN ELLIOTT**

58.

Plaintiff JOHN ELLIOTT realleges and incorporates by reference paragraphs 1-57.

59.

ELLIOTT was born in 1965.

60.

At all times relevant to this Complaint, ELLIOTT was a child involved in Scouting in Troop 99 sponsored by Southminster Presbyterian Church, Boise, Idaho.  ELLIOTT was under the care, custody, protection, and/or responsibility of Defendant BSA during the time he was involved in Scouting.

61.

When ELLIOTT was approximately 12 years old, during the summer of 1977, he

attended either Camp Tapawingo or Camp Morrison in McCall, Idaho.  While on an overnight

hike, SCHMIDT had ELLIOTT sleep in his tent, where SCHMIDT had ELLIOTT undress in front of

him, then put his hands down his underwear, then sexually touched and fondled ELLIOTT's

penis, and otherwise physically, sexually, and emotionally abused ELLIOTT.

## FACTS SPECIFIC TO JOHN DOE VIII

62.

Plaintiff JOHN DOE VIII realleges and incorporates by reference paragraphs 1-61.

63.

JOHN DOE VIII was born in 1965.

64.

At all times relevant to this Complaint, JOHN DOE VIII was a child involved in Scouting

and participated in Scout Troop 411, and was a member of the Caldwell 2nd Ward of the LDS

Church.  JOHN DOE VIII was under the care, custody, protection, and/or responsibility of each

Defendant during the time he was involved in Scouting.

65.

When JOHN DOE VIII was approximately 11 or 12 years old, in or around the summer

of 1976 or 1977, he attended Scout camp at Camp Morrison in McCall, Idaho.  He went on an

overnight nature hike with other Scouts, led by ARNOLD.  That evening ARNOLD told scary

stories to the Scouts and convinced Scouts, including JOHN DOE VIII, to sleep in his tent with

/ / /

him.  During the night, he sexually abused JOHN DOE VIII several times by fondling him and practicing oral sex on him.

## FACTS SPECIFIC TO JOHN DOE IX

66.

Plaintiff JOHN DOE IX realleges and incorporates by reference paragraphs 1-65.

67.

JOHN DOE IX was born in 1965.

68.

At all times relevant to this Complaint, JOHN DOE IX was a child involved in Scouting and participated in Scout Troop 99.  JOHN DOE IX was under the care, custody, protection, and/or responsibility of Defendant BSA during the time he was involved in Scouting.

69.

When JOHN DOE IX was approximately 12 years old, in or around the summer of 1977, he attended Scout camp at Camp Tapawingo or Camp Morrison in McCall, Idaho.  He went on an overnight nature hike with other Scouts, including Plaintiffs JOHN DOES VII and XI and ELLIOTT, led by SCHMIDT.  That evening SCHMIDT told scary stories to the Scouts and convinced JOHN DOES VII and IX and ELLIOTT to sleep in his tent with him.  During the night, he sexually abused JOHN DOE IX by fondling him and otherwise sexually and emotionally abusing him.

/ / /

/ / /

/ / /

**FACTS SPECIFIC TO JOHN DOE X**

70.

Plaintiff JOHN DOE X realleges and incorporates by reference paragraphs 1-69.

71.

JOHN DOE X was born in 1966.

72.

At all times relevant to this Complaint, JOHN DOE X was a child involved in Scouting. JOHN DOE X was under the care, custody, protection, and/or responsibility of Defendant BSA during the time he was involved in Scouting.

73.

When JOHN DOE X was approximately 10 or 11 years old, in or around the summer of 1976 or 1977, he attended Scout camp at Camp Morrison in McCall, Idaho.  He went on 3-day backpacking trip with other Scouts, led by SCHMIDT.  SCHMIDT sexually abused JOHN DOE X during that backpacking trip by fondling him and otherwise sexually and emotionally abusing him.

**FACTS SPECIFIC TO JOHN DOE XI**

74.

Plaintiff JOHN DOE XI realleges and incorporates by reference paragraphs 1-73.

75.

JOHN DOE XI was born in 1964.

/ / /

/ / /

76.

At all times relevant to this Complaint, JOHN DOE XI was a child involved in Scouting. JOHN DOE I was under the care, custody, protection, and/or responsibility of Defendant BSA during the time he was involved in Scouting.

77.

When JOHN DOE XI was approximately 13 years old, in or around the summer of 1977, he attended Scout camp at Camp Morrison in McCall, Idaho.  He went on an overnight nature hike with other Scouts, including Plaintiffs JOHN DOES VII and IX and ELLIOTT, led by SCHMIDT. That evening SCHMIDT told scary stories to the Scouts and convinced several Scouts, including JOHN DOES VII, IX, and XI and ELLIOTT to sleep in his tent with him.  During the night, he sexually abused JOHN DOE XI by fondling him and otherwise sexually and emotionally abusing him.

**FACTS SPECIFIC TO JOHN DOE XII**

78.

Plaintiff JOHN DOE XII realleges and incorporates by reference paragraphs 1-77.

79.

JOHN DOE XII was born in 1962.

80.

At all times relevant to this Complaint, JOHN DOE XII was a child involved in Scouting and participated in a Scout troop sponsored by the Nampa 2nd Ward of the LDS Church. JOHN DOE XII was under the care, custody, protection, and/or responsibility of each Defendant during the time he was involved in Scouting.

81.

When JOHN DOE XII was approximately eight years old, in or around 1970, ARNOLD was an adult volunteer with JOHN DOE XII's Scout Troop.  ARNOLD began sexually abusing JOHN DOE XII in or around 1973 for a period of six months, always in a group setting with other Scouts and usually during Scouting events.

**FACTS SPECIFIC TO JOHN DOE XIII**

82.

Plaintiff JOHN DOE XIII realleges and incorporates by reference paragraphs 1-81.

83.

JOHN DOE XIII was born in 1967.

84.

At all times relevant to this Complaint, JOHN DOE XIII was a child involved in Scouting and participated in a Cub Scout troop sponsored by the Twin Falls Stake of the LDS Church in Kimberly, Idaho.  He was also a child in a foster child placement program operated by the LDS Church.  JOHN DOE XIII was under the care, custody, protection, and/or responsibility of each Defendant during the time he was involved in Scouting.

85.

