# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN DOES I-XIX, and JOHN ELLIOTT,<br><br>      Plaintiffs,<br><br> v.<br><br>BOY SCOUTS OF AMERICA, a congressionally chartered corporation authorized to do business in Idaho; CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a foreign corporation sole registered to do business in Idaho; and CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS AND SUCCESSORS, a foreign corporation registered to business in Idaho,<br><br>      Defendants. | Case No. 1:13-cv-00275-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it Plaintiffs' Motion to Compel (Dkt. 174). The Motion is fully briefed and the Court heard oral argument on June 27, 2017. The parties completed supplemental briefing on August 18, 2017. For the reasons explained below, the Court will grant in part and deny in part the Motion to Compel.

# LEGAL STANDARD

Federal Rule of Civil Procedure 26(b), as amended effective December 1, 2015,

provides that:

> [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

This change to Rule 26(b) brings proportionality to the forefront in defining the

appropriate scope of discovery. However, as explained in the Advisory Committee's

note, the 2015 amendment was merely intended to codify principles that have long been

implicit in this analysis:

> This change *reinforces the obligation* of the parties to consider these [proportionality] factors in making discovery requests, responses or objections. Restoring the proportionality calculation to Rule 26(b)(1) *does not change the existing responsibilities of the court and the parties to consider proportionality*, and the change does not place on the party seeking discovery the burden of addressing all proportionality considerations.

Fed. R. Civ. P. 26(b) advisory committee's note to 2015 amendment (emphasis added);

*see also Dao v. Liberty Life Assurance Co. of Boston*, No. 14-CV-04749-SI (EDL), 2016

WL 796095, at *3 (N.D. Cal. Feb. 23, 2016) ("[W]hile the language of the Rule has

changed, the amended rule does not actually place a greater burden on the parties with

respect to their discovery obligations, including the obligation to consider proportionality,

than did the previous version of the Rule."); *Vaigasi v. Solow Mgmt. Corp.*, No. 11-CV-

5088, 2016 WL 616386, at *13 (S.D.N.Y. Feb. 16, 2016) ("[T]he 2015 Amendments

constitute a reemphasis on the importance of proportionality in discovery but not a substantive change in the law.").[1]

Pursuant to Rule 37, a party seeking discovery may move for an order compelling production by a party who has failed to answer an interrogatory or produce requested documents. Fed. R. Civ. P. 37(a)(3). While the moving party must make a threshold showing of relevance, *see, e.g.*, *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352 (1978), the party resisting discovery carries the "heavy burden" of showing specifically why the discovery request is irrelevant, unduly burdensome, disproportional to the needs of the case, or otherwise improper. *See Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975).

## ANALYSIS

Plaintiffs seek an order compelling BSA to produce: (1) Ineligible Volunteer Files ("IV Files"); (2) documents related to Dr. Finkelhor's 2006 proposal to study BSA's IV files; (3) complaints, petitions, and demand letters containing allegations of child sexual abuse; (4) deposition testimony from other cases. The Court considers each request in turn.

---

[1] BSA argues that the 2015 amendments represented a more fundamental change, seizing on Chief Justice Roberts' remark that the 2015 amendments to the Federal Rules of Civil Procedure "may not look like a big deal at first glance, but they are." *See Def.'s Resp.* at 6, Dkt. 179 (quoting John Roberts, 2015 Year-End Report on the Federal Judiciary, at 5 (Dec. 31, 2015)). As to Rule 26(b)(1) specifically, Justice Roberts stated only that the amendment "crystalizes" the concept of proportionality as a limit on discovery. *Id.* at 6. This statement is consistent with the view that the amendments to Rule 26(b)(1) emphasized, but did not substantively change, the responsibility of the court and the parties to consider proportionality. *See* Fed. R. Civ. P. 26(b) (1) (Advisory Committee Notes to 2015 Amendment) (the Rule does not "change the existing responsibilities of the court and the parties to consider proportionality," nor does it "alter the burdens imposed on the party resisting discovery.").