When JOHN DOE XIII was approximately nine or ten years old, in or around the summer of 1976 or 1977, his Cub Scout leader and foster parent RONALD JENKINS began sexually abusing him.  He abused him before and after Cub Scout meetings and activities and during Cub Scout overnight events such as camping trips.  His sexual abuse included fondling, mutual masturbation, and sodomy.

**FACTS SPECIFIC TO JOHN DOE XIV**

86.

Plaintiff JOHN DOE XIV realleges and incorporates by reference paragraphs 1-85.

87.

JOHN DOE XIV was born in 1958.

88.

At all times relevant to this Complaint, JOHN DOE XIV was a child involved in Scout Troop 49, sponsored by the Whitney United Methodist Church in Boise, Idaho. JOHN DOE XIV was under the care, custody, protection, and/or responsibility of Defendant BSA during the time he was involved in Scouting.

89.

When JOHN DOE XIV was involved in Scouting in the early 1970s, his Assistant Scoutmaster was ART KRIGBAUM.  From the early 1970s-1974, KRIGBAUM sexually abused JOHN DOE XIV before and after troop meetings, and during Scouting activities such as camping trips.  His sexual abuse include fondling, oral sex, and masturbation.

**FACTS SPECIFIC TO JOHN DOE XV**

90.

Plaintiff JOHN DOE XV realleges and incorporates by reference paragraphs 1-89.

91.

JOHN DOE XV was born in 1965.

///

///

92.

At all times relevant to this Complaint, JOHN DOE XV was a child involved in a Scout troop sponsored by the Christian Faith Center of the First Assembly of God in Nampa, Idaho. JOHN DOE XV was under the care, custody, protection, and/or responsibility of Defendant BSA during the time he was involved in Scouting.

93.

When JOHN DOE XV was approximately 11 or 12 years old, in or around the summer of 1976 or 1977, he attended Scout camp at Camp Morrison in McCall, Idaho.  He went on an overnight hike with other Scouts, led by SCHMIDT.  He slept in SCHMIDT'S tent, and during the night, he sexually abused JOHN DOE XV by fondling him and otherwise sexually and emotionally abusing him.

**FACTS SPECIFIC TO JOHN DOE XVI**

94.

Plaintiff JOHN DOE XVI realleges and incorporates by reference paragraphs 1-93.

95.

JOHN DOE XVI was born in 1968.

96.

At all times relevant to this Complaint, JOHN DOE XVI was a child involved in Scouting and participated in the Scout troop associated with the Nampa 2nd Ward of the LDS Church, of which he was also a member.  JOHN DOE XVI was under the care, custody, protection, and/or responsibility of each Defendant during the time he was involved in Scouting.

/ / /

97.

When JOHN DOE XVI was approximately 11 or 12 years old, in or around 1979 and/or 1980, he was molested by his Scout leader, ARNOLD.  ARNOLD molested him at the Ward building and at his home under the pretense of completing Scouting activities.

**FACTS SPECIFIC TO JOHN DOE XVII**

98.

Plaintiff JOHN DOE XVII realleges and incorporates by reference paragraphs 1-97.

99.

JOHN DOE XVII was born in 1963.

100.

At all times relevant to this Complaint, JOHN DOE XVII was a child involved in Scouting and participated in the "Blazer B" troop and Scout troop associated with the Nampa 5th Ward West of the LDS Church in Boise, Idaho, of which he was also a member.  JOHN DOE XVII was under the care, custody, protection, and/or responsibility of each Defendant during the time he was involved in Scouting.

101.

When JOHN DOE XVII was approximately 10-12 years old, DOUG BOWEN was the "Blazer B Advisor" of his "Blazer B" Scout troop in the Nampa 5th Ward West.  BOWEN sexually abused JOHN DOE XVII many times, at BOWEN's house under the pretense of working on merit badges, at pool parties with other Scouts present, and during a camping trip at the Pinetop Resort, owned and/or operated by the LDS Church.  BOWEN would give JOHN DOE XVII drugs and/or alcohol to induce him to fall asleep and then proceed to molest

him.  JOHN DOE XVII's abuse included but is not limited to fondling, oral sex, and anal

penetration.  Bowen was convicted in 1997 for Attempted Aggravated Sexual Abuse of a

Child in Utah for his sexual abuse of another Scout.

## FACTS SPECIFIC TO JOHN DOE XVIII

102.

Plaintiff JOHN DOE XVIII realleges and incorporates by reference paragraphs 1-101.

103.

JOHN DOE XVIII was born in 1955.

104.

At all times relevant to this Complaint, JOHN DOE XVIII was a child involved in

Scouting and, to the best of his memory at this time, participated in Troop 176.  JOHN DOE

XVIII was under the care, custody, protection, and/or responsibility of DEFENDANT BSA

during the time he was involved in Scouting.

105.

When JOHN DOE XVIII was approximately 12-13 years old, he was molested by his

Scout leader LIBEY.  LIBEY groped and fondled him in LIBEY's car to and from Scouting

activities and fondled him during a camping trip at Camp Grizzley.

## FACTS SPECIFIC TO JOHN DOE XIX

106.

Plaintiff JOHN DOE XIX realleges and incorporates by reference paragraphs 1-105.

///

///

107.

JOHN DOE XIX was born in 1962.

108.

At all times relevant to this Complaint, JOHN DOE XIX was a child involved in Scouting and participated in the Scout Troop sponsored by the Nampa 2nd Ward of the LDS Church. JOHN DOE XIX was under the care, custody, protection, and/or responsibility of each Defendant during the time he was involved in Scouting.

109.

When JOHN DOE XIX was approximately 10 ten years old, his older brother dieed, and his brother's friends in the Order of the Arrow invited him to participate, even though he was too young.  Arnold was the Order of the Arrow leader, and that is how JOHN DOE XIX first met Arnold and started being abused by him.  Arnold continued to abuse him through Scouts, until he was approximately 12 years old.  Arnold fondled him and engaged in other sexual acts with him many times, sometimes in group settings with other Scouts during Scouting activities, and other times alone at Arnold's house or during other Scouting activities, such as hiking or camping.  John Doe XIX reported the abuse to Bishop Elvin Hegstrom, who did not believe him and told him not to say anything to anyone else about the abuse.

**DEFENDANTS' KNOWLEDGE OF SEXUAL ABUSE IN SCOUTING**

110.