1. **Ineligible Volunteer Files**

Plaintiffs' Request for Production No. 1 seeks "all existing Ineligible Volunteer ('IV') Files, including but not limited to the 'Perversion' files, that document allegations that a Scout leader committed child sexual abuse." *See Dumas Decl.*, Ex. 1 at 4, Dkt. 175-1. BSA argued that the documents are irrelevant, as they go to BSA's state of mind, an element not required in a constructive fraud claim. BSA argues that at minimum, the Court should: (1) limit the production to years 1969 to 1982, the span of the alleged abuse at issue here; (2) limit the geographic scope to Idaho; and (3) subject any files to the parties' stipulated protective order and limited redactions.

For the reasons explained below, the Court orders BSA to produce a clean copy of the pre-1982 IV files, as well as IV files created after 1982 that document abuse occurring through 1982. BSA is not ordered to produce post-1982 IV files that document post-1982 abuse, subject to a stipulation that they will not introduce or argue evidence of post-1982 remedial changes to their Youth Protection efforts. The production of IV files is subject to the protective order already entered in this case (Dkt. 149) and to redaction of the name(s) of any alleged child victim, the parent(s) of any alleged child victim, and any third-party witnesses.

A. *Relevancy*

Plaintiffs assert a single claim for constructive fraud against BSA and the LDS Church. *See Third Am. Compl.* at 30, Dkt. 91. "Constructive fraud is a breach of legal or equitable duty which, irrespective of the moral guilt of the fraud feasor, the law declares fraudulent because of its tendency to deceive others, to violate public or private

confidence, or to injure public interests." *McGhee v. McGhee*, 353 P.2d 760, 762 (Idaho 1960) (quoting 37 C.J.S. Fraud § 2, p. 211). "Constructive fraud usually arises from a breach of duty where a relation of trust and confidence exists; such relationship may be said to exist whenever trust or confidence is reposed by one person in the integrity and fidelity of another." *Id.*

The elements of a constructive fraud claim are similar to the elements for actual fraud. Actual fraud requires proof of: "(1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury." *Gray v. Tri-Way Constr. Servs.*, 210 P.3d 63, 71 (Idaho 2009) (internal quotation marks omitted). Constructive fraud requires a plaintiff to establish the existence of a relationship of trust or confidence, but the plaintiff is not required to prove (4) the speaker's knowledge of the falsity, or (5) the speaker's intent that there be reliance. *Id.*

Here, Plaintiffs argue the IV files are relevant to: (1) BSA's state of mind; (2) the falsity of BSA's representations that Scouting was safe; and (3) Plaintiffs' ignorance of that falsity. The Court disagrees that evidence of BSA's state of mind is relevant to the claim of constructive fraud. Plaintiffs concede they are not *required* to introduce evidence of BSA's knowledge of falsity and intent, but nonetheless assert that they should be allowed to introduce such evidence. Plaintiffs provide no support for this contention and the Court sees none. Despite being similar in many respects, a constructive fraud claim and an actual fraud claim are two distinct causes of action.

Evidence of BSA's mental state is of no consequence in establishing a claim for constructive fraud. Moreover, the Court denied Plaintiffs' request to add a cause of action for actual fraud. *See Order*, Dkt. 119. Thus, Plaintiffs will not be permitted to prove fraud through direct means. The IV files are therefore not relevant on the ground that they will help establish BSA's state of mind.

The contents of the IV files also appear irrelevant to Plaintiffs' ignorance of the falsity of BSA's representations. Measures taken to cover up the existence of the IV files may be relevant in this regard, but Plaintiffs fail to explain how the IV files themselves will demonstrate BSA's efforts to hide evidence of sexual abuse or Plaintiffs' ignorance of the same.

In contrast, IV files created through 1982 are relevant to the falsity of BSA's representations that Scouting was safe. These files may help Plaintiffs establish the extent of the sexual abuse problem in Scouting, so as to establish that alleged representations regarding the safety of Scouting were false. Any IV files created after 1982 that document abuse that occurred through 1982 are relevant for the same reason. Since Plaintiffs are not required to prove BSA's knowledge of falsity, it is irrelevant that BSA may not have known about abuse documented in IV files created after 1982 at the time of the alleged misrepresentations.