Plaintiffs reallege and incorporate by reference paragraphs 1-109.

/ / /

/ / /

111.

Not later than 1965, Defendant BSA knew that Scouting posed a danger to minor boys because there had been a concrete, longstanding, consistent, and widespread problem with Scout leaders sexually abusing Scouts. Defendant BSA knew that Scouting was being used and exploited by child molesters to gain access to and gain the trust of Scouts, including Plaintiffs. Yet, Defendant BSA did nothing significant to alter the program, to ameliorate the sexual abuse problem, or to warn Scouts, Scouts' parents, other troop-level leaders, or the general public prior to and even after the time of Plaintiffs' abuse.

112.

Beginning in or around 1920, Defendant BSA started tracking incidences of child molestation by adult volunteers in Scouting. Defendant BSA created a file system then known as the "Red Flag" files—now the "Ineligible Volunteer" files ("IV files")— to track a variety of transgressions by adult volunteers, including child abuse. The IV Files are categorized according to the type of transgression committed, for example, Amoral" or "financial" transgressions. IV Files that reflect child sexual abuse allegations against adult volunteers are categorized as "Perversion" files. On information and belief, the Perversion IV Files have predominantly constituted a majority or plurality of the total IV Files. Between 1920 and 1935, at least 1,000 child molesters—between 50-60 per year—were discovered and subsequently excluded from Scouting. Now, at least 1,365 IV Perversion files still exist that were created between 1960 and 1985, with 25-96 IV Perversion files created per year during that time frame. However, the number of IV Perversion Files still existing significantly underrepresents the actual number of adult volunteers that molested Scouts, because

Defendant BSA has destroyed many IV Files for a variety of reasons, and because many children do not report their abuse.

113.

In Idaho alone, at least seven Scout leaders were accused of molesting Scouts or other youth between 1962 and 1977.  Between 1978 and 1983, at least three additional Idaho Scout leaders were accused of molesting Scouts or other youth. All of these Scout leaders operated in various councils in Idaho; at least six of them operated within the Ore-Ida Council.  In addition to knowing about the decades of sexual abuse by Scout leaders in Scouts prior to or during Plaintiffs' abuse, Defendant BSA became aware of all or most of the accusations regarding these specific Scout leaders by 1982.

114.

Prior to or during Plaintiffs' abuse, on information and belief, LDS Defendants were also aware of the risk that Scouts could be molested by Scout leaders, including by LDS Scout leaders and Scout leaders in LDS-sponsored troops.  In Idaho, LDS Defendants had notice prior to Plaintiffs' abuse that at least one LDS Scout leader in an LDS-sponsored troop within the Ore- Ida Council of Defendant BSA had been accused of molesting Scouts.

115.

Prior to Plaintiffs' abuse, Defendants knew to a moral certainty that at least some significant number of Scouts—including Scouts such as Plaintiffs—would be molested each and every year if Scouting remained structured as it was.

/ / /

/ / /

**CLAIM FOR RELIEF**
**(Constructive Fraud)**

**COUNT I**
**Plaintiffs JOHN DOES I, II, III, V, VI, VIII, XII, XIII, XVI, XVII, and XIX against all Defendants**

116.

Plaintiffs reallege and incorporate by reference paragraphs 1-115.

117.

At all times relevant to this Complaint, Defendants invited and encouraged Plaintiffs to participate in the Scouting program they jointly administered and controlled.  Their invitation created a special, fiduciary relationship, wherein these Plaintiffs and their parents relied upon Defendants' years of expertise and judgment in selecting morally upright and trustworthy men to lead Scouting activities.  These Plaintiffs and their parents gave Defendants authority to act *in loco parentis* over Plaintiffs at BSA meetings, camping trips, hiking trips, and in private social situations during Scouting activities.  Defendant BSA also invited Plaintiffs to enter into a commercial relationship by requiring Scouts to pay yearly dues and other assorted fees and required purchases, in exchange for participating in Scouting.

118.

Defendants represented that the Scout leaders they selected, controlled, and/or approved were appropriate and trustworthy mentors and leaders for young boys, merely by selecting, approving, and/or retaining certain men as Scout leaders.  They also promoted Scouting as being safe and beneficial for boys—physically, emotionally, and spiritually. Defendants claimed Scouting was a wholesome institution and emphasized the friendly and paternalistic role a Scout leader should play in a young boy's life.  As examples Defendant

BSA made specific statements in various editions of the Boy Scout Handbook—the

handbook that every Scout is given and uses as a guide to his Scouting experience.  The

Scout Oath was and remains: "On my honor I will do my best to do my duty to God and my

country and to obey the Scout law; To help other people at all times; To keep myself

physically strong, mentally awake, and morally straight."  The Scout law then describes the

characteristics a Scout should have: a Scout is trustworthy, loyal, helpful, friendly, courteous,

kind, obedient, cheerful, thrifty, brave, clean, and reverent.  These were ideals that both

Scouts and Scout leaders were expected to follow.  In the 1965-1972 *Boy Scout Handbook*,

the Scoutmaster is referred to as "a wonderful man" who goes on hikes and goes camping

with the Troop, and who "is the friend to whom you can always turn for advice."  Defendant

BSA, *Boy Scout Handbook*, at 94 (7th ed., 3rd printing, 1967).  The 1972-1978 *Boy Scout*

*Handbook*, BSA stated, "[o]ver there watching things is your Scoutmaster.  He's a great guy.

He gives hours of his time to you and the troop.  And do you know why?  Mostly because he

knows Scouting is important to his city and nation.  Besides, he is interested in boys."

Defendant BSA, *Boy Scout Handbook*, at 9 (8th ed., 2nd printing, 1973).  This edition also told

Scouts: "Your Scoutmaster is interested in and wants to know about you. Only then can he

help you to have fun in Scouting. . . . . [Y]our Scoutmaster wants to know you better.  He

wants to see what you have to bring to the troop.  Soon after joining you will have your first

personal growth agreement conference.  Here you and your Scoutmaster will sit down for a

talk. Tell him about yourself. . . .  Your Scoutmaster will probably ask about the things you

like to do. . . .  Your Scoutmaster will also want to know what things you do well." *Id*. at 82-83.

In the 1978-1990 *Boy Scout Handbook*, BSA tells Scouts that "First, there's your Scoutmaster.