Moreover, the relevance of such files is not limited to persons involved in Scouting in Idaho. Sexual abuse in Scouting was not limited to Idaho, and Plaintiffs' claims are based on misrepresentations made about a national program. Plaintiffs allege that BSA failed to warn Plaintiffs of a nationwide, program-wide, and longstanding

problem in Scouting. Thus, the Court will not limit production to a specific regional area on relevance grounds.

Plaintiffs also argue that all IV files created after 1982 are relevant to establishing their claim for punitive damages. Under Idaho law, a claim for punitive damages is available only where the defendant's "oppressive, fraudulent, malicious or outrageous conduct" is proven by clear and convincing evidence. Idaho Code § 6–1604. A party is prohibited from including a prayer for relief seeking punitive damages in the original complaint, and must instead seek leave to amend the pleadings to include punitive damages "pursuant to a pretrial motion and after hearing before the court." Idaho Code Ann. § 6–1604(2). For purposes of this motion to amend, Plaintiffs must show "a reasonable likelihood of proving facts at trial sufficient to support an award of punitive damages." *Id.*

Plaintiffs argue that IV files postdating the abuse at issue here will help establish its anticipated punitive damages claim, insofar as they establish that BSA willfully covered up a known child abuse problem after 1982 and will help refute any mitigation arguments BSA may make regarding punitive damages. BSA argues that the discovery is irrelevant, because a punitive damages claim cannot be based on conduct that happened in other jurisdictions, and is premature, because the claim has not been pled. *Def.'s Resp.* at 7, Dkt. 179 (*citing BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 573-74 (1996)).

The existence of IV files created after 1982 and documenting post-1982 abuse may demonstrate BSA's ongoing knowledge of abuse in scouting. But the Court finds no support for Plaintiffs' contention that substantive information in those files bears on

whether BSA intended to cover up pre-1982 abuse at the time of the alleged misrepresentations. The Court agrees, however, that post-1982 files related to post-1982 abuse would be relevant to rebut any mitigation arguments BSA may make regarding punitive damages. As BSA has agreed to stipulate they will not argue or introduce evidence of remedial changes to their Youth Protection efforts, the Court will not order the production of IV files created after 1982 that relate to post-1982 abuse. Pursuant to their stipulation, BSA will not be allowed to introduce or argue such evidence at trial, or at any hearing regarding punitive damages.

IV files created after 1982 documenting pre-1982 abuse, however, are relevant to the noneconomic damages cap and the punitive damages claim for the same reason as they are relevant to the constructive fraud claim -  they demonstrate the extent of sexual abuse occurring during the time of the alleged misrepresentations. BSA argues that information learned after 1982 cannot be used to prove whether BSA should have known of the risk of sexual abuse pre-1982. But the risk of sexual abuse at the time of the alleged misrepresentations is linked to the extent of abuse occurring at that time. Contemporary abuse reported later may bear on what BSA should have known about the extent, and thus the risk of abuse at the time of the alleged misrepresentations. As such, post-1982 IV files related to pre-1982 abuse are relevant to the Plaintiffs' punitive damages claim.

Nor is the relevancy of these files limited to those documenting abuse that occurred in Idaho. Again, evidence of conduct in other jurisdictions is relevant to Plaintiffs' claim for punitive damages, insofar as the abuse was a nationwide problem and

BSA responded to the problem in a centralized fashion. Instances of abuse in any state should have alerted Defendants to risks in others. Relying on *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 589-99 (1996), BSA argues that "punitive damages must *not* be based on conduct that happened in other jurisdictions." But BSA mischaracterizes the holding of *BMW*. The Court in *BMW* held only that the out-of-state conduct must have some impact on the state in which punitive damages are imposed. Instances of abuse in other jurisdictions are not so lacking a nexus to the allegations here that they must be excluded as a constitutional matter. *See also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409–10 (2003) ("Lawful out-of-state conduct may be probative when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious, but that conduct must have a nexus to the specific harm suffered by the plaintiff.").