He spends hours planning the fun and adventure you will have in your troop.  He is present at every troop meeting and goes hiking and camping with the troop. He is the friend to whom you can always turn for advice.  He coaches the patrol leaders. He gives his time and effort without pay. Why does he do all this?  Because he believes in scouting. Because he likes boys and wants to help them become real men."  Defendant BSA, *Boy Scout Handbook*, at 20-21 (9th ed., 1st printing, 1979).  This list of representations is not exhaustive.

119.

Defendants knew that, historically and increasingly, a significant number of Scout leaders had abused Scouts; therefore, Defendants knew that not all Scout leaders were trustworthy, morally upright, role models, and mentors.

120.

LDS Defendants also promoted Scouting as a wholesome, safe, and beneficial program for boys, by sanctioning Scouting as the official program for boys within the LDS Church.  By selecting men within the LDS Church to serve as Scout leaders, LDS Defendants represented that those men were trustworthy and morally upright leaders and mentors.  Young boys that were members of the LDS Church were required or strongly encouraged to join Scouting as part of their growth and development within the Church.  For example, in 1978, the president of the LDS Church said that "This [BSA] is not an optional program...Scouting is no longer on trial.  It is an economically, socially, and spiritually sound program." The LDS Church also was the first chartering organization within BSA.  In 1928, the LDS Church named Scouting as the activity program for Deacons and teachers (boys ages 12-16 years old) in the LDS Church.  The LDS Church and BSA continue to be closely integrated organizations—for example, the LDS Church is

the largest sponsor of Boy Scout troops in BSA, BSA has an entire LDS-BSA Relationships

department, and many key leaders within the LDS Church serve on BSA boards and in other

leadership positions in BSA.

121.

Defendants fraudulently misrepresented, failed to disclose, and/or actively

concealed the dangers and prevalence of child molesters in Scouting.   Defendants'

representations regarding the wholesomeness, trustworthiness, and mortal integrity of

Scouting and Scout leaders were, at best, partial representations of the facts, which should

have been corrected or supplemented by the additional contrary information regarding the

propensity of sexual abuse in Scouting that was in Defendants' possession.

122.

Plaintiffs read, digested, and integrated one or more of the *Boy Scout Handbook* versions

into their Scouting experience during their time in Scouting, and similar information and

propaganda promulgated by Defendants.  Plaintiffs also digested the LDS Defendants'

misrepresentations about the benefits and nature of Scouting and Scout leaders within the LDS

Church.  Plaintiffs relied upon Defendants' misrepresentations regarding Scouting and Scout

leaders in deciding whether to join and continue to participate in Scouting.

123.

Defendants had a duty to disclose known threats to the health and safety of the

minors involved with their organizations because Defendants had a special relationship of

trust and confidence with Plaintiffs, and Defendants exercised *in loco parentis* responsibilities

over Scouts, including Plaintiffs.  Alternatively or in addition to the duty arising from a special

relationship, Defendant BSA's invitation to Plaintiffs to participate in Scouting upon payment of fees required Defendant BSA to disclose all matters vital to entering into a commercial transaction.  The relative incidence of child molestation by Scout Leaders was vital and material information relevant to Plaintiffs entering into the transaction and maintaining their membership with Defendant BSA.  Further, alternatively or in addition to the aforementioned duties, Defendants actively concealed the problem of child molestation by Scout leaders, and Plaintiffs did not and could not obtain access to this information.  Due to Plaintiffs' inability to discover the truth and Defendants' full knowledge of it, Defendants were thus required to disclose the prevalence of molestation by Scout leaders.

124.

Defendants' knowledge of the dangers and prevalence of child molesters in Scouting constituted a material fact because Plaintiffs would not have entered into a relationship with or continued a relationship with Defendants and the Scouting program, including their individual abusers or other volunteers, employees, and agents of Defendants, had Plaintiffs and their parents been aware of such dangers.

125.

Despite the special relationship that Defendants maintained with Plaintiffs, prior to and during Plaintiffs' time in Scouting, Defendant BSA never made any warnings or issued any warnings in the *Boy Scout Handbook*, in materials to Plaintiffs' parents, in the Scout application and registration materials, or elsewhere in BSA materials that Scout leaders were not always safe and trustworthy, that they might make sexual demands or advances, or that significant numbers of Scout leaders had abused boys in the past.  Similarly, LDS Defendants did not warn

Scouts that Scout leaders—even those involved in the LDS Church—were not always safe,

trustworthy, and spiritually sound leaders, that these Scout leaders may make sexual demands

or advances, or that a significant number of Scout leaders had abused boys in the past.  This list

of omissions is not exclusive.  Despite their knowledge of the use of Scouting by child molesters

as described in paragraphs 110-115, Defendants knowingly failed to change the Scouting

program in any meaningful way to attempt to reduce the number of Scouts abused by Scout

leaders until after Plaintiffs' time in Scouting, and nonetheless concealed this material fact.

These failures to disclose the known danger of abuse by Scout leaders will be referred to in this

Complaint as "constructive fraud."

126.

Defendants knew that their constructive fraud consisted of false representations, or

Defendants made their constructive fraud with reckless disregard for the truth.  Defendants

made their constructive fraud with the intent of inducing Plaintiffs (and other children similarly

situated), Plaintiffs' parents or guardians (and other parents and guardians similarly situated),

and the community at large to rely on their constructive fraud; continue to trust Scouting and

Scout leaders; and continue to participate in Scouting.  Defendants also intended their

constructive fraud to shield Scouting from scrutiny to ensure that children continued to join,

for both a financial and reputational benefit.

127.

Plaintiffs and their parents justifiably and reasonably relied on their constructive fraud

in allowing Plaintiffs to join Scouting, remain in Scouting, and engage in a trust relationship

with their various Scout leaders.  The reliance of Plaintiffs and their parents was justified

because they did not know, nor could they have known, that Defendant BSA had a known, decades-long history of child molesters using Scouting to obtain victims.  Plaintiffs and their parents similarly did not know, nor could they have known, that the LDS Defendants also had a history of Scout leaders within the LDS Church abusing Scouts.  Plaintiffs and their parents justifiably and reasonably relied on Defendants' constructive fraud, as well as Defendants' conduct in maintaining the same rules for the Scouting program over time, and to believe that Scouting did not pose a known danger to Scouts.  This reliance was justified because Plaintiffs and their parents could not hope to conduct an investigation of Defendants' claims that Scoutmasters were safe and trustworthy, given that the records that would disprove the constructive fraud—*e.g.,* Defendant BSA's IV Files—were not available to the public until decades later.