Finally, despite the fact that Plaintiffs have not yet pled their claim for punitive damages, discovery related to that claim is not premature. Rather, discovery is necessary to establish evidence to support the motion to add a punitive damages claim. *See* Idaho Code Ann. § 6–1604(2).

**B.    *Proportionality***

BSA does not argue that production of the IV files would be unduly burdensome. They have already produced these files in other cases, and presumably have them available in a centralized, electronic format. Nor is there any reason to delay production of any of the IV files, as the files BSA is ordered to produce are relevant both to Plaintiffs' fraud claim, and to the showing Plaintiffs must make in order to bring their

claim for punitive damages.

Rather than produce clean copies, BSA has offered to authenticate the pre-1985 files currently available on the LA Times website in lieu of producing files created pre-1982. *See Def.'s Resp.* at 2, Dkt. 212. Plaintiffs object on the grounds that several pre-1982 files are either missing from the LA Times website, or are incomplete. *See Pl.'s Reply* at 1, Dkt. 214. Because the burden on BSA to produce and authenticate the pre-1982 files is not significantly higher than the burden to simply authenticate the files already available, BSA is ordered to produce clean copies of the pre-1982 files.

The IV files contain information that is highly sensitive. The production of IV files not already in the public domain necessarily implicates privacy concerns. The Court finds that production of these documents subject to the protective order (Dkt. 149)and redactions outlined above allays these concerns.

**2.    Finkelhor Documents**

In Request No. 8, Plaintiffs request all documents "regarding sexual abuse of Scouts by Scout leaders, regarding BSA's Youth Protection program, and/or regarding the IV Files, prepared by or for Dr. David Finkelhor and his staff[.]" *See Dumas Decl.*, Ex. 1, at 5-6, Dkt. 175-1. BSA's Youth Protection Task Force engaged Dr. David Finkelhor, along with other subject matter experts, to provide advice and consulting related to BSA's Youth Protection programs. *See Dumas Decl.* at ¶ 15, Dkt. 175. In or about late 2006, Finkelhor submitted a proposal to BSA to undertake some limited analysis of its IV Files. *Id*. Two of Dr. Finkelhor's associates were allowed to review certain IV Files at BSA headquarters. *Id*. Based on that review, Dr. Finkelhor submitted a

proposal for further analysis of the files. BSA did not go forward with the project. *Id.*

Plaintiffs have since narrowed the scope of this request to the "27 pages of documents

related to Dr. Finkelhor's 2006 proposal to study BSA's IV Files." *See Dumas Decl.* ¶ 14,

Dkt. 175.[2]

For the reasons discussed below, the Court orders BSA to produce the 27 pages of

documents identified by Plaintiffs.

A.    *Relevancy*

Plaintiffs argue that the Finkelhor documents are relevant to (1) BSA's mental

state, insofar as BSA's failure to proceed with Finkelhor's proposed project is evidence

of a willful coverup; (2) the applicability of the non-economic damages cap; and (3)

punitive damages. Idaho Code § 6–1603(1) imposes a limit on non-economic damages

sustained by a claimant who incurred personal injury. However, the limitation does not

apply to "[c]auses of action arising out of willful or reckless misconduct." Idaho Code §

6–1603(4)(a). Similarly, a claim for punitive damages requires proof that BSA's conduct

was "oppressive, fraudulent, malicious or outrageous." Idaho Code § 6–1604.

For the reasons stated above, the Court finds that state of mind evidence is not

relevant to BSA's constructive fraud claim. As to the noneconomic damages cap and

Plaintiffs' proposed punitive damages claim, BSA's conduct postdating the abuse may be

probative of BSA's state of mind at the time of the underlying misconduct. While BSA

---

[2] In a 2015 Oregon case, the court ordered BSA to produce those documents under protective order. *Id.* Plaintiffs' attorneys have lawfully abided the protective order in the Oregon case, so do not have the documents to use in this case and must move to compel them.

objects to Plaintiffs' description of the contents of the Finkelhor documents, such objections go more towards weight than relevance. Having reviewed the documents in camera, the Court finds that a reasonable person could conclude that BSA's decision not to proceed with the recommended studies is evidence of a course of willful conduct by BSA in covering up a known problem of child abuse. Thus the Court agrees that the Finkelhor documents are relevant to Plaintiffs' claims for punitive damages and their argument that the noneconomic damages cap should not apply.