128.

Within the past three years Plaintiffs JOHN DOES I, II, III, V, VI, VIII, XII, XIII, XVI, XVII, and XIX have discovered that throughout the time they were involved in the Scouting program and until at least 2010, Defendants perpetrated a fraud related to the dangers of Scout leaders molesting children in the Scouting program.  Prior to each Plaintiff's discovery of Defendants' fraud, each Plaintiff did not know and could not know that Defendants' representations, or lack thereof, regarding the trustworthiness of Scout leaders and the safety of the Scouting program were false, and that Defendants knew the Scouting program was structured in such a way that molestation of Scouts by Scout leaders was certain to occur to some degree within the Scouting program.  Relying on Defendants' representations, each Plaintiff joined Scouting and trusted his Scout leaders.

129.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiff JOHN DOE I was seriously injured and damaged.  Plaintiff JOHN DOE I's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity, and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  Plaintiff JOHN DOE I has incurred and will likely continue to incur damages.  These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to Plaintiff JOHN DOE I's general damages in an amount now unknown.  Plaintiff JOHN DOE I's damages include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

130.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiff JOHN DOE II was seriously injured and damaged.  Plaintiff JOHN DOE II's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity, and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  Plaintiff JOHN DOE II has incurred and will likely continue to incur damages.  These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to Plaintiff JOHN DOE II's general damages in an amount now unknown.  Plaintiff JOHN DOE II's claimed damages include,

but are not limited to, emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

131.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiff JOHN DOE III was seriously injured and damaged.  Plaintiff JOHN DOE III's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity, and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  Plaintiff JOHN DOE III has incurred and will likely continue to incur damages.  These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to Plaintiff JOHN DOE III's general damages in an amount now unknown.  Plaintiff JOHN DOE III's claimed damages include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

132.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiff JOHN DOE V was seriously injured and damaged.  Plaintiff JOHN DOE V's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity, and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  Plaintiff JOHN DOE V has incurred and will likely continue to incur

damages.  These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to Plaintiff JOHN DOE V's general damages in an amount now unknown.  Plaintiff JOHN DOE V's claimed damages include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

133.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiff JOHN DOE VI was seriously injured and damaged.  Plaintiff JOHN DOE VI's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity, and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  Plaintiff JOHN DOE VI has incurred and will likely continue to incur damages.  These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to Plaintiff JOHN DOE VI's general damages in an amount now unknown. Plaintiff JOHN DOE VI's claimed damages include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

134.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiff JOHN DOE VIII was seriously injured and damaged.  Plaintiff JOHN DOE VIII's injuries prevail and

will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity, and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  Plaintiff JOHN DOE VIII has incurred and will likely continue to incur damages.  These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to Plaintiff JOHN DOE VIII's general damages in an amount now unknown.  Plaintiff JOHN DOE VIII's claimed damages include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

135.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiff JOHN DOE XII was seriously injured and damaged.  Plaintiff JOHN DOE XII's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity, and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  Plaintiff JOHN DOE XII has incurred and will likely continue to incur damages.  These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to Plaintiff JOHN DOE XII's general damages in an amount now unknown.  Plaintiff JOHN DOE XII's claimed damages include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

/ / /

/ / /

136.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiff JOHN DOE XIII was seriously injured and damaged.  Plaintiff JOHN DOE XIII's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity, and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  Plaintiff JOHN DOE XIII has incurred and will likely continue to incur damages.  These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to Plaintiff JOHN DOE XIII's general damages in an amount now unknown.  Plaintiff JOHN DOE XIII's claimed damages include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

137.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiff JOHN DOE XVI was seriously injured and damaged.  Plaintiff JOHN DOE XVI's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity, and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  Plaintiff JOHN DOE XVI has incurred and will likely continue to incur damages.  These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to Plaintiff JOHN DOE XVI's general damages in an amount now unknown.  Plaintiff JOHN

DOE XVI's damages include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

138.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiff JOHN DOE XVII was seriously injured and damaged.  Plaintiff JOHN DOE XVII's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity, and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  Plaintiff JOHN DOE XVII has incurred and will likely continue to incur damages.  These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to Plaintiff JOHN DOE XVII's general damages in an amount now unknown. Plaintiff JOHN DOE XVII's damages include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

139.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, Plaintiff JOHN DOE XIX was seriously injured and damaged.  Plaintiff JOHN DOE XIX's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity, and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  Plaintiff JOHN DOE XIX has incurred and will likely continue to incur damages.  These damages include both physical and emotional

injury.  These damages include special and general damages to be proved at the time of trial,

all to Plaintiff JOHN DOE XIX's general damages in an amount now unknown.  Plaintiff JOHN

DOE XIX's damages include but are not limited to emotional and physical pain and suffering,

mental anguish, disability, and expenses for past and future therapy.

**COUNT II**
**Plaintiffs JOHN DOES IV, VII, IX, X, XI, XIV, XV, XVIII and JOHN ELLIOTT against Defendant BSA**

140.

Plaintiffs JOHN DOES IV, VII, IX, X, XI, XIV, XV, XVIII, and JOHN ELLIOTT reallege and

incorporate by reference paragraphs 1-139.

141.

At all times relevant to this Complaint, Defendant BSA invited and encouraged

Plaintiffs to participate in the Scouting program it administered and controlled.  Its invitation

created a special, fiduciary relationship, wherein Plaintiffs and their parents relied upon

Defendant BSA's years of expertise and judgment in selecting morally upright and trustworthy

men to lead Scout troops and other Scouting activities, such as BSA Camps.  Plaintiffs and

their parents gave Defendant BSA authority to act *in loco parentis* over Plaintiffs at BSA

meetings, camping trips, hiking trips, and in private social situations during Scouting activities.

Defendant BSA also invited Plaintiffs to enter into a commercial relationship by requiring him

to pay yearly dues and other fees and required purchases, in exchange for participating in

Scouting.

142.