### B. *Proportionality*

The burden of producing a single 27-page document is low, and BSA makes no argument to the contrary. Because any burden is outweighed by the likely benefit, the Court finds that production of the Finkelhor documents is proportional to the needs of this case.

### 3. Complaints, Petitions, and Demand Letters

Request No. 12 seeks "[a]ll complaints or petitions filed against BSA in any state or federal court, all demand letters and letters from parents/guardians sent to BSA that allege that any Scout leader committed child sexual abuse prior to 1987, regardless of when the documents were created." *See Dumas Decl.*, Ex. 1, at 7-8, Dkt. 175-1. Request No. 13 seeks the same documents, but concerns local Scouting Councils and sponsoring organizations of BSA. *Id.* At the discovery mediation, Plaintiffs agreed to limit their request to claims made after 1970.

The Court orders that BSA search the electronic files of both its Legal and Risk Management departments to identify and produce responsive documents either held or

tracked by those departments related to claims for sexual abuse that occurred between 1970 and 1982, regardless of when the claim was made. Production of these files is subject to the existing protective order (Dkt. 149) and the same redactions ordered for the IV files. To the extent that BSA finds that additional measures are necessary to ensure compliance with court orders from prior litigation, the parties are instructed to meet and confer to agree on adoption of any such measures.

A.    *Relevancy*

Records of claims for sexual abuse that occurred between 1970 and 1982 are relevant for the same reasons as the IV files discussed above. Complaints documenting abuse that occurred through 1982 may help Plaintiffs establish the extent of the sexual abuse problem at the time of the alleged misrepresentations. The extent of the sexual abuse problem is relevant to the falsity of BSA's representations concerning the safety of scouting. Again, because Plaintiffs do not have to show BSA's knowledge of falsity, later-filed complaints of abuse that occurred during 1970-1982 are relevant because they provide additional evidence of the extent of abuse occurring at the time of the alleged misrepresentations. And because Plaintiffs' claim is based on BSA's failure to warn about a nationwide problem, production is not limited to records of claims for sexual abuse that occurred in Idaho.

Further, records of claims filed between 1983 and 1987, related to post-1982 abuse are relevant to Plaintiffs' claim for punitive damages, as the existence of such claims may help Plaintiffs demonstrate BSA's ongoing knowledge of the problem of sexual abuse in Scouting. Again, however, the Court does not see how the substance of complaints,

petitions, and demand letters related to post-1982 abuse is relevant to whether BSA intended to cover up pre-1982 abuse at the time of the alleged misrepresentations.

### B.    *Proportionality*

BSA argues that the request is overly broad in scope, duplicative of prior requests, and unduly burdensome. BSA asserts that identifying and producing these documents would be unduly burdensome because doing so would require hundreds of hours of manual searching through poorly labeled files held in its records management system. *See Def.'s Supp. Resp.* at 3-4, Dkt. 224. The Court acknowledges the costs of producing responsive documents are likely to be significant. However, the Court finds it difficult to believe that the Legal and Risk Management departments rely solely on the generic tracking information kept by the records management system to maintain their files, such that a manual search is necessary to identify responsive documents. This is particularly true given that BSA was able to produce similar documents in a previous lawsuit, dating to an even earlier period than the one contemplated here. *See Pl.'s Br.* at 9, Dkt. 174-1. Further, BSA admits its Legal and Risk Management departments maintain electronic tracking systems separate from the records management system, and even offers to search the Risk Management department's own electronic database. *Def.'s Supp. Resp.* at 4, 14, Dkt. 224. BSA does not contend that a search of the electronic files and tracking systems of its Legal and Risk management departments would be unduly burdensome.