Defendant BSA represented that the Scout leaders it selected, controlled, and/or

approved were appropriate and trustworthy mentors and leaders for young boys.  It also

promoted Scouting as being safe and beneficial for boys—physically, emotionally, and

spiritually.  Defendant BSA claimed Scouting was a wholesome institution and emphasized the

friendly and paternalistic role a Scout leader should play in a young boy's life.  As examples,

Defendant BSA made specific statements in various editions of the *Boy Scout Handbook*—the

handbook that every Scout is given and uses as a guide to his Scouting experience.  The Scout

Oath was and remains: "On my honor I will do my best to do my duty to God and my country

and to obey the Scout law; To help other people at all times; To keep myself physically strong,

mentally awake, and morally straight."  The Scout law then describes the characteristics a Scout

should have: a Scout is trustworthy, loyal, helpful, friendly, courteous, kind, obedient,

cheerful, thrifty, brave, clean, and reverent.  These were ideals that both Scouts and Scout

leaders were expected to follow.  In the 1965-1972 *Boy Scout Handbook*, the Scoutmaster is

referred to as "a wonderful man" who goes on hikes and goes camping with the Troop, and who

"is the friend to whom you can always turn for advice."  Defendant BSA, *Boy Scout Handbook*,

at 94 (7th ed., 3rd printing, 1967).  In the 1972-1978 *Boy Scout Handbook*, BSA stated, "[o]ver

there watching things is your Scoutmaster.  He's a great guy.  He gives hours of his time to you

and the troop. And do you know why?  Mostly because he knows Scouting is important to his

city and nation. Besides, he is interested in boys."  Defendant BSA, *Boy Scout Handbook*, at 9

(8th ed., 2nd printing, 1973).  This edition also told Scouts: "Your Scoutmaster is interested in

and wants to know about you.  Only then can he help you to have fun in Scouting.  [Y]our

Scoutmaster wants to know you better.  He wants to see what you have to bring to the troop.

Soon after joining you will have your first personal growth agreement conference.  Here you

and your Scoutmaster will sit down for a talk.  Tell him about yourself.  Your Scoutmaster will

probably ask about the things you like to do.  Your Scoutmaster will also want to know what things you do well." Id. at 82-83.  In the 1978-1990 *Boy Scout Handbook*, BSA tells Scouts that "First, there's your Scoutmaster.  He spends hours planning the fun and adventure you will have in your troop. He is present at every troop meeting and goes hiking and camping with the troop. He is the friend to whom you can always turn for advice.  He coaches the patrol leaders. He gives his time and effort without pay. Why does he do all this?  Because he believes in scouting. Because he likes boys and wants to help them become real men." Defendant BSA, *Boy Scout Handbook*, at 20-21 (9th ed., 1st printing, 1979).  This list of Defendant BSA's representations is not exhaustive.  Plaintiff read, digested, and integrated one or more of the *Boy Scout Handbook* editions, as well as other BSA materials, into his Scouting experience during his time in Scouting.

143.

Defendant BSA knew that, historically and increasingly, a significant number of Scout leaders had abused Scouts; therefore, Defendant BSA knew that not all Scout leaders were trustworthy and morally upright, and appropriate role models and mentors.

144.

Defendant BSA fraudulently misrepresented, failed to disclose, and/or actively concealed the dangers and prevalence of child abuse in Scouting.   Defendant BSA's representations regarding the trustworthiness and mortal integrity of Scout leaders were, at best, partial representations of the facts, which should have been corrected or supplemented by the contrary information of the propensity of sexual abuse in Scouting in Defendant BSA's possession.

145.

Defendant BSA had a duty to disclose known threats to the health and safety of the minors involved with its organization because Defendant BSA had a special relationship of trust and confidence with Plaintiffs and exercised *in loco parentis* responsibilities over Scouts, including Plaintiffs.  Alternatively or in addition to the duty arising from *in loco parentis* status, Defendant BSA's invitation to Plaintiffs to participate in Scouting upon payment of fees required Defendant BSA to disclose all matters vital to entering into a commercial transaction. The relative incidence of child molestation by Scout Leaders was vital and material information relevant to Plaintiffs entering into the transaction with Defendant BSA.  Further, alternatively or in addition to the aforementioned duties, Defendant BSA actively concealed the problem of child molestation by Scout leaders, and Plaintiffs and their parents did not and could not obtain access to this information.  Due to their inability to discover the truth and Defendant BSA' full knowledge of it, Defendant BSA was required to disclose the prevalence of molestation by Scout leaders.

146.

Defendant BSA's knowledge of the dangers and prevalence of child molesters in Scouting as described in paragraphs 110-115 constituted a material fact because Plaintiffs would not have entered into a relationship with or continued a relationship with Defendant BSA and the Scouting program, including the individual abusers or other volunteers, employees, and agents of Defendant BSA, had Plaintiffs and their parents been aware of such dangers.

/ / /

147.

Despite the special relationship that Defendant BSA maintained with Plaintiffs prior to and during their time in Scouting, Defendant BSA never made any warnings or issued any warning in the *Boy Scout Handbook*, in materials to Plaintiffs' parents, in the Scout application and registration materials, or elsewhere in BSA materials that Scout leaders were not always safe and trustworthy, that they might make sexual demands or advances, or that significant numbers of Scout leaders had abused boys in the past.  This list of omissions is not exclusive. Despite its knowledge of the use of Scouting by child molesters, Defendant BSA knowingly failed to change the Scouting program in any meaningful way to attempt to reduce the number of Scouts abused by Scout leaders until after Plaintiffs' time in Scouting, and nonetheless concealed this material fact.

148.

Defendant BSA knew that its constructive fraud consisted of false representations, or Defendant BSA made its constructive fraud with reckless disregard for the truth. Defendant BSA made its constructive fraud with the intent of inducing Plaintiffs (and other children similarly situated), their parents or guardians (and other parents and guardians similarly situated), and the community at large to rely on its constructive fraud; continue to trust Scouting and Scout leaders; and continue to participate in Scouting.  Defendant BSA also intended its constructive fraud to shield Scouting from scrutiny to ensure that children continued to join, for both a financial and reputational benefit.

/ / /

/ / /

149.