BSA does contend, however, that Plaintiffs' request is overly broad and duplicative. Although records of claims related to abuse occurring from 1970 through 1982 may have some overlap with the IV files that will already be produced, BSA has

failed to show, as it must, that it would be "unreasonably cumulative or duplicative." Fed. R. Civ. P. 26(b)(2)(c)(i). Some overlap alone does not justify foreclosing discovery.

In contrast, records of claims related to abuse occurring from 1983 through 1987 are relevant to the proposed punitive damages claim, but only to the extent that their existence may help Plaintiffs' demonstrate BSA's ongoing knowledge of child abuse in Scouting. Unlike the existence of the IV files, Plaintiffs' may not be able to obtain evidence of all such claims' existence unless BSA is ordered to produce them. However, BSA's ongoing knowledge of child sexual abuse in Scouting is already clearly established by the existence of the IV files. As such, the Court finds the benefit of producing records of claims related to post-1982 abuse is outweighed by the cost of production.

As with the IV files, records of claims for sexual abuse contain sensitive material and implicate significant privacy concerns. Production subject to the protective order already in place (Dkt. 149) and the redactions outlined above, mitigate these concerns. BSA points out that some of the responsive documents may be subject to protective orders and thus require additional screening. To the extent BSA finds the existing protective order and ordered redactions insufficient to ensure compliance with previous protective orders, the parties are instructed to meet and confer to agree on any additional measures necessary.

**4.      Deposition Testimony from Other Cases**

Requests for Production Numbers 14 & 15 seek prior testimony from BSA employees and Scout Leaders in cases in which it was alleged that Scout leaders sexually

abused Scouts, prior to 1987. *See Dumas Decl.*, Ex. 1 at 8-9, Dkt. 175-1. Plaintiffs agreed to limit their Request to testimony given after 1980. Plaintiffs now also seek a list of lawsuits against BSA involving claims for child sex abuse between 1970 and 1987, such that they are able to identify additional deposition transcripts. *See Pl.'s Supp. Br.* at 4, Dkt. 222.

The Court orders BSA to produce responsive transcripts given that are in its command or control. Production is limited, however, to depositions taken of employees or volunteers who may be deceased or otherwise unable to testify. BSA is also ordered to produce a list of lawsuits against BSA involving claims for child sex abuse between 1970 and 1982. Production is subject to the same protective measures outlined above for records of claims for sexual abuse.

A.      *Relevancy*

Prior testimony of BSA employees and Scout leaders is relevant for the same reasons the IV files and prior complaints/demand letters are relevant—to help Plaintiffs establish (1) the falsity of BSA's representations and (2) that BSA had the state of mind necessary to support a punitive damages claim and remove the cap on non-economic damages. This evidence may also be relevant to agency issues. To establish that BSA committed constructive fraud, Plaintiffs will have to establish that BSA acted through, and thus can be held responsible for, acts of its agents. Testimony by BSA employees may help establish BSA's right to control volunteers and employees, and how BSA exercised that control.

**B.** *Proportionality*

The Court agrees, however, that Plaintiffs' request is overly broad. As BSA rightfully points out, much of the information Plaintiffs' seek in transcripts of past depositions could also be obtained through depositions taken in the normal course of this litigation. As such, the Court will limit production of responsive documents to depositions taken of employees or volunteers who may be deceased or otherwise unable to testify, as well as the list of lawsuits involving claims of sexual abuse that occurred between 1970-1982.

Because these files likely contain sensitive material, and implicate similar privacy concerns and legal obligations as the complaints, petitions, and demand letters, production is subject to the existing protective order and redactions outlined above. Again, if BSA determines that additional protections are necessary to meet its obligations under previous court orders, the parties are directed to meet and confer to agree on such measures.

## ORDER

**IT IS ORDERED:**

1.     Plaintiffs' Motion to Compel (Dkt. 174) is **GRANTED IN PART** and **DENIED IN PART** as explained above.

2.     The parties are further ordered to meet and confer as to the timing of any document productions ordered herein. The Court's law clerk is available to assist in informally resolving disputes regarding the timing of these

productions. Defendants should be aware, however, that the Court will err in favor of compelling a speedy production.

DATED: September 1, 2017

B. Lynn Winmill
Chief Judge
United States District Court