Plaintiffs and their parents justifiably and reasonably relied on Defendant BSA's constructive fraud in allowing them to join Scouting, remain in Scouting, and engage in a trust relationship with their various Scout leaders.  The reliance of Plaintiffs and their parents was justified because they did not know, nor could they have known, that Defendant BSA had a known, decades-long history of child molesters using Scouting to obtain victims.  Plaintiffs and their parents justifiably and reasonably relied on Defendant BSA's constructive fraud, as well as Defendant BSA's conduct in maintaining the same rules for the Scouting program over time, and to believe that Scouting did not pose a known danger to Scouts.  This reliance was justified because Plaintiffs and their parents could not hope to conduct an investigation of Defendants' claims that Scoutmasters were safe and trustworthy, given that the records that would disprove the constructive fraud—*e.g.*, Defendant BSA's IV Files—were not available to the public until decades later.

150.

Within the past three years, Plaintiffs JOHN DOES IV, VII, IX, X, XI, XIV, XV, XVIII, and JOHN ELLIOTT have discovered that throughout the time they were involved in the Scouting program and until at least 2010, Defendant BSA perpetrated a fraud related to the dangers of Scout leaders molesting children in the Scouting program.  Prior to their discovery of Defendant BSA's fraud, Plaintiffs did not know and could not know that Defendant BSA's representations, or lack thereof, regarding the trustworthiness of Scout leaders and the safety of the Scouting program were false, and that Defendant BSA knew the Scouting program was

///

structured in such a way that molestation of Scouts by Scout leaders was certain to occur to

some degree within the Scouting program.

151.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious,

and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, JOHN

DOE IV was seriously injured and damaged.  JOHN DOE IV's injuries prevail and will continue

to prevail for an indefinite time into the future.  It is impossible at this time to fix the full

nature, extent, severity and duration of said injuries, but they are alleged to be permanent,

progressive, and disabling.  JOHN DOE IV has incurred and will likely continue to incur

damages. These damages include both physical and emotional injury.  These damages include

special and general damages to be proved at the time of trial, all to JOHN DOE IV's general

damages in an amount now unknown.  JOHN DOE IV's claimed damages include but are not

limited to emotional and physical pain and suffering, mental anguish, disability, and expenses

for past and future therapy.

152.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious,

and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, JOHN

DOE VII was seriously injured and damaged.  JOHN DOE VII's injuries prevail and will continue

to prevail for an indefinite time into the future.  It is impossible at this time to fix the full

nature, extent, severity and duration of said injuries, but they are alleged to be permanent,

progressive, and disabling.  JOHN DOE VII has incurred and will likely continue to incur

damages.  These damages include both physical and emotional injury.  These damages

include special and general damages to be proved at the time of trial, all to JOHN DOE VII's general damages in an amount now unknown.  JOHN DOE VII's claimed damages include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

153.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, JOHN ELLIOTT was seriously injured and damaged.  ELLIOTT's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  ELLIOTT has incurred and will likely continue to incur damages.  These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to ELLIOTT's general damages in an amount now unknown.  ELLIOTT's claimed damages include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

154.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, JOHN DOE IX was seriously injured and damaged.  JOHN DOE IX's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity and duration of said injuries, but they are alleged to be permanent,

progressive, and disabling.  JOHN DOE IX has incurred and will likely continue to incur

damages. These damages include both physical and emotional injury.  These damages include

special and general damages to be proved at the time of trial, all to JOHN DOE IX's general

damages in an amount now unknown.  JOHN DOE IX's claimed damages include but are not

limited to emotional and physical pain and suffering, mental anguish, disability, and expenses

for past and future therapy.

155.

As a direct and proximate result of each Defendant's oppressive, fraudulent,

malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-

1604, JOHN DOE X was seriously injured and damaged.  JOHN DOE X's injuries prevail and

will continue to prevail for an indefinite time into the future.  It is impossible at this time to

fix the full nature, extent, severity and duration of said injuries, but they are alleged to be

permanent, progressive, and disabling.  JOHN DOE X has incurred and will likely continue to

incur damages. These damages include both physical and emotional injury.  These damages

include special and general damages to be proved at the time of trial, all to JOHN DOE X's

general damages in an amount now unknown.  JOHN DOE X's claimed damages include but

are not limited to emotional and physical pain and suffering, mental anguish, disability, and

expenses for past and future therapy.

156.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious,

and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, JOHN

DOE XI was seriously injured and damaged.  JOHN DOE XI's injuries prevail and will continue to

prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  JOHN DOE XI has incurred and will likely continue to incur damages. These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to JOHN DOE XI's general damages in an amount now unknown.  JOHN DOE XI's claimed damages include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

157.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, JOHN DOE XIV was seriously injured and damaged.  JOHN DOE XIV's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  JOHN DOE XIV has incurred and will likely continue to incur damages.  These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to JOHN DOE XIV's general damages in an amount now unknown.  JOHN DOE XIV's claimed damages include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

/ / /

/ / /

158.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, JOHN DOE XV was seriously injured and damaged.  JOHN DOE XV's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity and duration of said injuries, but they are alleged to be permanent, progressive, and disabling.  JOHN DOE XV has incurred and will likely continue to incur damages.  These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to JOHN DOE XV's general damages in an amount now unknown.  JOHN DOE XV's claimed damages include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

159.

As a direct and proximate result of each Defendant's oppressive, fraudulent, malicious, and/or outrageous conduct as described above and as defined in Idaho Code § 6-1604, JOHN DOE XVIII was seriously injured and damaged.  JOHN DOE XVIII's injuries prevail and will continue to prevail for an indefinite time into the future.  It is impossible at this time to fix the full nature, extent, severity and duration of said injuries, but they are alleged to be permanent,   progressive, and disabling.  JOHN DOE XVIII has incurred and will likely continue to incur damages.  These damages include both physical and emotional injury.  These damages include special and general damages to be proved at the time of trial, all to JOHN DOE XVIII's general damages in an amount now unknown.  JOHN DOE XVIII's claimed damages

include but are not limited to emotional and physical pain and suffering, mental anguish, disability, and expenses for past and future therapy.

    **WHEREFORE**, Plaintiffs pray for judgment as follows:

    1.      Non-economic damages by all Defendants for Plaintiff JOHN DOE I, the exact amount to be determined by the jury at the time of trial;

    2.      Economic damages by all Defendants for Plaintiff JOHN DOE I, the exact amount to be determined by the jury at the time of trial;

    3.      Non-economic damages by all Defendants for Plaintiff JOHN DOE II, the exact amount to be determined by the jury at the time of trial;

    4.      Economic damages by all Defendants for Plaintiff JOHN DOE II, the exact amount to be determined by the jury at the time of trial;

    5.      Non-economic damages by all Defendants for Plaintiff JOHN DOE III, the exact amount to be determined by the jury at the time of trial;

    6.      Economic damages by all Defendants for Plaintiff JOHN DOE III, the exact amount to be determined by the jury at the time of trial;

    7.      Non-economic damages by Defendant BSA for Plaintiff JOHN DOE IV, the exact amount to be determined by the jury at the time of trial;

    8.      Economic damages by Defendant BSA for Plaintiff JOHN DOE IV, the exact amount to be determined by the jury at the time of trial;

    9.      Non-economic damages by all Defendants for Plaintiff JOHN DOE V, the exact amount to be determined by the jury at the time of trial;

10.     Economic damages by all Defendants for Plaintiff JOHN DOE V, the exact amount to be determined by the jury at the time of trial;

11.     Non-economic damages by all Defendants for Plaintiff JOHN DOE VI, the exact amount to be determined by the jury at the time of trial;

12.     Economic damages by all Defendants for Plaintiff JOHN DOE VI, the exact amount to be determined by the jury at the time of trial;

13.     Non-economic damages by Defendant BSA for Plaintiff JOHN DOE VII, the exact amount to be determined by the jury at the time of trial;

14.     Economic damages by Defendant BSA for Plaintiff JOHN DOE VII, the exact amount to be determined by the jury at the time of trial;

15.     Non-economic damages by Defendant BSA for Plaintiff JOHN DOE VIII, the exact amount to be determined by the jury at the time of trial;

16.     Economic damages by Defendant BSA for Plaintiff JOHN DOE VIII, the exact amount to be determined by the jury at the time of trial;

17.     Non-economic damages by Defendant BSA for Plaintiff JOHN DOE IX, the exact amount to be determined by the jury at the time of trial;

18.     Economic damages by Defendant BSA for Plaintiff JOHN DOE IX, the exact amount to be determined by the jury at the time of trial;

19.     Non-economic damages by Defendant BSA for Plaintiff JOHN DOE X, the exact amount to be determined by the jury at the time of trial;

20.     Economic damages by Defendant BSA for Plaintiff JOHN DOE X, the exact amount to be determined by the jury at the time of trial;

21.     Non-economic damages by Defendant BSA for Plaintiff JOHN DOE XI, the exact amount to be determined by the jury at the time of trial;

22.     Economic damages by Defendant BSA for Plaintiff JOHN DOE XI, the exact amount to be determined by the jury at the time of trial;

23.     Non-economic damages by all Defendants for Plaintiff JOHN DOE XII, the exact amount to be determined by the jury at the time of trial;

24.     Economic damages by all Defendants for Plaintiff JOHN DOE XII, the exact amount to be determined by the jury at the time of trial;

25.     Non-economic damages by all Defendants for Plaintiff JOHN DOE XIII, the exact amount to be determined by the jury at the time of trial;

26.     Economic damages by all Defendants for Plaintiff JOHN DOE XIII, the exact amount to be determined by the jury at the time of trial;

27.     Non-economic damages by Defendant BSA for Plaintiff JOHN DOE XIV, the exact amount to be determined by the jury at the time of trial;

28.     Economic damages by Defendant BSA for Plaintiff JOHN DOE XIV, the exact amount to be determined by the jury at the time of trial;

29.     Non-economic damages by Defendant BSA for Plaintiff JOHN DOE XV, the exact amount to be determined by the jury at the time of trial;

30.     Economic damages by Defendant BSA for Plaintiff JOHN DOE XV, the exact amount to be determined by the jury at the time of trial;

31.     Non-economic damages by Defendant BSA for Plaintiff JOHN ELLIOTT, the exact amount to be determined by the jury at the time of trial; and

32.     Economic damages by Defendant BSA for Plaintiff JOHN ELLIOTT, the exact amount to be determined by the jury at the time of trial;

33.     Non-economic damages by all Defendants for Plaintiff JOHN DOE XVI, the exact amount to be determined by the jury at the time of trial;

34.     Economic damages by all Defendants for Plaintiff JOHN DOE XVI, the exact amount to be determined by the jury at the time of trial;

35.     Non-economic damages by all Defendants for Plaintiff JOHN DOE XVII, the exact amount to be determined by the jury at the time of trial;

36.     Economic damages by all Defendants for Plaintiff JOHN DOE XVII, the exact amount to be determined by the jury at the time of trial;

37.     Non-economic damages by all Defendants for Plaintiff JOHN DOE XVIII, the exact amount to be determined by the jury at the time of trial;

38.     Economic damages by all Defendants for Plaintiff JOHN DOE XVIII, the exact amount to be determined by the jury at the time of trial;

39.     Non-economic damages by all Defendants for Plaintiff JOHN DOE XIX, the exact amount to be determined by the jury at the time of trial;

40.     Economic damages by all Defendants for Plaintiff JOHN DOE XIX, the exact amount to be determine by the jury at the time of trial;

41.     For Plaintiffs' disbursements and incurred costs;

42.     Attorney fees; and

43.     For any other relief this Court deems just and equitable.

/ / /

**PLAINTIFFS DEMAND A TRIAL BY JURY.**

DATED this 7th day of October, 2015.

**CHASAN AND WALTON, LLC**

/ s / Andrew M. Chasan
Andrew M. Chasan, ISB #2100
Timothy C. Walton, ISB #2170

*Of Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 7th day of October, 2015, I filed the foregoing electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Stephen R. Thomas        srt@moffatt.com
Tyler J.  Anderson       tya@moffatt.com
Mindy M. Muller          mmw@moffatt.com, cih@moffatt.com

*Attorneys for Defendant Boy Scouts of America*

Thomas A. Banducci       tab@andersenbanducci.com
Brent Sidney Bastian     bsb@andersenbanducci.com
Wade L. Woodard          wlw@andersenbanducci.com
Alexander Dushku         adushku@kmclaw.com
Justin W. Starr          jstarr@kmclaw.com


*Attorneys for Defendant Corporation of the Presiding Bishop of The Church of*
*Jesus Christ of Latter-Day Saints and Defendant Corporation of the President of*
*The Church of Jesus Christ of Latter-Day Saints and Successors*



_____/s/_____
Andrew M. Chasan, Attorney for Plaintiffs