1

1        **UNITED STATES DISTRICT COURT**

2          **DISTRICT OF IDAHO**

3                                    )
    JOHN DOES I-XIX and JOHN         )  CASE NO. 1:13-cv-00275-BLW
4   ELLIOTT,                         )
                                     )  **MOTION HEARING**
5              Plaintiffs,           )
                                     )
6           vs.                      )
                                     )
7   BOY SCOUTS OF AMERICA, a         )
    congressionally chartered        )
8   corporation authorized to do     )
    business in Idaho; CORPORATION   )
9   OF THE PRESIDING BISHOP OF THE   )
    CHURCH OF JESUS CHRIST OF        )
10  LATTER-DAY SAINTS, a foreign     )
    corporation sole registered to   )
11  do business in Idaho; and        )
    CORPORATION OF THE PRESIDENT OF  )
12  THE CHURCH OF JESUS CHRIST OF    )
    LATTER-DAY SAINTS AND            )
13  SUCCESSORS, a foreign            )
    corporation registered to do     )
14  business in Idaho,               )
                                     )
15            Defendants.            )
    _____  )

16

17

                **TRANSCRIPT OF PROCEEDINGS**
18         **BEFORE THE HONORABLE B. LYNN WINMILL**
              **FRIDAY, JUNE 15, 2018; 1:03 P.M.**
19                    **BOISE, IDAHO**

20

21
    Proceedings recorded by mechanical stenography, transcript
22  produced by computer.
    _____

23

24         **TAMARA I. HOHENLEITNER, CSR 619, CRR**
              FEDERAL OFFICIAL COURT REPORTER
25       550 WEST FORT STREET, BOISE, IDAHO  83724

```
1        FOR PLAINTIFFS
             Andrew M. Chasan
2            Timothy C. Walton
             CHASAN & WALTON, LLC
3            P.O. Box 1069
             Boise, Idaho 83701
4
             Ashley L. Vaughn
5            DUMAS LAW GROUP, LLC
             3835 NE Hancock St., Ste. GL-B
6            Portland, OR 97212

7        FOR DEFENDANT BOY SCOUTS OF AMERICA
             Stephen R. Thomas
8            Mindy M. Muller
             Tyler J. Anderson
9            HAWLEY TROXELL
             877 W Main Street, Suite 1000
10           Boise, ID  83702

11       FOR DEFENDANT CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
             Steven B. Andersen
12           Wade L. Woodard
             ANDERSEN SCHWARTZMAN WOODARD BRAILSFORD, PLLC
13           101 S. Capitol Blvd., Suite 1600
             Boise, ID 83702
14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2                   JUNE 15, 2018

 3   Date      Proceeding                                  Page

 4
     6/15/18   Motions for Summary Judgment
 5
               Motion re: Constructive Fraud
 6               Argument by Mr. Woodard..........................  6
                 Argument by Mr. Thomas........................... 18
 7               Argument by Ms. Vaughn........................... 29
                 Argument by Mr. Woodard.......................... 44
 8               Argument by Mr. Thomas........................... 46

 9             Motion re: Statute of Limitations
                 Argument by Mr. Andersen......................... 52
10               Argument by Mr. Thomas........................... 62
                 Argument by Mr. Chasan........................... 69
11

12             Motion re: Damages
                 Argument by Mr. Woodard.......................... 84
13               Argument by Ms. Vaughn........................... 90
                 Argument by Ms. Muller........................... 95
14               Argument by Ms. Vaughn.......................... 100
                 Argument by Ms. Muller.......................... 101
15

16             Motion re: Res Judicata
                 Argument by Mr. Anderson........................ 101
17               Argument by Mr. Chasan.......................... 108

18
               Motion re: Affirmative Defenses
19               Argument by Mr. Andersen........................ 119
                 Argument by Mr. Anderson........................ 122
20               Argument by Ms. Vaughn.......................... 127

21

22

23

24

25
```

4

```
 1              P R O C E E D I N G S
 2                  June 15, 2018
 3         THE CLERK:  The court will now hear Civil Case 13-275,
 4  Doe I, et al., versus Boy Scouts of America, et al., regarding
 5  motions for summary judgment.
 6         THE COURT:  Good afternoon, Counsel.
 7      We had just a little technical problem with our timer, and
 8  if it doesn't start working, then Ms. Danahy will give us an
 9  alert.  Apparently, it is working.  So, with some luck, it will
10  continue working.
11      Counsel, there is a lot of ground to cover, so I'm going to
12  be brief.  But, as usual, I'm going to make just a few
13  preliminary comments, and there is one specific issue that I
14  want counsel to consider.
15      By way of background, this case was filed in 2013 on behalf
16  of a group of plaintiffs who participated in the Boy Scouts
17  program between 1969 and 1983, some of whom participated in
18  troops sponsored by the LDS troop.  Each plaintiff alleges that
19  he was subjected to sexual abuse at the hands of an adult male
20  acting in a leadership role with the Scouts.
21      Now, Counsel, I want to first start just to make sure that
22  we identify what the elements are and then talk just very
23  briefly about summary judgment.
24      The elements, of course, of a constructive fraud claim
25  include eight elements: a relationship of trust or confidence
```

5

```
 1  between the plaintiff and the defendant; that the defendant made
 2  a statement or representation to the plaintiff; the statement
 3  was false; it was material; the plaintiff relied upon that
 4  statement; the reliance was justified; and it resulted in an
 5  injury to the plaintiffs.
 6      Now, I think it's important for us to, again, keep in
 7  mind -- and I'm worried a little bit because of the briefing --
 8  that the focus here again on motion for summary judgment is not
 9  what you will be able to show at trial except to the extent
10  necessary to show whether there is, in fact, a disputed issue of
11  material fact.  Could -- are there facts that have been
12  developed in the course of discovery from which a reasonable
13  jury could find that the plaintiff can or cannot prevail on each
14  of the eight elements of the claim?
15      And I think that's important.  If the plaintiffs fail on
16  any one of the elements -- in other words, the court concludes
17  that there is no disputed issue of material fact and that the
18  defendants will prevail on any one of those eight elements --
19  then summary judgment will be granted.  And I think that's
20  important.
21      The other thing I wanted to comment on -- and this is the
22  area -- and I won't get into great detail.  The first element is
23  whether a relationship of trust and confidence exists.  And I
24  was concerned from reading the briefing that there was a little
25  conflation, if you will, between that relationship and a
```

6

```
 1  fiduciary relationship.
 2      I think that what is critical is to determine whether
 3  that's an issue of fact or an issue of law and whether or not
 4  there is any relationship between the typical fiduciary
 5  relationship and the relationship of trust and confidence that
 6  is referred to under this doctrine of constructive fraud:
 7      The court has previously held in the Tom Doe case, the
 8  predecessor to this case, that summary judgment as to the
 9  existence of a relationship of trust and confidence is precluded
10  so long as a jury can find that the defendant occupied a
11  superior position of influence and authority over plaintiff,
12  who, in turn, reposed trust and confidence in the defendant.
13      Now, I think that clearly is a question of fact.  And, in
14  fact, the Idaho Supreme Court, when we certified the question to
15  them, I think made that even more clear.
16      I think what has been troubling is that counsel in their
17  briefing has been using that somewhat interchangeably with a
18  fiduciary relationship.  And I think that that is troublesome,
19  and I think we need to have that clarified.
20      And I will admit that I think I added to the confusion,
21  because in the Tom Doe decision, I actually made a statement
22  suggesting that a fiduciary relationship was central to the case
23  and that, in fact, it was an issue of fact for the jury.  And I
24  think I was, frankly, mistaken on that point.
25      Rather, I think that the issue of whether there is a
```

7

```
 1  fiduciary relationship is a question of law for the court, that
 2  that's not what's at issue here.  I think, frankly, the Idaho
 3  Supreme Court made clear that the relationship of trust and
 4  confidence is something different, and I think it's a question
 5  of fact for a jury to determine; that is, whether there is such
 6  a relationship.
 7      Now, that's significant, I think, for a couple of reasons.
 8  The case law concerning fiduciary relationships which have
 9  developed has established certain categories of relationships in
10  which there is or is not a fiduciary relationship.  There is
11  such a relationship in an attorney-client relationship.  There
12  isn't one in a banker-customer relationship.
13      But that is not the case with regard to the relationship of
14  trust and confidence.  I don't think there is any categorical
15  exclusions of any relationship.  I think there has been a
16  discussion that perhaps the church-parishioner relationship
17  could not fall within that relationship.  And I think that's,
18  again, because we somewhat conflated the concept of fiduciary
19  relationship and this relationship of trust and confidence.
20      And secondly, it's a question of fact.  And so the court
21  can only grant summary judgment if there is no factual basis
22  upon which a jury could conclude that such a relationship
23  exists.
24      Now, if I have got that wrong -- and counsel may disagree
25  with me on that; I do want you to address that issue very
```

8

1  specifically as part of your argument, because I think it's
2  fairly central to this dispute -- please let me know.
3       The only other comment I would make is that, of course, I
4  have already -- one of the other arguments is that constructive
5  fraud only arises in commercial settings and can never justify
6  noneconomic damages. I think I held to the contrary in the *Tom*
7  *Doe* case. And while that is not binding here, that's certainly
8  my preliminary thinking.
9       And so you really need to persuade me either, A, I was
10 wrong when I made that decision now, what, eight years ago in
11 the *Tom Doe* case, or that there has been an intervening change
12 in the law that would suggest I should reach a different
13 conclusion today.
14      So with that, Counsel, we're on a strict time limit here,
15 so we are going to hold you exactly to the time that's been
16 allocated. I think each of the defendants will take 15 minutes
17 and reserving some time for rebuttal, and the plaintiffs will
18 have 30 minutes.
19      So with that, I think, Mr. Woodard, you're going to argue
20 first.
21          MR. WOODARD: Yes, Your Honor.
22      Thank you, Your Honor. And taking into account what you
23 just indicated, I'll address my arguments based on the direction
24 you just gave.
25      Your Honor, the Supreme Court has said that, as you

9

1  indicated, for constructive fraud, you need a confidential
2  relationship or relationship of confidence and trust. And the
3  court has described it at times as like a fiduciary
4  relationship, which I think is why there has been some
5  conflation.
6          THE COURT: Now, when the plaintiffs pled, they used
7  the term "fiduciary relationship" in the complaint.
8          MR. WOODARD: They did.
9          THE COURT: So I think that's where it started. But I
10 think the Idaho Supreme Court made really clear that a fiduciary
11 relationship is a relationship of trust and confidence, but not
12 the offers.
13         MR. WOODARD: That's correct, Your Honor. That's the
14 basis of our position.
15      We're not saying that it has to be a fiduciary
16 relationship, but I think the fiduciary type of relationship and
17 what needs to go into a fiduciary relationship helps guide what
18 a relationship of confidence and trust is.
19      You know, if I understand the way the Supreme Court is
20 saying it, they are saying it's a relationship of confidence and
21 trust like a fiduciary relationship, but it doesn't have to be a
22 fiduciary relationship.
23      Your Honor, I think where the conflation has taken place is
24 not between -- at least in the briefing that I have seen, it's
25 not between a fiduciary duty and a relationship of confidence

10

1  and trust, but it's the difference between a relationship of
2  confidence and trust and a special relationship.
3       And throughout the plaintiffs' briefing, they continually
4  refer to a "special relationship," and they cite cases that all
5  involve a special relationship. And a special relationship is
6  quite different from a relationship of confidence and trust.
7          THE COURT: Where does the special -- I mean, what's
8  the legal significance of a special relationship?
9          MR. WOODARD: So a special relationship comes into
10 play when -- the rule is, right, that the normal rule -- and
11 that's under the Restatement of Torts 314 -- is that you don't
12 owe a duty to protect somebody. You don't owe a general duty to
13 protect somebody. And when does that duty come into play? It
14 comes into play when there is a special relationship.
15      And so where a special relationship has been used -- let's
16 take the school setting -- is the school generally would not
17 have any duty of care toward a student but for the special
18 relationship, and it's that special relationship that the
19 students are entrusted to the care of the school that provides
20 this negligence tort duty to act in a reasonable basis to
21 protect them.
22      And so the special relationship is how you get to
23 reasonable care duty. It's not the heightened duty of a
24 relationship of confidence and trust.
25      And the reason that's important here is the cases that are

11

1  cited by the plaintiffs -- especially there is a lot of school
2  cases in there that refer to a special relationship, and
3  that's -- that's not what we have here.
4       The Church isn't disputing that the Scouts or the Church at
5  times owe special -- you know, have a special relationship with
6  parishioners or with Boy Scouts, in particular. In the *Beers*
7  case, that's one of the things that was looked at is, you know,
8  is -- where the circumstances in that case, was the young woman
9  in that case entrusted into the care of the Church at the time
10 she was injured? That's a special relationship-type issue, not
11 a relationship of confidence and trust.
12      So in this case, they need something more than a special
13 relationship. And what we have shown in our brief is they
14 haven't cited to a single case, and we haven't found a case,
15 where a court has found a confidential relationship or a
16 fiduciary relationship, either one, between a parishioner and a
17 priest or the Church.
18         THE COURT: But that --
19         MR. WOODARD: Without something more, right?
20         THE COURT: What is the flip side of that question,
21 though? Are there cases where they have said there is no such
22 relationship of trust and confidence, or is there just a lack of
23 case law?
24         MR. WOODARD: No. There are cases out there.
25      Your Honor, one of the good cases to look at that's a

12

1  school case which I think is very akin to the same relationship
2  is that *Lindemulder* case that's cited in our brief.  And I can
3  get you --
4          THE COURT:  That's fine.  I have got it.
5          MR. WOODARD:  Okay.  You've got the cite for it.  It's
6  884 N.W.2d 222.
7      And that case is an interesting case because it's -- their
8  argument, the plaintiffs' argument, was:  Well, this student was
9  something more than your normal student, almost the
10  *Martinelli* -- you know, the parishioner plus; that this was a
11  student plus.
12     And the argument was:  Well, this student not only was a
13  student, but she extensively participated in sports.  And it was
14  through the sports participation that she came into contact with
15  the coach who she ended up having sexual relationships with.
16     And, you know, it included overnight trips for out of the
17  city for, like, state tournament is one of the -- is part of the
18  facts.  It included overnight trips much like a scouting event.
19  And the court refused to find a fiduciary-type relationship.
20     There wasn't an argument in there about a confidential
21  relationship, but I think --
22         THE COURT:  Mr. Woodard, that's why I made the comment
23  about I'm concerned that we not get caught up in trying to find
24  categorical inclusions or categorical exclusions from a
25  relationship of trust or confidence but, rather, just look at

13

1  the legal standard which the Supreme Court has directed us to,
2  which is that the plaintiff reposed trust, the defendant had
3  reason to know that the plaintiff was reposing trust in them,
4  and that there was a basis for believing the one giving advice
5  is acting in the interest of the party reposing trust.
6      That's why I'm wondering:  Is this just not a factually
7  intensive inquiry in which the other cases don't mean a lot;
8  what really matters are the facts of this case?  Or am I wrong?
9          MR. WOODARD:  No.
10         THE COURT:  I shouldn't ask if I'm wrong because I
11  know you won't say it.
12         MR. WOODARD:  You're always right, Your Honor.
13     But there isn't a -- I don't think there can be a category.
14  But if you look at the *Martinelli* case, which you cited in *Tom*
15  *Doe,* you've got to have something more than just being a normal
16  participant in church.
17     And the problem with the Church, right, is everybody going
18  to say they reposed their trust in their church, and so it's got
19  to be something more than just --
20         THE COURT:  Is the fact that these were 12- and
21  13-year-old young men, does that make a difference?
22         MR. WOODARD:  Well, I don't think so.  Because,
23  otherwise, it would in the school cases; right?
24     And same with the trust.  Parents and students entrust that
25  when they go on an out-of-state trip with their coach, that they

14

1  are not going to be sexually abused by their coach.  I don't
2  think -- I don't think a school and extracurricular activities
3  with school that are sponsored by school is a whole lot
4  different than a boy scout in this case.
5      And so my reading of all the cases is it requires something
6  more than just that kind of, "Yeah, I trust my church, and I
7  trust that when my son goes to church, he is not going to get
8  abused at church," or in this case, at Boy Scouts.
9      So it's our position that it requires something more.  And,
10  you know, the *Martinelli* case, right, there was something more.
11  Those boys in that case had an extra special -- I hate to use
12  the word "special" -- relationship with the priest, Father
13  Brett.  And the Church knew that there was this kind of
14  relationship where they were spending extra time with him where
15  he singled out a group of boys as kind of this elite group of
16  boys that was different from the rest of the boys in the troop.
17  And so they were different -- the rest of the boys in the
18  parish, I mean, at the school.  So there was something different
19  about that.
20     And in this case, taking the plaintiffs that were LDS and
21  in LDS-sponsored troops, there is nothing distinguishing about
22  them from any other boy their age; right?  And as the plaintiffs
23  admit, Boy Scouts was the activity arm of the LDS Church, so all
24  boys their age were encouraged to participate in Scouts and it
25  did not make them different in any other male of their age.

15

1  There was none of the distinguishing characteristics that you
2  have in the *Martinelli* case because everybody does that.
3      And so from there, Your Honor, I think with the remaining
4  time, what I would like to talk about is the Doe II case because
5  it's different.  And, Your Honor, the reason it's different is
6  in Doe V, there is evidence that Jim Schmidt was Doe V's scout
7  leader.  It's unclear whether he was the scoutmaster or
8  assistant scoutmaster, but he was definitely the -- that ward's
9  troop's scout leader; at least there is evidence of it for
10  Doe V.  I'm not saying that's enough, but I want to talk about
11  how Doe II is much different.
12     And here is the thing with Doe II is:  Jim Schmidt was not
13  a member of that ward.  He was not a religious figure in
14  Doe II's life.  Jim Schmidt was not the scoutmaster for that
15  ward.  There is no evidence of that whatsoever in the record.
16     There was a scoutmaster in that ward; his name is David
17  Farrow.  And he said that Schmidt one time came to him and asked
18  to help in the troop, and he told Schmidt he didn't want any
19  help from Schmidt.
20     The testimony of Doe II's mother is that she didn't think
21  that he would have any involvement with the ward, but she
22  thought that he was from the scout district office.
23     There is testimony from all the leaders that were -- that
24  have been deposed in the Caldwell Fourth Ward, and that's --
25  it's more important that Doe II was in the Caldwell Fourth Ward,

16

1  and he was in the troop in the Caldwell Fourth Ward.  All of
2  them testified that Schmidt had no involvement in Scouts in
3  their ward.
4        So what is the evidence that they have that Schmidt
5  had any church-sponsored relationship with Doe II?  And the
6  evidence that they have is there is testimony that Schmidt was
7  at the Church teaching a merit badge on one or more occasions.
8  It's not clear, but at least one occasion he was teaching a
9  merit badge.
10       The other testimony that they have is that he had a church
11  key.  Now, the testimony doesn't say which church he had a key
12  to.  It could have been a church in Nampa.  But that's the state
13  of the evidence of Schmidt's involvement with Doe II.
14       The other evidence that they cite to is a scout roster for
15  the Caldwell Third Ward, which is not the ward that Doe II was
16  in.  In that roster, Schmidt's name shows up as a committee
17  member, which is not a scoutmaster or an assistant scoutmaster.
18  And it's a different ward, and all the people in the Caldwell
19  Third -- by the way, it's not an LDS Church document, and there
20  is no foundation for it, and we talk about that in our brief.
21  But --
22       THE COURT:  I was thinking that the problem with that
23  argument is that the plaintiffs are alleging a general
24  representation of the safety of scouting and your ability to
25  rely upon scoutmasters.  At first, I was thinking your argument

17

1  was not really addressing that, but I can see now it is; because
2  what you're saying is he was not a scoutmaster.
3        MR. WOODARD:  Yeah.  And so general representations
4  about the safety of the scoutmaster, well, Doe II is not a --
5  wasn't abused by a scoutmaster.
6        And there has got to be something more than this tangential
7  relationship with the Church.  The evidence that we cite in
8  there is that Schmidt was banned from scouting by the LDS Church
9  by this point.
10       Now, you know --
11       THE COURT:  "By this point," by the time Doe II --
12       MR. WOODARD:  By the time Doe II is abused.
13       THE COURT:  -- accused abuse?
14       MR. WOODARD:  Now, we have met pedophiles; they are
15  sneaky people.  And there is testimony that he was telling
16  people that he was from the district office and this and that.
17  And, you know, who knows how he got involved with Doe II, but it
18  wasn't through the Church.
19       And so any general statements that the scoutmaster was
20  safe, well, Doe II wasn't abused by a scoutmaster.  And any
21  failure to warn about the scoutmaster, Jim Schmidt wasn't the
22  scoutmaster for Doe II.
23       THE COURT:  Mr. Woodard, I'd suggest almost that you
24  reserve some time.  Because I want you to respond.  I want to
25  hear what the plaintiffs have to say as to Doe II, because I

18

1  think that would be helpful.  And I think you talked about
2  reserving three minutes, and you used half of that.
3        MR. WOODARD:  I did.
4        THE COURT:  So, Mr. Thomas, are you going to argue?
5        MR. THOMAS:  I think I'll submit it, Your Honor.
6  (Laughter.)
7        THE COURT:  If you want.
8        MR. THOMAS:  Stephen Thomas for the Boy Scouts,
9  Your Honor.
10       I would like to begin with reference to an old friend of
11  mine and really everybody here as the Honorable Larry M. Boyle,
12  who was, indeed, a gentleman, a jurist, a wise and practical
13  judge.
14       The metaphor he used in cases where I was before him is:
15  "Counsel, what are you going to do with the boulder in the road,
16  big, practical, obvious problem in your case?"  I heard that a
17  number of times cutting against me sometimes and cutting against
18  my adversary other times.
19       Here, Your Honor, if I can focus this --
20       THE COURT:  It will focus itself.
21       MR. THOMAS:  There we go.
22       Here we have the problem in the case which is I think the
23  boulder, and that is the perpetrator.
24       I will read the language at the bottom.  Hard copies were
25  delivered to Ms. Danahy.  But the language at the bottom says:

19

1        "Plaintiffs are not asserting a vicarious liability
2        claim arising from the listed perpetrator's sexual
3        abuse of plaintiffs.  Plaintiffs have never made a
4        claim in this case for vicarious liability," close
5        quote.
6        And that never was in the original.
7        And so, Your Honor, the point I'm reaching for as really an
8  introduction to the entire afternoon is that this is a major
9  problem in the case.  This, frankly, differentiates this case
10  from virtually all of the other cases around the country in
11  which there was an agency relationship, and the perpetrator and
12  his fault was being attributed to the Scouts or the Church.
13       Here, of course, the proximate cause of the harm was the
14  perpetrator sexually abusing these scouts; and they, the
15  perpetrators, are not agents of the defendant.
16       Let me talk about this relationship of trust and confidence
17  as a fiduciary or near fiduciary.  I guess I'm not able at this
18  point, on the fly, to differentiate between special relationship
19  and T and C, or trust and confidence.  To me, it's a distinction
20  without a difference.
21       The point is the relationship of trust and confidence is
22  like a fiduciary.  It is a heightened duty; it is one that's
23  very close: a good friend, a business associate, or perhaps an
24  insurance agent and the insured; in other words, somebody you
25  actually know well, who knows something about your history, your

20

1 parents, your finances, something more than just a casual, "Hey,
2 how are you doing?"
3          THE COURT:  You agree, though, that there are no
4 category called inclusions or exclusions?  It's a factual
5 question which we apply the Idaho Supreme Court's standard for
6 what constitutes a relationship of trust and confidence to the
7 unique facts of this case?
8          MR. THOMAS:  Your Honor, I think I disagree.  I don't
9 think that's what the court was saying.  Or, to put it
10 differently, I think we can look at the undisputed facts of this
11 case --
12          THE COURT:  No.  And that's why --
13          MR. THOMAS:  -- and see that we can't get there.  And
14 that's what I would like to do next.
15          THE COURT:  Let me just clarify.
16          MR. THOMAS:  Okay.
17          THE COURT:  On summary judgment, if the plaintiffs
18 can't get there -- as a matter of law, I say they can't get
19 there --
20          MR. THOMAS:  Yes.
21          THE COURT:  -- but we don't say that there is a
22 category of relationships which cannot fall within a
23 relationship of trust and confidence as a category, it's a
24 question of factual determination and, on summary judgment,
25 whether there is a disputed issue of material fact.

21

1          MR. THOMAS:  It's not like *Bliss Valley Foods*, where
2 the court has already said debtor-lender doesn't cut it.  I
3 understand that.  That's clearly -- that's clearly the case.
4          And frankly, that's part of the reason why this is a very
5 problematic area in which the court should be very careful,
6 because it leads us to the rule of law -- of men, not law if we
7 don't be careful.  Because there really are no standards if we
8 just say, "Well, it's whatever happened."
9          Let me, though, then take off from the parishioner-plus
10 discussion because it was an important one that is commenced by
11 Mr. Woodard, and it's in the briefing.  We have been there
12 before.
13          Let me compare and contrast that to my client, the Boy
14 Scouts.
15          In the parishioner-plus rule, the debate is whether if
16 you're a parishioner and you do something more, then a
17 heightened duty might arise.  I'm going to look at the bottom
18 half of that, the foundation of the concept that a mere
19 parishioner does not have a heightened duty.  Okay?  And I would
20 like to take that and illustrate it compared to my client's
21 relationship, if any.
22          The parishioner who goes to his church, say, an hour or two
23 or three each Sunday, he might come back and help on some other
24 projects, fundraisers or what have you during the week; he gets
25 to know his pastor, has conversations of the utmost importance,

22

1 like immortality, the history of your faith, things like
2 weddings -- you would have the church involved in weddings,
3 funerals, confession.  Extremely personal relationships are part
4 of being a parishioner, and they are held not to be enough for
5 this relationship of trust and confidence.
6          Compare that, Your Honor, to my client.  We all know that
7 my client is a corporation.  Corporations are legal fictions.
8 They operate through their employees.
9          During the time period in question, my client was based in
10 New Jersey and later in Texas, thousands of miles from Idaho.
11 And I listened very hard in discovery for a reference to
12 Farragut State Park, because it is a matter of public record
13 that twice in the late 1960s, Boy Scouts of America did come to
14 Idaho.  They came to Farragut State Park for a national jamboree
15 and international jamboree in the '60s.
16          But there was no evidence at all from any of the plaintiffs
17 they attended or they met with Boy Scouts employees and that
18 they had a representation from the Scout employees that you can
19 be sure there is no risk of sexual abuse from rogue pedophilic
20 scoutmasters, or words to that effect.
21          THE COURT:  You are not suggesting that the Boy Scouts
22 of America cannot be held responsible for what happens in
23 councils and in the individual troops?
24          I mean, they sponsor, they provide standards, they provide
25 guidance, they create a mechanism in which scout camps can

23

1 occur.
2          Are you saying that there is just simply no liability for
3 the Boy Scouts of America because it's the corporate umbrella?
4          MR. THOMAS.  No.  I'm saying there is a boulder in the
5 road, Judge, that these -- that these people with whom the
6 relationships did grow up, if you look at the statement of
7 material facts offered by plaintiffs, that relationship was with
8 the perpetrators.
9          Those are the people who groomed them and got to be good
10 friends with them and good buddies.  But they are rogues; they
11 are not our agents.  They are criminals.  They are not people to
12 whom their conduct can be attributed vicariously to my client.
13          THE COURT:  But, again, this is a case of constructive
14 fraud, and the elements are a misrepresentation.  And the
15 misrepresentations are in large part in Scout handbooks.
16          MR. THOMAS:  Well, that's where I'm going exactly.
17          THE COURT:  Okay.
18          MR. THOMAS:  So my point is we have employees that
19 have never been named from far, far away with whom there is no
20 relationship with these people at all.
21          So what do we have left?  What do we have left?  It's a
22 book called "The Scout Handbook."  That's exactly right.  What
23 they are trying to do here is hold my clients liable for some of
24 the heinous, immoral criminal activity 35 years ago based upon
25 remote publication of a manual on how to camp and how to become

24

1  a good citizen as you grow up.  That's effectively what this is
2  about.
3      These are not like Keats or Shelley with remote love
4  sonnets and stuff to your single beloved person or enticing some
5  young lady from Russia to be your bride.  That's nothing like
6  that at all.  This is a very general, open document.  You can
7  buy the handbook anywhere in the world since 1911.  You have to
8  pay for it.  It's not thrust upon you.  But it is a book, a
9  manual on how to be a good citizen, how to orienteer, tie knots,
10  and the like, first-aid.
11      You know, that's not a relationship of trust and
12  confidence.  Anybody could be held liable anyplace from
13  publishing books.
14      And my point is, ultimately -- and thus moving onto other
15  elements -- where is the representation?  Where is the false
16  representation of fact, Your Honor?  And ultimately, the
17  plaintiffs' position is the Scout oath and the Scout law are
18  materially false facts.
19      I submit to you that's nonsense.  That's nonsense.  They
20  are not present facts or past facts.  They are, indeed, more in
21  the nature of opinion or prefatory statements, idealistic
22  statements.  They are stuff of which the Idaho court has held in
23  *Gillespie vs. Mountain Park Estates*, personal opinions and
24  predictions.  Those kinds of things are not actionable
25  statements.

25

1      And so, Your Honor, I would submit that there is missing
2  from this case in a classic fraud case not only the fraud of the
3  relationship of confidence and trust, there is missing a
4  declaration of the plaintiff that said:  On or about this time,
5  this employee of the defendant said these things to me that were
6  false.
7      There is not any such -- the counsel are weaving their
8  argument out of the existence of the handbook.  They read the
9  handbook that said, oh, the scoutmaster is a wonderful man.
10  Your Honor, being a wonderful man is not an actionably false
11  material fact.  It is prefatory statements that is general, it's
12  opinion, and it is not the stuff of which fraud is made under
13  many, many, many cases.
14      THE COURT:  Mr. Thomas, I --
15      MR. THOMAS:  Yes, sir.
16      THE COURT:  -- was reversed by the Idaho Supreme Court
17  when I was a state court judge in a case called *G & M Farms,*
18  which was cited here a number of times.
19      MR. THOMAS:  Yes.
20      THE COURT:  And frankly, they were right and I was
21  wrong, as I reflected back on it, except in one respect which I
22  may bring up to a question for the plaintiffs here in a moment.
23      But in that case, it had to do with puffery, the kind of
24  thing you are talking about in a commercial setting.
25      MR. THOMAS:  Yes.  I'm aware of the case.

26

1      THE COURT:  The thing that the Supreme Court concluded
2  was that the defendants in that case were in a unique position
3  to know that the statements they were making were false, and the
4  plaintiffs had no ability to discern whether they were true or
5  false, and that made a difference.
6      Why isn't that true here as well?
7      MR. THOMAS:  Well, let me dive into that just a little
8  bit.
9      The case that Funk Irrigation, the *G & M Farms* case, as I
10  recall it, the representation was that the line of irrigation
11  equipment being sold was very well -- you know, there were lots
12  of them out there; I think thousands of these machines were out
13  there.  Discovery showed, depending upon which model they were
14  really talking about, somewhere between 30 at the high and 4
15  units at the low.
16      These were designed in such a way there was an intrinsic
17  likelihood of breakdown.  So I think that -- with all due
18  respect, I think the appellate court did get it right.  There
19  was a carve-out there because it was an objectively verifiable
20  false fact that the seller was misrepresenting his product.
21      Now, if he had simply said, "This is a good system,"
22  different case.  Because good or beautiful -- this painting,
23  it's a beautiful painting; you'll love it.  Is that actionable?
24  No, no, no.  It's subjective.  So I think there is a material
25  distinction.

27

1      And the ultimate truth of the matter is that there was
2  probably some kind of a relationship in this case.  It
3  wasn't with my folks in New Jersey.  It was with this
4  perpetrator who was actually there, who met with these kids
5  every week, who went camping, he helped them with merit badges,
6  he did things which were up close and personal.
7      But that's the boulder in the road, Judge.  That man, these
8  plaintiffs have a now conceded, as they must, that he is not our
9  agent, and there is no vicarious liability.
10      So let me touch on a couple other quick points.  IDJI 4.60
11  is the reliance on proximate causation standard, and it's pretty
12  tight.  Proximately caused by reliance not led to injury.
13  That's an important point.
14      The transaction piece that's missing, Ms. Muller will talk
15  about it later.
16      Finally, a general observation notwithstanding all of this
17  theoretical discussion at this level, ultimately all of these
18  cases, as you know, are consolidated for discovery and motions,
19  but each one has to be looked at individually.  And the facts
20  are generally similar, but I urge the court to take a look at
21  each set of facts because they are not perfectly identical.
22      THE COURT:  Actually, I have done that.  And as I have
23  reflected, I -- in fact, I'll tip my hand now -- I'm becoming
24  more skeptical of the idea of any kind of a joint trial because
25  there are such unique facts on things such as the statute of

28

1    limitations and all of that.
2        Now, I may be persuaded that one or two cases can be tried
3    together.  But at this point, I'm certainly leaning towards that
4    just for the reason you pointed out.
5        MR. THOMAS:  Well, to conclude, Your Honor, putting
6    aside the absence of a trust-and-confidence relationship with
7    this remote corporation based solely upon a book it published
8    millions of copies of, the fact is the plaintiffs need to come
9    to you with an admissible piece of evidence of a specific
10   representation that is colorably false dealing with past or
11   present facts, not prefatory stuff, puffing and the Article 2 is
12   the same concept.  And they haven't done it.
13       They are running against the Scout oath and the Scout law
14   as if it is a representation of absolute safety from rogue
15   pedophilic scoutmasters.  I suggest the plain English language
16   does not get you there.
17       Thank you.
18       THE COURT:  Okay.  Ms. Vaughn, as you step to the
19   lectern, I'm going to refer now to G & M Farms as well.
20       MS. VAUGHN:  Right.
21       THE COURT:  One of the other areas where the Ninth --
22   or where the Idaho Supreme Court disagreed with me is that I
23   concluded that in deciding whether to grant or deny summary
24   judgment, the court should take into account the burden of proof
25   upon the plaintiffs.  And in that case, on a fraud case, this

29

1    burden of proof is by clear and convincing evidence.
2        The Idaho Supreme Court said:  No.  You just apply summary
3    judgment generally without regard to what the standard of proof
4    is.
5        Now, the Ninth Circuit agrees with me and does conclude
6    that, in fact, you have to take into account what the burden of
7    proof is in assessing whether or not summary judgment can be
8    granted.  But as far as I know, the Idaho Supreme Court has
9    stuck to its guns and says no, which raises the question:  Which
10   standard do I apply?
11       I'm assuming that that's a procedural issue, and that I
12   would apply the Ninth Circuit standard, which means your burden
13   is a little higher, because you not only must convince me that
14   there is a disputed issue of material fact upon which the jury
15   could find for the plaintiff by preponderance of the evidence
16   but must convince me that they could do so by clear and
17   convincing evidence.
18       Do you agree or not?  And if not, I may give you a chance
19   to offer some supplemental briefing on that issue.  And perhaps
20   the defendants will want to raise that in their response as
21   well.
22       MS. VAUGHN:  Thank you, Your Honor.
23       And just at the outset, I think if this is going to be a
24   substantial issue, we would like to reserve some supplemental
25   briefing on that issue.  Because I am not as familiar with the

30

1    G & M Farms case as should be, I will admit.  And obviously, I'm
2    going to say that we have the lesser burden of proof, the
3    some-evidence standard.
4        This case -- this issue frequently arises in my home
5    jurisdiction in Oregon, and the defendants make the same
6    argument that we have to show fraud by clear and convincing
7    evidence at summary judgment.
8        But summary judgment in Idaho and in the Ninth Circuit is
9    similar to the directed verdict standard, where you only have to
10   show some evidence or the absence of no evidence.  I think I
11   said that right or I used too many negatives.
12       THE COURT:  I'm not sure.  I mean, the standard is
13   Rule 56, and it says what it means and means what it says.
14       MS. VAUGHN:  Right.
15       THE COURT:  Is there a disputed issue of material fact
16   after I construe all the evidence in a light most favorable to
17   the plaintiff, including all reasonable inferences that can be
18   derived?  And that's pretty close to verbatim.
19       So that is the standard I apply; correct?
20       MS. VAUGHN:  Correct.  I would agree, Your Honor.
21       THE COURT:  Go ahead.
22       MS. VAUGHN:  Thank you.
23       At the outset, I just want to address one kind of
24   subsidiary issue that Mr. Thomas raised because I think it's a
25   bit -- I think his characterization of our position is a bit

31

1    misleading.
2        We do not have a vicarious liability claim, a legal claim
3    in this case, for the sexual abuse of the perpetrators.  That
4    does not mean that there are not vicarious liability issues
5    present in the case -- or not -- I should not say "vicarious
6    liability issues," but agency issues present in the case.
7        There are -- you address those some in the Tom Doe case.
8    They have arisen in discovery.  There are agency issues.  That
9    does not mean we are seeking to hold BSA vicariously liable for
10   the sex abuse of the perpetrators.
11       We have not conceded that, as Mr. Thomas argued, that the
12   scoutmasters are not agents of the Boy Scouts.  In fact, in our
13   response briefing, we argued very strongly and we introduced
14   evidence that can lead a jury to conclude that they are agents
15   of the scoutmasters.
16       And I think that that is significant when we get to this
17   relationship of trust and confidence.  Because it's true the
18   relationship of trust and confidence is largely formed between
19   the scoutmaster as an agent of the Boy Scouts and the LDS Church
20   and Scouts.  That does not mean that they are, therefore,
21   vicariously liable for the sexual abuse.  We are still looking
22   at constructive fraud and representations that were made about
23   the safety of the scouts and the safety of the scoutmasters.
24       However, you know, a lot of that relationship of trust and
25   confidence is made at the local level with the scoutmasters.

**United States Courts, District of Idaho**

32

1    THE COURT: I don't recall seeing a lot in the
2 briefing that, in fact, there were -- that in discovery, that
3 any of the plaintiffs said, "Well, James Schmidt or Mr. Arnold
4 or any of the other perpetrators actually told me that you can
5 trust me, you can rely upon me." The focus, rather, was on
6 national publications and things stated within a church setting
7 about trusting your scoutmaster.
8    Are you now suggesting that you can look not only to what
9 the national Scout office and the Church headquarters and their
10 policy said as opposed to what an individual scoutmaster may or
11 may not have said?
12    MS. VAUGHAN: Well, I think you have to look at the
13 picture as a whole.
14    THE COURT: Okay.
15    MS. VAUGHAN: I think you have to look at not only the
16 statements but also the actions at the local level. Because
17 constructive fraud can be based on not only explicit
18 misrepresentations but failure to disclose material information,
19 which is an element that the defendants really have not
20 addressed, and I fear they don't want to address, because that's
21 much easier for us to show.
22    Additionally, it can be based on action, actionable --
23 holding somebody out as a scoutmaster, as the safe and
24 trustworthy person even if you don't make that explicit
25 misrepresentation about them.

33

1    So I think I just wanted to address that initial issue
2 about vicarious liability because that is our argument. Yes,
3 some of it was -- this relationship was formed at the local
4 level. And we did put evidence in the record that those
5 scoutmasters are agents of both the LDS Church and agents of the
6 Boy Scouts of America.
7    So getting back to your initial question about the
8 relationship between fiduciary relationship or a relationship of
9 trust and confidence. I will agree with Mr. Woodard that a
10 fiduciary relationship can form the basis of a constructive
11 fraud claim, but it's not necessary. A relationship of trust
12 and confidence is really what we are looking at in this case.
13    THE COURT: And I think that's what the Idaho Supreme
14 Court said fairly explicitly --
15    MS. VAUGHAN: I agree, Your Honor.
16    THE COURT: -- in their decision. All right.
17    MS. VAUGHAN: And the test for that, as you
18 articulated, is whether the plaintiff reposed trust and the
19 defendant in this case -- whether the defendant anticipated that
20 trust and accepted that trust.
21    These organizations have explicitly asked children to join
22 their organizations and form relationships of trust and
23 confidence with them and with their agents, scoutmasters, and
24 with the Church. And now they are trying to say that those
25 relationships of trust and confidence shouldn't exist. But they

34

1 make those statements explicitly, not only in the scout
2 handbook; they made that statement to the United States Supreme
3 Court in *Dale v. Boy Scouts of America* case. They make that
4 statement in the LDS materials related to scouting. And they
5 make that statement implicitly by holding these men out as role
6 models, in the case of the LDS Church, who were sanctioned by
7 the Church as men that parents should trust to send their kids
8 out in the woods with for several days at a time.
9    So they are inviting -- so I think we easily have
10 introduced evidence that they anticipated that relationship, and
11 they also accepted that trust by accepting these children into
12 their program.
13    We are really just asking -- you know, we talk a lot about
14 this heightened standard, but we are really just asking that you
15 find that the relationship -- there are facts to show
16 relationship of trust and confidence such that they had the duty
17 to tell the truth.
18    And for the largest youth organization in the world, that
19 shouldn't be that much of a high standard, that they had a duty
20 to tell the truth, that they had a duty to disclose significant
21 material information about the risk of sexual abuse in scouting
22 to the children that they invited into that program.
23    Now, the defendants have argued that if we rely on this
24 trust and confidence test, that this will kind of open the door,
25 and that would mean that every kid involved in scouting has a

35

1 relationship of trust and confidence. And that may be true;
2 maybe they do.
3    I don't necessarily see anything wrong with that, but I
4 also think in this case we have additional factors, factors that
5 you set forth in the -- you looked at for the parishioner-plus
6 rule in the *Tom Doe* case.
7    THE COURT: Well, the parishioner-plus -- actually,
8 Ms. Danahy and I are exchanging instant messages, so we are
9 having a little dialogue on that very topic, a little dirty
10 secret we have in the federal court.
11    MS. VAUGHAN: Messaging?
12    THE COURT: Yeah. But is parishioner-plus even
13 relevant if you are not -- I mean, it's relevant because
14 fiduciary relationships can be a subset of a relationship of
15 trust and confidence.
16    But my recollection is that parishioner-plus -- and again,
17 I went down that rabbit hole in *Tom Doe* -- if it's only relevant
18 to a fiduciary relationship, it may not be at least conclusive
19 when we are talking about a somewhat different, broader issue of
20 the trust -- relationship of trust and confidence. Do you
21 agree? I just don't know, and I guess I want --
22    MS. VAUGHAN: I agree it's not necessarily conclusive,
23 but I think the factors that you analyzed in the *Tom Doe* case
24 that courts have looked at when applying this parishioner-plus
25 rule, are still relevant and are factors that can be considered

**36**

1  in whether there is a relationship of trust and confidence.
2  THE COURT:  All right.
3  MS. VAUGHAN:  Because, you know, in the *McGhee* case,
4  *McGhee* vs. *McGhee*, 82 Idaho 367, the Idaho Supreme Court says:
5  "Trust and confidence may be said to exist whenever
6  trust or confidence is reposed in one person and the
7  integrity and fidelity of another."
8  Other identified Supreme Court cases have looked at the
9  disparity in age.  Others have looked at the disparity in
10  knowledge to -- as factors that you can consider in finding a
11  relationship of trust and confidence.  And those are very
12  similar factors to those that you analyzed in the *Tom Doe* case
13  with the parishioner-plus rule.
14  And I think that we have introduced evidence in the record
15  from which a jury could find on each of those issues and find
16  that all of -- the confluence of all of those factors in this
17  case leads to a relationship of trust and confidence with these
18  organizations that invited that trust and confidence.
19  I would also like to address the -- Mr. Woodard raised the
20  specific issue of Doe II and argued that Doe II is different
21  because, in that case, they didn't know that Schmidt was a
22  scoutmaster; the LDS Church didn't know that Schmidt was a
23  scoutmaster, so they could not have anticipated this trust
24  relationship in that because they didn't -- they had no idea
25  that he was a scoutmaster.

**37**

1  Your Honor, that is a highly contested issue of fact as to
2  whether James Schmidt was a scoutmaster for the LDS Fourth Ward.
3  We have evidence from several scouts who were involved in troops
4  and Cub Scout packs that were sponsored by the LDS Fourth Ward,
5  and they have all testified that Schmidt was their scoutmaster
6  and that, through that role, he sexually abused them.  And they
7  are listed on the rosters for the LDS Fourth Ward.
8  Doe II's mother testified that she went to meetings in the
9  Caldwell Forth Ward building with her son, scout meetings, and
10  saw Mr. Schmidt there helping with scouting activities.
11  He also had a key to one of the buildings.  We also know
12  that he was represented by a BSA scout executive as being a
13  scout leader for the LDS Church.
14  And so I think maybe the semantics are significant -- not
15  significant here because we'll use the scoutmaster or an
16  assistant scoutmaster.  He wasn't some man that was coming off
17  of the streets.  He had been involved with scouting with the LDS
18  Church; he had a long history of it.
19  And the fact that his IV file shows that they kicked him
20  out before Doe II was abused isn't conclusive because he went on
21  to sexually abuse several other children who are plaintiffs in
22  this case and the other case, the second case, who were members
23  of the LDS Fourth Ward-sponsored troops.
24  THE COURT:  But isn't there a causation problem?
25  Again, I'm assuming, for sake of argument, that, in fact, he was

**38**

1  not a scoutmaster.  And you're saying there is a disputed issue
2  of fact on that.  I'll have to examine that more closely.
3  But if he is not, if he was there as a merit badge
4  counselor -- and merit badge counselors I think are brought in
5  from the community.  It could have been a lawyer, it could have
6  been a business person, it could have been a teacher at a
7  university being a merit badge counselor.  And if they happened
8  to abuse a scouter involved in that, isn't there a problem of
9  causation when you're talking about constructive fraud in a
10  misrepresentation about the dangers of scouting and particularly
11  the dangers of scoutmasters?
12  MS. VAUGHN:  Well, I think that our allegations are
13  broader than just the dangers of scoutmasters, with the dangers
14  of volunteer scout leaders at a local level.
15  THE COURT:  Which could include merit badge
16  counselors?
17  MS. VAUGHN:  Right.  And I think when you're -- even
18  when men are acting as merit badge counselors from the
19  community, they are still acting as agents of LDS Church in this
20  case and the BSA.
21  THE COURT:  But one of the elements is the falsity of
22  the representation.  And if the falsity is geared toward not
23  scoutmasters but merit badge counselors, these ineligible --
24  these IV files that we have heard so much about, I assume those
25  deal with scoutmasters and not merit badge counselors -- or am I

**39**

1  mistaken?
2  MS. VAUGHN:  Respectfully, you are mistaken, Your
3  Honor.  They deal with any adult and scout who has been
4  dismissed from scouting for sexually abusing a child and for
5  other reasons.  But the perversion files deal with any adult.
6  And that could be an employee or any type of volunteer, whether
7  at the district or the local level.
8  So there are merit badge counselors and other types of men
9  in those files besides scoutmasters or assistant scoutmasters.
10  So they represent the false representations and the knowledge
11  that they had of danger in the scout program.  It goes to scout
12  leaders at the local level in general who are -- who are
13  interacting one-on-one with these kids.
14  Schmidt may have been a merit badge counselor as opposed to
15  a scoutmaster, but he was still taking these children for
16  overnight camping trips for two or three days at a time and
17  abusing them during those camping trips.
18  So from the perspective of those children and their
19  parents, it doesn't matter whether he was a merit badge
20  counselor or a scoutmaster.  They still believed he was a safe
21  man that could be trusted due to his affiliation with these
22  organizations.
23  I already touched on this a little bit, Your Honor, that
24  the evidence that we have introduced in the record about the
25  falsity of the statements that the defendants made are not just

40

1   based on the Scout oath and the Scout law. We have introduced
2   much more evidence relating to advertisements, other types of
3   manuals and handbooks.
4        And as I -- as I iterated before, constructive fraud can
5   also be on the failure to disclose information. And I don't
6   think that there is any dispute -- and I haven't heard the
7   defendants argue -- that they actually disclosed the existence
8   of the IV files or at anytime made any type of warning that a
9   scout could be sexually abused by a scout leader, even though
10  they had thousands of files showing the exact circumstances
11  under which that happened in the past.
12       Whether that is a fact versus an opinion, I think that's a
13  question for the jury to decide. Because, certainly, from a
14  parent who is entrusting their child to this program and from a
15  child, and they are making specific representations about the
16  safety of this program and the safety of scout leaders, I think
17  a reasonable person could find that that parent would want to
18  know this information about the past history of sexual abuse in
19  scouting and would want to know about the risks. And that they
20  would think that any information that was being given about
21  scout leaders and their safety and their trustworthiness,
22  implicit in that is the fact that they can be trusted not to
23  sexually abuse your child.
24       I think that is what -- you know, distinguishes -- I have
25  to admit, I don't know the facts of the *G & M Farms* case as much

41

1   as I would like to, but Mr. Thomas said in that case they knew
2   of an intrinsic likelihood of a breakdown.
3        In this case, they knew of an intrinsic likelihood that if
4   they didn't, you know, warn scouts, tell them about ways they
5   could better protect themselves, give them information about
6   what had happened, that this would continue to happen in
7   scouting as well.
8        The defendants' right to raise the argument that it wasn't
9   a significant risk, I think whether it was significant enough to
10  be a risk -- to be something that they should have disclosed is
11  a question of fact. But we're not talking about statistics
12  here.
13       It was a significant risk in that it was the risk of a
14  child being sexually abused by a scoutmaster. So even if it
15  didn't happen very often, which I would debate, that's akin to
16  saying: We didn't have to warn you that you might be murdered
17  because it doesn't happen very often, or we don't have to warn
18  you that your plane might fall out of the sky because it doesn't
19  happen very often.
20       I also think that we have produced sufficient evidence to
21  meet the other elements required for constructive fraud, such as
22  reliance. Each of our clients have testified that they would
23  not have joined scouting or would have been better able to
24  protect themselves or would have taken different action if they
25  had known of these risks. And that -- that is -- that creates a

42

1   question of fact on the reliance piece.
2        THE COURT: Ms. Vaughn, we messed you up by putting
3   only 15 minutes on your clock. You may have noticed, all of a
4   sudden, you have a lot more time than you thought, and I need
5   to --
6        MS. VAUGHN: I have no idea what's going on with the
7   clock at this point.
8        THE COURT: That was our fault. We now corrected it.
9   You do have 12 minutes, but maybe I'll shortchange all the
10  attorneys on time if it will rush them through their arguments.
11  My apologies for not --
12       MS. VAUGHN: Thank you for clarifying. So I have 12
13  minutes left?
14       THE COURT: Whatever the time is, 12 minutes.
15       MS. VAUGHN: Okay. I would like to -- can I reserve
16  time, or are you only allowing that for the defendants?
17       THE COURT: They only have about less than two minutes
18  apiece. If you want to -- if there is something that cries out
19  for a response, I'll give you a few minutes.
20       MS. VAUGHN: Okay. Thank you, Your Honor.
21       So going back to reliance -- now that I know I have a
22  little bit more time -- I think we have introduced evidence in
23  the record creating a disputed issue of fact on that element.
24  All of our clients have testified that in some way, shape, or
25  form, they would have acted differently or changed their course

43

1   of conduct based on if they had known.
2        The defendants have argued in their briefing that that's
3   speculative; you can't rely on that testimony because it's
4   speculative. But, you know, I submit that with any fraud claim,
5   the reliance piece is always going to be a bit speculative
6   because you're trying to conceive of what you would have done
7   had something happened or had something not happened. So I
8   think that plaintiffs' testimony on that issue is enough to
9   create an issue of fact.
10       Getting to the plaintiffs' ignorance of falsity of
11  their representations, and I really don't think that that --
12       THE COURT: Just so we're clear, that's not an element
13  of the case.
14       MS. VAUGHN: The plaintiffs' ignorance of the falsity.
15       THE COURT: Oh, the plaintiffs' --
16       MS. VAUGHN: Yes, I believe it is.
17       THE COURT: I'm sorry.
18       MS. VAUGHN: I don't think that that's a highly
19  contested element as much as the other ones are. Because,
20  certainly, at the time they were 12 and 13 years old, they had
21  no knowledge of IV files, they had no knowledge of past history
22  of sexual abuse in scouting, they had no knowledge that their
23  scoutmasters who abused them were pedophiles.
24       So I think we have -- and all of our plaintiffs have
25  testified to that fact. I think we have presented sufficient

**44**

1 evidence to meet our burden on that element to create an issue
2 of fact.
3       Your Honor, I would greatly appreciate if you have any
4 additional questions for me --
5       THE COURT: No.
6       MS. VAUGHN: -- on any of the other elements or going
7 back to some of your initial questions.
8       THE COURT: When we move into the statute of
9 limitations in the next hour, I will have a lot more questions
10 for you. I think here, it's more questions for the defendants.
11      MS. VAUGHN: Thankfully, I'm not arguing that.
12 Thank you, Your Honor.
13      THE COURT: All right. Thank you.
14      MR. WOODARD: I'll try to talk really fast,
15 Your Honor.
16      THE COURT: Now --
17      MR. WOODARD: Your Honor, I think I'm going to focus
18 on Doe II quickly. And the question I have is: What is the
19 evidence that's out there that the LDS Church held Doe II
20 out -- not Doe II -- Jim Schmidt out as to Doe II's scout
21 leader; that he helped -- the LDS Church held him out as
22 somebody who could be trusted, that they held him out as
23 somebody who could be safe, that they held him out as anything
24 when it goes to Doe II?
25      And I want to point out these activities that was talked

**45**

1 about with regard to Doe II and maybe some of the other
2 plaintiffs in the cases that are upcoming, there is no evidence
3 that those were LDS-sponsored activities. And names may show up
4 on a roster, but there is no evidence that when they were with
5 Schmidt, that that was an LDS activity. Nobody remembers that,
6 and Schmidt wasn't the scoutmaster or the scout leader.
7       We are not saying that Schmidt didn't somehow find these
8 guys and hold himself out as a scout leader of some type.
9       In fact, I want to read to you from Doe II's mother's
10 deposition. And this is pages 50 and 52. And she talks about
11 this. She thought that -- not that Jim Schmidt -- because she
12 knew he wasn't in the ward and that he wasn't the ward
13 scoutmaster. She thought he was with -- worked for the Scouts
14 and that he was with the Scouts.
15      And she says -- the question was:
16      "Did anybody in your presence, including yourself, ever
17 say, "Hey, Schmidt, why are you wearing that uniform?"
18      "No. I think I may have assumed he was a professional
19 scouter for his job."
20      "You say 'may have assumed.' Did you, in fact, assume that
21 back then?"
22      "Yes, I thought that's what he did for income."
23      So she thought he was a professional scouter.
24      And they talked about the Scout executive holding Schmidt
25 out as a -- as a scout leader.

**46**

1       I refer you to page 31 of Pamela Mayberry's deposition.
2 That's not what that testimony says. It says that the scout
3 executive came and said that he was there with this -- on behalf
4 of the Scouts and that he was a ward member.
5       THE COURT: Okay. I'm going to have to look at that
6 much more closely because that's --
7       MR. WOODARD: By the way, there is no evidence he was
8 a member of that ward. We are not doubting that this LDS --
9 that the scout executive was an LDS Church member; many are.
10      THE COURT: All right. Thank you.
11 Mr. Thomas.
12      MR. WOODARD: I meant 50 and 51. I said 51 and 52 as
13 the page numbers for --
14      THE COURT: Hopefully, we'll be able to figure that
15 out.
16 Mr. Thomas.
17      MR. THOMAS: Thank you, Your Honor. Do I have two
18 minutes, I guess?
19      THE COURT: Yeah.
20      MR. THOMAS: Thank you.
21      Point 1: I'll go out on a limb and say, with thanks, we
22 don't need additional briefing to know that under *Erie* and I
23 think it was *Hanson v. Denckla* that the Federal Rules of Civil
24 Procedure govern procedure in this court. Otherwise, we would
25 have the Idaho rules being used, and I don't think I have ever

**47**

1 heard of that in my whole life.
2       THE COURT: I'm going to give the plaintiffs a brief
3 opportunity -- maybe Friday of next week -- to file, like, a
4 three-page brief of that issue. But I'm almost certain that
5 that's right; that under *Erie*, we are here on diversity;
6 therefore, we follow Idaho substantive law but follow federal
7 procedural law. And I think that would include the applicable
8 summary judgment standard --
9       MR. THOMAS: Yes, sir.
10      THE COURT: -- not just Rule 56 but whether or not the
11 underlying burden of proof is relevant to that consideration.
12      MR. THOMAS: Your Honor, the second point I would like
13 to make -- I thought I had said this; my colleague said I
14 didn't -- but in terms of the types of representations that are
15 not actionable for fraud, future promises, talking about the
16 future generally are not actionable.
17      Point 3: Reliance. The plaintiffs have put in a ton of
18 evidence about representations made in a brief to the Supreme
19 Court in 2000 or bylaws of my association or the parent
20 handbook, and other things of this nature.
21      But if you look at the actual testimony -- declarations and
22 testimony in deposition -- of the plaintiffs, there is no
23 reliance. With one exception, these people are not saying: Oh,
24 I went out and read these bylaws, or I went out and read the
25 brief that's yet to be written 25 years hence and relied upon

48

1    it.
2         That's impossible.  They didn't.  The only exception is,
3    gee, some of them said they read the scout handbook.
4         Thank you.
5         THE COURT:  Okay.
6         Ms. Vaughn, if there is anything, you left some time on the
7    clock.  Do you have anything you want to add?  And I will give
8    you, like I said, an opportunity for maybe a three-page brief
9    filed next Friday on the issue of clear and convincing versus
10   preponderance of the evidence under summary judgment standard,
11   and then I'll determine whether I need to hear a response from
12   the defendants.
13        But I'm pretty confident that I have got that right.  But
14   none of the parties really raised it, I don't think, in the
15   briefing.  And I think it's -- you know, it may or may not make
16   a difference, but I think we ought to at least make sure I got
17   that right.
18        MS. VAUGHN:  And I appreciate that opportunity, Your
19   Honor.  I don't have anything to add in response.
20        THE COURT:  Counsel, then we'll take a recess at this
21   time.  Let's take 10 minutes and come back and argue statute of
22   limitations and the other issues that are still before us.
23        We will be in recess.
24        (Recess at 2:04 p.m. until 2:21 p.m.)
25        THE COURT:  I guess we can get back to our chummy

49

1    little club.  We don't have a large group of people here.
2         Counsel, I want to make some comments about the statute of
3    limitations issues.  This raises some -- again, there are issues
4    of fact that -- the court has to determine whether there are
5    issues of fact.
6         Of course, you know, the defendants disagree with my prior
7    determination that the fraud statute of limitations applies, but
8    I'm assuming we are not arguing that today because that's really
9    just a question, first, covered in the briefs and, second, the
10   court has already ruled on that.  And I assume you are more
11   reserving that issue.
12        The thing that I want the plaintiffs to address here -- and
13   defendants may want to reserve a fair amount of time so that
14   they can give a chance to the plaintiffs to address the issue
15   and then you can respond -- is as to defendant -- or Does I, II,
16   and V, and whether they had actual notice of the falsity of
17   defendants' representations in 2007.
18        My concern is that in that case, the plaintiffs
19   specifically alleged that the Boy Scouts had represented that
20   scouting was safe even while knowing that child abuse was
21   occurring within scouting and that they had a practice and
22   pattern of harboring child abusers which exposed children to
23   harm.
24        Specifically, the complaint reads -- and I actually quoted
25   it in my notes here:

50

1         "Defendants promoted BSA services under the
2              representation that they provide a safe, wholesome,
3              and protected environment for children all the while
4              knowing that Defendants BSA attracted and had been
5              infiltrated by child predators like Schmidt."
6         That seems to me to be an allegation that brings together
7    all of the factual underpinnings to the constructive fraud
8    claim, that there was a representation about whether scouting
9    was a safe, wholesome, protected environment for children.
10        This says "all the while knowing," and it's not relevant
11   for constructive fraud whether they knew it, but specifically
12   alleging that "Defendants BSA attracted and had been infiltrated
13   by child predators like Schmidt."
14        And my question is:  How the plaintiffs can argue, given
15   those -- to a jury, given those allegations, that they did not
16   know in 2007 that representations made to them by at least the
17   Boy Scouts and perhaps the Church regarding the safety of
18   scouting were false.
19        And that's not a question, again, of what the Church or the
20   Scouts knew but whether or not those statements were false in
21   2007; and for purposes of the statute of limitations and whether
22   or not the cause of action had accrued, whether the plaintiffs
23   had at least notice by 2007 -- those three plaintiffs -- that
24   the representations made earlier were, in fact, false.
25        I think that's a challenge, and I think the plaintiffs are

51

1    going to have to address that head-on.  And as I suggested, the
2    defendants may want to reserve a fair amount of time there so
3    that they can respond.
4         The second comment I wanted to make has to do with whether
5    or not knowledge of lawyers can be imputed to the clients.  I
6    have already ruled, I think -- I want to say in *Doe XII*, but it
7    may have been in *Tom Doe* -- that an attorney's knowledge gained
8    in the course of representing one client, whether that can be
9    imputed to other clients the attorney represents either
10   concurrently in a separate case or even if it is not concurrent.
11   I think I have ruled that if it's not concurrent, it can't be
12   held against the client.
13        But I think there are some serious questions that even if
14   an attorney is representing multiple clients in which
15   information obtained in one case is relevant to the other, I
16   think there are some real strong policy concerns about imputing
17   that information to other clients.  Because it somewhat requires
18   the court to probe into the attorney-client relationship, and
19   I'm just concerned about that.
20        So I want counsel to address that not only on the level of
21   what the law is and maybe what the law should be, because it, as
22   I said, may actually pose some serious almost policy issues
23   about the attorney-client relationship.
24        So with that, I don't know if there is a going to be a
25   change in who is arguing.

52

1      All right. Mr. Andersen.

2            MR. ANDERSEN:  Thank you, Your Honor.  Thank you for

3      the time today.

4            Your Honor, I had assumed, based upon the email setting the

5      statute of limitations argument and the other arguments for time

6      today, that the court might want to entertain some discussion

7      about which statute of limitation applies.  From the comments

8      that the court just made, apparently, we don't want to get into

9      that.  And if so --

10           THE COURT:  No.  You can.

11           MR. ANDERSEN:  -- I'll just skip over it.

12           THE COURT:  It's your time.  I'm just saying that I

13     think I have spoken to it.  The Idaho Supreme Court has at least

14     looked at the issue to some extent, and I have some other more

15     serious concerns that the plaintiffs need to address.  But if

16     that's a concern for the defense, then let's have at it.

17           MR. ANDERSEN:  I think, then, let me spend my time on

18     the questions the court has raised.  And then if I have a few

19     moments at the end, I'll put it at the end, because it appears

20     to be less of a matter of importance to the court.

21           It is a matter of great importance to us because we do

22     think that 5-219 applies, and I can explain, although it's

23     already been briefed.  But I don't think we have really actually

24     argued the issue of 5-219's application.  It's formed in the

25     context of what the Idaho Supreme Court ruled on certification,

53

1      and I don't think that precise question was before the court.

2            THE COURT:  Okay.

3            MR. ANDERSEN:  All right.  So let's talk about the

4      issues that were -- the court raised and how those apply here.

5            And I would like to do so by limiting my comments to Doe II

6      rather than the universe of Doe I, II, and V, and so on.  So

7      I'll just talk about that one case because there are specific

8      parts of that case that are not unique to him necessarily, but

9      they are slightly different than they are as to Doe V.

10           THE COURT:  Doe I, II, and V were all plaintiffs in

11     the 2007 cases; correct?

12           MR. ANDERSEN:  That's correct, Your Honor.  That's

13     correct.

14           So for purposes of what I'm going to say now, let's just

15     assume that 5-218 applies, the fraud statute.  And because their

16     only theory is one of constructive fraud, I want to show how the

17     facts demonstrate that the time still bars their claim.

18           And I think that it's important to point out that statute

19     of limitations is a threshold issue, obviously.  We are kind of

20     far into the proceedings to be talking about it, but that's the

21     way the motions have come out, the discovery has proceeded, many

22     depositions and so on.  It doesn't mean that the threshold issue

23     should not be paramount in terms of deciding whether or not

24     these cases can even go forward at all.

25           I would like to be able to say I can solve everybody's

54

1      problems because it turns out these cases are time-barred

2      anyway.  And maybe that's persuasive in and of itself but

3      probably not.

4            But the analysis I think that falls behind the application

5      of 5-218 is persuasive because 5-218 has a trigger date.  As

6      everyone knows, 5-219 -- discovery, I should say, provision; and

7      5-219 does not.

8            In this jurisdiction, 5-219 nor 5-218, statutes of

9      limitations generally are very strictly construed.  I mean,

10     there are many, many cases -- and for people who do substantial

11     plaintiffs' work, you are often met with the problem of a claim

12     that has accrued by application of the some-damage rule, and

13     it's objectively ascertainable standard which applies.

14           Many times meritorious claims are time-barred, sometimes

15     even when the plaintiff does not know that he or she has been

16     damaged, because it's objectively ascertainable in another way.

17           So Idaho has very strict statute of limitations statutes,

18     and it has very strict statute of limitations jurisprudence.  In

19     the case of 5-218, the court had been very clear -- the Idaho

20     Supreme Court, that is, has been very clear that you cannot have

21     forever to assert your constructive fraud or your fraud claim

22     because it will be triggered at the moment that you can discover

23     or should have discovered the facts constituting the fraud.

24           And that the big deal in these cases has been the discovery

25     of the IV files and the use of the IV files as they have been

55

1      referenced here in these arguments and in these briefing, the

2      briefing that's before us.

3            The IV files are very important because they contain

4      certain information.  And if I could, I will just put up

5      the -- I'll put up the 2007 complaint, which the court can see

6      here was filed on July 27th of 2007.

7            And if I can flip over to some of the information that's

8      contained within this 2007 complaint, it references specifically

9      James Schmidt.  It referenced specifically, as far as the LDS

10     Church is concerned, that Schmidt had a close relationship with

11     Sanderson, a bishop; that Morgan had discovered that Schmidt had

12     engaged in wrongful conduct and reported it to Sanderson; and

13     that there were other instances where members of the -- or

14     officials of the LDS Church -- in particular, Stake President

15     Hess -- said that he had received calls about Schmidt himself

16     making homosexual advances; and that the LDS Church had asked

17     Schmidt to cease scouting activities in the Nampa stake.

18           And so these facts were known to Doe II in 2007, and the

19     reason that we know he was -- it was known to him is because he

20     alleged it.

21           So there simply is no way for Doe II in this case to say

22     anything other than, "I knew that other scouts were abused

23     before I was abused," because the Morgan abuse happened in '79

24     and '80, and the Doe II abuse happened in 1982.

25           So he already alleged that scouting was unsafe, and he knew

56

1   that scouting was unsafe for him in 1982 as he alleged it in
2   2007.
3       He alleged in 2007 that notice to the LDS Church had
4   already occurred, even though knowledge is not important. He
5   was saying -- for constructive fraud, he was saying: And the
6   LDS Church knew this before I was ever abused.
7       And he alleged in the complaint in particular that a
8   particular predator, Jim Schmidt, was the individual that abused
9   him and had also abused an earlier boy, he claims.
10      So he knew that any statements in 19 -- in 2007, he knew
11  that any statements or omissions by the Church about the safety
12  of the scouting program were false. Those are his allegations.
13  And we --
14          THE COURT: Mr. Andersen --
15          MR. ANDERSEN: Please.
16          THE COURT: -- let me ask you -- excuse me. This has
17  been kind of banging around in my mind trying to sort this out.
18  And in part, it has to do with whether or not the plaintiffs
19  should have known at the time they were molested. I'm trying to
20  draw a distinction between recognizing that there is a
21  scoutmaster who is a pedophile and knowing that generically
22  there is a problem in scouting --
23          MR. ANDERSEN: Yes.
24          THE COURT: -- with pedophiles.
25      I guess my thought is that a 13- or 14-year-old boy may

57

1   think: Okay, this is a one-off. This is just one bad apple.
2   So the representation that you can trust scoutmasters and
3   scouting as wholesome and safe isn't false because just of one
4   incident.
5       And maybe you expand it to not just one incident involving
6   one perpetrator, but that perpetrator is just the one bad apple.
7   And it's when you expand it and when you can show that there
8   were statements made scouting generally is safe and that
9   scoutmasters generally should be trusted, that that's -- isn't
10  that the statement that needs to be false and for which the
11  plaintiff has to have kind of a notice before the statute of
12  limitations accrues?
13          MR. ANDERSEN: No, Your Honor. I don't believe so.
14      And the reason that I say that is because I'm going to
15  adopt my own nomenclature here, and I'm going to call
16  something -- I'm going to make up a term here and call it "false
17  plus" or "false extra," just like "parishioner plus."
18      If at the time in 2007 -- which is the good, solid date we
19  can rely upon because we have admissions of what one knew in
20  2007 -- if those facts were known to be false by Doe II in 2007
21  as to him -- and that's why I'm limiting it to Doe II -- then he
22  knew that representations about scouting being false -- about
23  scouting being safe were false as to him. And he is the only
24  one we care about.
25      What the court is saying is: Well, but there was more to

58

1   learn. There was a wider-spread pattern of abuse of other boys
2   at other times. The fact of that -- the fact that that was
3   discovered in the 2013 lawsuit in the IV files that were
4   discovered prior to that and formed the basis for the 2013
5   lawsuit, is completely immaterial as to what the court has to
6   decide and whether the statute of limitations ran under 5-218
7   because the facts constituting the fraud were known to the
8   aggrieved party.
9           THE COURT: Okay.
10          MR. ANDERSEN: And so falsity-plus or falsity-extra or
11  super-duper false does not get you anywhere legally in terms of
12  application of the statute.
13      Now, we contest the facts that there were any false
14  statements made, but certainly the allegation is clear in the
15  2007 lawsuit that those allegations were false and Doe II knew
16  it.
17      Now, it isn't just that, Your Honor. It's also that when
18  Doe II was asked questions about this very subject in his
19  deposition -- and I'll just go to that right now -- this is what
20  he testified. And this also goes to answer the court's
21  question. So this is the deposition of Doe II. It was
22  taken -- I beg your pardon for the date, Your Honor -- June 20,
23  2017, on page 222.
24      The question I put to the plaintiff in that case was:
25      "All right. So by 2007, you were aware that any

59

1   representations that scouting was safe and that scout leaders
2   were trustworthy, and so on -- by 2007, you knew that was not
3   correct, didn't you?"
4       "By 2007, yeah. I would say much earlier, in fact, I
5   learned that scouting wasn't safe."
6       Question: "And similarly by at least 2007" -- this is the
7   operative testimony we would like the court to focus on right
8   here -- "you were aware that any representations that the LDS
9   Church had made that scouting was safe and that scoutmasters
10  were trustworthy was also false?"
11      He questioned: "By which date?"
12      I said: "By 2007 at least, if not earlier."
13      And his testimony was: "Yes."
14      And those were just immutable facts. I mean, it wasn't
15  taking great testimony of this witness or anything. It was
16  simply confirming with him what his complaint had already said,
17  which was: I knew in 2007 that representations that the LDS
18  Church had made about scouting being safe were false, and I knew
19  that in 2007.
20      If he knows those facts in 2007, he can't wait six years to
21  bring the lawsuit alleging that same cause of action again based
22  upon the fact that there were false representations that
23  were -- that were not true with respect to his trustworthiness
24  and safety.
25      So because in constructive fraud the court has held that

60

1  knowledge of the LDS Church is not an element, what the LDS
2  Church knew is not germane for purposes of the court's analysis.
3  In this context, that blocks the plaintiffs from going forward
4  with the case, because Doe II's entire argument to avoid being
5  time-barred is that he did not know -- and this goes to the
6  court's point -- specific facts or, as he states it elsewhere in
7  his brief, didn't know the full facts or didn't know -- I only
8  had a surface understanding.
9      And what he is saying there is that:  Well, I wasn't aware
10  that other boys had been abused.  I wasn't aware that there was
11  a pattern of abuse.
12      And none of that matters because -- with respect to his
13  personal claim for constructive fraud because there were
14  allegations and representations of safety.  But if he knew
15  those were false in 2007, which he says in his deposition he
16  did, then he is time-barred three years at the latest, three
17  years from 2007, as he admitted in his deposition.
18      Now, what we're hearing by way of a response to this is:
19  Oh, gosh.  I mean, I just didn't know everything.  I didn't know
20  all the facts.  I didn't know about Schmidt abusing other
21  people, and I didn't know other scoutmasters had these same
22  problems.
23      That's all fine as long as -- even if the court is going to
24  go with some kind of an analysis that, well, they are entitled
25  to have at least found out all of those facts, the only other

61

1  thing I want to say in my time here, Your Honor, is that there
2  is no evidence in the record of any diligence to determine those
3  other wider instances of abuse between 2007 and 2013.
4      So it isn't a fact question for court to kick to the jury
5  because there has to be something in the record that says:  We
6  tried to find out.  We looked.  We weren't able to tell.
7      The IV files had been in their possession before -- that
8  is, the plaintiffs' counsel's possession -- before 2007.  They
9  simply let it go until a self-initiated revival on this theory
10  of constructive fraud many years later and a phone call to
11  Doe II saying:  Don't you want to have another lawsuit because
12  we have a different theory we can proceed on?  And he obviously
13  said yes.
14      But what was discovered later about more widespread is not
15  new.  Because as I have stated, a representation cannot be more
16  false than just being false.  So if a representation is admitted
17  as false and known to be false in 2007, while the plaintiff, a
18  sophisticated adult which he is, and while being represented by
19  the same counsel in the exact same type of case -- not some
20  other type of dispute -- all of the elements in 2007 were
21  present to bring the constructive fraud claim that wasn't
22  brought until six years later.
23      THE COURT:  Mr. Andersen, it looks like your time is
24  up.  I don't know if you were --
25      MR. ANDERSEN:  Thank you, Your Honor.  I wanted to

62

1  emphasize those points, and I appreciate the time.
2      THE COURT:  Okay.  Thank you.
3  Mr. Thomas.
4      MR. THOMAS:  Ms. Danahy, could I have -- give me 12
5  minutes, please.  Thank you.
6      Your Honor, with one exception, I agree with what
7  Mr. Andersen has said and adopted; it applies equally to Does I,
8  II, and V.  The one exception is that he said there is no
9  discovery provision in 5-219.  There is, and I will be arguing
10  it very soon.
11      But let me start on something broader than that.  This is
12  the first occasion since August 27, 2015, and the issuance of
13  opinion No. 84 by the Idaho Supreme Court -- this is the first
14  time that we have a chance to argue the characterization
15  question to this court.
16      And in fairness, the whole Rule 12.1 certification process
17  I have never seen more strangely handled in my life.  This court
18  sent two questions to the Idaho Supreme Court, and the Supreme
19  Court tore them apart and didn't answer the guts of the question
20  put.
21      And this court was basically told:  Sorry.  We are not
22  going to characterize this claim for you.  We will assume
23  arguendo for the purposes of the rest of this opinion.  I'll
24  show that to Your Honor in a moment.  But they finally said on
25  page 3 or 4 that it's this court's job to characterize the

63

1  claim.  That is for the federal district court to decide; and
2  thus, it will be assumed, without deciding, that the appellant's
3  underlying action asserted is a constructive fraud claim.
4      And, Your Honor, I urge you as earnestly as any human being
5  can to take a fresh look at this issue.  Because whether the
6  court was wrong before or not, this is a major new development
7  that warrants special attention from our highest court.  This
8  is, of course, a court, federal district court, in diversity.
9  And *Erie* says the court has to follow the law of the Idaho
10  court.
11      Now, I also note that the court reinvigorates *Trimming v.*
12  *Howard* and the whole issue of substance over form.  And I would
13  point out in case I missed -- but thank you, Mr. Woodard --
14  *McCormick v. Caldwell*, a Court of Appeals case from Idaho 2006
15  -- excuse me -- 2011, expressly says that the plaintiffs' label
16  or the plaintiffs' characterization does not count.  There is no
17  presumption of validity; it's just plain immaterial.
18      So we start with a clean slate, and we have to look at the
19  guts of the case, the substance of the case.
20      In fact, let me show you my other -- my other -- Footnote
21  3, page 3 of Opinion 84, gives a lot of guidance from the Idaho
22  Supreme Court to this court helping it to characterize the
23  claim.
24      In essence, what it's saying is that the source of the
25  damages, the source of the harm is the key.  And in this case,

64

1 that's the abuse. There is no question, if you look at the
2 interrogatory answers, the deposition testimony, these folks are
3 suing for emotional distress from sex abuse in the mid 1970s.
4 That's what the case is about.
5 And I notice in terms of constructive fraud analysis that
6 the left side, which is to say the side of the scales favoring
7 plaintiff and their chosen label or form of constructive fraud,
8 is very light, indeed. Because there are missing elements
9 necessary from all the classic Idaho constructive fraud cases.
10 Missing is the commercial transaction --
11 THE COURT: Counsel, let me ask.
12 MR. THOMAS: Yes, sir.
13 THE COURT: Why can't a plaintiff characterize their
14 claim in the way they want, but understanding that when they do
15 they subject themselves to certain limitations? In fact, that's
16 kind of what you identified about what is missing. If they
17 characterize a claim as constructive fraud, then they have to
18 show a relationship of confidence and trust; they have to show
19 that a representation was made; they have to show that the
20 representation when made was false; that there was reliance, it
21 was justifiable.
22 None of that comes up in any negligence or typical personal
23 injury claim. And you can argue, and you have argued, that
24 another consequence is that they don't get economic -- they only
25 get economic damages.

65

1 Now, why -- I mean, I understand that you do need to look
2 at the substance of the claim, but if the claim is really driven
3 by a misrepresentation as opposed to the actual underlying acts,
4 why can't the plaintiff pursue the claim in that fashion?
5 MR. THOMAS: If it walks like a duck, waddles and
6 quacks, it's a duck. Your Honor, if what you said is true, then
7 the plaintiffs' bar can do anything they want. They can pull
8 out their word and slap it onto a set of facts and do end runs
9 around such things as the statute of limitations. And --
10 THE COURT: Well, but in fairness, they can't say:
11 Okay. This is constructive fraud. And the elements of
12 constructive fraud are a duty, a breach of that duty, and
13 damages.
14 In other words, they can't take a claim that they are
15 describing by title in one fashion but by elements in something
16 else. But as long as they stay within the elements of the claim
17 as they have described it and characterized it, why -- is there
18 a case that says that that practice is, in fact, something that
19 we don't do and we, in fact --
20 MR. THOMAS: Oh, yes, sir. Oh, yes, sir.
21 THE COURT: Give me that case.
22 MR. THOMAS: Absolutely. *Trimming vs. Howard*
23 reaffirmed in 2015 by the Idaho Supreme Court. In that case, a
24 doctor had injected a hypodermic needle in the spine and
25 allegedly broke it off but hid that for 10 years. The plaintiff

66

1 sued trying to allege fraud to get around a two-year statute.
2 The Idaho court said: Sorry. This is professional malpractice.
3 You get two years.
4 The better case, the one I like, is the one Mr. Woodard
5 found, *McCormick*. In that case, it had to do with some worker's
6 comp disability benefits. And the plaintiff sued his law firm
7 under a theory asserting mishandling of the checks, which were
8 stolen according to the plaintiff. There was a signature -- he
9 cashed them, but he says somebody had forged his signature.
10 And so at trial, the defendant said statute of limitations,
11 5-219, professional malpractice -- he said, well, that's the
12 right statute, but there is a discovery exception that applies.
13 District court said no; summary judgment was granted.
14 On appeal, plaintiff argues 218. This was a fraud. It
15 should have been fraud. Defendant says 219. Supreme
16 Court -- excuse me -- Court of Appeals says: You're both wrong.
17 And they went to article 3 of the UCC to find the correct
18 statute. Because you know what they said? This is a claim for
19 conversion. The substance of this claim is conversion. The
20 plaintiffs' label does not matter.
21 And it can't matter, Judge. Think about it. Think about
22 it. If the plaintiffs come in here and say we'll call it
23 whatever we want so I can go see a jury, that's the essence of
24 *Trimming*. Since 1932, the Idaho Supreme Court has said you
25 can't do that. You've got the face the reality, the meat of the

67

1 case, the gravamen, the substance.
2 That's why Your Honor, with due respect, is mistaken. In
3 this case, the Idaho Supreme Court said you have to characterize
4 it. You haven't done that, Your Honor. You have simply been
5 accepting on face value the allegation of what the plaintiffs
6 chose to label it. You don't have to do that. Indeed, I would
7 have submit you have a right and a duty to characterize this
8 case. You must.
9 So let's take a look at my scales briefly. I'm almost out
10 of time.
11 My point is that all of the elements for commercial -- for
12 fraud are missing in a classic sense. All of the pecuniary
13 damages, economic interests, all that stuff are not here. What
14 we do have --
15 THE COURT: But if they are missing, they should be
16 dismissed because they are missing.
17 MR. THOMAS: I agree with that, too. There are lots
18 of good reasons to dismiss the case, Your Honor, and that would
19 be one of them. Seriously, Ms. Muller will get into that on her
20 section on damages here pretty quick.
21 But my point is that if you look at the type of the harm,
22 the personal injury, the source is clearly the abuse. Every
23 single plaintiff has said, you know, that's what did it.
24 And think about it. Why not? Why wouldn't that unnatural,
25 immoral, criminal act be the source of harm, psychological harm?

68

1   Of course, it would.  And they knew any alleged representation
2   of falsity was not true when that happened.
3       But let me shift gears for just a moment.  And this is
4   where Mr. Andersen and I disagree.  I think it's critically
5   important to use a plain-meaning concept.  And as you sit as an
6   *Erie* judge applying the state law.  For substantive *Erie*
7   purposes, that includes the statute of limitations.
8       And here we have a statute in 5-219 that has all of the
9   critical concepts and words: personal injury, neglect or other
10  wrongful act; indeed, it even has a discovery exception built
11  right into it.
12      And so as my friend, Bob Bakes, used to say:  When you are
13  looking for the intent of the legislature, let's look at the
14  entire chapter; or if you're looking at a contract and the
15  intent of the draftsman, look at the entire document.  Harmonize
16  it.
17      My point is:  There is no good reason, as a neutral, solid
18  jurist, to go shopping in 5-218, to go next door.  Let's stick
19  with 5-219.  It has all the magic words that happen to fit this
20  case.
21      We're being sued for a failure to warn or to protect from
22  these rogue scoutmasters who then took advantage of a personal
23  relationship and abused the kids.  That's what the truth.  It's
24  the truth.
25      And I submit to you, Your Honor, that 5-219 does fit.

69

1   Properly characterized, this is labeled constructive fraud, but
2   the label is immaterial.  It's a personal injury case based upon
3   neglect.  That's the truth, and the case should be dismissed.
4       Thank you.
5       THE COURT:  Mr. Chasan.
6       MR. CHASAN:  Thank you, Your Honor.  Good afternoon,
7   Judge.
8       So I want to talk about *Kawai Farms*.  And everybody here
9   knows the case law.  I just feel like I'm at the bottom of the
10  law school class again, so I'm going to analyze it my way.
11     And so we have got this case where Kawai Farms buys some
12  property from Longstreet, and they find out that the property
13  isn't worth what they paid for it.  And they allege -- they
14  filed a lawsuit after they paid for it or while they are paying
15  for it, and they say it's falsely represented the value of the
16  property they bought, that the defendant falsely represented the
17  value and falsely represented the condition of the property.
18     And then they settle that; they resolve it.  That's -- that
19  lawsuit is stipulated dismissed.  And then six months later,
20  they file again.  And this time, it's because of an inadequate
21  water supply.
22     And Deborah Bail, who we all know and have appeared in
23  front of a million times, who is a district court judge,
24  reasoned that that was they don't -- that the plaintiffs Kawai
25  Farms, do not have a cause of action.

70

1      And let me read:  "If the first case had been tried, proof
2   of the value of the lots would have been essential to
3   plaintiffs' claim for fraud."  Proof of the value of the lots.
4      When a developable property has adequate water and
5   potential for decent sewage disposal is a key factor in the
6   value of the property.  Res judicata bars relitigation of the
7   same claim even if there is new evidence to support it.  Even if
8   there is new evidence to support it.
9      The claim that false representations made about the
10  characteristics of the property and that, because of the
11  allegedly false claims, the property has a lower value or, as
12  plaintiff contends, no value is the same claim.  That's what she
13  thought.
14     And, in fact, the president of Kawai Farms could have gone
15  down to the building that houses the Department of Water
16  Resources and looked in the public record to check on the
17  adequate water supply and did not.  But, nevertheless, the
18  Supreme Court ruled that there was a question of material fact
19  as to whether Kawai Farms should have reasonably discovered the
20  lack of abundant available water in the relatively short time it
21  was in possession under the provisions of the 1987 agreement.
22     So if you discover under Idaho law additional fraud, you
23  have created a question of fact as to whether you have
24  diligently pursued discovery of the facts constituting the
25  fraud.

71

1      THE COURT:  All right.  Mr. Chasan, under that view,
2   if you can find one more example of information -- one more
3   example of a -- someone who perpetrated abuse of a child in the
4   1980s when the representations were made, then the statute of
5   limitations -- it's an issue of fact, and you're free to go
6   ahead and argue that.  If that is the case, the statute of
7   limitations disappears from the face of the earth because that
8   will always be the case.  It has to mean something.
9      And where, in 2007, at least as to Does I, II, and V, you
10  specifically allege the core facts which give rise to your
11  constructive fraud claim filed in 2013, I'm having a real hard
12  time seeing how you didn't at least have notice that would have
13  required inquiry into that claim.
14     MR. CHASAN:  Okay.  I agree.  But the question of fact
15  becomes -- and there are many questions of facts here, right?
16  But that creates the question of fact under *Nancy Lee Mines* as
17  to whether there was a diligent pursuit for discovery of the
18  facts constituting the fraud.
19     THE COURT:  Well, it's even more.  I mean, you have
20  laid the facts out.  There is one specific paragraph that lays
21  out virtually all the facts and certainly the core facts --
22     MR. CHASAN:  No, no.  That's an allegation.  That's
23  not evidence, and that's not a fact.  And -- and -- no, but
24  wait --
25     THE COURT:  Well, under Rule 11, presumably you don't

72

1  file a claim unless you have done investigation and there is a
2  factual predicate for those allegations.
3        MR. CHASAN: There was a factual predicate, and it was
4  Schmidt's IV file.
5        THE COURT: Well, the allegations --
6        MR. CHASAN: All of those --
7        THE COURT: The allegations are much broader than
8  Schmidt's IV file. It's something to the effect that pedophiles
9  had intruded their way into the scouting organization -- and not
10 just Schmidt but on a much broader, perhaps national level. And
11 that's where my concern is.
12       And that's why it's hard for me to see how you get around
13 that when you have a specific allegation in the 2007 complaint.
14       MR. CHASAN: Well, you get around it because of *Nancy*
15 *Lee Mines* and *Kawai Farms* and the facts of the case. And the
16 facts of the case are that it was impossible for these
17 plaintiffs to have discovered what it took us between four and
18 five years of litigation, almost 100 depositions, literally
19 thousands and thousands of pages of documents in discovery to
20 establish not just the fact that there were these IV files,
21 these perversion files; what we have established is a case where
22 they had specific knowledge, both defendants, of the local
23 pedophiles, 10 local pedophiles who had -- specific pedophiles
24 who abused these plaintiffs as well as other boys before them.
25 That was never discoverable.

73

1        THE COURT: Well, wait. Mr. Chasan, you don't need to
2  discover that under constructive fraud. All you need to
3  discover is that the statements, when made, about the safe
4  nature of scouting and how you can rely and trust upon a
5  scoutmaster were false when made, not that the Boy Scouts knew
6  that or the LDS Church knew that, but those statements were just
7  false. That's the nature of constructive fraud.
8        So you didn't need to establish what the Boy Scouts knew or
9  what the Church knew. You need to establish that they were
10 false. And in 2007, you alleged, under a Rule 11 obligation of
11 at least some basis for making the allegation, that the
12 defendants promoted -- and this is I think just the Boy
13 Scouts -- that it's relevant to the question of what was the
14 fact, not what the Church or the Boy Scouts knew -- the
15 defendants promoted BSA services under the representation that
16 they provide a safe, wholesome, and protected environment for
17 children, all the while knowing that Defendant BSA attracted and
18 had been infiltrated by child predators like Schmidt.
19       That's where I'm having a hard time. I mean, that is a
20 statement of your case embodied in one paragraph in a complaint
21 filed in 2007. And I'm having a real hard time seeing how that
22 does not constitute a -- just a mountain that can't be overcome
23 because it lays out the fact that you knew that the statements
24 made were false because the BSA had been infiltrated by child
25 predators like Schmidt.

74

1        And that's where I'm struggling. So I -- getting past that
2  at least as to those -- well, only as to Does I, II and V,
3  because no one else was involved in that 2007 litigation.
4        MR. CHASAN: The complaint was based on the Schmidt IV
5  file. And the Schmidt IV file does not establish as a factual
6  predicate the allegations made. And it took us all this time to
7  establish the extent of the falsehood.
8        And I can't get over the fact that in *Kawai Farms,* the
9  value of the property was in contention in the first lawsuit and
10 it was in contention in the second lawsuit. And the only thing
11 that allowed the second lawsuit was the fact that there was not
12 an adequate water supply.
13       So there was fraud in the first action that affected --
14 concerning the value of the property, and further fraud was
15 discovered after the first lawsuit that also affected the value
16 of the property, and the case was allowed to proceed.
17       THE COURT: But there isn't further fraud; it's the
18 same fraud, isn't it? It's the allegation made at the time of a
19 child who was induced to participate in scouting that scouting
20 is safe. That is the fraud. It was the fraud in -- so there is
21 no new fraud. It's the same fraud that was apparently known
22 based upon that paragraph I read from the complaint in 2007.
23       MR. CHASAN: I know. Yeah, I know the paragraph,
24 yeah.
25       But *Kawai Farms*, the first lawsuit, concerned -- sorry.

75

1  The first lawsuit confirmed that they falsely represented the
2  value of the property and that they falsely represented the
3  condition of the property. And what is an inadequate water
4  supply, as Judge Bail reasoned, other than something that
5  affects the value and the condition of the property?
6        I mean, I don't see the distinction between our situation
7  here where the allegations in the 2007 complaint are based
8  solely on the Schmidt file and then in 2013, we have a massive
9  amount of additional facts that are material and that show that
10 there were -- they said it was safe and it wasn't.
11       And it's not just -- it's not just that it was on a
12 national basis; it was on a local basis with other specific
13 pedophiles.
14       So inadequate water supply affects the value and condition
15 of the property. Schmidt is a bad guy and has infiltrated the
16 Scouts. And we established that there are many more bad guys
17 and many more victims. So I don't understand the qualitative
18 difference between adequate water supply and value of the
19 property and Schmidt versus many more pedophiles and many more
20 victims.
21       THE COURT: If you have to know the full extent of
22 falsehood and all of the details that you might elicit in
23 discovery before you have knowledge that will cause your claim
24 to accrue, then, again, doesn't the statute of limitations just
25 disappear into the ether, and it's no longer even a relevant

76

1  consideration? Because under that standard, you would never
2  have a statute of limitations until the end of the case when you
3  had actually completed all your discovery and you now have all
4  the details. And that can't be the law, can it?
5      MR. CHASAN: Well, no. But there is other similar
6  case law in other areas of law when it -- in other areas when it
7  concerns fraud.
8      I agree, it's a liberalized test. It is a liberal test.
9  It is a liberal test, but we have the law of Idaho in *Kawai*
10 *Farms*, and so I think we have created a question for the jury:
11 Did they know everything they needed to know at the time in 2007
12 or not?
13     You know, there is one other thing, too, that I want to
14 add. In the 2007 lawsuit, there wasn't really any discovery,
15 but we did ask for information about other child abusers in
16 scouting besides Schmidt, and we were never given that
17 information.
18     The Boy Scouts offered to give us the Schmidt file if we
19 kept it confidential. Now, if they had given us that
20 information, we would be dead, dead in the water. But they
21 never did.
22     THE COURT: In other words, no discovery? As I
23 recall --
24     MR. CHASAN: Well, we propounded discovery, but we
25 didn't get any back other than they offered to provide us

77

1  Schmidt's file.
2      And here is another conundrum: Every boy knows that
3  scouting isn't safe at the time they are abused. But as you and
4  the Idaho Supreme Court have ruled, that's not enough. That's a
5  mere awareness; it's a suspicion. And that's what the Schmidt IV
6  file created, a suspicion, an awareness that something was wrong.
7  And we have gone out and proved now everything that was wrong,
8  everything that was unsafe.
9      And as you've pointed out in your prior rulings, our case
10 is twofold. It's a complaint that a national organization knew
11 of a national fraud that they were perpetrating. And then there
12 is the local incidence of lack of safety and dangerousness when
13 the local counsel's and the local wards are aware of the
14 individual perpetrators time and again and, therefore, were
15 aware of the falsity of their statements.
16     And so the fraud was committed in two separate ways, on a
17 national level and on a local level. And that was not apparent
18 in 2007, either.
19     I mean, besides Schmidt, there was a guy named Douglas
20 Bowen. There was a guy named Larren Arnold, both LDS, both
21 served in LDS troops. And there was Lawrence Libey up in
22 Lewiston who abused our clients. And they were all
23 contemporaneous in time.
24     And so what's the difference between an inadequate water
25 supply and value of the property and Jim Schmidt versus Lawrence

78

1  Libey, Douglas Bowen, and Larren Arnold? I think it's
2  completely analogous. I think it's exactly our case.
3      THE COURT: Anything else?
4      MR. WALTON: May I make a comment, Your Honor?
5      THE COURT: I usually don't allow tag-team argument.
6      MR. CHASAN: We have 11 minutes.
7  I thought I said that, but --
8      MR. WALTON: You did.
9      MR. CHASAN: I mean, well, what he said and what I
10 have said before is that if it's an awareness of the falsehood,
11 it's a discovery of the danger, of that material fact. And
12 every boy knows that at the time of the abuse. And this court
13 and the Idaho Supreme Court have both ruled that that's not
14 sufficient, that that's a mere awareness. It's a mere suspicion,
15 and it is not discovery of the facts that constitute the fraud.
16     Just as a discovery of Schmidt, solely of Schmidt, is not a
17 discovery of the facts that constitute a national -- a national
18 deception based on thousands of pedophiles.
19     THE COURT: All right. I made the comment -- I think
20 it was with Mr. Andersen -- that I struggle -- and this goes
21 back to I think the North Carolina and Utah cases involving
22 Catholic Church and Catholic priests -- that suggesting that
23 simply being molested is enough to put you on notice of
24 allegations of fraud, the statements made that you can trust
25 your priest, trust this particular priest, is false.

79

1      But what I suggested was that a scout may feel or conclude
2  that the fact that they were molested may be a one-off, and that
3  this may be the only perpetrator; and therefore, the statement
4  made by the scouts and the Church, or at least allegedly made by
5  them, is still true because I don't know of anybody else doing
6  this.
7      But the challenge here is that the statement made in 2007
8  that pedophiles had infiltrated the Boy Scouts of America
9  organization, that then goes not to knowledge based upon being
10 molested; it's knowledge based upon an understanding that there
11 was, in fact, a widespread problem of pedophiles in the Boy
12 Scouts, you know, at the time they were making the
13 representations that scouting is safe.
14     MR. CHASAN: Okay. But other than that mere
15 allegation, if there is no meat on the bone, there is no -- I
16 agree there was that allegation. And as I reread the complaint
17 several times in preparation, I mean, that jumped out at me,
18 too.
19     But the difference is -- and we have briefed this. The
20 difference in the -- in how we particularly alleged the
21 complaint in 2013 to detail allege the constructive fraud,
22 how -- the facts of the fraud and the details of all of the
23 elements, it's night and day between the 2013 complaint and the
24 2007 complaint. The nature and specificity of the allegations
25 are night and day.

**United States Courts, District of Idaho**

80

```
1        I don't have anything else.
2             THE COURT:  All right.
3             MR. CHASAN:  I don't need to use the time.
4             THE COURT:  That's fine.  Thank you.
5        Nobody got to the question of the attorneys' knowledge
6   being attributed to -- that's something I have to wrestle with.
7   I don't know.  Obviously, the decision is not going to be based
8   only on oral argument.  There is a lot we haven't covered that's
9   very important in the briefing.  I think that's fine, but I have
10  already highlighted that I have a concern, almost as a policy
11  matter, about attributing the knowledge of an attorney obtained
12  in one case to that attorney's other clients.  I just --
13  it's --
14            MR. CHASAN:  I'll address that.
15            THE COURT:  If you want to, you can, but it's not been
16  addressed by the other side.
17            MR. CHASAN:  Well, all I was going to offer is -- I
18  thought about it, too.  And the thing that occurred to me was it
19  makes every attorney a witness.  And if every attorney is a
20  witness, what happens to confidentiality?  And it becomes -- and
21  in addition, it becomes an impossible burden for the attorney to
22  know -- to be -- to have encyclopedic knowledge for the rest of
23  his career or her career and make sure that they have clearly
24  forecasted which clients that knowledge applies to and which it
25  doesn't.  And it's an impossible burden.  It is.
```

81

```
1   And you were in private practice.  You know.  I mean, you
2   gain a depth of knowledge, but you don't retain the specificity
3   of it.  And it becomes an impossible burden, and every lawyer
4   becomes a witness, and there is no confidentiality.
5             THE COURT:  Okay.  All right.  Thank you.
6             MR. CHASAN:  Then they will want to take our depos,
7   and I don't want my depo taken.
8             THE COURT:  Mr. Thomas.
9        I think, Mr. Anderson, you actually ran out the clock.
10            MR. THOMAS:  You broke the clock.  So I get 4:58?
11  Wait.
12            MR. CHASAN:  It's a commercial transaction.
13            MR. THOMAS:  No. I think --
14  (Laughter.)
15            MR. THOMAS:  Your Honor, with due respect, it's Friday
16  afternoon, my colleague Tyler Anderson will address the *Kawai*
17  *Farms* and the entire issue of res judicata.  So far, we have
18  been talking about the 2007 complaint in terms of accrual
19  notice, and Mr. Anderson will get into that, so I won't here at
20  this moment.
21        In terms of the attorney issue, that's another issue for
22  another day, and I don't have 2-1/2 minutes to cover something
23  that big.  I think we have done it in brief pretty well.  I
24  think the black-letter law is clear, though, the facts --
25  communicating facts to an attorney do not create a privilege
```

82

```
1   problem and vice versa.  In fact, that's the unique aspect of
2   this case, as stated in several of the plaintiffs' brief -- not
3   just in the text of the brief but in the header of certain
4   sections -- that the statute accrued when the attorneys told
5   them stuff in 2013 about the IV files.  And that's an issue
6   which we do have teed up for discovery.  As the court knows,
7   there was a stipulation filed -- I think it's CR304 -- in the
8   last week, June 4th, putting off this issue about Mr. Kosnoff
9   and Mr. Pfau, anticipating after -- we may have to come back and
10  redo some of this stuff when we get the testimony from the
11  attorneys, but that's another matter for the moment I'll defer
12  to my colleague Mr. Tyler Anderson.
13        I do want to say on the Morgan case, the 2007 case:  Yes,
14  discovery was promulgated against my client.  Yes, they did
15  respond.  Yes, they were asked expressly for the IV files.
16  That's at CR300, Exhibit 70, I think it was RFP 25 and 26.
17        In terms of the statute of limitations questions,
18  Your Honor put it better than I can.  It's the standard for
19  knowledge sufficient to accrue a fraud cause of action is what
20  does a plaintiff or his attorney know at the end of the case.
21  When I rest my case, there will never be another statute of
22  limitations.
23        *Bonner v. Roman Catholic Diocese* cannot be understated.  It
24  addresses the issue.  Some damage did occur for the purposes of
25  the accrual analysis on the statute of limitations.  That is the
```

83

```
1   law in this jurisdiction since 1996.
2        Finally, for lack of another place to put it, laches.
3   Article 1, Section 18 of the Idaho Constitution provides that we
4   are entitled to have justice administered without delay and
5   without prejudice.  Your Honor, 35 years is too long.  We are
6   prejudiced.  Our witnesses are all dead.
7        Thank you.
8             THE COURT:  All right.  Counsel, I was going to try to
9   go straight through, but I think we will take a five-minute
10  break and then come back.  Your head starts hurting after a
11  while, and walking around actually helps out a little bit in
12  that regard.
13        So -- all right.  Let's -- actually take just a moment,
14  though, to get my notes in order before we take that break.
15        Let's take a break.  We'll try to hold it to about five
16  minutes, just enough to time to use the restroom, if need be,
17  and go from there.  All right.  We'll be in recess.
18        (Recess at 3:23 p.m. until 3:36 p.m.)
19            THE COURT:  Counsel, I actually don't know that I have
20  a breakdown.  I know we're going to hear 10 minutes per side on
21  different arguments, I assume you know the order of how you're
22  going to proceed, and I'll let you just get started -- or
23  Ms. Danahy can help us out because I don't have that list here.
24            MR. WOODARD:  Your Honor, I understand it's damages
25  next.
```

84

1 THE COURT: All right. Thank you.

2 MS. VAUGHN: That's correct. My understanding as

3 well.

4 THE COURT: I know we are going to hear damages. In

5 fact, Ms. Danahy, why don't you give me the breakdown so I

6 can -- I know that res judicata and affirmative defenses were

7 still -- and I think one more issue.

8 LAW CLERK DANAHY: The res judicata and the recission

9 and settlement agreement are one since --

10 THE COURT: Let's start with damages.

11 MR. WOODARD: Okay. Your Honor, with damages, the

12 plaintiffs have contended that personal injury damages are

13 available in a constructive fraud case, and they have cited to

14 *McGhee*, and they have also cited to prior orders from this

15 court.

16 And as I understand it, this court, in its certification

17 order, ruled that although the Idaho Supreme Court has held that

18 nonpecuniary damages generally are not recoverable in fraud

19 actions -- and you cite the *Umphrey* case -- it has more

20 specifically held that a plaintiff who succeeded on a

21 constructive fraud claim could recover nonpecuniary damages.

22 And then the court cites to the *McGhee* case as well.

23 Thus, if I understand the court's basis for allowing the

24 plaintiffs to proceed on a fraud claim for pecuniary damages,

25 it's that this is a constructive fraud claim rather than an

85

1 actual fraud claim based on *McGhee*.

2 But there is nothing in the two elements that are missing

3 from a constructive fraud claim that would allow for personal

4 injury damages and not allow for them in a fraud claim, which to

5 me kind of begs the question: You know, why is *McGhee*

6 different? Why did *McGhee* --

7 THE COURT: Well, is the difference not so much what's

8 missing in a constructive fraud as to what is additionally

9 required, which is this relationship of trust and confidence?

10 And that doesn't sound like necessarily the kind of claim that

11 would be tied to only monetary -- pecuniary loss.

12 MR. WOODARD: Your Honor, the only time that -- the

13 courts -- *McGhee* didn't -- the *McGhee* court didn't distinguish

14 between constructive fraud or fraud. And when *McGhee* cited the

15 allowance of mental anguish damages, it didn't speak at all

16 about these damages are allowed because of the relationship of

17 confidence and trust.

18 What it did talk about, though, is fraud in the inducement

19 of marriage. And the key quote -- so the key quote there I have

20 highlighted -- and this is from *McGhee* -- and it says:

21 "The general rule of damages applicable in such a case

22 is damages in an action by a woman against a man for

23 fraud in inducing her to enter into a marriage are not

24 limited to pecuniary loss but cover change of single

25 status, humiliation, disgrace, mental anguish, and

86

1 deprivation of that conjugal society, comfort, and

2 attention to which one is entitled by reason of change

3 from single to marital status. Such damages are

4 naturally somewhat speculative depending on the

5 circumstances of a particular case, and their

6 computation is largely in the discretion of the jury."

7 And then what's important is the citations there that

8 *McGhee* cites to, and that Am. Jur. section that *McGhee* cites to

9 is under the marriage section, Your Honor. And then those cases

10 that are cited there, the *Leventhal* case, the *Beach* case, and

11 the *Kujek* case, what's interesting about them is they are all

12 actual fraud cases. They are not constructive fraud cases. But

13 they all involve fraud in the inducement of marriage.

14 So the distinguishing factor of *McGhee* is not that it's

15 constructive fraud; it's that there is this old exception to the

16 general rule for fraud in the inducement of marriage. And you

17 know, it may be an anachronism now. It's old, and some of those

18 cases that are cited in there are from the 1890s.

19 One of the cases, like the *Kujek* case, it's an interesting

20 case where this guy has a maidservant that he gets pregnant, and

21 he convinces an associate of his to marry her so that nobody

22 will find out what he did. And the associate marries her and

23 then finds out that, this guy didn't tell me that she was

24 pregnant.

25 THE COURT: Two thoughts, Mr. Woodard. Is this really

87

1 just a statement that damages need to flow from the nature of

2 the injury, and typically fraud is done in a commercial setting;

3 therefore, the damages that flow from that typically are

4 pecuniary? I guess that's question 1.

5 So, therefore, you can't take those cases that involve

6 commercial transactions and necessarily, from that, draw any

7 firm conclusions about what the damages would be in a

8 noncommercial setting.

9 And then, secondly, is there -- what is the reasoned basis

10 for why you would require -- require pecuniary damages before

11 you can assert a claim of constructive fraud given the nature of

12 the claim and it being tiered off from this relationship of

13 trust and confidence?

14 MR. WOODARD: Well, Your Honor, first I'll note that

15 the cases cited by *McGhee*, those three cases that are cited

16 there, they talk about marriage being a civil contract, and they

17 talk about it being a transaction. So I don't think that they

18 are making that distinction. And those are the cases that the

19 court is relying on there.

20 You know, Idaho Code -- we cite this in our brief that the

21 Idaho Code recognizes that marriage is a type of civil contract.

22 And so these are transactional cases.

23 But there has never been a case that I have seen in Idaho

24 where there has been an allowance of personal injury damages for

25 constructive fraud or regular fraud outside of the context of

88

1  fraud in the inducement of marriage.
2      And the Supreme Court has been -- you know, as you have
3  cited, has been very clear about that.  And I think when -- even
4  recently when the Supreme Court has said, you know, noneconomic
5  damages are not available for fraud generally, it's recognizing
6  that there is an exception for fraud in the inducement of
7  marriage.  I don't know if that answers the question.
8      THE COURT:  Thank you.
9      MR. WOODARD:  And if I understand, your second
10 question I think goes to, well, what about this -- isn't this
11 confidential -- this relationship of confidence and trust
12 somehow --
13     THE COURT:  Well, in the absence of an express holding
14 that says that in a noneconomic, noncommercial setting, that
15 you're still precluded from recovering anything but pecuniary
16 damages, and if we look then at what the law should be -- and
17 maybe we're not there.  I assume you're going to argue we are
18 not there, that the case law is clear on the point.  But it does
19 seem to me that we are in somewhat in uncharted territory.
20     What is the rationale, what is the policy reason why the
21 law would restrict you to pecuniary damages given the fact that
22 constructive fraud is generated only in this -- or arises only
23 in this setting of a relationship of trust and confidence?
24     MR. WOODARD:  Your Honor, I think you're right.  That
25 hasn't been addressed, and it hasn't been said either way;

89

1  right?  It hasn't been said one way or the other.  And the Idaho
2  Supreme Court hasn't spoke about what the policy would be, for
3  one reason or the other.
4      But I think we have to go with what the Idaho Supreme Court
5  has said.  And what they have said, as the court knows in
6  *Umphrey* and *Walston* and *Nab* is that you can't get nonpecuniary
7  damages in a fraud case.  And so the only thing --
8      THE COURT:  Didn't they say that generally they are
9  not available.
10     MR. WOODARD:  Well, that's what the court said in
11 2015, right, that generally they are not available.
12     But if we look at that, it's talking about that in the
13 context of which statute of limitations to apply.  And it's a
14 very interesting quote, and the Supreme Court says that
15 because -- the court said:
16         "Because the federal district court rejected the
17         argument that the underlying claim was a personal
18         injury claim, Idaho's personal injury statute of
19         limitations is not applicable here.  It certainly
20         should not apply to constructive fraud claims as a
21         class because constructive fraud generally results in
22         an economic harm rather than personal injury.  Idaho's
23         personal injury statute of limitations does not
24         contemplate the type of harm that results from
25         constructive fraud."

90

1      The court is talking about that in the context of the
2  statute of limitations.  It's saying:  Look -- and what I think
3  it's saying is:  If there is an exception for personal injuries
4  for constructive fraud, then you've got to apply the personal
5  injury statute of limitations.
6      And I think what it's saying in that exception is the
7  *McGhee* exception -- the court cited to *McGhee*.  That's the
8  exception, but it's not saying that there is a broad exception
9  for economic damages for constructive fraud.  It says generally
10 those result in pecuniary damages.  So the only basis for that
11 exception is this fraud in the inducement.
12     I'm out of time, Your Honor, so I will stop there.
13     THE COURT:  All right.  Thank you.
14     Ms. Muller.
15     MS. MULLER:  Your Honor, I'm going to argue for Boy
16 Scouts of America, but I'm reserving my time for rebuttal.
17     THE COURT:  All of it?
18     MS. MULLER:  Yes.  LDS basically argued for both of
19 us, and I'm arguing for both of us.
20     THE COURT:  Thank you.  I understand.
21     MS. MULLER:  Thank you.
22     THE COURT:  Ms. Vaughn.
23     MS. VAUGHN:  Thank you, Your Honor.
24     Your Honor, at the outset of this hearing today, you asked
25 the defendants to persuade you why your ruling in the *Tom Doe*

91

1  with respect to *McGhee* and the availability of noneconomic
2  damages -- I'm going to say that because it's easier for me to
3  say than "pecuniary" -- are available for constructive fraud to
4  convince you why you were either wrong or why there's been some
5  change in the case law.  So far, I haven't heard them answer
6  either question.
7      *McGhee* is still good law.  Yes, it was a fraudulent
8  inducement of marriage case, but that was -- the fraudulent
9  inducement of marriage was the type of constructive fraud, and
10 the holding of the case is much broader than fraudulent
11 inducement of marriage.  And it's never been -- the Idaho
12 Supreme Court has since then never discussed it in this
13 fraudulent inducement of marriage context, and they have never
14 said that it's limited to that context.
15     This is an argument that the defendants have come up with.
16 But the Idaho Supreme Court has issued -- or the Idaho Court of
17 Appeals has issued no statement saying that *McGhee* should only
18 be limited to the fraudulent inducement of marriage context.
19     It was a constructive fraud case.  It remains a
20 constructive fraud case.  And the court's holding was that
21 nonpecuniary damages are available for a constructive fraud
22 claim just as you found in *Tom Doe* case.
23     The Idaho Supreme Court in our case in 2015 could have said
24 that nonpecuniary damages are never available for constructive
25 fraud claims, but they didn't.  They said generally not

92

1    available and that those types of -- the types of harms that
2    we're alleging in this case are generally not contemplated by a
3    fraud claim.
4          And I will be the first to admit that our fraud claim, our
5    constructive fraud claim, is kind of an animal or a horse of a
6    different color. It's a little bit unique. Except for the *Tom*
7    *Doe* case, you know, there is not a factual predicate to our case
8    in Idaho. But that doesn't mean that the law as a general
9    statement shouldn't apply to our claim.
10         This case is different. It's not a purely commercial
11   arm's-length transaction. We are not buying a car or buying a
12   house. We have fraudulent statements about the safety of
13   scouting that led to the sexual abuse of scouts that arose from
14   this relationship of trust and confidence. And that is the
15   distinguishing factor.
16         When you have this relationship of trust and confidence, it
17   anticipates that necessarily your damages are going to be
18   somewhat emotional and in a nonpecuniary context. That's why we
19   cited a Law Review article that examines this issue, and many
20   jurisdictions find that nonpecuniary damages are available in
21   constructive -- in constructive fraud claims for exactly that
22   policy reason.
23         THE COURT: I'll have to confess I didn't read the Law
24   Review article. I saw the citation, but there is only so much I
25   could read in preparation for the hearing.

93

1          Did that case actually break down the different
2    jurisdictions and identify some that said that economic damages
3    are available in some jurisdictions, and others it's not? And
4    if so, was there any clear trend?
5          MS. VAUGHN: I would not say there is a clear trend,
6    like a modern trend. And that Law Review article I think is
7    from 1989, so it's quite old. We did look for more recent case
8    law, but there are jurisdictions that allow it, and there are
9    jurisdictions that don't allow it.
10         I think there are good policy reasons for allowing it if we
11   get to that point of what the law should be. But I think the
12   law in Idaho is clear at this point and that we can't say as a
13   matter of law, with *McGhee* out there, that nonpecuniary damages
14   are never available in constructive fraud claims because there
15   is a case from the Idaho Supreme Court that clearly says that
16   they are.
17         THE COURT: Unless Mr. Woodard argues it's intended to
18   apply only to this unique antiquated understanding that there is
19   some body of law that's applicable to marriage contracts. But
20   you dispute that, obviously?
21         MS. VAUGHN: I do. I have seen nothing in any Idaho
22   case law that suggests that. The Idaho Supreme Court in 2015
23   and this case certainly didn't make that distinction. The
24   court's holding in the case was broader than that and applied to
25   constructive fraud in general. So I think it's an exception

94

1    that just isn't there.
2          The defendants -- I anticipate Ms. Muller, in response,
3    will argue that even if we -- even if noneconomic damages are
4    available for a constructive fraud claim, the plaintiffs haven't
5    produced any evidence that those damages -- that their damages
6    were caused by the fraud in this case. And to that, I say
7    that's a question of fact.
8          Certainly, there is some evidence in the case where --
9    testimony by our plaintiffs where they said, yes, they believed
10   they were damaged by the abuse. There is also evidence where
11   they reiterate over and over again that they were damaged by the
12   fraud, by the betrayal, by the deception that occurred, and that
13   fraud led to them being abused.
14         It does not have to be the sole cause of their damages,
15   only a substantial contributing factor. They cite the *Trimming*
16   *v. Howard* case for the concept that it has to be -- fraud has to
17   be the sole cause of the damages. But that part of the case, as
18   you recognized in *Tom Doe*, has been overruled.
19         And as the Idaho Supreme Court said in this case, the issue
20   is whether John Doe's action seeks relief from or an account of
21   constructive fraud. And there is evidence that we have put in
22   the record, substantial evidence from our plaintiffs' testimony,
23   that they believe that their damages were caused by the fraud
24   and the fraud that led to them being sexually abused. And so I
25   don't think, as a matter of law, that we can say that that

95

1    evidence is insufficient.
2          That's all I have, Your Honor. Thank you.
3          THE COURT: Ms. Muller.
4          MS. MULLER: Thank you, Your Honor.
5          There are three reasons why plaintiffs should be precluded
6    from recovering personal injury damages in a constructive fraud
7    case.
8          First, fraud claims, including constructive fraud claims,
9    are designed to protect economic interests, not physical
10   interests.
11         Second, Idaho has a clear rule that monetary damages are
12   limited to economic loss. The only exception to the rule is
13   *McGhee*, and that case does not apply.
14         Third, this court is required to follow Idaho law per *Erie*.
15         So as to the first reason, fraud claims arise in a
16   contractual setting. Now, Your Honor challenged us or presented
17   the challenge that you already addressed this in *Tom Doe*. But
18   in *Tom Doe*, all due respect, Your Honor, you looked at other
19   cases. You didn't cite any cases from Idaho to hold that a
20   constructive fraud claim should be limited to a transactional
21   setting.
22         If you look at the cases in Idaho --
23         THE COURT: I think I did cite *McGhee*, didn't I?
24         MS. MULLER: *McGhee*, but that's the only Idaho case.
25   So, yes, a misrepresentation is a core element of a fraud

96

1    claim, but it can also be an element of other claims, such as
2    negligence, libel and slander, invasion of privacy, and
3    intentional infliction of emotional distress.
4          Professor Dobbs lays this out in the "Law of Remedies."
5    The setting for the misrepresentation is critical because it
6    reveals the source of damages and the type of damages available.
7    If the misrepresentation arises in a contractual setting, then
8    the claim for fraud or constructive fraud is limited to economic
9    damages in Idaho with the one exception being *McGhee*.
10         THE COURT:  But, Counsel, just because *McGhee* is the
11   only example we have -- I mean, Idaho is a small state with a
12   short history.  I can tell you that many states will have 10,
13   maybe even 100 times more reported cases that we can look to.
14   So the fact that there is only one case in a noneconomic setting
15   where a constructive fraud claim was recognized by the Idaho
16   Supreme Court, that doesn't tell us that they don't exist
17   anywhere except in a marriage setting, do they, unless the
18   *McGhee* court said, no, this is a one off; it's the only time
19   these principles apply.  We are just extrapolating from that,
20   aren't we?
21         And if other states have not so limited themselves, isn't
22   it fair to assume that Idaho might follow suit if presented with
23   the opportunity outside of the marriage setting?
24         MS. MULLER:  Your Honor, other states have limited it,
25   constructive fraud claims to the economic damages with the one

97

1    carve-out being the fraudulent inducement to marriage.  New York
2    is an example of that.  I don't have the cases in front of me,
3    but we have cited New York in our brief.
4          There's the New York case that's cited in *McGhee*, and there
5    is subsequent New York law saying pecuniary-only damages.  Idaho
6    is not the only jurisdiction.  And so we have cited other cases
7    for this court so that the court can see Idaho is not alone in
8    requiring pecuniary damages or economic loss for fraud claims.
9          I would also like to point Your Honor's attention to the
10   Am. Jur. that *McGhee* relied upon.  That Am. Jur. was not
11   available at the Idaho State Law Library.  I contacted the
12   University of Idaho Law Library to obtain a copy of it.  And
13   it's attached to my second declaration as Exhibit F.  I was
14   going to bring it up, and I left it.  But my second declaration
15   is CR315.
16         And you will see that that entire Am. Jur. is dealing
17   solely with marriage.  It's not something that's focused on
18   constructive fraud.  It's talking about all of the particular
19   rules that are particular in the marriage context.  And then
20   when it gets to fraudulent inducement, it talks about the type
21   of remedies that are available.  And so it's very specific to
22   marriage.
23         These are just some of the fraud cases in Idaho.  And
24   defendants have --
25         THE COURT:  Are these all constructive fraud cases?

98

1          MS. MULLER:  No.  Some of them are fraud cases, but
2    these are all -- or I don't know that they're all -- but they
3    are cases that the defendants have cited in the brief.  And
4    clearly, they're not all the cases about fraud and constructive
5    fraud in Idaho.  This is just a sampling.
6          And I think it's significant that the *McGhee* case was in
7    1960.  And no case since *McGhee*, until the Idaho Supreme Court's
8    decision, recognized that there is a carve-out for the
9    fraudulent inducement to marriage.  They have all held -- well,
10   *Walston* and *Umphrey* held pecuniary damages.
11         Now, there is another type of damages available in fraud,
12   and that's recision and injunctive relief, both contractual
13   remedies.
14         Fraud claims arise in a contractual setting, and that's
15   even true of *McGhee*.  It's a contractual setting.  So all of
16   these cases, whether the fraud claim was allowed to go forward
17   or whether it was dismissed, they all arose in the transactional
18   setting.
19         This court is charged with following Idaho law.  *Erie v.*
20   *Tompkins,* or the *Erie Railroad v. Tompkins* case says the law to
21   be applied in any case is the law of the state.
22         Recently, the Ninth Circuit stated in *Teleflex Med v.*
23   *National Union Fire,* at 851 F.3d 976, that federal courts are
24   bound by decisions of the state's highest court only -- and then
25   it's only in the absence of such a decision that a federal court

99

1    must predict how the highest state court would decide the issue.
2          Here, we have case law from Idaho saying pecuniary damages
3    is required in a fraud -- that's what you're limited to in a
4    fraud claim, and the only carve-out has been in the fraudulent
5    inducement to marriage context.
6          When this court addressed the issue in the *Tom Doe*, it
7    cited the Restatement (Second) of Torts 557A and *O'Hara* v. -- a
8    California case, *O'Hara v. Western Seven Trees Corp.*  Plaintiffs
9    rely on those same two authorities in this case.  Very
10   importantly, the Idaho Supreme Court has not adopted that
11   restatement.  And if it's not adopted it, it's not the law in
12   Idaho.
13         As to the California case, it's very important to note that
14   California actually has a statute dating back to the late 1800s
15   saying that any type of damages is recoverable in a deceit
16   action.  And it's very clear from the case law in that *O'Hara*
17   case that it's intentional torts in which you can get mental
18   distress or emotional damages, not in constructive fraud.
19         And that's the law in other jurisdictions, is that the
20   emotional distress or the mental distress, there has to be the
21   intentional tort to actually get there.  You don't get there
22   through a constructive fraud claim.
23         So both of those authorities are not -- do not govern in
24   this case.  Idaho is law, and until the law is changed, this
25   court is bound by that law.

**United States Courts, District of Idaho**

1      Do you have any other questions for me?

2            THE COURT: No, I don't.

3            MS. MULLER: So, based on Idaho law, we ask that

4      plaintiffs be precluded from recovering personal injury damages,

5      including emotional distress and mental anguish, because the

6      general rule, not *McGhee*, applies. Thank you.

7            THE COURT: Okay. Thank you.

8      Ms. Vaughn, I'll give you a brief chance to respond if you

9      want because we had a different attorney arguing here in

10     rebuttal. Very briefly, if you have any further comments.

11           MS. VAUGHN: Your Honor, I will just stay here.

12     I don't disagree that you are bound to follow Idaho law.

13     There is an Idaho Supreme Court case that says that noneconomic

14     damages are available in constructive fraud cases.

15           Of all of the cases that they put on the screen and they

16     cite in their brief, the Idaho Supreme Court's has never

17     reversed that ruling, and they have never said that it was

18     limited to a fraudulent inducement of marriage context.

19           I would also encourage you to look at the Law Review

20     article we cited that summarized the jurisdictions that allow

21     noneconomic damages for constructive fraud and the jurisdictions

22     that don't, and you will find that they are not all limited to

23     the fraudulent inducement of marriage context.

24           MS. MULLER: Your Honor, I had two minutes left. May

25     I rebut one thing?

1            THE COURT: Yes.

2            MS. MULLER: And that's just with the Law Review

3      article. I'd note that that Law Review article identifies Idaho

4      as being a state that does not allow nonpecuniary damages.

5            THE COURT: All right. Thank you.

6            Who is going to argue? Mr. Anderson.

7            MR. ANDERSON: So, Your Honor, I have res judicata,

8      and I have the release for Doe XII. And those are actually

9      unique to BSA because they don't happen to have any overlap, at

10     least for purposes of what we're presenting today, for the LDS.

11     So let's just get right at it.

12           On res judicata, the only element that's at issue is the

13     third element, and that's whether or not this case in 2013

14     arises from the same transaction as what we saw back in 2007.

15     Okay?

16           And so this focuses on Does I, II, and V just at the

17     outset. There was a suggestion that the court applies a central

18     issue test, and that test really is only for issue preclusion,

19     and that's not something that we are arguing.

20           THE COURT: The question is whether it was raised or

21     could have been raised.

22           MR. ANDERSON: That's right. That's part of the

23     question.

24           Really, the beginning of the analysis from *Andrus* is

25     whether there was a transaction. *Andrus* tells us that a

1      transaction is a grouping of facts. And really, I think

2      something else that comes out of *Andrus* that is important is

3      that the theory of liability could be different, and the

4      supporting evidence could be different, but we need to be

5      talking about the grouping of facts.

6            And so if we are looking for a grouping of facts, it's

7      different a little bit from the statute of limitations argument

8      in terms of what the plaintiff knew or should have discovered

9      with respect to awareness of facts constituting a fraud.

10           So, Your Honor, you have already looked at this and pointed

11     this out to everyone, which is right here where I'm pointing to.

12     The 2007 first amended complaint paragraph 2.24 and 2.25

13     captured the heart of what was alleged again in 2013.

14           And this is -- this comes from Exhibit 1 to our statement

15     of facts, which is in the record at Docket 275-2. And we did

16     the side-by-side analysis. And when you're looking for a

17     grouping of facts, each of the plaintiffs alleged both times,

18     2007 and 2013, that they were subjected to child sexual abuse

19     and other harm.

20           They allege that BSA had notice that Schmidt was a

21     dangerous pedophile going back to 1979. They allege that BSA

22     promoted scouts as being safe and beneficial and that BSA was

23     wholesome. They allege in both cases that BSA knew that scout

24     leaders abused scouts. They alleged that BSA promoted services

25     and programs that were unreasonably dangerous.

1            And then what the court focused on, that BSA had a practice

2      of harboring child abuse, was protecting their identities and

3      exposing children to harm at the hands of abusers. They allege

4      in both cases that BSA willfully caused each plaintiff to be

5      injured. And as a result of that conduct, they allege damages.

6            That factual grouping back in 2007 and 2013 is the same,

7      and it tells the story. And *Andrus* suggests that we are

8      supposed to look at this analysis in a pragmatic point of view;

9      I mean, just a plain, old, simple get up in the morning, put

10     your pants on one leg at a time type of analysis.

11           And I don't see it any other way. I mean, *Andrus* teaches

12     we have to look at time, space, and origin. And we are talking

13     about the exact same time, space, and origin.

14           So that's the factual grouping. And we are supposed to be

15     pragmatic. And so -- and just one view of the pragmatism here

16     is that these Does are here because they were sexually abused.

17     They alleged that same claim in 2007. That's the reason they

18     were court in 2007. That's the reason they are in court now.

19     There's nothing that's come up to make a change.

20           There is an effort in the brief to talk about what's

21     additional, new allegations. And that includes the IV files;

22     that includes the relationship of trust and confidence; and that

23     includes the new legal theory of constructive fraud.

24           We can break all of these down in the minute that I have

25     left to devote to this, but Mr. Thomas showed you where in the

104

1  record the plaintiffs in 2007 sought discovery on the IV files.
2  So that's not new. That's not an "Aha. Something happened
3  between 2007 and 2013." The relationship of trust and
4  confidence, the plaintiffs were one part of that relationship.
5  So they had the information available.
6       And the legal theory, constructive fraud has been available
7  for a long time under the law. So there is really nothing new.
8       THE COURT: How is this different -- I was trying to
9  think how conceptually res judicata and statute of limitations
10  works in this case. Statute of limitations is based upon what
11  was known or should have been known --
12       MR. ANDERSON: Right.
13       THE COURT: -- with reasonable diligence. Res
14  judicata is what was raised or could have been raised arising
15  out of the same core set of facts.
16       MR. ANDERSON: Right.
17       THE COURT: Did I properly state those?
18       MR. ANDERSON: I think that's right, and that's why I
19  focussed on what is the factual body of work that you have to
20  bring the court and work with.
21       THE COURT: Obviously, they are pretty close. But I
22  suppose notice is just look at the complaint to see what it
23  reflects about what the plaintiffs understood at the time in
24  terms of the statute of limitations and also what it is that
25  they alleged and what more they could have alleged based upon

105

1  the same operative facts for purposes of res judicata.
2       MR. ANDERSON: Right. And that's why I focused on
3  *Andrus* being so important in the sense that new legal theories
4  or variance of evidence to shade those legal theories is really
5  not the test; it is what is the factual grouping that you have
6  to work with.
7       THE COURT: All right.
8       MR. ANDERSON: I'm going to switch gears before I run
9  out of time to Doe XII and the release argument there.
10       Okay. We have been painted with the same brush. We have
11  had the not-so-indelicate shot over our bow that we're seeking
12  the same thing that the LDS sought in essentially the form of a
13  motion to reconsider.
14       If I say one thing, I need to explain why we are absolutely
15  different. And I took Doe XII's deposition. I made a tactical
16  decision different from the LDS to ask him question about his
17  intent when he signed that release.
18       And the significant difference is -- and it's in the
19  record, paragraph 10 of our statement of facts -- "You intended
20  to release all claims related to the abuse by Larren Arnold?"
21       Answer: "Yes."
22       So with respect to the LDS motion, their challenge was
23  simply the words on the page of the release. And we took it a
24  step further and got into his intent. And we know what his
25  intent was. He intended to release all claims related to the

106

1  abuse. And he is here back seeking damages for the abuse, just
2  under a different theory.
3       THE COURT: Well, what is the court to do with the
4  fact that it's a general release on a form that refers to I
5  think arising out of an accident. There was no accident. I
6  mean --
7       MR. ANDERSON: That's fair, Your Honor. And that's
8  the reason I asked him the questions that I did.
9       THE COURT: What his intent was.
10       MR. ANDERSON: "What's your intent?"
11       THE COURT: So where we are, we're saying there is an
12  ambiguity because of the use of the term an "accident" and
13  therefore resolve that through parol evidence, and that's
14  provided that through his deposition testimony that says this is
15  what I did.
16       MR. ANDERSON: That's right. That was my thinking in
17  getting ready for the deposition, because I struggled with what
18  to do with "accident."
19       THE COURT: And I can see why you take a different
20  tack. Because, frankly, the LDS Church's release was, with all
21  due respect, not better drafted.
22       MR. ANDERSON: Not here to argue about that,
23  Your Honor.
24       Another point that I think I need to make before I sit down
25  is as it relates to this release. The trouble that I have, even

107

1  though we've talked about the accident and what it means and his
2  intent, there is no claim to rescind the contract, in other
3  words, kill the contract and make it go away. So it's still
4  binding. Something got released.
5       And when there has been no effort here to seek recision or
6  some other remedy that gets the contract out of the way, we
7  still have to treat it somehow and give it some force. And in
8  that contract, he agreed that he was releasing all known or
9  unknown personal injuries.
10       And so that's the other trouble that I have. Because the
11  record is clear; it goes back to 1974 and '75. It's abuse by
12  Larren Arnold, and he released all known or unknown personal
13  injuries.
14       You know, the other -- even in his deposition in 2017, he
15  still treats the agreement as valid. The admissions are in the
16  record. He confirmed that he read and understood it. He
17  confirmed that he read it before he signed it. He confirmed
18  that he, in fact, did sign it voluntarily. He confirmed he
19  wasn't under duress. He confirmed that he accepted the
20  settlement money. He confirmed that he deposited that money
21  into his bank account. And he confirmed all the other
22  foundational pieces, which are the dates of abuse and who the
23  abuser was.
24       And so asking him the additional questions, taking it a
25  step further on intent, that's not an issue in this record

108

1  anymore.

2        And so that's why we believe we are very different.  Even

3  though with the document we had to work with side by side

4  compared to the LDS may not be the same language, we made that

5  decision to develop the record so we would know what his intent

6  was and potentially obviate the need to call a jury to hear the

7  very question.

8        So that's our position on Doe XII.

9              THE COURT:  Thank you.

10             MR. ANDERSON:  Thank you.

11             THE COURT:  Mr. Chasan.

12             MR. CHASAN:  Well, like Your Honor mentioned in

13  speaking with Mr. Anderson, res judicata I feel like is just the

14  opposite side of the coin from the statute of limitations

15  especially in this situation.  We are back to the same Kawai

16  Farms analysis from the plaintiffs' point of view.

17        And I mean, I need to start out by saying, though, that you

18  recognized and the Idaho Supreme Court recognized that the 2007

19  lawsuit was for abuse.  And you said -- I'll just -- I'll

20  paraphrase your quote:  The substance of plaintiffs' claims is

21  not that they were sexually abused when they were children, but

22  that the Boy Scouts and the LDS Church deceived them by telling

23  them to trust their scoutmaster and at the same time not telling

24  them about the dangers of pedophilic scoutmasters.

25        So it was not about abuse.  And the Idaho Supreme Court, in

109

1  fact, ruled that the first section had nothing to do with fraud.

2  It was all about whether it was retroactive, whether the statute

3  6-1701 for child sexual abuse -- which that's what it's for --

4  was retroactive.  And they decided that it was not.  There was

5  no consideration of fraud.

6        So does it --

7              THE COURT:  But, Mr. Chasan, it's not a question of

8  how the Idaho Supreme Court perceived the issue on appeal.  It's

9  a question of what were the claims that were brought.  And I

10  think the case law is not only the claims that were brought but

11  the claims that could have been brought under the same operative

12  facts even if the claims are under a different legal theory.

13  And I may have that wrong.

14             MR. CHASAN:  No, no, no.  I mean, I don't have any

15  reason to disagree.  But, okay, could have been brought.  "Could

16  have been brought" gets you and I back to this issue of

17  reasonable diligence.  Reasonable diligence.  What could have

18  been discovered with reasonable diligence?

19        And the point I was trying to make before was that every

20  scout who was abused knows at the time of the abuse that it

21  wasn't safe, but is that -- is that -- is that just a simple

22  awareness, or is that the be-all and end-all of what the scouts

23  should know?  Is that discovery of the facts that constitute the

24  fraud?

25        And we know by the decisions in this case that the abuse is

110

1  not the discovery.  The abuse is not the discovery, so it

2  creates a continuum that the jury has to decide where in the

3  discovery process does the plaintiff finally know?  Where in the

4  discovery continuum does the plaintiff finally discover the

5  facts, and have they brought the lawsuit within that

6  continuum -- I mean, within the period of accrual?

7        And so the 2013 lawsuit becomes part of the diligent

8  discovery process.

9        I mean, we went through it in the brief.  And the reason I

10  brought up the Idaho Supreme Court decision was not because it

11  was dispositive on the issue but because it was a recognition by

12  a court of five people who did not perceive that as a fraud

13  claim; they perceived it as an abuse claim, which is really what

14  it was.  It was an abuse claim based on an abuse statute.

15        And the other thing about Kawai Farms, Your Honor, is this:

16  You know, in Kawai Farms, they found that there was not

17  res judicata, when all the president of the corporation had to

18  do was go down and look at public records.  This is a much more

19  difficult situation.  Here there are no public records, and the

20  records that were available were guarded and kept secret and

21  maintained as confidential, in quotes.

22        It took us from 2007 until December of 2017 to finally get

23  the Boy Scouts to produce the IV files.  It took us 10 years.

24  And that's a measure of the diligent pursuit and what was

25  reasonable for the -- to be expected of the plaintiffs to

111

1  accomplish in their discovery of the facts.

2        The plaintiffs had to trust and rely on two parties who

3  actively hid and concealed the dangers.  That's what my notes

4  say.

5        Do you have any more questions on that issue?

6              THE COURT:  No.  That's fine.  Thank you.

7              MR. CHASAN:  Okay.  And then on the -- on the release

8  for Doe XII, it's --

9              THE COURT:  Mr. Chasan, you heard my, I guess,

10  colloquy with Mr. Anderson that I determined previously, I

11  think, as I recall, that even the release agreement with the

12  Church had some ambiguity and even though it was far more

13  specific than the one used by the Boy Scouts.

14        So if we assume that there is ambiguity -- and I can't

15  imagine how I couldn't find some ambiguity in the agreement --

16  then it becomes an issue of parol evidence about what would the

17  parties intend.  And if your client said, "My intent was to

18  release all claims arising -- or any damages arising out of" --

19             MR. CHASAN:  The abuse.  But we don't have a cause of

20  action for abuse.  And you have distinguished yourself between

21  constructive fraud and abuse.  The abuse cause of action --

22             THE COURT:  So I guess it would be ambiguous even with

23  his verbal testimony on the same reason, because that roughly

24  was the basis for my decision, although it was a very close call

25  on my part with regard to the LDS defendant.

**United States Courts, District of Idaho**

112

1    MR. CHASAN: Yeah. The word "accident" is not
2 defined. And this wasn't an accident; it was a deliberate act.
3 And the fraud is distinct from the abuse.
4    So, yes, I think it's a question of fact. I think it is an
5 ambiguity. I won't belabor it anymore unless you have more
6 questions.
7    THE COURT: No. That's fine. Thank you.
8 Mr. Anderson.
9    MR. ANDERSON: Your Honor, candidly, I ran out of time
10 because of the court's schedule.
11    THE COURT: I have to drive to Pocatello tonight. So
12 I'm just saying I am not going to be anxious to hear more
13 argument, but we do need to take up affirmative defenses.
14    I would make just an observation that I'm not going to
15 fault the parties for including -- and actually, the drafting of
16 the pleadings was in 2013, I think, and that was before the 2015
17 amendments to the federal rules, which make it fairly clear that
18 we are not supposed to do boilerplate, you know, voluminous
19 affirmative defenses. So I'm not going fault anyone for
20 following the practice then, which is to put the kitchen sink
21 into your answers as far as affirmative defenses.
22    My normal practice, having read the briefing on that, would
23 be to probably clean up the affirmative defenses, knock out a
24 bunch, but with a clear understanding that, in so doing, I'm not
25 saying that the defendants can't raise this as a defense.

113

1 Because a lot of them are simply denials of elements of the
2 plaintiffs' case. And I think that's probably the best way to
3 deal with all that.
4    The one area that is somewhat unique, it's the due process,
5 which -- my only question there is whether or not an argument of
6 laches is not enough to cover that without bringing in the 14th
7 or 5th Amendment or just some fundamental notion of fairness
8 implicit in due process into the case.
9    Now, I don't know quite what to do with that. It might be
10 something that we can address a little bit later and sort out
11 whether I might limit the parties in presenting evidence if one
12 side has been unfairly prevented from being able to respond as
13 to a specific factual matter. But I'll leave it with counsel;
14 I'm not going to cut you off.
15    So with that, Mr. Andersen, for some reason, I sense that
16 it might have been your -- you may have had -- Mr. Steve
17 Andersen, you may have had the primary role in that, but I don't
18 know why I think that. You just look like the kind of person
19 that would make that kind of argument.
20    MR. ANDERSEN: Yeah, kind of these crazy arguments.
21    THE COURT: It's not crazy at all.
22    MR. ANDERSEN: Your Honor, I think that I prefer to
23 wait to hear what the requested relief is.
24    THE COURT: All right.
25    MR. ANDERSEN: And then I can respond.

114

1    THE COURT: Okay. So Ms. --
2    MS. VAUGHN: Vaughn.
3    THE COURT: Yes. Wait a minute. I guess -- all
4 right. I guess now I do have it turned around. Because the
5 plaintiffs are talking about affirmative defense of due process.
6 As I said, late in the day my head hurts.
7    MS. VAUGHN: I understand. I feel the same way.
8    With your comments, you read my mind. I'm going to be very
9 brief. I'm only going to address two of our motions
10 substantively because a lot of them were more housekeeping
11 motions aimed at affirmative defenses that were improperly pled.
12    I do think now is a good time to dismiss them or strike
13 them with the understanding that, of course, they can still
14 argue that we haven't met our burden of proof and proved our
15 claim; that's what a denial is. But I don't think they should
16 be pled as affirmative defenses. I think it's confusing and
17 bulky for all of the reasons you stated. So that is the request
18 we are seeking on many of those.
19    The only two I'm going to spend -- address very briefly,
20 the due process affirmative defense, it is very similar to the
21 laches defense. They are basically arguing that plaintiffs
22 waited too long, and they have been unfairly prejudiced. But
23 it's a little bit different because there is no due process
24 defense that covers that ground.
25    The U.S. Supreme Court has been very clear that when you

115

1 have the situation where a statute of limitations and the
2 defendant is arguing that their due process rights have been
3 violated by either the extending of the statute of limitations
4 or bringing a claim too late, they have to show that they had a
5 vested right in reliance on that old statute of limitations.
6 They can't just show that evidence has been lost. Because if
7 that was the case, then they would be able -- all defendants
8 would be able to make that argument and show that they were
9 deprived of due process in any case which evidence has been
10 lost.
11    So I think the U.S. Supreme Court has been very clear that
12 unless they can make this very specific showing that they have
13 been deprived of a vested right and of separate special
14 hardships or oppressive effects in reliance on the old statute
15 of limitations, that there is no due process right in this
16 particular context of a civil -- private civil litigant, you
17 know, whether in -- prefiling delay is what the defendants have
18 called it.
19    The second one I want to address is just the general
20 affirmative defense that our claims are barred by the First
21 Amendment. You addressed this issue a bit in the *Tom Doe* case.
22 I think the case law around the nation is very clear that when
23 there is no excessive entanglement with religious doctrine --
24 which there isn't here -- that generally applicable civil law
25 can be applied to a religious organization in the tort context.

116

1    We haven't -- none of us have been talking about the
2    religious doctrine of the LDS Church at all today, and I
3    wouldn't profess to.  There is no significant entanglement.
4    This is a secular program, and this is a generally applicable
5    civil tort law, and they are not precluded from liability simply
6    by being --
7        THE COURT:  The one area that gave me a little bit of
8    pause is the idea that, as a matter of theology, a teaching of
9    deference to men in leadership positions over the young men's
10   program, whether that somehow becomes involved in this given the
11   allegations that you can trust your scoutmaster, which typically
12   in the LDS troops, it's a dual role in which they are not only a
13   scoutmaster, but they hold -- I don't want to use the word
14   "priesthood" status, because that's the vernacular used.
15       Does that -- how do you respond to a suggestion which
16   perhaps someone from the defendants, even Mr. Anderson or I
17   don't know who -- or Mr. Woodard may argue that that really does
18   implicate the First Amendment because that's a theological
19   teaching?
20       MS. VAUGHN:  Your Honor, but it's not a significant
21   entanglement with religious doctrine.  I think you can reach the
22   question of whether there was this relationship of trust and
23   confidence with these men, without getting into analyzing the
24   religious doctrine of the LDS Church.  And certainly, there are
25   plenty of cases from around the nation on point in the context

117

1    of the Catholic Church when claims of sexual abuse, breach of
2    fiduciary duty, et cetera, have been brought due to actions by a
3    Catholic priest.  And courts have said that you can analyze
4    whether a relationship existed and analyze that relationship
5    without having to get into the religious doctrine.
6        THE COURT:  You know, let me test that just a little
7    bit.  Because it strikes me that, you know, Mr. Andersen --
8    excuse me -- Mr. Thomas and I had a little exchange here about
9    whether or not -- under I think it's *Trimming v. Howard*, whether
10   or not the court can kind of refashion the plaintiffs' claim for
11   them.  And I made the comment that if you fashion your complaint
12   in a certain way, that's fine, but then you're bound by the
13   elements of that claim.  And if you can't prove the elements of
14   that claim, you're out of court.
15       In this case, kind of playing off from that, one of the
16   elements, of course, is to show this relationship of trust and
17   confidence, and you have to also show that there was a false
18   statement.  And both of those implicate possibly theological
19   principles.  Because one of the false statements is you can
20   trust your scoutmaster/priesthood leader and should do so and
21   then with regard to the relationship of trust and confidence.
22       So I guess what I'm asking is:  Does that -- the fact that
23   that's the way you've packaged your claim, does that change the
24   dynamic from what other courts have looked at in terms of the
25   Catholic Church claims?  Because there no one has ever suggested

118

1    that, as a matter of theology, molestation is somehow part of
2    Catholic theology.  It's not.  But some could argue that
3    deference to a scoutmaster is a matter of theological principle.
4        So does that change the dynamic for this case because of
5    the way you've characterized your claims?
6        MS. VAUGHN:  I don't think so, Your Honor.  Because
7    the scout program is still a program.  As they -- you know, the
8    counsel for BSA reiterates that it's just this program that they
9    characterize as they package it up to any sponsoring
10   organizations.  And, yes, it was adopted by the LDS Church as
11   their program, and they have handbooks and whatnot that relate
12   specifically to scouting and the LDS Church.
13       THE COURT:  But where the scout leader often -- and I
14   don't know if the individual scoutmasters here did or did not --
15   I think they did, or at least one of them did -- actually have
16   this dual role of scoutmaster/priesthood leader.  Does that --
17       MS. VAUGHN:  I don't think their status as a
18   priesthood leader, just the status of a Catholic priest.
19       THE COURT:  And in any event, you are pledging right
20   now you will never raise that as an issue during the trial, that
21   somehow -- we talked about parishioner-plus.  They are not going
22   to argue that with regard to the plaintiffs, the suits against
23   the LDS defendant, that there all your arguments are somehow
24   exponentially increased.  Because it's not only that you should
25   do it because he's a scoutmaster, but you should also be

119

1    obedient because he holds this priesthood role in addition.
2        MS. VAUGHN:  Well, I think we have argued that,
3    Your Honor.  But I don't think that gets into a significant
4    entanglement with doctrine.
5        I think you can still evaluate that role that they serve in
6    the secular program without getting into a significant -- the
7    test is significant entanglement, and I don't think that
8    requires us to analyze the weeds of the doctrine.
9        Those were the only two affirmative defenses I was going to
10   address in any detail, except that some of them -- for example,
11   the affirmative defense against vicarious liability or improper
12   joinder and noneconomic damages capped for charitable
13   organizations are simply irrelevant to this case.
14       In the case with noneconomic damages cap, there is no
15   charitable immunity in Idaho anymore.
16       Thank you, Your Honor.
17       THE COURT:  Thank you.  Was I right, Mr. Andersen?
18       MR. ANDERSEN:  You were correct, Your Honor.
19       THE COURT:  You just had a knowing look on your face.
20       MR. ANDERSEN:  I don't know if anyone has ever accused
21   me of having that before.
22       Sir, Your Honor, very briefly.  Our position is that we
23   will rest upon our pleadings with respect to the motion for
24   partial summary judgment on the affirmative defenses.
25       I will address the two that were addressed here.  And I

120

1  just would like to point out that with respect to the eighth
2  affirmative defense, which was the due process argument, in our
3  briefing we stated that the defense will not be ripe for
4  adjudication until the evidence has been submitted. And I think
5  that is correct, because exactly how much we are affected by
6  witnesses we can call, can't call because of the lapse of time
7  is a very unusual argument to make because we're in a situation
8  where, for instance, Bishop Sanderson and other important
9  witnesses in the case are deceased.
10      And so there is due process of veneer or layer that has to
11  be looked at at some point, but the court can't assess that
12  right now until we make our record during the trial, if there is
13  one, about witnesses we don't have and what documents we don't
14  have.
15      I think, actually, the problem is going to be multisided.
16  I mean, I think the plaintiffs are going to have some
17  difficulties proving our case, and we are going to have some
18  difficulties defending the case for those very same reasons.
19      THE COURT: Why isn't laches enough? Why can't we
20  just decide that based on laches?
21      MR. ANDERSEN: They are actually almost -- I won't say
22  they're two sides of the same coin. They are the same side of
23  the same coin, I think, really. But they are pled, and they are
24  pled for the reasons that the court indicated.
25      On the First Amendment issue, this is going to be, again,

121

1  dependent upon the evidence that's put forth in the case. When
2  the court pressed counsel to say, well, okay, you pledged this
3  is not going to become an issue, we didn't get a complete denial
4  of that's not going to be an issue. It's going to be fact
5  dependent.
6      And as an example, it isn't just the fact that the boy
7  scout leader may have had a dual priesthood role -- priesthood
8  leadership role. It is also that other individuals within the
9  ward may have had a role which also informed this whole issue
10  about whether or not you're holding forth the scouting program
11  as safe and whether you are acting reasonably upon notice.
12      And that could involve a bishop. That could involve other
13  types of leaders or youth leaders or something like that, and it
14  would just depend on who was abused and how they're abused and
15  what was reported.
16      So it's almost going to be impossible for the plaintiffs to
17  present their case at trial, if there is a trial, without
18  implicating a cast of characters which would include people
19  beyond just the scoutmaster. And therefore, First Amendment and
20  entanglement is implicated depending upon how they present their
21  case. And that's why we pled the issue and summary judgment.
22      THE COURT: How do I address it? And I obviously
23  don't want to address it in a jury instruction. Do I preclude
24  them from putting on evidence, perhaps similar to what I kind of
25  hinted at, that they should commit not to raise some kind of --

122

1      MR. ANDERSEN: Yes. I think the way it's going to
2  behoove us, Your Honor, at the motion in limine stage to say:
3  Okay. Now that we have seen witness lists and exhibit lists and
4  we have read trial briefs, we're in the position we can tell the
5  court this is what we think the evidence is going to be. And
6  our MIL is that type of evidence should not be admitted.
7      There will be more focus then for the court to say: Okay.
8  I grant or deny the motion in limine on First Amendment grounds
9  if and when we make that argument. But at this stage, it's just
10  pled. It's not ripe for summary adjudication.
11      Thank you.
12      THE COURT: All right. Mr. Thomas, Mr. Anderson,
13  Ms. Muller, if there's anything --
14      MR. ANDERSON: Very brief, Your Honor.
15      THE COURT: Yes.
16      MR. ANDERSON: Your Honor, we have the same position
17  as the LDS Church as it relates to submitting this on the
18  briefs. Because it's been raised, I'll talk about due process
19  and just offer some thoughts, not to repeat but maybe to add
20  hopefully. And then also for the First Amendment. And then I
21  do want to talk about vicarious liability because I'm not sure
22  where we are with respect to that issue in this case.
23      So I guess, to start, the due process piece, I tend to
24  agree. You know, we found case authority that suggests there is
25  a right to a fair trial in a civil case, and that has a due

123

1  process dimension. And I think all of us in this room agree
2  that due process should not be taken out of these proceedings.
3  The question is: How does it apply? And I agree with
4  Mr. Andersen's observations that we won't know that until we're
5  there.
6      But we offered in the example of George Poleson, who was a
7  60-year-old man in Lewiston, and he is going to turn out to be
8  pretty significant in the Doe IV and Doe XVIII cases, because he
9  is the conduit to notice. And he is essentially the only
10  witness available.
11      And we put in our briefing the context and the detail of
12  how he fits in, but even now having this conversation in the
13  summary judgment context, really we're not going anywhere with
14  it until we have all the facts and see how he fits in and how
15  that notice inquiry works.
16      So we think due process certainly is something that needs
17  to stay in the case, and we can deal with it. In fact, most all
18  of these, as I have looked at it, have shades of some sort of
19  motion in limine.
20      And even with due process, it was twice in the opening
21  brief and in the reply brief, there is a suggestion about what
22  we, as the defense, can say to the jury when we mouth the words
23  "due process," and if we can even do that.
24      So that's why, you know, we believe it's an issue for
25  potentially another day, something that will come up and be

124

1  significant.
2      On First Amendment, that's really more the LDS's water to
3  carry, so to speak.  But an observation I have on that is when
4  you talk about entanglement, sitting from the sidelines at BSA,
5  there has been a lot of effort by the plaintiffs to really learn
6  and understand the workings of the Church and how callings, for
7  example, play a role in the selection of scoutmasters and other
8  things.
9      So I think that we may get into those issues, and it's
10 probably safe, like Mr. Andersen suggests, to -- when we know
11 what may become an issue, let's present it and do it at a
12 different stage, maybe not at the summary judgment stage, to
13 foreclose it.
14     The last point that I would like to make is as it relates
15 to the vicarious liability.  You know, we put up the
16 boulder-in-the-road slide and the statement we're not making a
17 claim for vicarious liability.  And then the first effort by
18 counsel to respond to that is:  But that's not saying -- the
19 same thing as saying that the perpetrators are not the agents of
20 BSA.  Well, and the perpetrators are the sexual abusers that
21 caused the damages to these plaintiffs.
22         THE COURT:  I thought that statement was made in the
23 context that they're not the agents in terms of representations
24 they may make.  But maybe I misunderstood.  My sense is there is
25 no vicarious liability claim here.  The claim is one for fraud.

125

1         MR. ANDERSON:  Yeah.  And I guess -- and maybe that's
2  part of my confusion.  But when I hear -- there is either a
3  vicarious liability claim that connects the dots from the
4  perpetrators to the BSA or there is not.
5      And as I listen to that argument, there is kind of:  Well,
6  we'll grab a representation over here, and we'll grab some
7  falsity over there.  And some of it's coming from the handbook;
8  some of it may be coming from other parts of what may have been
9  said by a scoutmaster.  And it just kind of all goes into the
10 mix.
11         THE COURT:  Well, you know, I mean, again, I
12 think -- well, I know I disclosed at the outset of the case that
13 there was a time I was a scoutmaster 25, 30 years ago.  And I
14 know that there is communications that goes out to Boy Scouts
15 from -- what do they call it? -- the council, I think, the
16 troop.  Probably when you go to scout camp, there is probably
17 communications made through the scout camps about what you can
18 and shouldn't do.  And I wouldn't be at all surprised if there's
19 some comment made there about the role of the scoutmaster and
20 how much you should rely upon them in certain things.
21     You are not suggesting that those kind of representations
22 could not be considered as a representation of Boy Scouts of
23 America when that's how Boy Scouts function, is through councils
24 and troops?  Maybe that's not fair, because that's a battle for
25 another day.  Because we need to get into agency and all of

126

1  that.  But that's not vicarious liability; that's a different
2  animal.
3         MR. ANDERSON:  And I'm out of time, Your Honor.  But
4  if I could respond to that.
5         THE COURT:  Sure.
6         MR. ANDERSON:  That's the framework in which the
7  organization exists.  And I can agree with that.
8      The issue that I have is that there is also suggestion that
9  the jury won't be able to have an instruction that says:  Now,
10 wait a minute.  If you're confused and the theory here is that
11 BSA is held responsible for what the agents did, and that's as
12 far as it goes -- excuse me -- what the perpetrators did, and
13 that's as far as it goes, that's the issue that we have.
14         THE COURT:  Okay.  Well, if this case goes to the
15 jury -- and I'm not saying -- I just haven't -- you know, there
16 are things I have to wade through; there may be potential for
17 settlement; I just don't know.  But if the case goes to the
18 jury, I do think this is a case where the court is probably
19 going to be very specific in instructions just to ensure that
20 there is no unintended vicarious liability considered by the
21 jury.
22     They will be very clearly instructed there is one issue and
23 one issue only, and that's constructive fraud.  And that's the
24 beginning and the end of the case.  And I have a sense when we
25 get to that point, juries, in my experience, generally follow my

127

1  instructions.  I have talked to jurors after every trial, and I
2  have always been pleasantly surprised on how carefully they
3  tried to follow the court's instructions.  So we will see how
4  that shakes out.
5         MR. ANDERSON:  Thank you, Your Honor.
6         THE COURT:  Any brief response?
7         MS. VAUGHN:  Very, very briefly.
8      We are talking around in circles about this vicarious
9  liability issue.
10         THE COURT:  Ms. Vaughn, just for future reference, the
11 lectern is adjustable.  There is a little toggle switch.  And I
12 always think sometimes, particularly with someone like
13 Mr. Thomas or Mr. Andersen, who is quite tall, those who aren't
14 so tall struggle a little bit.  So you can move it up and down,
15 but save that for when we're back here for another matter.
16         MS. VAUGHN:  Thank you.
17         MR. WOODARD:  Your Honor, thank you for not bringing
18 that up.
19         THE COURT:  The thought crossed my mind, but I tried
20 to be a thoughtful human being and not say a word.
21         MR. CHASAN:  I resemble that, Your Honor.
22         THE COURT:  Well, I'm kind of in the boat with both of
23 you guys.
24     So go ahead.
25         MS. VAUGHN:  With that, just very briefly.  Their

1    affirmative defense is:  Ask -- you know, saying that they would
2    not be liable for the -- vicariously liable for the sexual
3    abuse, not for -- we are not talking about agency issues in a
4    different context.  Vicariously liable for the sexual abuse.
5         We have not pleaded a claim ever in this case -- I don't
6    understand quite why it's so confusing -- for vicarious
7    liability for sexual abuse.  I plead those claims in many other
8    cases, but we are not seeking relief.  So I don't think it's an
9    appropriate affirmative defense in this case.
10        And one more item on the due process defense.  It differs
11   from laches because they have to show more than they have just
12   been prejudiced.  We don't even get to that point.  They say --
13   you know, they're arguing that this is premature.
14        We are not arguing that due process should be taken out of
15   the civil case completely.  I would never argue that.  Of
16   course, there is due process.  There is not the specific due
17   process relief that they have pleaded, which is the due process
18   right to be free from prefiling civil delay.  That is not a due
19   process right that exists unless they can show that they have
20   been deprived of a vested right, and they've made no effort to
21   do that, Your Honor.
22        Thank you.
23             THE COURT:  Okay.  Counsel, we will take the matter
24   under advisement and issue a written decision as soon as we can.
25   We will be in recess.
          (Proceedings concluded at 4:45 p.m.)

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5

6              I, Tamara Hohenleitner, Federal Official Realtime

7     Court Reporter, in and for the United States District Court for

8     the District of Idaho, do hereby certify that pursuant to

9     Section 753, Title 28, United States Code, that the foregoing

10    is a true and correct transcript of the stenographically

11    reported proceedings held in the above-entitled matter and that

12    the transcript page format is in conformance with the

13    regulations of the Judicial Conference of the United States.

14

15              Dated this 21st day of June, 2018.

16

17

18              /S/ TAMARA I. HOHENLEITNER
                _____
19              TAMARA I. HOHENLEITNER, CSR NO. 619, CRR
                FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

'

**'60s** [1] - 22:15
**'75** [1] - 107:11
**'79** [1] - 55:23
**'80** [1] - 55:24
**'may** [1] - 45:20

**1**

**1** [4] - 46:21, 83:3, 87:4, 102:14
**10** [7] - 48:21, 65:25, 72:23, 83:20, 96:12, 105:19, 110:23
**100** [2] - 72:18, 96:13
**11** [3] - 71:25, 73:10, 78:6
**12** [6] - 13:20, 42:9, 42:12, 42:14, 43:20, 62:4
**12.1** [1] - 62:16
**13** [2] - 43:20, 56:25
**13-275** [1] - 4:3
**13-year-old** [1] - 13:21
**14-year-old** [1] - 56:25
**14th** [1] - 113:6
**15** [3] - 4:2, 8:16, 42:3
**18** [1] - 83:3
**1800s** [1] - 99:14
**1890s** [1] - 86:18
**19** [1] - 56:10
**1911** [1] - 24:7
**1932** [1] - 66:24
**1960** [1] - 98:7
**1960s** [1] - 22:13
**1969** [1] - 4:17
**1970s** [1] - 64:3
**1974** [1] - 107:11
**1979** [1] - 102:21
**1980s** [1] - 71:4
**1982** [2] - 55:24, 56:1
**1983** [1] - 4:17
**1987** [1] - 70:21
**1989** [1] - 93:7
**1996** [1] - 83:1

**2**

**2** [1] - 28:11
**2-1/2** [1] - 81:22
**2.24** [1] - 102:12
**2.25** [1] - 102:12
**20** [1] - 58:22
**2000** [1] - 47:19
**2006** [1] - 63:14
**2007** [54] - 49:17,

50:16, 50:21, 50:23, 53:11, 55:5, 55:6, 55:8, 55:18, 56:2, 56:3, 56:10, 57:18, 57:20, 58:15, 58:25, 59:2, 59:4, 59:6, 59:12, 59:17, 59:19, 59:20, 60:15, 60:17, 61:3, 61:8, 61:17, 61:20, 71:9, 72:13, 73:10, 73:21, 74:3, 74:22, 75:7, 76:11, 76:14, 77:18, 79:7, 79:24, 81:18, 82:13, 101:14, 102:12, 102:18, 103:6, 103:17, 103:18, 104:1, 104:3, 108:18, 110:22
**2011** [1] - 63:15
**2013** [16] - 4:15, 58:3, 58:4, 61:3, 71:11, 75:8, 79:21, 79:23, 82:5, 101:13, 102:13, 102:18, 103:6, 104:3, 110:7, 112:16
**2015** [6] - 62:12, 65:23, 89:11, 91:23, 93:22, 112:16
**2017** [3] - 58:23, 107:14, 110:22
**2018** [1] - 4:2
**218** [1] - 66:14
**219** [1] - 66:15
**222** [2] - 12:6, 58:23
**25** [3] - 47:25, 82:16, 125:13
**26** [1] - 82:16
**27** [1] - 62:12
**275-2** [1] - 102:15
**27th** [1] - 55:6
**2:04** [1] - 48:24
**2:21** [1] - 48:24

**3**

**3** [5] - 47:17, 62:25, 63:21, 66:17
**30** [3] - 8:18, 26:14, 125:13
**31** [1] - 46:1
**314** [1] - 10:11
**35** [2] - 23:24, 83:5
**367** [1] - 36:4
**3:23** [1] - 83:18
**3:36** [1] - 83:18

**4**

**4** [2] - 26:14, 62:25
**4.60** [1] - 27:10
**4:45** [1] - 129:1
**4:58** [1] - 81:10
**4th** [1] - 82:8

**5**

**5-218** [7] - 53:15, 54:5, 54:8, 54:19, 58:6, 68:18
**5-219** [9] - 52:22, 54:6, 54:7, 54:8, 62:9, 66:11, 68:8, 68:19, 68:25
**5-219's** [1] - 52:24
**50** [2] - 45:10, 46:12
**51** [2] - 46:12
**52** [2] - 45:10, 46:12
**557A** [1] - 99:7
**56** [2] - 30:13, 47:10
**5th** [1] - 113:7

**6**

**6-1701** [1] - 109:3
**60-year-old** [1] - 123:7

**7**

**70** [1] - 82:16

**8**

**82** [1] - 36:4
**84** [2] - 62:13, 63:21
**851** [1] - 98:23
**884** [1] - 12:6

**9**

**976** [1] - 98:23

**A**

**ability** [2] - 16:24, 26:4
**able** [10] - 5:9, 19:17, 41:23, 46:14, 53:25, 61:6, 113:12, 115:7, 115:8, 126:9
**absence** [4] - 28:6, 30:10, 88:13, 98:25
**absolute** [1] - 28:14
**absolutely** [2] - 65:22, 105:14
**abundant** [1] - 70:20

**abuse** [51] - 4:19, 17:13, 19:3, 22:19, 31:3, 31:10, 31:21, 34:21, 37:21, 38:8, 40:18, 40:23, 43:22, 49:20, 55:23, 55:24, 58:1, 60:11, 61:3, 64:1, 64:3, 67:22, 71:3, 78:12, 92:13, 94:10, 102:18, 103:2, 105:20, 106:1, 107:11, 107:22, 108:19, 108:25, 109:3, 109:20, 109:25, 110:1, 110:13, 110:14, 111:9, 111:20, 111:21, 112:3, 117:1, 128:3, 128:4, 128:7
**abused** [28] - 14:1, 14:8, 17:5, 17:12, 17:20, 37:6, 37:20, 40:9, 41:14, 43:23, 55:22, 55:23, 56:6, 56:8, 56:9, 60:10, 68:23, 72:24, 77:3, 77:22, 94:13, 94:24, 102:24, 103:16, 108:21, 109:20, 121:14
**abuser** [1] - 107:23
**abusers** [4] - 49:22, 76:15, 103:3, 124:20
**abusing** [4] - 19:14, 39:4, 39:17, 60:20
**accepted** [3] - 33:20, 34:11, 107:19
**accepting** [2] - 34:11, 67:5
**accident** [7] - 106:5, 106:12, 106:18, 107:1, 112:1, 112:2
**accomplish** [1] - 111:1
**according** [1] - 66:8
**account** [5] - 8:22, 28:24, 29:6, 94:20, 107:21
**accrual** [3] - 81:18, 82:25, 110:6
**accrue** [2] - 75:24, 82:19
**accrued** [3] - 50:22, 54:12, 82:4
**accrues** [1] - 57:12
**accused** [2] - 17:13, 119:20
**act** [4] - 10:20, 67:25, 68:10, 112:2
**acted** [1] - 42:25

**acting** [5] - 4:20, 13:5, 38:18, 38:19, 121:11
**action** [13] - 32:22, 41:24, 50:22, 59:21, 63:3, 69:25, 74:13, 82:19, 85:22, 94:20, 99:16, 111:20, 111:21
**actionable** [5] - 24:24, 26:23, 32:22, 47:15, 47:16
**actionably** [1] - 25:10
**actions** [3] - 32:16, 84:19, 117:2
**actively** [1] - 111:3
**activities** [5] - 14:2, 37:10, 44:25, 45:3, 55:17
**activity** [3] - 14:23, 23:24, 45:5
**acts** [1] - 65:3
**actual** [5] - 47:21, 49:16, 65:3, 85:1, 86:12
**add** [4] - 48:7, 48:19, 76:14, 122:19
**added** [1] - 6:20
**addition** [2] - 80:21, 119:1
**additional** [7] - 35:4, 44:4, 46:22, 70:22, 75:9, 103:21, 107:24
**additionally** [2] - 32:22, 85:8
**address** [22] - 7:25, 8:23, 30:23, 31:7, 32:20, 33:1, 36:19, 49:12, 49:14, 51:1, 51:20, 52:15, 80:14, 81:16, 113:10, 114:9, 114:19, 115:19, 119:10, 119:25, 121:22, 121:23
**addressed** [7] - 32:20, 80:16, 88:25, 95:17, 99:6, 115:21, 119:25
**addresses** [1] - 82:24
**addressing** [1] - 17:1
**adequate** [4] - 70:4, 70:17, 74:12, 75:18
**adjudication** [2] - 120:4, 122:10
**adjustable** [1] - 127:11
**administered** [1] - 83:4
**admissible** [1] - 28:9

**admissions** [2] - 57:19, 107:15
**admit** [5] - 6:20, 14:23, 30:1, 40:25, 92:4
**admitted** [3] - 60:17, 61:16, 122:6
**adopt** [1] - 57:15
**adopted** [4] - 62:7, 99:10, 99:11, 118:10
**adult** [4] - 4:19, 39:3, 39:5, 61:18
**advances** [1] - 55:16
**advantage** [1] - 68:22
**adversary** [1] - 18:18
**advertisements** [1] - 40:2
**advice** [1] - 13:4
**advisement** [1] - 128:24
**affected** [3] - 74:13, 74:15, 120:5
**affects** [2] - 75:5, 75:14
**affiliation** [1] - 39:21
**afternoon** [4] - 4:6, 19:8, 69:6, 81:16
**age** [4] - 14:22, 14:24, 14:25, 36:9
**agency** [5] - 19:11, 31:6, 31:8, 125:25, 128:3
**agent** [3] - 19:24, 27:9, 31:19
**agents** [11] - 19:15, 23:11, 31:12, 31:14, 33:5, 33:23, 38:19, 124:19, 124:23, 126:11
**aggrieved** [1] - 58:8
**ago** [3] - 8:10, 23:24, 125:13
**agree** [16] - 20:3, 29:18, 30:20, 33:9, 33:15, 35:21, 35:22, 62:6, 67:17, 71:14, 76:8, 79:16, 122:24, 123:1, 123:3, 126:7
**agreed** [1] - 107:8
**agreement** [5] - 70:21, 84:9, 107:15, 111:11, 111:15
**agrees** [1] - 29:5
**Aha** [1] - 104:2
**ahead** [3] - 30:21, 71:6, 127:24
**aid** [1] - 24:10
**aimed** [1] - 114:11
**akin** [2] - 12:1, 41:15

**al** [2] - 4:4
**alert** [1] - 4:9
**allegation** [9] - 50:6, 58:14, 67:5, 71:22, 72:13, 73:11, 74:18, 79:15, 79:16
**allegations** [14] - 38:12, 50:15, 56:12, 58:15, 60:14, 72:2, 72:5, 72:7, 74:6, 75:7, 78:24, 79:24, 103:21, 116:11
**allege** [9] - 66:1, 69:13, 71:10, 79:21, 102:20, 102:21, 102:23, 103:3, 103:5
**alleged** [5] - 49:19, 55:20, 55:25, 56:1, 56:3, 56:7, 68:1, 73:10, 79:20, 102:13, 102:17, 102:24, 103:17, 104:25
**allegedly** [2] - 65:25, 70:11, 79:4
**alleges** [1] - 4:18
**alleging** [4] - 16:23, 50:12, 59:21, 92:2
**allocated** [2] - 8:16
**allow** [7] - 78:5, 85:3, 85:4, 93:8, 93:9, 100:20, 101:4
**allowance** [2] - 85:15, 87:24
**allowed** [4] - 74:11, 74:16, 85:16, 98:16
**allowing** [3] - 42:16, 84:23, 93:10
**almost** [9] - 12:9, 17:23, 47:4, 51:22, 67:9, 72:18, 80:10, 120:21, 121:16
**alone** [1] - 97:7
**ambiguity** [5] - 106:12, 111:12, 111:14, 111:15, 112:5
**ambiguous** [1] - 111:22
**amended** [1] - 102:12
**Amendment** [8] - 113:7, 115:21, 116:18, 120:25, 121:19, 122:8, 122:20, 124:2
**amendments** [1] - 112:17
**America** [9] - 4:4, 22:13, 22:22, 23:3, 33:6, 34:3, 79:8, 90:16, 125:23

**amount** [3] - 49:13, 51:2, 75:9
**anachronism** [1] - 86:17
**analogous** [1] - 78:2
**analysis** [10] - 54:4, 60:2, 60:24, 64:5, 82:25, 101:24, 102:16, 103:8, 103:10, 108:16
**analyze** [4] - 69:10, 117:3, 117:4, 119:8
**analyzed** [2] - 35:23, 36:12
**analyzing** [1] - 116:23
**Andersen** [12] - 52:1, 56:14, 61:23, 62:7, 68:4, 78:20, 113:15, 113:17, 117:7, 119:17, 124:10, 127:13
**ANDERSEN** [17] - 52:2, 52:11, 52:17, 53:3, 53:12, 56:15, 56:23, 57:13, 58:10, 61:25, 113:20, 113:22, 113:25, 119:18, 119:20, 120:21, 122:1
**Andersen's** [1] - 123:4
**Anderson** [10] - 81:9, 81:16, 81:19, 82:12, 101:6, 108:13, 111:10, 112:8, 116:16, 122:12
**ANDERSON** [19] - 101:7, 101:22, 104:12, 104:16, 104:18, 105:2, 105:8, 106:7, 106:10, 106:16, 106:22, 108:10, 112:9, 122:14, 122:16, 125:1, 126:3, 126:6, 127:5
**Andrus** [6] - 101:24, 101:25, 102:2, 103:7, 103:11, 105:3
**anguish** [3] - 85:15, 85:25, 100:5
**animal** [2] - 92:5, 126:2
**answer** [4] - 58:20, 62:19, 91:5, 105:21
**answers** [3] - 64:2, 88:7, 112:21
**anticipate** [1] - 94:2
**anticipated** [3] -

33:19, 34:10, 36:23
**anticipates** [1] - 92:17
**anticipating** [1] - 82:9
**antiquated** [1] - 93:18
**anxious** [1] - 112:12
**anyplace** [1] - 24:12
**anytime** [1] - 40:8
**anyway** [1] - 54:2
**apart** [1] - 62:19
**apiece** [1] - 42:18
**apologies** [1] - 42:11
**apparent** [1] - 77:17
**appeal** [2] - 66:14, 109:8
**Appeals** [3] - 63:14, 66:16, 91:17
**appeared** [1] - 69:22
**appellant's** [1] - 63:2
**appellate** [1] - 26:18
**apple** [2] - 57:1, 57:6
**applicable** [6] - 47:7, 85:21, 89:19, 93:19, 115:24, 116:4
**application** [4] - 52:24, 54:4, 54:12, 58:12
**applied** [3] - 93:24, 98:21, 115:25
**applies** [10] - 49:7, 52:7, 52:22, 53:15, 54:13, 62:7, 66:12, 80:24, 100:6, 101:17
**apply** [14] - 20:5, 29:2, 29:10, 29:12, 30:19, 53:4, 89:13, 89:20, 90:4, 92:9, 93:18, 95:13, 96:19, 123:3
**applying** [2] - 35:24, 68:6
**appreciate** [3] - 44:3, 48:18, 62:1
**appropriate** [1] - 128:9
**area** [4] - 5:22, 21:5, 113:4, 116:7
**areas** [3] - 28:21, 76:6
**argue** [8] - 8:19, 18:4, 40:7, 48:21, 50:14, 62:14, 64:23, 71:6, 88:17, 90:15, 94:3, 101:6, 106:22, 114:14, 116:17, 118:2, 118:22, 128:15
**argued** [9] - 31:11, 31:13, 34:23, 36:20,

43:2, 52:24, 64:23, 90:18, 119:2
**arguendo** [1] - 62:23
**argues** [2] - 66:14, 93:17
**arguing** [4] - 44:11, 49:8, 51:25, 62:9, 90:19, 100:9, 101:19, 114:21, 115:2, 128:13, 128:14
**argument** [28] - 8:1, 12:8, 12:12, 12:20, 16:23, 16:25, 25:8, 30:6, 33:2, 37:25, 41:8, 52:5, 60:4, 78:5, 80:8, 89:17, 91:15, 102:7, 105:19, 112:13, 113:5, 113:19, 115:8, 120:2, 120:7, 122:9, 125:5
**arguments** [8] - 8:4, 8:23, 42:10, 52:5, 55:1, 83:21, 113:20, 118:23
**arise** [3] - 21:17, 95:15, 98:14
**arisen** [1] - 31:8
**arises** [5] - 8:5, 30:4, 88:22, 96:7, 101:14
**arising** [5] - 19:2, 104:14, 106:5, 111:18
**arm** [1] - 14:23
**arm's** [1] - 92:11
**arm's-length** [1] - 92:11
**Arnold** [5] - 32:3, 77:20, 78:1, 105:20, 107:12
**arose** [2] - 92:13, 98:17
**Article** [1] - 28:11
**article** [8] - 66:17, 83:3, 92:19, 92:24, 93:6, 100:20, 101:3
**articulated** [1] - 33:18
**ascertainable** [2] - 54:13, 54:16
**aside** [1] - 28:6
**aspect** [1] - 82:1
**assert** [2] - 54:21, 87:11
**asserted** [1] - 63:3
**asserting** [2] - 19:1, 66:7
**assess** [1] - 120:11
**assessing** [1] - 29:7
**assistant** [4] - 15:8, 16:17, 37:16, 39:9
**associate** [3] -

19:23, 86:21, 86:22
**association** [1] -
47:19
**assume** [9] - 38:24,
45:20, 49:10, 53:15,
62:22, 83:21, 88:17,
96:22, 111:14
**assumed** [4] - 45:18,
45:20, 52:4, 63:2
**assuming** [3] -
29:11, 37:25, 49:8
**attached** [1] - 97:13
**attended** [1] - 22:17
**attention** [3] - 63:7,
86:2, 97:9
**attorney** [13] - 7:11,
51:9, 51:14, 51:18,
51:23, 80:11, 80:19,
80:21, 81:21, 81:25,
82:20, 100:9
**attorney's** [2] - 51:7,
80:12
**attorney-client** [3] -
7:11, 51:18, 51:23
**attorneys** [3] - 42:10,
82:4, 82:11
**attorneys'** [1] - 80:5
**attracted** [3] - 50:4,
50:12, 73:17
**attributed** [3] -
19:12, 23:12, 80:6
**attributing** [1] -
80:11
**August** [1] - 62:12
**authorities** [2] -
99:9, 99:23
**authority** [2] - 6:11,
122:24
**availability** [1] - 91:1
**available** [22] -
70:20, 84:13, 88:5,
89:9, 89:11, 91:3,
91:21, 91:24, 92:1,
92:20, 93:3, 93:14,
94:4, 96:6, 97:11,
97:21, 98:11, 100:14,
104:5, 104:6, 110:20,
123:10
**avoid** [1] - 60:4
**awarance** [3] - 77:5,
77:6, 78:14
**aware** [7] - 25:25,
58:25, 59:8, 60:9,
60:10, 77:13, 77:15
**awareness** [3] -
78:10, 102:9, 109:22

**B**

**background** [1] -

4:15
**bad** [4] - 57:1, 57:6,
75:15, 75:16
**badge** [12] - 16:7,
16:9, 38:3, 38:4, 38:7,
38:15, 38:18, 38:23,
38:25, 39:8, 39:14,
39:19
**badges** [1] - 27:5
**Bail** [2] - 69:22, 75:4
**Bakes** [1] - 68:12
**banging** [1] - 56:17
**bank** [1] - 107:21
**banker** [1] - 7:12
**banker-customer** [1]
- 7:12
**banned** [1] - 17:8
**bar** [1] - 65:7
**barred** [5] - 54:1,
54:14, 60:5, 60:16,
115:20
**bars** [2] - 53:17, 70:6
**based** [24] - 8:23,
22:9, 23:24, 28:7,
32:17, 32:22, 40:1,
43:1, 52:4, 59:21,
69:2, 74:4, 74:22,
75:7, 78:18, 79:9,
79:10, 80:7, 85:1,
100:3, 104:10,
104:25, 110:14,
120:20
**basis** [13] - 7:21,
9:14, 10:20, 13:4,
33:10, 58:4, 73:11,
75:12, 84:23, 87:9,
90:10, 111:24
**battle** [1] - 125:24
**be-all** [1] - 109:22
**Beach** [1] - 86:10
**beautiful** [1] - 26:22,
26:23
**become** [3] - 23:25,
121:3, 124:11
**becomes** [6] - 71:15,
80:20, 80:21, 81:3,
81:4, 110:7, 111:16,
116:10
**becoming** [1] - 27:23
**Beers** [1] - 11:6
**beg** [1] - 58:22
**begin** [1] - 18:10
**beginning** [2] -
101:24, 126:24
**begs** [1] - 85:5
**behalf** [2] - 4:15,
46:3
**behind** [1] - 54:4
**behoove** [1] - 122:2
**belabor** [1] - 112:5

**beloved** [1] - 24:4
**beneficial** [1] -
102:22
**benefits** [1] - 66:6
**best** [1] - 113:2
**betrayal** [1] - 94:12
**better** [5] - 41:5,
41:23, 66:4, 82:18,
106:21
**between** [22] - 4:17,
5:1, 5:25, 6:4, 9:24,
9:25, 10:1, 11:16,
19:18, 26:14, 31:18,
33:8, 56:20, 61:3,
72:17, 75:6, 75:18,
77:24, 79:23, 85:14,
104:3, 111:20
**beyond** [1] - 121:19
**big** [3] - 18:16,
54:24, 81:23
**binding** [2] - 8:7,
107:4
**Bishop** [1] - 120:8
**bishop** [2] - 55:11,
121:12
**bit** [16] - 5:7, 26:8,
30:25, 39:23, 42:22,
43:5, 83:11, 92:6,
102:7, 113:10,
114:23, 115:21,
116:7, 117:7, 127:14
**black** [1] - 81:24
**black-letter** [1] -
81:24
**Bliss** [1] - 21:1
**blocks** [1] - 60:3
**boat** [1] - 127:22
**Bob** [1] - 68:12
**body** [2] - 93:19,
104:19
**boilerplate** [1] -
112:18
**bone** [1] - 79:15
**Bonner** [1] - 82:23
**book** [3] - 23:22,
24:8, 28:7
**books** [1] - 24:13
**bottom** [4] - 18:24,
18:25, 21:17, 69:9
**bought** [1] - 69:16
**boulder** [5] - 18:15,
18:23, 23:4, 27:7,
124:16
**boulder-in-the-
road** [1] - 124:16
**bound** [4] - 98:24,
99:25, 100:12, 117:12
**bow** [1] - 105:11
**Bowen** [2] - 77:20,
78:1

**boy** [7] - 14:4, 14:22,
56:9, 56:25, 77:2,
78:12, 121:6
**Boy** [31] - 4:4, 4:16,
11:6, 14:8, 14:23,
18:8, 21:13, 22:13,
22:17, 22:21, 23:3,
31:12, 31:19, 33:6,
34:3, 49:19, 50:17,
73:5, 73:8, 73:12,
73:14, 76:18, 79:8,
79:11, 90:15, 108:22,
110:23, 111:13,
125:14, 125:22,
125:23
**Boyle** [1] - 18:11
**boys** [9] - 14:11,
14:15, 14:16, 14:17,
14:24, 58:1, 60:10,
72:24
**breach** [2] - 65:12,
117:1
**break** [5] - 83:10,
83:14, 83:15, 93:1,
103:24
**breakdown** [4] -
26:17, 41:2, 83:20,
84:5
**Brett** [1] - 14:13
**bride** [1] - 24:5
**brief** [25] - 4:12,
11:13, 12:2, 16:20,
47:2, 47:4, 47:18,
47:25, 48:8, 60:7,
81:23, 82:2, 82:3,
87:20, 97:3, 98:3,
100:8, 100:16,
103:20, 110:9, 114:9,
122:14, 123:21, 127:6
**briefed** [2] - 52:23,
79:19
**briefing** [19] - 5:7,
5:24, 6:17, 9:24, 10:3,
21:11, 29:19, 29:25,
31:13, 32:2, 43:2,
46:22, 48:15, 55:1,
55:2, 80:9, 112:22,
120:3, 123:11
**briefly** [7] - 4:23,
67:9, 100:10, 114:19,
119:22, 127:7, 127:25
**briefs** [3] - 49:9,
122:4, 122:18
**bring** [5] - 25:22,
59:21, 61:21, 97:14,
104:20
**bringing** [3] - 113:6,
115:4, 127:17
**brings** [1] - 50:6
**broad** [1] - 90:8

**broader** [7] - 35:19,
38:13, 62:11, 72:7,
72:10, 91:10, 93:24
**broke** [2] - 65:25,
81:10
**brought** [10] - 38:4,
61:22, 109:9, 109:10,
109:11, 109:15,
109:16, 110:5,
110:10, 117:2
**brush** [1] - 105:10
**BSA** [22] - 31:9,
37:12, 38:20, 50:1,
50:4, 50:12, 73:15,
73:17, 73:24, 101:9,
102:20, 102:21,
102:22, 102:23,
102:24, 103:1, 103:4,
118:8, 124:4, 124:20,
125:4, 126:11
**buddies** [1] - 23:10
**building** [2] - 37:9,
70:15
**buildings** [1] - 37:11
**built** [1] - 68:10
**bulky** [1] - 114:17
**bunch** [1] - 112:24
**burden** [11] - 28:24,
29:1, 29:6, 29:12,
30:2, 44:1, 47:11,
80:21, 80:25, 81:3,
114:14
**business** [2] - 19:23,
38:6
**buy** [1] - 24:7
**buying** [1] - 92:11
**buys** [1] - 69:11
**bylaws** [2] - 47:19,
47:24

**C**

**Caldwell** [7] - 15:24,
15:25, 16:1, 16:15,
16:18, 37:9, 63:14
**California** [3] - 99:8,
99:13, 99:14
**callings** [1] - 124:6
**camp** [2] - 23:25,
125:16
**camping** [3] - 27:5,
39:16, 39:17
**camps** [2] - 22:25,
125:17
**candidly** [1] - 112:9
**cannot** [6] - 5:13,
20:22, 22:22, 54:20,
61:15, 82:23
**cap** [1] - 119:14
**capped** [1] - 119:12

**captured** [1] - 102:13
**car** [1] - 92:11
**care** [5] - 10:17, 10:19, 10:23, 11:9, 57:24
**career** [2] - 80:23
**careful** [2] - 21:5, 21:7
**carefully** [1] - 127:2
**Carolina** [1] - 78:21
**carry** [1] - 124:3
**carve** [4] - 26:19, 97:1, 98:8, 99:4
**carve-out** [4] - 26:19, 97:1, 98:8, 99:4
**Case** [1] - 4:3
**case** [206] - 4:15, 6:7, 6:8, 6:22, 7:8, 7:13, 8:7, 8:11, 11:7, 11:8, 11:9, 11:12, 11:14, 11:23, 12:1, 12:2, 12:7, 13:8, 13:14, 14:4, 14:8, 14:10, 14:11, 14:20, 15:2, 15:4, 18:16, 18:22, 19:4, 19:9, 20:7, 20:11, 21:3, 23:13, 25:2, 25:17, 25:23, 25:25, 26:2, 26:9, 26:22, 27:2, 28:25, 30:1, 30:4, 31:3, 31:5, 31:6, 31:7, 33:12, 33:19, 34:3, 34:6, 35:4, 35:6, 35:23, 36:3, 36:12, 36:17, 36:21, 37:22, 38:20, 40:25, 41:1, 41:3, 43:13, 49:18, 51:10, 51:15, 53:7, 53:8, 54:19, 55:21, 58:24, 60:4, 61:19, 63:13, 63:14, 63:19, 63:25, 64:4, 65:18, 65:21, 65:23, 66:4, 66:5, 67:1, 67:3, 67:8, 67:18, 68:20, 69:2, 69:3, 69:9, 69:11, 70:1, 71:6, 71:8, 72:15, 72:16, 72:21, 73:20, 74:16, 76:2, 76:6, 77:9, 78:2, 80:12, 82:2, 82:13, 82:20, 82:21, 84:13, 84:19, 84:22, 85:21, 86:5, 86:10, 86:11, 86:19, 86:20, 87:23, 88:18, 89:7, 91:5, 91:8, 91:10, 91:19, 91:20, 91:22, 91:23, 92:2, 92:7, 92:10,

93:1, 93:7, 93:15, 93:22, 93:23, 93:24, 94:6, 94:8, 94:16, 94:17, 94:19, 95:7, 95:13, 95:24, 96:14, 97:4, 98:6, 98:7, 98:20, 98:21, 99:2, 99:8, 99:9, 99:13, 99:16, 99:17, 99:24, 100:13, 101:13, 104:10, 109:10, 109:25, 113:2, 113:8, 115:7, 115:9, 115:21, 115:22, 117:15, 118:4, 119:13, 119:14, 120:9, 120:17, 120:18, 121:1, 121:17, 121:21, 122:22, 122:24, 122:25, 123:17, 125:12, 126:14, 126:17, 126:18, 126:24, 128:5, 128:9, 128:15
**cases** [52] - 10:4, 10:25, 11:2, 11:21, 11:24, 11:25, 13:7, 13:23, 14:5, 18:14, 19:10, 25:13, 27:18, 28:2, 36:8, 45:2, 53:11, 53:24, 54:1, 54:10, 54:24, 64:9, 78:21, 86:9, 86:12, 86:18, 86:19, 87:5, 87:15, 87:18, 87:22, 95:19, 95:22, 96:13, 97:2, 97:6, 97:23, 97:25, 98:1, 98:3, 98:4, 98:16, 100:14, 100:15, 102:23, 103:4, 116:25, 123:8, 128:8
**cashed** [1] - 66:9
**cast** [1] - 121:18
**casual** [1] - 20:1
**categorical** [1] - 7:14, 12:24
**categories** [1] - 7:9
**category** [4] - 13:13, 20:4, 20:22, 20:23
**Catholic** [8] - 78:22, 82:23, 117:1, 117:3, 117:25, 118:2, 118:18
**caught** [1] - 12:23
**causation** [3] - 27:11, 37:24, 38:9
**caused** [5] - 27:12, 94:6, 94:23, 103:4, 124:21
**cease** [1] - 55:17

**central** [3] - 6:22, 8:2, 101:17
**certain** [7] - 7:9, 47:4, 55:4, 64:15, 82:3, 117:12, 125:20
**certainly** [1] - 8:7, 28:3, 40:13, 43:20, 58:14, 71:21, 89:19, 93:23, 94:8, 116:24, 123:16
**certification** [3] - 52:25, 62:16, 84:16
**certified** [1] - 6:14
**cetera** [1] - 117:2
**challenge** [4] - 50:25, 79:7, 95:17, 105:22
**challenged** [1] - 95:16
**chance** [4] - 29:18, 49:14, 62:14, 100:8
**change** [8] - 41:9, 51:25, 85:24, 86:2, 91:5, 103:19, 117:23, 118:4
**changed** [2] - 42:25, 99:24
**chapter** [1] - 68:14
**characteristics** [2] - 15:1, 70:10
**characterization** [3] - 30:25, 62:14, 63:16
**characterize** [8] - 62:22, 62:25, 63:22, 64:13, 64:17, 67:3, 67:7, 118:9
**characterized** [3] - 65:17, 69:1, 118:5
**characters** [1] - 121:18
**charged** [1] - 98:19
**charitable** [2] - 119:12, 119:15
**Chasan** [6] - 69:5, 71:1, 73:1, 108:11, 109:7, 111:9
**CHASAN** [24] - 69:6, 71:14, 71:22, 72:3, 72:6, 72:14, 74:4, 74:23, 76:5, 76:24, 78:6, 78:9, 79:14, 80:3, 80:14, 80:17, 81:6, 81:12, 108:12, 109:14, 111:7, 111:19, 112:1, 127:17
**check** [1] - 70:16
**checks** [1] - 66:7
**child** [17] - 39:4, 40:14, 40:15, 40:23, 41:14, 49:20, 49:22,

50:5, 50:13, 71:3, 73:18, 73:24, 74:19, 76:15, 102:18, 103:2, 109:3
**children** [12] - 33:21, 34:11, 34:22, 37:21, 39:15, 39:18, 49:22, 50:3, 50:9, 73:17, 103:3, 108:21
**chose** [1] - 67:6
**chosen** [1] - 64:7
**chummy** [1] - 48:25
**church** [13] - 7:16, 13:16, 13:18, 14:6, 14:7, 14:8, 16:5, 16:10, 16:11, 16:12, 21:22, 22:2, 32:6
**Church** [53] - 11:4, 11:9, 11:17, 13:17, 14:13, 14:23, 16:7, 16:19, 17:7, 17:8, 17:18, 19:12, 31:19, 32:9, 33:5, 33:24, 34:6, 34:7, 36:22, 37:13, 37:18, 38:19, 44:19, 44:21, 46:9, 50:17, 50:19, 55:10, 55:14, 55:16, 56:3, 56:6, 56:11, 59:9, 59:18, 60:1, 60:2, 73:6, 73:9, 73:14, 78:22, 79:4, 108:22, 111:12, 116:2, 116:24, 117:1, 117:25, 118:10, 118:12, 122:17, 124:6
**Church's** [1] - 106:20
**church-parishioner** [1] - 7:16
**church-sponsored** [1] - 16:5
**circles** [1] - 127:8
**Circuit** [4] - 29:5, 29:12, 30:8, 98:22
**circumstances** [3] - 11:8, 40:10, 86:5
**citation** [1] - 92:24
**citations** [1] - 86:7
**cite** [10] - 10:4, 12:5, 16:14, 17:7, 84:19, 87:20, 94:15, 95:19, 95:23, 100:16
**cited** [21] - 11:1, 11:14, 12:2, 13:14, 25:18, 84:13, 84:14, 85:14, 86:10, 86:18, 87:15, 88:3, 90:7, 92:19, 97:3, 97:4, 97:6, 98:3, 99:7,

100:20
**cites** [3] - 84:22, 86:8
**citizen** [2] - 24:1, 24:9
**city** [1] - 12:17
**Civil** [2] - 4:3, 46:23
**civil** [9] - 87:16, 87:21, 115:16, 115:24, 116:5, 122:25, 128:15, 128:18
**claim** [76] - 4:24, 5:14, 19:2, 19:4, 31:2, 33:11, 43:4, 50:8, 53:17, 54:11, 54:21, 60:13, 61:21, 62:22, 63:1, 63:3, 63:23, 64:14, 64:17, 64:23, 65:2, 65:4, 65:14, 65:16, 66:18, 66:19, 70:3, 70:7, 70:9, 70:12, 71:11, 71:13, 72:1, 75:23, 84:21, 84:24, 84:25, 85:1, 85:3, 85:4, 85:10, 87:11, 87:12, 89:17, 89:18, 91:22, 92:3, 92:4, 92:5, 92:9, 94:4, 95:20, 96:1, 96:8, 96:15, 98:16, 99:4, 99:22, 103:17, 107:2, 110:13, 110:14, 114:15, 115:4, 117:10, 117:13, 117:14, 117:23, 124:17, 124:25, 125:3, 128:5
**claims** [27] - 54:14, 56:9, 70:11, 89:20, 91:25, 92:21, 93:14, 95:8, 95:15, 96:1, 96:25, 97:8, 98:14, 105:20, 105:25, 108:20, 109:9, 109:10, 109:11, 109:12, 111:18, 115:20, 117:1, 117:25, 118:5, 128:7
**clarified** [1] - 6:19
**clarify** [1] - 20:15
**clarifying** [1] - 42:12
**class** [2] - 69:10, 89:21
**classic** [3] - 25:2, 64:9, 67:12
**clean** [2] - 63:18, 112:23
**clear** [26] - 6:15, 7:3, 9:10, 16:8, 29:1, 29:16, 30:6, 43:12,

48:9, 54:19, 54:20, 58:14, 81:24, 88:3, 88:18, 93:4, 93:5, 93:12, 95:11, 99:16, 107:11, 112:17, 112:24, 114:25, 115:11, 115:22

**clearly** [8] - 6:13, 21:3, 67:22, 80:23, 93:15, 98:4, 126:22

**CLERK** [2] - 4:3, 84:8

**client** [12] - 7:11, 21:13, 22:6, 22:7, 22:9, 23:12, 51:8, 51:12, 51:18, 51:23, 82:14, 111:17

**client's** [1] - 21:20

**clients** [10] - 23:23, 41:22, 42:24, 51:5, 51:9, 51:14, 51:17, 77:22, 80:12, 80:24

**clock** [5] - 42:3, 42:7, 48:7, 81:9, 81:10

**close** [7] - 19:4, 19:23, 27:6, 30:18, 55:10, 104:21, 111:24

**closely** [2] - 38:2, 46:6

**club** [1] - 49:1

**coach** [3] - 12:15, 13:25, 14:1

**Code** [1] - 87:20, 87:21

**coin** [3] - 108:14, 120:22, 120:23

**colleague** [3] - 47:13, 81:16, 82:12

**colloquy** [1] - 111:10

**color** [1] - 92:6

**colorably** [1] - 28:10

**comfort** [1] - 86:1

**coming** [3] - 37:16, 125:7, 125:8

**commenced** [1] - 21:10

**comment** [8] - 5:21, 8:3, 12:22, 51:4, 78:4, 78:19, 117:11, 125:19

**comments** [6] - 4:13, 49:2, 52:7, 53:5, 100:10, 114:8

**commercial** [8] - 8:5, 25:24, 64:10, 67:11, 81:12, 87:2, 87:6, 92:10

**commit** [1] - 121:25

**committed** [1] - 77:16

**committee** [1] -

16:16

**communicating** [1] - 81:25

**communications** [2] - 125:14, 125:17

**community** [2] - 38:5, 38:19

**comp** [1] - 66:6

**compare** [2] - 21:13, 22:6

**compared** [2] - 21:20, 108:4

**complaint** [20] - 9:7, 49:24, 55:5, 55:8, 56:7, 59:16, 72:13, 73:20, 74:4, 74:22, 75:7, 77:10, 79:16, 79:21, 79:23, 79:24, 81:18, 102:12, 104:22, 117:11

**complete** [1] - 121:3

**completed** [1] - 76:3

**completely** [3] - 58:5, 78:2, 128:15

**computation** [1] - 86:6

**concealed** [1] - 111:3

**conceded** [2] - 27:8, 31:11

**conceive** [1] - 43:6

**concept** [5] - 7:18, 21:18, 28:12, 68:5, 94:16

**concepts** [1] - 68:9

**conceptually** [1] - 104:9

**concern** [4] - 49:18, 52:16, 72:11, 80:10

**concerned** [5] - 5:24, 12:23, 51:19, 55:10, 74:25

**concerning** [2] - 7:8, 74:14

**concerns** [3] - 51:16, 52:15, 76:7

**conclude** [5] - 7:22, 28:5, 29:5, 31:14, 79:1

**concluded** [3] - 26:1, 28:23, 129:1

**concludes** [1] - 5:16

**conclusion** [1] - 8:13

**conclusions** [1] - 87:7

**conclusive** [3] - 35:18, 35:22, 37:20

**concurrent** [2] - 51:10, 51:11

**concurrently** [1] -

51:10

**condition** [4] - 69:17, 75:3, 75:5, 75:14

**conduct** [4] - 23:12, 43:1, 55:12, 103:5

**conduit** [1] - 123:9

**confess** [1] - 92:23

**confession** [1] - 22:3

**confidence** [59] - 4:25, 5:23, 6:5, 6:9, 6:12, 7:4, 7:14, 7:19, 9:2, 9:11, 9:18, 9:20, 9:25, 10:2, 10:6, 10:24, 11:11, 11:22, 12:25, 19:16, 19:19, 19:21, 20:6, 20:23, 22:5, 24:12, 25:3, 28:6, 31:17, 31:18, 31:25, 33:9, 33:12, 33:23, 33:25, 34:16, 34:24, 35:1, 35:15, 35:20, 36:1, 36:5, 36:6, 36:11, 36:17, 36:18, 64:18, 85:9, 85:17, 87:13, 88:11, 88:23, 92:14, 92:16, 103:22, 104:4, 116:23, 117:17, 117:21

**confident** [1] - 48:13

**confidential** [6] - 9:1, 11:15, 12:20, 76:19, 88:11, 110:21

**confidentiality** [2] - 80:20, 81:4

**confirmed** [8] - 75:1, 107:16, 107:17, 107:18, 107:19, 107:20, 107:21

**confirming** [1] - 59:16

**conflated** [1] - 7:18

**conflation** [3] - 5:25, 9:5, 9:23

**confluence** [1] - 36:16

**confused** [1] - 126:10

**confusing** [2] - 114:16, 128:6

**confusion** [2] - 6:20, 125:2

**conjugal** [1] - 86:1

**connects** [1] - 125:3

**consequence** [1] - 64:24

**consider** [2] - 4:14, 36:10

**consideration** [3] - 47:11, 76:1, 109:5

**considered** [3] - 35:25, 125:22, 126:20

**consolidated** [1] - 27:18

**constitute** [4] - 73:22, 78:15, 78:17, 109:23

**constitutes** [1] - 20:6

**constituting** [5] - 54:23, 58:7, 70:24, 71:18, 102:9

**Constitution** [1] - 83:3

**constructive** [78] - 4:24, 6:6, 8:4, 9:1, 23:13, 31:22, 32:17, 33:10, 38:9, 40:4, 41:21, 50:7, 50:11, 53:16, 54:21, 56:5, 59:25, 60:13, 61:10, 61:21, 63:3, 64:5, 64:7, 64:9, 64:17, 65:11, 65:12, 69:1, 71:11, 73:2, 73:7, 79:21, 84:13, 84:21, 84:25, 85:3, 85:8, 85:14, 86:12, 86:15, 87:11, 87:25, 88:22, 89:20, 89:21, 89:25, 90:4, 90:9, 91:3, 91:9, 91:19, 91:20, 91:21, 91:24, 92:5, 92:21, 93:14, 93:25, 94:4, 94:21, 95:6, 95:8, 95:20, 96:8, 96:15, 96:25, 97:18, 97:25, 98:4, 99:18, 99:22, 100:14, 100:21, 103:23, 104:6, 111:21, 126:23

**construe** [1] - 30:16

**construed** [1] - 54:9

**contact** [1] - 12:14

**contacted** [1] - 97:11

**contain** [1] - 55:3

**contained** [1] - 55:8

**contemplate** [1] - 89:24

**contemplated** [1] - 92:2

**contemporaneous** [1] - 77:23

**contended** [1] - 84:12

**contends** [1] - 70:12

**contention** [2] - 74:9, 74:10

**contest** [1] - 58:13

**contested** [2] - 37:1, 43:19

**context** [20] - 52:25, 60:3, 87:25, 89:13, 90:1, 91:13, 91:14, 91:18, 92:18, 97:19, 99:5, 100:18, 100:23, 115:16, 115:25, 116:25, 123:11, 123:13, 124:23, 128:4

**continually** [1] - 10:3

**continue** [2] - 4:10, 41:6

**continuum** [3] - 110:2, 110:4, 110:6

**contract** [7] - 68:14, 87:16, 87:21, 107:2, 107:3, 107:6, 107:8

**contracts** [1] - 93:19

**contractual** [5] - 95:16, 96:7, 98:12, 98:14, 98:15

**contrary** [1] - 8:6

**contrast** [1] - 21:13

**contributing** [1] - 94:15

**conundrum** [1] - 77:2

**conversation** [1] - 123:12

**conversations** [1] - 21:25

**conversion** [2] - 66:19

**convince** [3] - 29:13, 29:16, 91:4

**convinces** [1] - 86:21

**convincing** [4] - 29:1, 29:17, 30:6, 48:9

**copies** [2] - 18:24, 28:8

**copy** [1] - 97:12

**core** [4] - 71:10, 71:21, 95:25, 104:15

**Corp** [1] - 99:8

**corporate** [1] - 23:3

**corporation** [3] - 22:7, 28:7, 110:17

**corporations** [1] - 22:7

**correct** [11] - 9:13, 30:19, 30:20, 53:11, 53:12, 53:13, 59:3, 66:17, 84:2, 119:18, 120:5

**corrected** [1] - 42:8

**council** [1] - 125:15

**councils** [2] - 22:23, 125:23

**Counsel** [5] - 4:6,

4:21, 8:14, 18:15, 96:10

**counsel** [17] - 4:11, 4:14, 6:16, 7:24, 25:7, 48:20, 49:2, 51:20, 61:19, 64:11, 83:8, 83:19, 113:13, 118:8, 121:2, 124:18, 128:23

**counsel's** [2] - 61:8, 77:13

**counselor** [4] - 38:4, 38:7, 39:14, 39:20

**counselors** [6] - 38:4, 38:16, 38:18, 38:23, 38:25, 39:8

**count** [1] - 63:16

**country** [1] - 19:10

**couple** [2] - 7:7, 27:10

**course** [12] - 4:24, 5:12, 8:3, 19:13, 42:25, 49:6, 51:8, 63:8, 68:1, 114:13, 117:16, 128:16

**court** [88] - 4:3, 5:16, 6:7, 7:1, 7:20, 9:3, 11:15, 12:19, 20:9, 21:2, 21:5, 24:22, 25:17, 26:18, 27:20, 28:24, 35:10, 46:24, 49:4, 49:10, 51:18, 52:6, 52:8, 52:18, 52:20, 53:1, 53:4, 54:19, 55:5, 57:25, 58:5, 59:7, 59:25, 60:23, 61:4, 62:15, 62:17, 62:21, 63:1, 63:6, 63:7, 63:8, 63:9, 63:10, 63:11, 63:22, 66:2, 66:13, 69:23, 78:12, 82:6, 84:15, 84:16, 84:22, 85:13, 87:19, 89:5, 89:10, 89:15, 89:16, 90:1, 90:7, 95:14, 96:18, 97:7, 98:19, 98:24, 98:25, 99:1, 99:6, 99:25, 101:17, 103:1, 103:18, 104:20, 106:3, 110:12, 117:10, 117:14, 120:11, 120:24, 121:2, 122:5, 122:7, 126:18

**Court** [54] - 6:14, 7:3, 8:25, 9:10, 9:19, 13:1, 25:16, 26:1, 28:22, 29:2, 29:8, 33:14, 34:3, 36:4, 36:8, 47:19, 52:13, 52:25,

54:20, 62:13, 62:18, 62:19, 63:14, 63:22, 65:23, 66:16, 66:24, 67:3, 70:18, 77:4, 78:13, 84:17, 88:2, 88:4, 89:2, 89:4, 89:14, 91:12, 91:16, 91:23, 93:15, 93:22, 94:19, 96:16, 99:10, 100:13, 108:18, 108:25, 109:8, 110:10, 114:25, 115:11

**court's** [9] - 58:20, 60:2, 60:6, 62:25, 84:23, 91:20, 93:24, 112:10, 127:3

**Court's** [3] - 20:5, 98:7, 100:16

**courts** [5] - 35:24, 85:13, 98:23, 117:3, 117:24

**cover** [4] - 4:11, 81:22, 85:24, 113:6

**covered** [2] - 49:9, 80:8

**covers** [1] - 114:24

**CR300** [1] - 82:16

**CR304** [1] - 82:7

**CR315** [1] - 97:15

**crazy** [2] - 113:20, 113:21

**create** [4] - 22:25, 43:9, 44:1, 81:25

**created** [3] - 70:23, 76:10, 77:6

**creates** [3] - 41:25, 71:16, 110:2

**creating** [1] - 42:23

**cries** [1] - 42:18

**criminal** [2] - 23:24, 67:25

**criminals** [1] - 23:11

**critical** [3] - 6:2, 68:9, 96:5

**critically** [1] - 68:4

**crossed** [1] - 127:19

**Cub** [1] - 37:4

**customer** [1] - 7:12

**cut** [2] - 21:2, 113:14

**cutting** [1] - 18:17

**D**

**Dale** [1] - 34:3

**damage** [1] - 54:12, 82:24

**damaged** [3] - 54:16, 94:10, 94:11

**damages** [67] - 8:6,

63:25, 64:25, 65:13, 67:13, 67:20, 83:24, 84:4, 84:10, 84:11, 84:12, 84:18, 84:21, 84:24, 85:4, 85:15, 85:16, 85:21, 85:22, 86:3, 87:1, 87:3, 87:7, 87:10, 87:24, 88:5, 88:16, 88:21, 89:7, 90:9, 90:10, 91:2, 91:21, 91:24, 92:17, 92:20, 93:2, 93:13, 94:3, 94:5, 94:14, 94:17, 94:23, 95:6, 95:11, 96:6, 96:9, 96:25, 97:5, 97:8, 98:10, 98:11, 99:2, 99:15, 99:18, 100:4, 100:14, 100:21, 101:4, 103:5, 106:1, 111:18, 119:12, 119:14, 124:21

**Danahy** [6] - 4:8, 18:25, 35:8, 62:4, 83:23, 84:5

**DANAHY** [1] - 84:8

**danger** [2] - 39:11, 78:11

**dangerous** [2] - 102:21, 102:25

**dangerousness** [1] - 77:12

**dangers** [4] - 38:10, 38:11, 38:13, 108:24, 111:3

**date** [4] - 54:5, 57:18, 58:22, 59:11

**dates** [1] - 107:22

**dating** [1] - 99:14

**David** [1] - 15:16

**days** [2] - 34:8, 39:16

**dead** [3] - 76:20, 83:6

**deal** [6] - 38:25, 39:3, 39:5, 54:24, 113:3, 123:17

**dealing** [2] - 28:10, 97:16

**debate** [2] - 21:15, 41:15

**Deborah** [1] - 69:22

**debtor** [1] - 21:2

**debtor-lender** [1] - 21:2

**deceased** [1] - 120:9

**deceit** [1] - 99:15

**deceived** [1] - 108:22

**December** [1] - 110:22

**decent** [1] - 70:5

**deception** [2] - 78:18, 94:12

**decide** [6] - 40:13, 58:6, 63:1, 99:1, 110:2, 120:20

**decided** [1] - 109:4

**deciding** [3] - 28:23, 53:23, 63:2

**decision** [11] - 6:21, 8:10, 33:16, 80:7, 98:8, 98:25, 105:16, 108:5, 110:10, 111:24, 128:24

**decisions** [2] - 98:24, 109:25

**declaration** [3] - 25:4, 97:13, 97:14

**declarations** [1] - 47:21

**defendant** [16] - 5:1, 6:10, 6:12, 13:2, 19:15, 25:5, 33:19, 49:15, 66:10, 66:15, 69:16, 111:25, 115:2, 118:23

**Defendant** [1] - 73:17

**Defendants** [2] - 50:4, 50:12

**defendants** [29] - 5:18, 8:16, 26:2, 29:20, 30:5, 32:19, 34:23, 39:25, 40:7, 42:16, 43:2, 44:10, 48:12, 49:6, 49:13, 50:1, 51:2, 72:22, 73:12, 73:15, 90:25, 91:15, 94:2, 97:24, 98:3, 112:25, 115:7, 115:17, 116:16

**defendants'** [2] - 41:8, 49:17

**defending** [1] - 120:18

**defense** [14] - 52:16, 112:25, 114:5, 114:20, 114:21, 114:24, 115:20, 119:11, 120:2, 120:3, 123:22, 128:1, 128:9, 128:10

**defenses** [9] - 84:6, 112:13, 112:19, 112:21, 112:23, 114:11, 114:16, 119:9, 119:24

**defer** [1] - 82:11

**deference** [2] - 116:9, 118:3

**defined** [1] - 112:2

**definitely** [1] - 15:8

**delay** [3] - 83:4, 115:17, 128:18

**deliberate** [1] - 112:2

**delivered** [1] - 18:25

**demonstrate** [1] - 53:17

**Denckla** [1] - 46:23

**denial** [2] - 114:15, 121:3

**denials** [1] - 113:1

**deny** [2] - 28:23, 122:8

**Department** [1] - 70:15

**dependent** [2] - 121:1, 121:5

**depo** [1] - 81:7

**depos** [1] - 81:6

**deposed** [1] - 15:24

**deposited** [1] - 107:20

**deposition** [12] - 45:10, 46:1, 47:22, 58:19, 58:21, 60:15, 60:17, 64:2, 105:15, 106:14, 106:17, 107:14

**depositions** [2] - 53:22, 72:18

**deprivation** [1] - 86:1

**deprived** [3] - 115:9, 115:13, 128:20

**depth** [1] - 81:2

**derived** [1] - 30:18

**described** [2] - 9:3, 65:17

**describing** [1] - 65:15

**designed** [2] - 26:16, 95:9

**detail** [4] - 5:22, 79:21, 119:10, 123:11

**details** [3] - 75:22, 76:4, 79:22

**determination** [2] - 20:24, 49:7

**determine** [5] - 6:2, 7:5, 48:11, 49:4, 61:2

**determined** [1] - 111:10

**develop** [1] - 108:5

**developable** [1] - 70:4

**developed** [2] - 5:12, 7:9

**development** [1] - 63:6

**devote** [1] - 103:25
**dialogue** [1] - 35:9
**difference** [11] -
10:1, 13:21, 19:20,
26:5, 48:16, 75:18,
77:24, 79:19, 79:20,
85:7, 105:18
**different** [38] - 7:4,
8:12, 10:6, 14:4,
14:16, 14:17, 14:18,
14:25, 15:5, 15:11,
16:18, 26:22, 35:19,
36:20, 41:24, 53:9,
61:12, 83:21, 85:6,
92:6, 92:10, 93:1,
100:9, 102:3, 102:4,
102:7, 104:8, 105:15,
105:16, 106:2,
106:19, 108:2,
109:12, 114:23,
124:12, 126:1, 128:4
**differentiate** [1] -
19:18
**differentiates** [1] -
19:9
**differently** [2] -
20:10, 42:25
**differs** [1] - 128:10
**difficult** [1] - 110:19
**difficulties** [2] -
120:17, 120:18
**diligence** [5] - 61:2,
104:13, 109:17,
109:18
**diligent** [3] - 71:17,
110:7, 110:24
**diligently** [1] - 70:24
**dimension** [1] -
123:1
**Diocese** [1] - 82:23
**directed** [2] - 13:1,
30:9
**direction** [1] - 8:23
**dirty** [1] - 35:9
**disability** [1] - 66:6
**disagree** [6] - 7:24,
20:8, 49:6, 68:4,
100:12, 109:15
**disagreed** [1] - 28:22
**disappear** [1] - 75:25
**disappears** [1] - 71:7
**discern** [1] - 26:4
**disclose** [3] - 32:18,
34:20, 40:5
**disclosed** [3] - 40:7,
41:10, 125:12
**discover** [5] - 54:22,
70:22, 73:2, 73:3,
110:4
**discoverable** [1] -

72:25
**discovered** [10] -
54:23, 55:11, 58:3,
58:4, 61:14, 70:19,
72:17, 74:15, 102:8,
109:18
**discovery** [34] - 5:12,
22:11, 26:13, 27:18,
31:8, 32:2, 53:21,
54:6, 54:24, 62:9,
66:12, 68:10, 70:24,
71:17, 72:19, 75:23,
76:3, 76:14, 76:22,
76:24, 78:11, 78:15,
78:16, 78:17, 82:6,
82:14, 104:1, 109:23,
110:1, 110:3, 110:4,
110:8, 111:1
**discretion** [1] - 86:6
**discussed** [1] -
91:12
**discussion** [4] -
7:16, 21:10, 27:17,
52:6
**disgrace** [1] - 85:25
**dismiss** [2] - 67:18,
114:12
**dismissed** [5] - 39:4,
67:16, 69:3, 69:19,
98:17
**disparity** [2] - 36:9
**disposal** [1] - 70:5
**dispositive** [1] -
110:11
**dispute** [4] - 8:2,
40:6, 61:20, 93:20
**disputed** [7] - 5:10,
5:17, 20:25, 29:14,
30:15, 38:1, 42:23
**disputing** [1] - 11:4
**distinct** [1] - 112:3
**distinction** [6] -
19:19, 26:25, 56:20,
75:6, 87:18, 93:23
**distinguish** [1] -
85:13
**distinguished** [1] -
111:20
**distinguishes** [1] -
40:24
**distinguishing** [4] -
14:21, 15:1, 86:14,
92:15
**distress** [6] - 64:3,
96:3, 99:18, 99:20,
100:5
**district** [8] - 15:22,
17:16, 39:7, 63:1,
63:8, 66:13, 69:23,
89:16

**dive** [1] - 26:7
**diversity** [2] - 47:5,
63:8
**Dobbs** [1] - 96:4
**Docket** [1] - 102:15
**doctor** [1] - 65:24
**doctrine** [8] - 6:6,
115:23, 116:2,
116:21, 116:24,
117:5, 119:4, 119:8
**document** [4] -
16:19, 24:6, 68:15,
108:3
**documents** [2] -
72:19, 120:13
**Doe** [72] - 4:4, 6:7,
6:21, 8:7, 8:11, 13:15,
15:4, 15:6, 15:10,
15:11, 15:12, 15:14,
15:20, 15:25, 16:5,
16:13, 16:15, 17:4,
17:11, 17:12, 17:17,
17:20, 17:22, 17:25,
31:7, 35:6, 35:17,
35:23, 36:12, 36:20,
37:8, 37:20, 44:18,
44:19, 44:20, 44:24,
45:1, 45:9, 51:6, 51:7,
53:5, 53:6, 53:9,
53:10, 55:18, 55:21,
55:24, 57:20, 57:21,
58:15, 58:18, 58:21,
60:4, 61:11, 90:25,
91:22, 92:7, 94:18,
95:17, 95:18, 99:6,
101:8, 105:9, 105:15,
108:8, 111:8, 115:21,
123:8
**Doe's** [1] - 94:20
**done** [7] - 27:22,
28:12, 43:6, 67:4,
72:1, 81:23, 87:2
**door** [2] - 34:24,
68:18
**dots** [1] - 125:3
**doubting** [1] - 46:8
**Douglas** [2] - 77:19,
78:1
**down** [7] - 35:17,
70:15, 93:1, 103:24,
106:24, 110:18,
127:14
**drafted** [1] - 106:21
**drafting** [1] - 112:15
**draftsman** [1] -
68:15
**draw** [2] - 56:20,
87:6
**drive** [1] - 112:11
**driven** [1] - 65:2

**dual** [3] - 116:12,
118:16, 121:7
**duck** [2] - 65:5, 65:6
**due** [30] - 26:17,
39:21, 67:2, 81:15,
95:18, 106:21, 113:4,
113:8, 114:5, 114:20,
114:23, 115:2, 115:9,
115:15, 117:2, 120:2,
120:10, 122:18,
122:23, 122:25,
123:2, 123:16,
123:20, 123:23,
128:10, 128:14,
128:16, 128:17,
128:18
**duper** [1] - 58:11
**duress** [1] - 107:19
**during** [5] - 21:24,
22:9, 39:17, 118:20,
120:12
**duty** [18] - 9:25,
10:12, 10:13, 10:17,
10:20, 10:23, 19:22,
21:17, 21:19, 34:16,
34:19, 34:20, 65:12,
67:7, 117:2
**dynamic** [2] -
117:24, 118:4

## E

**earnestly** [1] - 63:4
**earth** [1] - 71:7
**easier** [2] - 32:21,
91:2
**easily** [1] - 34:9
**economic** [11] -
64:24, 64:25, 67:13,
89:22, 90:9, 93:2,
95:9, 95:12, 96:8,
96:25, 97:8
**effect** [2] - 22:20,
72:8
**effectively** [1] - 24:1
**effects** [1] - 115:14
**effort** [5] - 103:20,
107:5, 124:5, 124:17,
128:20
**eight** [4] - 4:25, 5:14,
5:18, 8:10
**eighth** [1] - 120:1
**either** [9] - 8:9,
11:16, 51:9, 77:18,
88:25, 91:4, 91:6,
115:3, 125:2
**element** [11] - 5:22,
32:19, 42:23, 43:12,
43:19, 44:1, 60:1,
95:25, 96:1, 101:12,

101:13
**elements** [23] - 4:22,
4:24, 4:25, 5:14, 5:16,
5:18, 23:14, 24:15,
38:21, 41:21, 44:6,
61:20, 64:8, 65:11,
65:15, 65:16, 67:11,
79:23, 85:2, 113:1,
117:13, 117:16
**elicit** [1] - 75:22
**elite** [1] - 14:15
**elsewhere** [1] - 60:6
**email** [1] - 52:4
**embodied** [1] - 73:20
**emotional** [6] - 64:3,
92:18, 96:3, 99:18,
99:20, 100:5
**emphasize** [1] - 62:1
**employee** [2] - 25:5,
39:6
**employees** [4] -
22:8, 22:17, 22:18,
23:18
**encourage** [1] -
100:19
**encouraged** [1] -
14:24
**encyclopedic** [1] -
80:22
**end** [7] - 52:19, 65:8,
76:2, 82:20, 109:22,
126:24
**end-all** [1] - 109:22
**ended** [1] - 12:15
**engaged** [1] - 55:12
**English** [1] - 28:15
**ensure** [1] - 126:19
**entanglement** [7] -
115:23, 116:3,
116:21, 119:4, 119:7,
121:20, 124:4
**enter** [1] - 85:23
**entertain** [1] - 52:6
**enticing** [1] - 24:4
**entire** [6] - 19:8,
60:4, 68:14, 68:15,
81:17, 97:16
**entitled** [3] - 60:24,
83:4, 86:2
**entrust** [1] - 13:24
**entrusted** [2] -
10:19, 11:9
**entrusting** [1] -
40:14
**environment** [3] -
50:3, 50:9, 73:16
**equally** [1] - 62:7
**equipment** [1] -
26:11
**Erie** [8] - 46:22, 47:5,

63:9, 68:6, 95:14, 98:19, 98:20
  **especially** [2] - 11:1, 108:15
  **essence** [2] - 63:24, 66:23
  **essential** [1] - 70:2
  **essentially** [2] - 105:12, 123:9
  **establish** [5] - 72:20, 73:8, 73:9, 74:5, 74:7
  **established** [3] - 7:9, 72:21, 75:16
  **Estates** [1] - 24:23
  **et** [3] - 4:4, 117:2
  **ether** [1] - 75:25
  **evaluate** [1] - 119:5
  **event** [2] - 12:18, 118:19
  **evidence** [56] - 15:6, 15:9, 15:15, 16:4, 16:6, 16:13, 16:14, 17:7, 22:16, 28:9, 29:1, 29:15, 29:17, 30:3, 30:7, 30:10, 30:16, 31:14, 33:4, 34:10, 36:14, 37:3, 39:24, 40:2, 41:20, 42:22, 44:1, 44:19, 45:2, 45:4, 46:7, 47:18, 48:10, 61:2, 70:7, 70:8, 71:23, 94:5, 94:8, 94:10, 94:21, 94:22, 95:1, 102:4, 105:4, 106:13, 111:16, 113:11, 115:6, 115:9, 120:4, 121:1, 121:24, 122:5, 122:6
  **exact** [3] - 40:10, 61:19, 103:13
  **exactly** [6] - 8:15, 23:16, 23:22, 78:2, 92:21, 120:5
  **examine** [1] - 38:2
  **examines** [1] - 92:19
  **example** [8] - 71:2, 71:3, 96:11, 97:2, 119:10, 121:6, 123:6, 124:7
  **except** [5] - 5:9, 25:21, 92:6, 96:17, 119:10
  **exception** [17] - 47:23, 48:2, 62:6, 62:8, 66:12, 68:10, 86:15, 88:6, 90:3, 90:6, 90:7, 90:8, 90:11, 93:25, 95:12, 96:9

  **excessive** [1] - 115:23
  **exchange** [1] - 117:8
  **exchanging** [1] - 35:8
  **exclusions** [3] - 7:15, 12:24, 20:4
  **excuse** [5] - 56:16, 63:15, 66:16, 117:8, 126:12
  **executive** [4] - 37:12, 45:24, 46:3, 46:9
  **exist** [3] - 33:25, 36:5, 96:16
  **existed** [1] - 117:4
  **existence** [3] - 6:9, 25:8, 40:7
  **exists** [4] - 5:23, 7:23, 126:7, 128:19
  **expand** [2] - 57:5, 57:7
  **expected** [1] - 110:25
  **experience** [1] - 126:25
  **explain** [2] - 52:22, 105:14
  **explicit** [2] - 32:17, 32:24
  **explicitly** [3] - 33:14, 33:21, 34:1
  **exponentially** [1] - 118:24
  **exposed** [1] - 49:22
  **exposing** [1] - 103:3
  **express** [1] - 88:13
  **expressly** [2] - 63:15, 82:15
  **extending** [1] - 115:3
  **extensively** [1] - 12:13
  **extent** [4] - 5:9, 52:14, 74:7, 75:21
  **extra** [4] - 14:11, 14:14, 57:17, 58:10
  **extracurricular** [1] - 14:2
  **extrapolating** [1] - 96:19
  **extremely** [1] - 22:3

## F

  **F.3d** [1] - 98:23
  **face** [4] - 66:25, 67:5, 71:7, 119:19
  **fact** [76] - 5:10, 5:11, 5:17, 6:3, 6:13, 6:14, 6:23, 7:5, 7:20, 13:20,

20:25, 24:16, 25:11, 26:20, 27:23, 28:8, 29:6, 29:14, 30:15, 31:12, 32:2, 37:1, 37:19, 37:25, 38:2, 40:12, 40:22, 41:11, 42:1, 42:23, 43:9, 43:25, 44:2, 45:9, 45:20, 49:4, 49:5, 50:24, 58:2, 59:4, 59:22, 61:4, 63:20, 64:15, 65:18, 65:19, 70:14, 70:18, 70:23, 71:5, 71:14, 71:16, 71:23, 72:20, 73:14, 73:23, 74:8, 74:11, 78:11, 79:2, 79:11, 82:1, 84:5, 88:21, 94:7, 96:14, 106:4, 107:18, 109:1, 112:4, 117:22, 121:4, 121:6, 123:17
  **factor** [4] - 70:5, 86:14, 92:15, 94:15
  **factors** [7] - 35:4, 35:23, 35:25, 36:10, 36:12, 36:16
  **facts** [57] - 5:11, 12:18, 13:8, 20:7, 20:10, 23:7, 24:18, 24:20, 27:19, 27:21, 27:25, 28:11, 34:15, 40:25, 53:17, 54:23, 55:18, 57:20, 58:7, 58:13, 59:14, 59:20, 60:6, 60:7, 60:20, 60:25, 65:8, 70:24, 71:10, 71:15, 71:18, 71:20, 71:21, 72:15, 72:16, 75:9, 78:15, 78:17, 79:22, 81:24, 81:25, 102:1, 102:5, 102:6, 102:9, 102:15, 102:17, 104:15, 105:1, 105:19, 109:12, 109:23, 110:5, 111:1, 123:14
  **factual** [13] - 7:21, 20:4, 20:24, 50:7, 72:2, 72:3, 74:5, 92:7, 103:6, 103:14, 104:19, 105:5, 113:13
  **factually** [1] - 13:6
  **fail** [1] - 5:15
  **failure** [4] - 17:21, 32:18, 40:5, 68:21
  **fair** [6] - 49:13, 51:2, 96:22, 106:7, 122:25, 125:24
  **fairly** [3] - 8:2, 33:14,

112:17
  **fairness** [3] - 62:16, 65:10, 113:7
  **faith** [1] - 22:1
  **fall** [3] - 7:17, 20:22, 41:18
  **falls** [1] - 54:4
  **false** [42] - 5:3, 24:15, 24:18, 25:6, 25:10, 26:3, 26:5, 26:20, 28:10, 39:10, 50:18, 50:20, 50:24, 56:12, 57:3, 57:10, 57:16, 57:17, 57:20, 57:22, 57:23, 58:11, 58:13, 58:15, 59:10, 59:18, 59:22, 60:15, 61:16, 61:17, 64:20, 70:9, 70:11, 73:5, 73:7, 73:10, 73:24, 78:25, 117:17, 117:19
  **falsehood** [3] - 74:7, 75:22, 78:10
  **falsely** [5] - 69:15, 69:16, 69:17, 75:1, 75:2
  **falsity** [11] - 38:21, 38:22, 39:25, 43:10, 43:14, 49:16, 58:10, 68:2, 77:15, 125:7
  **falsity-extra** [1] - 58:10
  **falsity-plus** [1] - 58:10
  **familiar** [1] - 29:25
  **far** [11] - 23:19, 29:8, 53:20, 55:9, 81:17, 91:5, 111:12, 112:21, 126:12, 126:13
  **Farms** [18] - 25:17, 26:9, 28:19, 30:1, 40:25, 69:8, 69:11, 69:25, 70:14, 70:19, 72:15, 74:8, 74:25, 76:10, 81:17, 108:16, 110:15, 110:16
  **Farragut** [2] - 22:12, 22:14
  **Farrow** [1] - 15:17
  **fashion** [3] - 65:4, 65:15, 117:11
  **fast** [1] - 44:14
  **Father** [1] - 14:12
  **fault** [4] - 19:12, 42:8, 112:15, 112:19
  **favorable** [1] - 30:16
  **favoring** [1] - 64:6
  **fear** [1] - 32:20
  **federal** [8] - 35:10, 47:6, 63:1, 63:8,

89:16, 98:23, 98:25, 112:17
  **Federal** [1] - 46:23
  **few** [3] - 4:12, 42:19, 52:18
  **fictions** [1] - 20:7
  **fidelity** [1] - 36:7
  **fiduciary** [27] - 6:1, 6:4, 6:18, 6:22, 7:1, 7:8, 7:10, 7:18, 9:3, 9:7, 9:10, 9:15, 9:16, 9:17, 9:21, 9:22, 9:25, 11:16, 12:19, 19:17, 19:22, 33:8, 33:10, 35:14, 35:18, 117:2
  **fiduciary-type** [1] - 12:19
  **figure** [2] - 15:13, 46:14
  **file** [12] - 37:19, 47:3, 69:20, 72:1, 72:4, 72:8, 74:5, 75:8, 76:18, 77:1, 77:6
  **filed** [7] - 4:15, 48:9, 55:6, 69:14, 71:11, 73:21, 82:7
  **files** [18] - 38:24, 39:5, 39:9, 40:8, 40:10, 43:21, 54:25, 55:3, 58:3, 61:7, 72:20, 72:21, 82:5, 82:15, 103:21, 104:1, 110:23
  **finally** [6] - 27:16, 62:24, 83:2, 110:3, 110:4, 110:22
  **finances** [1] - 20:1
  **fine** [7] - 12:4, 60:23, 80:4, 80:9, 111:6, 112:7, 117:12
  **Fire** [1] - 98:23
  **firm** [2] - 66:6, 87:7
  **first** [21] - 4:21, 5:22, 8:20, 16:25, 24:10, 49:9, 62:12, 62:13, 70:1, 74:9, 74:13, 74:15, 74:25, 75:1, 87:14, 92:4, 95:8, 95:15, 102:12, 109:1, 124:17
  **First** [7] - 115:20, 116:18, 120:25, 121:19, 122:8, 122:20, 124:2
  **first-aid** [1] - 24:10
  **fit** [2] - 68:19, 68:25
  **fits** [2] - 123:12, 123:14
  **five** [4] - 72:18, 83:9, 83:15, 110:12

**five-minute** [1] - 83:9
**flip** [2] - 11:20, 55:7
**flow** [2] - 87:1, 87:3
**fly** [1] - 19:18
**focus** [7] - 5:8, 18:19, 18:20, 32:5, 44:17, 59:7, 122:7
**focused** [3] - 97:17, 103:1, 105:2
**focuses** [1] - 101:16
**focussed** [1] - 104:19
**folks** [2] - 27:3, 64:2
**follow** [8] - 47:6, 63:9, 95:14, 96:22, 100:12, 126:25, 127:3
**following** [2] - 98:19, 112:20
**Foods** [1] - 21:1
**Footnote** [1] - 63:20
**force** [1] - 107:7
**forecasted** [1] - 80:24
**foreclose** [1] - 124:13
**forever** [1] - 54:21
**forged** [1] - 66:9
**form** [7] - 33:10, 33:22, 42:25, 63:12, 64:7, 105:12, 106:4
**formed** [4] - 31:18, 33:3, 52:24, 58:4
**forth** [3] - 35:5, 121:1, 121:10
**Forth** [1] - 37:9
**forward** [3] - 53:24, 60:3, 98:16
**foundation** [2] - 16:20, 21:18
**foundational** [1] - 107:22
**four** [1] - 72:17
**Fourth** [7] - 15:24, 15:25, 16:1, 37:2, 37:4, 37:7, 37:23
**framework** [1] - 126:6
**frankly** [6] - 6:24, 7:2, 19:9, 21:4, 25:20, 106:20
**fraud** [157] - 4:24, 6:6, 8:5, 9:1, 23:14, 25:2, 25:12, 28:25, 30:6, 31:22, 32:17, 33:11, 38:9, 40:4, 41:21, 43:4, 47:15, 49:7, 50:7, 50:11, 53:15, 53:16, 54:21, 54:23, 56:5, 58:7, 59:25, 60:13, 61:10,

61:21, 63:3, 64:5, 64:7, 64:9, 64:17, 65:11, 65:12, 66:1, 66:14, 66:15, 67:12, 69:1, 70:3, 70:22, 70:25, 71:11, 71:18, 73:2, 73:7, 74:13, 74:14, 74:17, 74:18, 74:20, 74:21, 76:7, 77:11, 77:16, 78:15, 78:24, 79:21, 79:22, 82:19, 84:13, 84:18, 84:21, 84:24, 84:25, 85:1, 85:3, 85:4, 85:8, 85:14, 85:18, 85:23, 86:12, 86:13, 86:15, 86:16, 87:2, 87:11, 87:25, 88:1, 88:5, 88:6, 88:22, 89:7, 89:20, 89:21, 89:25, 90:4, 90:9, 90:11, 91:3, 91:9, 91:19, 91:20, 91:21, 91:25, 92:3, 92:4, 92:5, 92:21, 93:14, 93:25, 94:4, 94:6, 94:12, 94:13, 94:16, 94:21, 94:23, 94:24, 95:6, 95:8, 95:15, 95:20, 95:25, 96:8, 96:15, 96:25, 97:8, 97:18, 97:23, 97:25, 98:1, 98:4, 98:5, 98:11, 98:14, 98:16, 99:3, 99:4, 99:18, 99:22, 100:14, 100:21, 102:9, 103:23, 104:6, 109:1, 109:5, 109:24, 110:12, 111:21, 112:3, 124:25, 126:23
**fraudulent** [12] - 91:7, 91:8, 91:10, 91:13, 91:18, 92:12, 97:1, 97:20, 98:9, 99:4, 100:18, 100:23
**free** [2] - 71:5, 128:18
**frequently** [1] - 30:4
**fresh** [1] - 63:5
**Friday** [3] - 47:3, 48:9, 81:15
**friend** [3] - 18:10, 19:23, 68:12
**friends** [1] - 23:10
**front** [2] - 69:23, 97:2
**full** [2] - 60:7, 75:21
**function** [1] - 125:23
**fundamental** [1] - 113:7
**fundraisers** [1] -

21:24
**funerals** [1] - 22:3
**Funk** [1] - 26:9
**future** [3] - 47:15, 47:16, 127:10

# G

**gain** [1] - 81:2
**gained** [1] - 51:7
**geared** [1] - 38:22
**gears** [2] - 68:3, 105:8
**gee** [1] - 48:3
**general** [15] - 10:12, 16:23, 17:3, 17:19, 24:6, 25:11, 27:16, 39:12, 85:21, 86:16, 92:8, 93:25, 100:6, 106:4, 115:19
**generally** [18] - 10:16, 27:20, 29:3, 47:16, 54:9, 57:8, 57:9, 84:18, 88:5, 89:8, 89:11, 89:21, 90:9, 91:25, 92:2, 115:24, 116:4, 126:25
**generated** [1] - 88:22
**generically** [1] - 56:21
**gentleman** [1] - 18:12
**George** [1] - 123:6
**germane** [1] - 60:2
**Gillespie** [1] - 24:23
**given** [8] - 40:20, 50:14, 50:15, 76:16, 76:19, 87:11, 88:21, 116:10
**gosh** [1] - 60:19
**govern** [2] - 46:24, 99:23
**grab** [2] - 125:6
**grant** [3] - 7:21, 28:23, 122:8
**granted** [3] - 5:19, 29:8, 66:13
**gravamen** [1] - 67:1
**great** [3] - 5:22, 52:21, 59:15
**greatly** [1] - 44:3
**groomed** [1] - 23:9
**ground** [2] - 4:11, 114:24
**grounds** [1] - 122:8
**group** [4] - 4:16, 14:15, 49:1
**grouping** [7] - 102:1, 102:5, 102:6, 102:17, 103:6, 103:14, 105:5

**grow** [2] - 23:6, 24:1
**guarded** [1] - 110:20
**guess** [13] - 19:17, 35:21, 46:18, 48:25, 56:25, 87:4, 111:9, 111:22, 114:3, 114:4, 117:22, 122:23, 125:1
**guidance** [2] - 22:25, 63:21
**guide** [1] - 9:17
**guns** [1] - 29:9
**guts** [2] - 62:19, 63:19
**guy** [5] - 75:15, 77:19, 77:20, 86:20, 86:23
**guys** [3] - 45:8, 75:16, 127:23

# H

**half** [2] - 18:2, 21:18
**hand** [1] - 27:23
**Handbook** [1] - 23:22
**handbook** [7] - 24:7, 25:8, 25:9, 34:2, 47:20, 48:3, 125:7
**handbooks** [3] - 23:15, 40:3, 118:11
**handled** [1] - 62:17
**hands** [2] - 4:19, 103:3
**Hanson** [1] - 46:23
**harboring** [2] - 49:22, 103:2
**hard** [6] - 18:24, 22:11, 71:11, 72:12, 73:19, 73:21
**hardships** [1] - 115:14
**harm** [10] - 19:13, 49:23, 63:25, 67:21, 67:25, 89:22, 89:24, 102:19, 103:3
**harmonize** [1] - 68:15
**harms** [1] - 92:1
**hate** [1] - 14:11
**head** [3] - 51:1, 83:10, 114:6
**head-on** [1] - 51:1
**header** [1] - 82:3
**headquarters** [1] - 32:9
**hear** [9] - 4:3, 17:25, 48:11, 83:20, 84:4, 108:6, 112:12, 113:23, 125:2
**heard** [6] - 18:16,

38:24, 40:6, 47:1, 91:5, 111:9
**hearing** [3] - 60:18, 90:24, 92:25
**heart** [1] - 102:13
**heightened** [5] - 10:23, 19:22, 21:17, 21:19, 34:14
**heinous** [1] - 23:24
**held** [17] - 6:7, 8:6, 22:4, 22:22, 24:12, 24:22, 44:19, 44:21, 44:22, 44:23, 51:12, 59:25, 84:17, 84:20, 98:9, 98:10, 126:11
**help** [4] - 15:18, 15:19, 21:23, 83:23
**helped** [2] - 27:5, 44:21
**helpful** [1] - 18:1
**helping** [2] - 37:10, 63:22
**helps** [2] - 9:17, 83:11
**hence** [1] - 47:25
**Hess** [1] - 55:15
**hid** [2] - 65:25, 111:3
**high** [2] - 26:14, 34:19
**higher** [1] - 29:13
**highest** [3] - 63:7, 98:24, 99:1
**highlighted** [2] - 80:10, 85:20
**highly** [2] - 37:1, 43:18
**himself** [2] - 45:8, 55:15
**hinted** [1] - 121:25
**history** [6] - 19:25, 22:1, 37:18, 40:18, 43:21, 96:12
**hold** [8] - 8:15, 23:23, 31:9, 45:8, 83:15, 95:19, 116:13
**holding** [8] - 32:23, 34:5, 45:24, 88:13, 91:10, 91:20, 93:24, 121:10
**holds** [1] - 119:1
**hole** [1] - 35:17
**home** [1] - 30:4
**homosexual** [1] - 55:16
**Honor's** [1] - 97:9
**Honorable** [1] - 18:11
**hopefully** [2] - 46:14, 122:20
**horse** [1] - 92:5

**hour** [2] - 21:22, 44:9
**house** [1] - 92:12
**housekeeping** [1] - 114:10
**houses** [1] - 70:15
**Howard** [4] - 63:12, 65:22, 94:16, 117:9
**human** [2] - 63:4, 127:20
**humiliation** [1] - 85:25
**hurting** [1] - 83:10
**hurts** [1] - 114:6
**hypodermic** [1] - 65:24

**I**

**Idaho** [83] - 6:14, 7:2, 9:10, 20:5, 22:10, 22:14, 24:22, 25:16, 28:22, 29:2, 29:8, 30:8, 33:13, 36:4, 46:25, 47:6, 52:13, 52:25, 54:17, 54:19, 62:13, 62:18, 63:9, 63:14, 63:21, 64:9, 65:23, 66:2, 66:24, 67:3, 70:22, 76:9, 77:4, 78:13, 83:3, 84:17, 87:20, 87:21, 87:23, 89:1, 89:4, 91:11, 91:16, 91:23, 92:8, 93:12, 93:15, 93:21, 93:22, 94:19, 95:11, 95:14, 95:19, 95:22, 95:24, 96:9, 96:11, 96:15, 96:22, 97:5, 97:7, 97:11, 97:12, 97:23, 98:5, 98:7, 98:19, 99:2, 99:10, 99:12, 99:24, 100:3, 100:12, 100:13, 100:16, 101:3, 108:18, 108:25, 109:8, 110:10, 119:15
**Idaho's** [2] - 89:18, 89:22
**idea** [4] - 27:24, 36:24, 42:6, 116:8
**idealistic** [1] - 24:21
**identical** [1] - 27:21
**identified** [2] - 36:8, 64:16
**identifies** [1] - 101:3
**identify** [1] - 4:22, 93:2
**identities** [1] - 103:2
**IDJI** [1] - 27:10

**ignorance** [2] - 43:10, 43:14
**II** [39] - 15:4, 15:11, 15:12, 15:25, 16:5, 16:13, 16:15, 17:4, 17:11, 17:12, 17:17, 17:20, 17:22, 17:25, 36:20, 37:20, 44:18, 44:19, 44:20, 44:24, 45:1, 49:15, 53:5, 53:6, 53:10, 55:18, 55:21, 55:24, 57:20, 57:21, 58:15, 58:18, 58:21, 61:11, 62:8, 71:9, 74:2, 101:16
**II's** [6] - 15:14, 15:20, 37:8, 44:20, 45:9, 60:4
**illustrate** [1] - 21:20
**imagine** [1] - 111:15
**immaterial** [3] - 58:5, 63:17, 69:2
**immoral** [2] - 23:24, 67:25
**immortality** [1] - 22:1
**immunity** [1] - 119:15
**immutable** [1] - 59:14
**implicate** [2] - 116:18, 117:18
**implicated** [1] - 121:20
**implicating** [1] - 121:18
**implicit** [2] - 40:22, 113:8
**implicitly** [1] - 34:5
**importance** [3] - 21:25, 52:20, 52:21
**important** [17] - 5:6, 5:15, 5:20, 10:25, 15:25, 21:10, 27:13, 53:18, 55:3, 56:4, 68:5, 80:9, 86:7, 99:13, 102:2, 105:3, 120:8
**importantly** [1] - 99:10
**impossible** [6] - 48:2, 72:16, 80:21, 80:25, 81:3, 121:16
**improper** [1] - 119:11
**improperly** [1] - 114:11
**imputed** [2] - 51:5, 51:9
**imputing** [1] - 51:16

**inadequate** [4] - 69:20, 75:3, 75:14, 77:24
**incidence** [1] - 77:12
**incident** [2] - 57:4, 57:5
**include** [4] - 4:25, 38:15, 47:7, 121:18
**included** [2] - 12:16, 12:18
**includes** [4] - 68:7, 103:21, 103:22, 103:23
**including** [5] - 30:17, 45:16, 95:8, 100:5, 112:15
**inclusions** [2] - 12:24, 20:4
**income** [1] - 45:22
**increased** [1] - 118:24
**indeed** [5] - 18:12, 24:20, 64:8, 67:6, 68:10
**indelicate** [1] - 105:11
**indicated** [3] - 8:23, 9:1, 120:24
**individual** [5] - 22:23, 32:10, 56:8, 77:14, 118:14
**individually** [1] - 27:19
**individuals** [1] - 121:8
**induced** [1] - 74:19
**inducement** [17] - 85:18, 86:13, 86:16, 88:1, 88:6, 90:11, 91:8, 91:9, 91:11, 91:13, 91:18, 97:1, 97:20, 98:9, 99:5, 100:18, 100:23
**inducing** [1] - 85:23
**ineligible** [1] - 38:23
**inferences** [1] - 30:17
**infiltrated** [6] - 50:5, 50:12, 73:18, 73:24, 75:15, 79:8
**infliction** [1] - 96:3
**influence** [1] - 6:11
**information** [1] - 32:18, 34:21, 40:5, 40:18, 40:20, 41:5, 51:15, 51:17, 55:4, 55:7, 71:2, 76:15, 76:17, 76:20, 104:5
**informed** [1] - 121:9
**initial** [3] - 33:1,

33:7, 44:7
**initiated** [1] - 61:9
**injected** [1] - 65:24
**injunctive** [1] - 98:12
**injured** [2] - 11:10, 103:5
**injuries** [3] - 90:3, 107:9, 107:13
**injury** [17] - 5:5, 27:12, 64:23, 67:22, 68:9, 69:2, 84:12, 85:4, 87:2, 87:24, 89:18, 89:22, 89:23, 90:5, 95:6, 100:4
**inquiry** [3] - 13:7, 71:13, 123:15
**instance** [1] - 120:8
**instances** [2] - 55:13, 61:3
**instant** [1] - 35:8
**instructed** [1] - 126:22
**instruction** [2] - 121:23, 126:9
**instructions** [3] - 126:19, 127:1, 127:3
**insufficient** [1] - 95:1
**insurance** [1] - 19:24
**insured** [1] - 19:24
**integrity** [1] - 36:7
**intend** [1] - 111:17
**intended** [3] - 93:17, 105:19, 105:25
**intensive** [1] - 13:7
**intent** [11] - 68:13, 68:15, 105:17, 105:24, 105:25, 106:9, 106:10, 107:2, 107:25, 108:5, 111:17
**intentional** [3] - 96:3, 99:17, 99:21
**interacting** [1] - 39:13
**interchangeably** [1] - 6:17
**interest** [1] - 13:5
**interesting** [4] - 12:7, 86:11, 86:19, 89:14
**interests** [3] - 67:13, 95:9, 95:10
**international** [1] - 22:15
**interrogatory** [1] - 64:2
**intervening** [1] - 8:11
**intrinsic** [3] - 26:16, 41:2, 41:3
**introduced** [6] -

31:13, 34:10, 36:14, 39:24, 40:1, 42:22
**introduction** [1] - 19:8
**intruded** [1] - 72:9
**invasion** [1] - 96:2
**investigation** [1] - 72:1
**invited** [2] - 34:22, 36:18
**inviting** [1] - 34:9
**involve** [5] - 10:5, 86:13, 87:5, 121:12
**involved** [8] - 17:17, 22:2, 34:25, 37:3, 37:17, 38:8, 74:3, 116:10
**involvement** [3] - 15:21, 16:2, 16:13
**involving** [2] - 57:5, 78:21
**irrelevant** [1] - 119:13
**Irrigation** [1] - 26:9
**irrigation** [1] - 26:10
**issuance** [1] - 62:12
**issue** [75] - 4:13, 5:10, 5:17, 6:3, 6:23, 6:25, 7:2, 7:25, 11:10, 20:25, 29:11, 29:14, 29:19, 29:24, 29:25, 30:4, 30:15, 30:24, 33:1, 35:19, 36:20, 37:1, 38:1, 42:23, 43:8, 43:9, 44:1, 47:4, 48:9, 49:11, 49:14, 52:14, 52:24, 53:19, 53:22, 63:5, 63:12, 71:5, 81:17, 81:21, 82:5, 82:8, 82:24, 84:7, 92:19, 94:19, 99:1, 99:6, 101:12, 107:18, 107:25, 109:8, 109:16, 110:11, 111:5, 111:16, 115:21, 118:20, 120:25, 121:3, 121:4, 121:9, 121:21, 122:22, 123:24, 124:11, 126:8, 126:13, 126:22, 126:23, 127:9, 128:24
**issued** [2] - 91:16, 91:17
**issues** [13] - 31:4, 31:6, 31:8, 36:15, 48:22, 49:3, 49:5, 51:22, 53:4, 124:9, 128:3

**item** [1] - 128:10
**iterated** [1] - 40:4
**itself** [2] - 18:20, 54:2
**IV** [21] - 37:19, 38:24, 40:8, 43:21, 54:25, 55:3, 58:3, 61:7, 72:4, 72:8, 72:20, 74:4, 74:5, 77:5, 82:5, 82:15, 103:21, 104:1, 110:23, 123:8

**J**

**jamboree** [2] - 22:14, 22:15
**James** [3] - 32:3, 37:2, 55:9
**Jersey** [2] - 22:10, 27:3
**Jim** [8] - 15:6, 15:12, 15:14, 17:21, 44:20, 45:11, 56:8, 77:25
**job** [2] - 45:19, 62:25
**John** [1] - 94:20
**join** [1] - 33:21
**joinder** [1] - 119:12
**joined** [1] - 41:23
**joint** [1] - 27:24
**judge** [4] - 18:13, 25:17, 68:6, 69:23
**Judge** [5] - 23:5, 27:7, 66:21, 69:7, 75:4
**judgment** [20] - 4:5, 4:23, 5:8, 5:19, 6:8, 7:21, 20:17, 20:24, 28:24, 29:3, 29:7, 30:7, 30:8, 47:8, 48:10, 66:13, 119:24, 121:21, 123:13, 124:12
**judicata** [11] - 70:6, 81:17, 84:6, 84:8, 101:7, 101:12, 104:9, 104:14, 105:1, 108:13, 110:17
**July** [1] - 55:6
**jumped** [1] - 79:17
**June** [3] - 4:2, 58:22, 82:8
**Jur** [4] - 86:8, 97:10, 97:16
**juries** [1] - 126:25
**jurisdiction** [4] - 30:5, 54:8, 83:1, 97:6
**jurisdictions** [8] - 92:20, 93:2, 93:3, 93:8, 93:9, 99:19, 100:20, 100:21

**jurisprudence** [1] - 54:18
**jurist** [2] - 18:12, 68:18
**jurors** [1] - 127:1
**jury** [22] - 5:13, 6:10, 6:23, 7:5, 7:22, 29:14, 31:14, 36:15, 40:13, 50:15, 61:4, 66:23, 76:10, 86:6, 108:6, 110:2, 121:23, 123:22, 126:9, 126:15, 126:18, 126:21
**justice** [1] - 83:4
**justifiable** [1] - 64:21
**justified** [1] - 5:4
**justify** [1] - 8:5

**K**

**Kawai** [13] - 69:8, 69:11, 69:24, 70:14, 70:19, 72:15, 74:8, 74:25, 76:9, 81:16, 108:15, 110:15, 110:16
**Keats** [1] - 24:3
**keep** [1] - 5:6
**kept** [2] - 76:19, 110:20
**key** [7] - 16:11, 37:11, 63:25, 70:5, 85:19
**kick** [1] - 61:4
**kicked** [1] - 37:19
**kid** [1] - 34:25
**kids** [4] - 27:4, 34:7, 39:13, 68:23
**kill** [1] - 107:3
**kind** [27] - 14:6, 14:13, 14:15, 25:23, 27:2, 27:24, 30:23, 34:24, 53:19, 56:17, 57:11, 60:24, 64:16, 85:5, 85:10, 92:5, 113:18, 113:19, 113:20, 117:10, 117:15, 121:24, 121:25, 125:5, 125:9, 125:21, 127:22
**kinds** [1] - 24:24
**kitchen** [1] - 112:20
**knock** [1] - 112:23
**knots** [1] - 24:9
**knowing** [6] - 49:20, 50:4, 50:10, 56:21, 73:17, 119:19
**knowledge** [19] - 36:10, 39:10, 43:21,

43:22, 51:5, 51:7, 56:4, 60:1, 72:22, 75:23, 79:9, 79:10, 80:5, 80:11, 80:22, 80:24, 81:2, 82:19
**known** [23] - 41:25, 43:1, 55:18, 55:19, 56:19, 57:20, 58:7, 61:17, 74:21, 104:11, 107:8, 107:12
**knows** [10] - 17:17, 19:25, 54:6, 59:20, 69:9, 77:2, 78:12, 82:6, 89:5, 109:20
**Kosnoff** [1] - 82:8
**Kujek** [2] - 86:11, 86:19

**L**

**label** [5] - 63:15, 64:7, 66:20, 67:6, 69:2
**labeled** [1] - 69:1
**laches** [6] - 83:2, 113:6, 114:21, 120:19, 120:20, 128:11
**lack** [4] - 11:22, 70:20, 77:12, 83:2
**lady** [1] - 24:5
**laid** [1] - 71:20
**language** [4] - 18:24, 18:25, 28:15, 108:4
**lapse** [1] - 120:6
**large** [2] - 23:15, 49:1
**largely** [1] - 31:18, 86:6
**largest** [1] - 34:18
**Larren** [4] - 77:20, 78:1, 105:20, 107:12
**Larry** [1] - 18:11
**last** [2] - 82:8, 124:14
**late** [4] - 22:13, 99:14, 114:6, 115:4
**latest** [1] - 60:16
**Laughter** [2] - 18:6, 81:14
**LAW** [1] - 84:8
**Law** [9] - 92:19, 92:23, 93:6, 96:4, 97:11, 97:12, 100:19, 101:2, 101:3
**law** [59] - 6:3, 7:1, 7:8, 8:12, 11:23, 20:18, 21:6, 24:17, 28:13, 40:1, 47:6, 47:7, 51:21, 63:9, 66:6, 68:6, 69:9,

69:10, 70:22, 76:4, 76:6, 76:9, 81:24, 83:1, 88:16, 88:18, 88:21, 91:5, 91:7, 92:8, 93:8, 93:11, 93:12, 93:13, 93:19, 93:22, 94:25, 95:14, 97:5, 98:19, 98:20, 98:21, 99:2, 99:11, 99:16, 99:19, 99:24, 99:25, 100:3, 100:12, 104:7, 109:10, 115:22, 115:24, 116:5, 116:7
**Lawrence** [2] - 77:21, 77:25
**lawsuit** [17] - 58:3, 58:5, 58:15, 59:21, 61:11, 69:14, 69:19, 74:9, 74:10, 74:11, 74:15, 74:25, 75:1, 76:14, 108:19, 110:5, 110:7
**lawyer** [2] - 38:5, 81:3
**lawyers** [1] - 51:5
**layer** [1] - 120:10
**lays** [3] - 71:20, 73:23, 96:4
**LDS** [52] - 4:18, 14:20, 14:21, 14:23, 16:19, 17:8, 31:19, 33:5, 34:4, 34:6, 36:22, 37:2, 37:4, 37:7, 37:13, 37:17, 37:23, 38:19, 44:19, 44:21, 45:3, 45:5, 46:8, 46:9, 55:9, 55:14, 55:16, 56:3, 56:6, 59:8, 59:17, 60:1, 73:6, 77:20, 77:21, 90:18, 101:10, 105:12, 105:16, 105:22, 106:20, 108:4, 108:22, 111:25, 116:2, 116:12, 116:24, 118:10, 118:12, 118:23, 122:17
**LDS's** [1] - 124:2
**LDS-sponsored** [2] - 14:21, 45:3
**lead** [1] - 31:14
**leader** [13] - 15:7, 15:9, 37:13, 40:9, 44:21, 45:6, 45:8, 45:25, 117:20, 118:13, 118:16, 118:18, 121:7
**leaders** [9] - 15:23, 38:14, 39:12, 40:16,

40:21, 59:1, 102:24, 121:13
**leadership** [3] - 4:20, 116:9, 121:8
**leads** [2] - 21:6, 36:17
**leaning** [1] - 28:3
**learn** [2] - 58:1, 124:5
**learned** [1] - 59:5
**least** [18] - 9:24, 15:9, 16:8, 35:18, 48:16, 50:16, 50:23, 52:13, 59:6, 59:12, 60:25, 71:9, 71:12, 73:11, 74:2, 79:4, 101:10, 118:15
**leave** [1] - 113:13
**lectern** [2] - 28:19, 127:11
**led** [4] - 27:12, 92:13, 94:13, 94:24
**Lee** [2] - 71:16, 72:15
**left** [8] - 23:21, 42:13, 48:6, 64:6, 97:14, 100:24, 103:25
**leg** [1] - 103:10
**legal** [9] - 10:8, 13:1, 22:7, 31:2, 103:23, 104:6, 105:3, 105:4, 109:12
**legally** [1] - 58:11
**legislature** [1] - 68:13
**lender** [1] - 21:2
**length** [1] - 92:11
**less** [2] - 42:17, 52:20
**lesser** [1] - 30:2
**letter** [1] - 81:24
**level** [11] - 27:17, 31:25, 32:16, 33:4, 38:14, 39:7, 39:12, 51:20, 72:10, 77:17
**Leventhal** [1] - 86:10
**Lewiston** [2] - 77:22, 123:7
**liability** [20] - 19:1, 19:4, 23:2, 27:9, 31:2, 31:4, 31:6, 33:2, 102:3, 116:5, 119:11, 122:21, 124:15, 124:17, 124:25, 125:3, 126:1, 126:20, 127:9, 128:7
**liable** [7] - 23:23, 24:12, 31:9, 31:21, 128:2, 128:4
**libel** [1] - 96:2
**liberal** [2] - 76:8,

76:9
**liberalized** [1] - 76:8
**Libey** [2] - 77:21, 78:1
**Library** [2] - 97:11, 97:12
**life** [3] - 15:14, 47:1, 62:17
**light** [2] - 30:16, 64:8
**likelihood** [3] - 26:17, 41:2, 41:3
**limb** [1] - 46:21
**limine** [3] - 122:2, 122:8, 123:19
**limit** [2] - 8:14, 113:11
**limitation** [1] - 52:7
**limitations** [38] - 28:1, 44:9, 48:22, 49:3, 49:7, 50:21, 52:5, 53:19, 54:9, 54:17, 54:18, 57:12, 58:6, 64:15, 65:9, 66:10, 68:7, 71:5, 71:7, 75:24, 76:2, 82:17, 82:22, 82:25, 89:13, 89:19, 89:23, 90:2, 90:5, 102:7, 104:9, 104:10, 104:24, 108:14, 115:1, 115:3, 115:5, 115:15
**limited** [11] - 85:24, 91:14, 91:18, 95:12, 95:20, 96:8, 96:21, 96:24, 99:3, 100:18, 100:22
**limiting** [2] - 53:5, 57:21
**Lindemulder** [1] - 12:2
**line** [1] - 26:10
**list** [1] - 83:23
**listed** [2] - 19:2, 37:7
**listen** [1] - 125:5
**listened** [1] - 22:11
**lists** [2] - 122:3
**literally** [1] - 72:18
**litigant** [1] - 115:16
**litigation** [2] - 72:18, 74:3
**local** [13] - 31:25, 32:16, 33:3, 38:14, 39:7, 39:12, 72:22, 72:23, 75:12, 77:12, 77:13, 77:17
**Longstreet** [1] - 69:12
**look** [33] - 11:25, 12:25, 13:14, 20:10,

21:17, 23:6, 27:20, 32:8, 32:12, 32:15, 46:5, 47:21, 63:5, 63:18, 64:1, 65:1, 67:9, 67:21, 68:13, 68:15, 88:16, 89:12, 90:2, 93:7, 95:22, 96:13, 100:19, 103:8, 103:12, 104:22, 110:18, 113:18, 119:19
**looked** [14] - 11:7, 27:19, 35:5, 35:24, 36:8, 36:9, 52:14, 61:6, 70:16, 95:18, 102:10, 117:24, 120:11, 123:18
**looking** [6] - 31:21, 33:12, 68:13, 68:14, 102:6, 102:16
**looks** [1] - 61:23
**loss** [4] - 85:11, 85:24, 95:12, 97:8
**lost** [2] - 115:6, 115:10
**love** [2] - 24:3, 26:23
**low** [1] - 26:15
**lower** [1] - 70:11
**luck** [1] - 4:9

# M

**machines** [1] - 26:12
**magic** [1] - 68:19
**maidservant** [1] - 86:20
**maintained** [1] - 110:21
**major** [2] - 19:8, 63:6
**male** [2] - 4:19, 14:25
**malpractice** [2] - 66:2, 66:11
**man** [7] - 25:9, 25:10, 27:7, 37:16, 39:21, 85:22, 123:7
**manual** [2] - 23:25, 24:9
**manuals** [1] - 40:3
**marital** [1] - 86:3
**marriage** [25] - 85:19, 85:23, 86:9, 86:13, 86:16, 87:16, 87:21, 88:1, 88:7, 91:8, 91:9, 91:11, 91:13, 91:18, 93:19, 96:17, 96:23, 97:1, 97:17, 97:19, 97:22, 98:9, 99:5, 100:18, 100:23
**marries** [1] - 86:22

**marry** [1] - 86:21
**Martinelli** [4] - 12:10, 13:14, 14:10, 15:2
**massive** [1] - 75:8
**material** [14] - 5:3, 5:11, 5:17, 20:25, 23:7, 25:11, 26:24, 29:14, 30:15, 32:18, 34:21, 70:18, 75:9, 78:11
**materially** [1] - 24:18
**materials** [1] - 34:4
**matter** [18] - 20:18, 22:12, 27:1, 39:19, 52:20, 52:21, 66:20, 66:21, 80:11, 82:11, 93:13, 94:25, 113:13, 116:8, 118:1, 118:3, 127:15, 128:23
**matters** [2] - 13:8, 60:12
**Mayberry's** [1] - 46:1
**McCormick** [2] - 63:14, 66:5
**McGhee** [34] - 36:3, 36:4, 84:14, 84:22, 85:1, 85:5, 85:6, 85:13, 85:14, 85:20, 86:8, 86:14, 87:15, 90:7, 91:1, 91:7, 91:17, 93:13, 95:13, 95:23, 95:24, 96:9, 96:10, 96:18, 97:4, 97:10, 98:6, 98:7, 98:15, 100:6
**mean** [34] - 10:7, 13:7, 14:18, 22:24, 30:12, 31:4, 31:9, 31:20, 34:25, 35:13, 53:22, 54:9, 59:14, 60:19, 65:1, 71:8, 71:19, 73:19, 75:6, 77:19, 78:9, 79:17, 81:1, 92:8, 96:11, 103:9, 103:11, 106:6, 108:17, 109:14, 110:6, 110:9, 120:16, 125:11
**meaning** [1] - 68:5
**means** [4] - 29:12, 30:13, 107:1
**meant** [1] - 46:12
**measure** [1] - 110:24
**meat** [2] - 66:25, 79:15
**mechanism** [1] - 22:25
**Med** [1] - 98:22
**meet** [2] - 41:21, 44:1

**meetings** [2] - 37:8, 37:9
**member** [5] - 15:13, 16:17, 46:4, 46:8, 46:9
**members** [2] - 37:22, 55:13
**men** [8] - 13:21, 21:6, 34:5, 34:7, 38:18, 39:8, 116:9, 116:23
**men's** [1] - 116:9
**mental** [5] - 85:15, 85:25, 99:17, 99:20, 100:5
**mentioned** [1] - 108:12
**mere** [5] - 21:18, 77:5, 78:14, 79:14
**merit** [13] - 16:7, 16:9, 27:5, 38:3, 38:4, 38:7, 38:15, 38:18, 38:23, 38:25, 39:8, 39:14, 39:19
**meritorious** [1] - 54:14
**messages** [1] - 35:8
**messaging** [1] - 35:11
**messed** [1] - 42:2
**met** [5] - 17:14, 22:17, 27:4, 54:11, 114:14
**metaphor** [1] - 18:14
**mid** [1] - 64:3
**might** [10] - 21:17, 21:23, 41:16, 41:18, 52:6, 75:22, 96:22, 113:9, 113:11, 113:16
**MIL** [1] - 122:6
**miles** [2] - 22:10
**million** [1] - 69:23
**millions** [1] - 28:8
**mind** [4] - 5:7, 56:17, 114:8, 127:19
**mine** [1] - 18:11
**Mines** [2] - 71:16, 72:15
**minute** [4] - 83:9, 103:24, 114:3, 126:10
**minutes** [17] - 8:16, 8:18, 18:2, 42:3, 42:9, 42:13, 42:14, 42:17, 42:19, 46:18, 48:21, 62:5, 78:6, 81:22, 83:16, 83:20, 100:24
**mishandling** [1] - 66:7
**misleading** [1] - 31:1
**misrepresentation**

[7] - 23:14, 32:25, 38:10, 65:3, 95:25, 96:5, 96:7
**misrepresentations** [2] - 23:15, 32:18
**misrepresenting** [1] - 26:20
**missed** [1] - 63:13
**missing** [5] - 25:1, 25:3, 27:14, 64:8, 64:10, 64:16, 67:12, 67:15, 67:16, 85:2, 85:8
**mistaken** [4] - 6:24, 39:1, 39:2, 67:2
**misunderstood** [1] - 124:24
**mix** [1] - 125:10
**model** [1] - 34:6
**models** [1] - 34:6
**modern** [1] - 93:6
**molestation** [1] - 118:1
**molested** [4] - 56:19, 78:23, 79:2, 79:10
**moment** [7] - 25:22, 54:22, 62:24, 68:3, 81:20, 82:11, 83:13
**moments** [1] - 52:19
**monetary** [2] - 85:11, 95:11
**money** [2] - 107:20
**months** [1] - 69:19
**Morgan** [3] - 55:11, 55:23, 82:13
**morning** [1] - 103:9
**most** [2] - 30:16, 123:17
**mother** [2] - 15:20, 37:8
**mother's** [1] - 45:9
**motion** [7] - 5:8, 105:13, 105:22, 119:23, 122:2, 122:8, 123:19
**motions** [5] - 4:5, 27:18, 53:21, 114:9, 114:11
**mountain** [1] - 24:23, 73:22
**mouth** [1] - 123:22
**move** [2] - 44:8, 127:14
**moving** [1] - 24:14
**MR** [117] - 8:21, 9:8, 9:13, 10:9, 11:19, 11:24, 12:5, 13:9, 13:12, 13:22, 17:3, 17:12, 17:14, 18:3, 18:5, 18:8, 18:21,

20:8, 20:13, 20:16, 20:20, 21:1, 23:4, 23:16, 23:18, 25:15, 25:19, 25:25, 26:7, 28:5, 44:14, 44:17, 46:7, 46:12, 46:17, 46:20, 47:9, 47:12, 52:2, 52:11, 52:17, 53:3, 53:12, 56:15, 56:23, 57:13, 58:10, 61:25, 62:4, 64:12, 65:5, 65:20, 65:22, 67:17, 69:6, 71:14, 71:22, 72:3, 72:6, 72:14, 74:4, 74:23, 76:5, 76:24, 78:4, 78:6, 78:8, 78:9, 79:14, 80:3, 80:14, 80:17, 81:6, 81:10, 81:12, 81:13, 81:15, 83:24, 84:11, 85:12, 87:14, 88:9, 88:24, 89:10, 101:7, 101:22, 104:12, 104:16, 104:18, 105:2, 105:8, 106:7, 106:10, 106:16, 106:22, 108:10, 108:12, 109:14, 111:7, 111:19, 112:1, 112:9, 113:20, 113:22, 113:25, 119:18, 119:20, 120:21, 122:1, 122:14, 122:16, 125:1, 126:3, 126:6, 127:5, 127:17, 127:21

**MS** [49] - 28:20, 29:22, 30:14, 30:20, 30:22, 32:12, 32:15, 33:15, 33:17, 35:11, 35:22, 36:3, 38:12, 38:17, 39:2, 42:6, 42:12, 42:15, 42:20, 43:14, 43:16, 43:18, 44:6, 44:11, 48:18, 84:2, 90:15, 90:18, 90:21, 90:23, 93:5, 93:21, 95:4, 95:24, 96:24, 98:1, 100:3, 100:11, 100:24, 101:2, 114:2, 114:7, 116:20, 118:6, 118:17, 119:2, 127:7, 127:16, 127:25

**MULLER** [10] - 90:15, 90:18, 90:21, 95:4, 95:24, 96:24, 98:1, 100:3, 100:24, 101:2

**Muller** [6] - 27:14,

67:19, 90:14, 94:2, 95:3, 122:13
**multiple** [1] - 51:14
**multisided** [1] - 120:15
**murdered** [1] - 41:16
**must** [5] - 27:8, 29:13, 29:16, 67:8, 99:1

## N

**N.W.2d** [1] - 12:6
**Nab** [1] - 89:6
**name** [2] - 15:16, 16:16
**named** [3] - 23:19, 77:19, 77:20
**names** [2] - 45:3
**Nampa** [2] - 16:12, 55:17
**Nancy** [2] - 71:16, 72:14
**nation** [2] - 115:22, 116:25
**National** [1] - 98:23
**national** [10] - 22:14, 32:6, 32:9, 72:10, 75:12, 77:10, 77:11, 77:17, 78:17
**naturally** [1] - 86:4
**nature** [7] - 24:21, 47:20, 73:4, 73:7, 79:24, 87:1, 87:11
**near** [1] - 19:17
**necessarily** [6] - 35:3, 35:22, 53:8, 85:10, 87:6, 92:17
**necessary** [3] - 5:10, 33:11, 64:9
**need** [24] - 6:19, 8:9, 9:1, 11:12, 28:8, 42:4, 46:22, 48:11, 52:15, 65:1, 73:1, 73:2, 73:8, 73:9, 80:3, 83:16, 87:1, 102:4, 105:14, 106:24, 108:6, 108:17, 112:13, 125:25
**needed** [1] - 76:11
**needle** [1] - 65:24
**needs** [3] - 9:17, 57:10, 123:16
**negatives** [1] - 30:11
**neglect** [2] - 68:9, 69:3
**negligence** [3] - 10:20, 64:22, 96:2
**neutral** [1] - 68:17
**never** [20] - 8:5, 19:3,

19:6, 23:19, 62:17, 72:25, 76:1, 76:16, 76:21, 82:21, 87:23, 91:11, 91:12, 91:13, 91:24, 93:14, 100:16, 100:17, 118:20, 128:15
**nevertheless** [1] - 70:17
**New** [6] - 22:10, 27:3, 97:1, 97:3, 97:4, 97:5
**new** [10] - 61:15, 63:6, 70:7, 70:8, 74:21, 103:21, 103:23, 104:2, 104:7, 105:3
**next** [6] - 20:14, 44:9, 47:3, 48:9, 68:18, 83:25
**night** [2] - 79:23, 79:25
**Ninth** [5] - 28:21, 29:5, 29:12, 30:8, 98:22
**nobody** [3] - 45:5, 80:5, 86:21
**nomenclature** [1] - 57:15
**noncommercial** [2] - 87:8, 88:14
**none** [5] - 15:1, 48:14, 60:12, 64:22, 116:1
**noneconomic** [10] - 8:6, 88:4, 88:14, 91:1, 94:3, 96:14, 100:13, 100:21, 119:12, 119:14
**nonpecuniary** [9] - 84:18, 84:21, 89:6, 91:21, 91:24, 92:18, 92:20, 93:13, 101:4
**nonsense** [2] - 24:19
**normal** [4] - 10:10, 12:9, 13:15, 112:22
**North** [1] - 78:21
**not-so-indelicate** [1] - 105:11
**note** [4] - 63:11, 87:14, 99:13, 101:3
**notes** [3] - 49:25, 83:14, 111:3
**nothing** [7] - 14:21, 24:5, 85:2, 93:21, 103:19, 104:7, 109:1
**notice** [13] - 49:16, 50:23, 56:3, 57:11, 64:5, 71:12, 78:23, 81:19, 102:20,

104:22, 121:11, 123:9, 123:15
**noticed** [1] - 42:3
**notion** [1] - 113:7
**notwithstanding** [1] - 27:16
**number** [2] - 18:17, 25:18
**numbers** [1] - 46:13

## O

**O'Hara** [3] - 99:7, 99:8, 99:16
**oath** [3] - 24:17, 28:13, 40:1
**obedient** [1] - 119:1
**objectively** [3] - 26:19, 54:13, 54:16
**obligation** [1] - 73:10
**observation** [3] - 27:16, 112:14, 124:3
**observations** [1] - 123:4
**obtain** [1] - 97:12
**obtained** [2] - 51:15, 80:11
**obviate** [1] - 108:6
**obvious** [1] - 18:16
**obviously** [7] - 30:1, 53:19, 61:12, 80:7, 93:20, 104:21, 121:22
**occasion** [2] - 16:8, 62:12
**occasions** [1] - 16:7
**occupied** [1] - 6:10
**occur** [2] - 23:1, 82:24
**occurred** [3] - 56:4, 80:18, 94:12
**occurring** [1] - 49:21
**offer** [3] - 29:19, 80:17, 122:19
**offered** [4] - 23:7, 76:18, 76:25, 123:6
**offers** [1] - 9:12
**office** [3] - 15:22, 17:16, 32:9
**officials** [1] - 55:14
**often** [5] - 41:15, 41:17, 41:19, 54:11, 118:13
**old** [8] - 18:10, 43:20, 86:15, 86:17, 93:7, 103:9, 115:5, 115:14
**omissions** [1] - 56:11
**one** [81] - 4:13, 5:16, 5:18, 7:12, 8:4, 11:7,

11:16, 11:25, 12:17, 13:4, 15:17, 16:7, 16:8, 19:22, 21:10, 25:21, 27:19, 28:2, 28:21, 30:23, 36:6, 37:11, 38:21, 39:13, 47:23, 51:8, 51:15, 53:7, 53:16, 57:1, 57:3, 57:5, 57:6, 57:19, 57:24, 62:6, 62:8, 65:15, 66:4, 67:19, 71:2, 71:20, 73:20, 74:3, 76:13, 79:2, 80:12, 84:7, 84:9, 86:2, 86:19, 89:1, 89:3, 96:9, 96:14, 96:18, 96:25, 100:25, 103:10, 103:15, 104:4, 105:14, 111:13, 113:4, 113:11, 115:19, 116:7, 117:15, 117:19, 117:25, 118:15, 120:13, 124:25, 126:22, 126:23, 128:10
**one-off** [2] - 57:1, 79:2
**one-on-one** [1] - 39:13
**ones** [1] - 43:19
**open** [2] - 24:6, 34:24
**opening** [1] - 123:20
**operate** [1] - 22:8
**operative** [2] - 59:7, 105:1, 109:11
**opinion** [5] - 24:21, 25:12, 40:12, 62:13, 62:23
**Opinion** [1] - 63:21
**opinions** [1] - 24:23
**opportunity** [4] - 47:3, 48:8, 48:18, 96:23
**opposed** [2] - 32:10, 39:14, 65:3
**opposite** [1] - 108:14
**oppressive** [1] - 115:14
**oral** [1] - 80:8
**order** [3] - 83:14, 83:21, 84:17
**orders** [1] - 84:14
**Oregon** [1] - 30:5
**organization** [6] - 34:18, 72:9, 77:10, 79:9, 115:25, 126:7
**organizations** [6] -

33:21, 33:22, 36:18, 39:22, 118:10, 119:13
**orienteer** [1] - 24:9
**origin** [2] - 103:12, 103:13
**original** [1] - 19:6
**otherwise** [2] - 13:23, 46:24
**ought** [1] - 48:16
**out-of-state** [1] - 13:25
**outset** [5] - 29:23, 30:23, 90:24, 101:17, 125:12
**outside** [2] - 87:25, 96:23
**overcome** [1] - 73:22
**overlap** [1] - 101:9
**overnight** [3] - 12:16, 12:18, 39:16
**overruled** [1] - 94:18
**owe** [3] - 10:12, 11:5
**own** [1] - 57:15

## P

**p.m** [5] - 48:24, 83:18, 129:1
**package** [1] - 118:9
**packaged** [1] - 117:23
**packs** [1] - 37:4
**page** [8] - 46:1, 46:13, 47:4, 48:8, 58:23, 62:25, 63:21, 105:23
**pages** [2] - 45:10, 72:19
**paid** [2] - 69:13, 69:14
**painted** [1] - 105:10
**painting** [2] - 26:22, 26:23
**Pamela** [1] - 46:1
**pants** [1] - 103:10
**paragraph** [6] - 71:20, 73:20, 74:22, 74:23, 102:12, 105:19
**paramount** [1] - 53:23
**paraphrase** [1] - 108:20
**pardon** [1] - 58:22
**parent** [3] - 40:14, 40:17, 47:19
**parents** [4] - 13:24, 20:1, 34:7, 39:19
**parish** [1] - 14:18
**parishioner** [17] - 7:16, 11:16, 12:10,

21:9, 21:15, 21:16, 21:19, 21:22, 22:4, 35:5, 35:7, 35:12, 35:16, 35:24, 36:13, 57:17, 118:21
**parishioner-plus** [9] - 21:9, 21:15, 35:5, 35:7, 35:12, 35:16, 35:24, 36:13, 118:21
**parishioners** [1] - 11:6
**Park** [3] - 22:12, 22:14, 24:23
**parol** [2] - 106:13, 111:16
**part** [13] - 8:1, 12:17, 21:4, 22:3, 23:15, 56:18, 94:17, 101:22, 104:4, 110:7, 111:25, 118:1, 125:2
**partial** [1] - 119:24
**participant** [1] - 13:16
**participate** [2] - 14:24, 74:19
**participated** [3] - 4:16, 4:17, 12:13
**participation** [1] - 12:14
**particular** [9] - 11:6, 55:14, 56:7, 56:8, 78:25, 86:5, 97:18, 97:19, 115:16
**particularly** [3] - 38:10, 79:20, 127:12
**parties** [5] - 48:14, 111:2, 111:17, 112:15, 113:11
**parts** [2] - 53:8, 125:8
**party** [2] - 13:5, 58:8
**past** [6] - 24:20, 28:10, 40:11, 40:18, 43:21, 74:1
**pastor** [1] - 21:25
**pattern** [3] - 49:22, 58:1, 60:11
**pause** [1] - 116:8
**pay** [1] - 24:8
**paying** [1] - 69:14
**pecuniary** [14] - 67:12, 84:24, 85:11, 85:24, 87:4, 87:10, 88:15, 88:21, 90:10, 91:3, 97:5, 97:8, 98:10, 99:2
**pecuniary-only** [1] - 97:5
**pedophile** [2] - 56:21, 102:21

**pedophiles** [12] - 17:14, 43:23, 56:24, 72:8, 72:23, 75:13, 75:19, 78:18, 79:8, 79:11
**pedophilic** [3] - 22:19, 28:15, 108:24
**people** [13] - 16:18, 17:15, 17:16, 23:5, 23:9, 23:11, 23:20, 47:23, 49:1, 54:10, 60:21, 110:12, 121:18
**per** [2] - 83:20, 95:14
**perceive** [1] - 110:12
**perceived** [2] - 109:8, 110:13
**perfectly** [1] - 27:21
**perhaps** [7] - 7:16, 19:23, 29:19, 50:17, 72:10, 116:16, 121:24
**period** [2] - 22:9, 110:6
**perpetrated** [1] - 71:3
**perpetrating** [1] - 77:11
**perpetrator** [7] - 18:23, 19:11, 19:14, 27:4, 57:6, 79:3
**perpetrator's** [1] - 19:2
**perpetrators** [10] - 19:15, 23:8, 31:3, 31:10, 32:4, 77:14, 124:19, 124:20, 125:4, 126:12
**person** [6] - 24:4, 32:24, 36:6, 38:6, 40:17, 113:18
**personal** [22] - 22:3, 24:23, 27:6, 60:13, 64:22, 67:22, 68:9, 68:22, 69:2, 84:12, 85:3, 87:24, 89:17, 89:18, 89:22, 89:23, 90:3, 90:4, 95:6, 100:4, 107:9, 107:12
**perspective** [1] - 39:18
**persuade** [2] - 8:9, 90:25
**persuaded** [1] - 28:2
**persuasive** [2] - 54:2, 54:5
**perversion** [2] - 39:5, 72:21
**Pfau** [1] - 82:9
**phone** [1] - 61:10
**physical** [1] - 95:9
**picture** [1] - 32:13

**piece** [5] - 27:14, 28:9, 42:1, 43:5, 122:23
**pieces** [1] - 107:22
**place** [4] - 9:23, 83:2
**plain** [4] - 28:15, 63:17, 68:5, 103:9
**plain-meaning** [1] - 68:5
**plaintiff** [31] - 4:18, 5:1, 5:2, 5:3, 5:13, 6:11, 13:2, 13:3, 25:4, 29:15, 30:17, 33:18, 54:15, 57:11, 58:24, 61:17, 64:7, 64:13, 65:4, 65:25, 66:6, 66:8, 66:14, 67:23, 70:12, 82:20, 84:20, 102:8, 103:4, 110:3, 110:4
**Plaintiffs** [2] - 19:1, 99:8
**plaintiffs** [62] - 4:16, 5:5, 5:15, 8:17, 9:6, 11:1, 14:20, 14:22, 16:23, 17:25, 19:3, 20:17, 22:16, 23:7, 25:22, 26:4, 27:8, 28:8, 28:25, 32:3, 37:21, 43:24, 45:2, 47:2, 47:17, 47:22, 49:12, 49:14, 49:18, 50:14, 50:22, 50:23, 50:25, 52:15, 53:10, 56:18, 60:3, 66:22, 67:5, 69:24, 72:17, 72:24, 84:12, 84:24, 94:4, 94:9, 95:5, 100:4, 102:17, 104:1, 104:4, 104:23, 110:25, 111:2, 114:5, 114:21, 118:22, 120:16, 121:16, 124:5, 124:21
**plaintiffs'** [20] - 10:3, 12:8, 24:17, 43:8, 43:10, 43:14, 43:15, 54:11, 61:8, 63:15, 63:16, 65:7, 66:20, 70:3, 82:2, 94:22, 108:16, 108:20, 113:2, 117:10
**plane** [1] - 41:18
**play** [4] - 10:10, 10:13, 10:14, 124:7
**playing** [1] - 117:15
**plead** [1] - 128:7
**pleaded** [2] - 128:5, 128:17
**pleadings** [2] -

112:16, 119:23
**pleasantly** [1] - 127:2
**pled** [7] - 9:6, 114:11, 114:16, 120:23, 120:24, 121:21, 122:10
**pledged** [1] - 121:2
**pledging** [1] - 118:19
**plenty** [1] - 116:25
**plus** [14] - 12:10, 12:11, 21:9, 21:15, 35:5, 35:7, 35:12, 35:16, 35:24, 36:13, 57:17, 58:10, 118:21
**Pocatello** [1] - 112:11
**point** [35] - 6:24, 17:9, 17:11, 19:7, 19:18, 19:21, 23:18, 24:14, 27:13, 28:3, 42:7, 44:25, 46:21, 47:12, 47:17, 53:18, 60:6, 63:13, 67:11, 67:21, 68:17, 88:18, 93:11, 93:12, 97:9, 103:8, 106:24, 108:16, 109:19, 116:25, 120:1, 120:11, 124:14, 126:25, 128:12
**pointed** [3] - 28:4, 77:9, 102:10
**pointing** [1] - 102:11
**points** [2] - 27:10, 62:1
**Poleson** [1] - 123:6
**policy** [8] - 32:10, 51:16, 51:22, 80:10, 88:20, 89:2, 92:22, 93:10
**pose** [1] - 51:22
**position** [10] - 6:11, 9:14, 14:9, 24:17, 26:2, 30:25, 108:8, 119:22, 122:4, 122:16
**positions** [1] - 116:9
**possession** [3] - 61:7, 61:8, 70:21
**possibly** [1] - 117:18
**potential** [2] - 70:5, 126:16
**potentially** [2] - 108:6, 123:25
**practical** [2] - 18:12, 18:16
**practice** [6] - 49:21, 65:18, 81:1, 103:1, 112:20, 112:22
**pragmatic** [2] -

103:8, 103:15
**pragmatism** [1] - 103:15
**precise** [1] - 53:1
**preclude** [1] - 121:23
**precluded** [5] - 6:9, 88:15, 95:5, 100:4, 116:5
**preclusion** [1] - 101:18
**predator** [1] - 56:8
**predators** [4] - 50:5, 50:13, 73:18, 73:25
**predecessor** [1] - 6:8
**predicate** [4] - 72:2, 72:3, 74:6, 92:7
**predict** [1] - 99:1
**predictions** [1] - 24:24
**prefatory** [3] - 24:21, 25:11, 28:11
**prefer** [1] - 113:22
**prefiling** [2] - 115:17, 128:18
**pregnant** [2] - 86:20, 86:24
**prejudice** [1] - 83:5
**prejudiced** [3] - 83:6, 114:22, 128:12
**preliminary** [2] - 4:13, 8:8
**premature** [1] - 128:13
**preparation** [2] - 79:17, 92:25
**preponderance** [2] - 29:15, 48:10
**presence** [1] - 45:16
**present** [8] - 24:20, 28:11, 31:5, 31:6, 61:21, 121:17, 121:20, 124:11
**presented** [3] - 43:25, 95:16, 96:22
**presenting** [2] - 101:10, 113:11
**President** [1] - 55:14
**president** [2] - 70:14, 110:17
**pressed** [1] - 121:2
**presumably** [1] - 71:25
**presumption** [1] - 63:17
**pretty** [7] - 27:11, 30:18, 48:13, 67:20, 81:23, 104:21, 123:8
**prevail** [2] - 5:13, 5:18

**prevented** [1] - 113:12
**previously** [2] - 6:7, 111:10
**priest** [6] - 11:17, 14:12, 78:25, 117:3, 118:18
**priesthood** [5] - 116:14, 118:18, 119:1, 121:7
**priests** [1] - 78:22
**primary** [1] - 113:17
**principle** [1] - 118:3
**principles** [2] - 96:19, 117:19
**privacy** [1] - 96:2
**private** [2] - 81:1, 115:16
**privilege** [1] - 81:25
**probe** [1] - 51:18
**problem** [13] - 4:7, 13:17, 16:22, 18:16, 18:22, 19:9, 37:24, 38:8, 54:11, 56:22, 79:11, 82:1, 120:15
**problematic** [1] - 21:5
**problems** [2] - 54:1, 60:22
**procedural** [2] - 29:11, 47:7
**Procedure** [1] - 46:24
**procedure** [1] - 46:24
**proceed** [4] - 61:12, 74:16, 83:22, 84:24
**proceeded** [1] - 53:21
**Proceedings** [1] - 129:1
**proceedings** [2] - 53:20, 123:2
**process** [26] - 62:16, 110:3, 110:8, 113:4, 113:8, 114:5, 114:20, 114:23, 115:2, 115:9, 115:15, 120:2, 120:10, 122:18, 122:23, 123:1, 123:2, 123:16, 123:20, 123:23, 128:10, 128:14, 128:16, 128:17, 128:19
**produce** [1] - 110:23
**produced** [2] - 41:20, 94:5
**product** [1] - 26:20
**profess** [1] - 116:3
**professional** [4] -

45:18, 45:23, 66:2, 66:11
**Professor** [1] - 96:4
**program** [11] - 4:17, 34:12, 34:22, 39:11, 40:14, 40:16, 56:12, 116:4, 116:10, 118:7, 118:8, 118:11, 119:6, 121:10
**programs** [1] - 102:25
**projects** [1] - 21:24
**promises** [1] - 47:15
**promoted** [5] - 50:1, 73:12, 73:15, 102:22, 102:24
**promulgated** [1] - 82:14
**proof** [8] - 28:24, 29:1, 29:3, 29:7, 30:2, 47:11, 70:1, 70:3, 114:14
**properly** [2] - 69:1, 104:17
**property** [17] - 69:12, 69:16, 69:17, 70:4, 70:6, 70:10, 70:11, 74:9, 74:14, 74:16, 75:2, 75:3, 75:5, 75:15, 75:19, 77:25
**propounded** [1] - 76:24
**protect** [7] - 10:12, 10:13, 10:21, 41:5, 41:24, 68:21, 95:9
**protected** [5] - 50:3, 50:9, 73:16
**protecting** [1] - 103:2
**prove** [1] - 117:13
**proved** [2] - 77:7, 114:14
**provide** [5] - 22:24, 50:2, 73:16, 76:25
**provided** [1] - 106:14
**provides** [2] - 10:19, 83:3
**proving** [1] - 120:17
**provision** [2] - 54:6, 62:9
**provisions** [1] - 70:21
**proximate** [2] - 19:13, 27:11
**proximately** [1] - 27:12
**psychological** [1] - 67:25
**public** [4] - 22:12, 70:16, 110:18, 110:19

**publication** [1] - 23:25
**publications** [1] - 32:6
**published** [1] - 28:7
**publishing** [1] - 24:13
**puffery** [1] - 25:23
**puffing** [1] - 28:11
**pull** [1] - 65:7
**purely** [1] - 92:10
**purposes** [8] - 50:21, 53:14, 60:2, 62:23, 68:7, 82:24, 101:10, 105:1
**pursue** [1] - 65:4
**pursued** [1] - 70:24
**pursuit** [2] - 71:17, 110:24
**put** [18] - 20:9, 33:4, 47:17, 52:19, 55:4, 55:5, 58:24, 62:20, 78:23, 82:18, 83:2, 94:21, 100:15, 103:9, 112:20, 121:1, 123:11, 124:15
**putting** [4] - 28:5, 42:2, 82:8, 121:24

## Q

**quacks** [1] - 65:6
**qualitative** [1] - 75:17
**questioned** [1] - 59:11
**questions** [15] - 44:4, 44:7, 44:9, 44:10, 51:13, 52:18, 58:18, 62:18, 71:15, 82:17, 100:1, 106:8, 107:24, 111:5, 112:6
**quick** [2] - 27:10, 67:20
**quickly** [1] - 44:18
**quite** [5] - 10:6, 93:7, 113:9, 127:13, 128:6
**quote** [5] - 19:5, 85:19, 89:14, 108:20
**quoted** [1] - 49:24
**quotes** [1] - 110:21

## R

**rabbit** [1] - 35:17
**Railroad** [1] - 98:20
**raise** [5] - 29:20, 41:8, 112:25, 118:20, 121:25
**raised** [10] - 30:24,

36:19, 48:14, 52:18, 53:4, 101:20, 101:21, 104:14, 122:18
**raises** [2] - 29:9, 49:3
**ran** [3] - 58:6, 81:9, 112:9
**rather** [6] - 6:25, 12:25, 32:5, 53:6, 84:25, 89:22
**rationale** [1] - 88:20
**reach** [2] - 8:12, 116:21
**reaching** [1] - 19:7
**read** [15] - 18:24, 25:8, 45:9, 47:24, 48:3, 70:1, 74:22, 92:23, 92:25, 107:16, 107:17, 112:22, 114:8, 122:4
**reading** [2] - 5:24, 14:5
**reads** [1] - 49:24
**ready** [1] - 106:17
**reaffirmed** [1] - 65:23
**real** [3] - 51:16, 71:11, 73:21
**reality** [1] - 66:25
**really** [31] - 8:9, 9:10, 13:8, 17:1, 18:11, 19:7, 21:7, 26:14, 32:19, 33:12, 34:13, 34:14, 43:11, 44:14, 48:14, 49:8, 52:23, 65:2, 76:14, 86:25, 101:18, 101:24, 102:1, 104:7, 105:4, 110:13, 116:17, 120:23, 123:13, 124:2, 124:5
**reason** [20] - 10:25, 13:3, 15:5, 21:4, 28:4, 55:19, 57:14, 68:17, 86:2, 88:20, 89:3, 92:22, 95:15, 103:17, 103:18, 106:8, 109:15, 110:9, 111:23, 113:15
**reasonable** [10] - 5:12, 10:20, 10:23, 30:17, 40:17, 104:13, 109:17, 109:18, 110:25
**reasonably** [2] - 70:19, 121:11
**reasoned** [3] - 69:24, 75:4, 87:9
**reasons** [8] - 7:7, 39:5, 67:18, 93:10,

95:5, 114:17, 120:18, 120:24
**rebut** [1] - 100:25
**rebuttal** [3] - 8:17, 90:16, 100:10
**received** [1] - 55:15
**recent** [1] - 93:7
**recently** [2] - 88:4, 98:22
**recess** [4] - 48:20, 48:23, 83:17, 128:25
**Recess** [2] - 48:24, 83:18
**recision** [2] - 98:12, 107:5
**recission** [1] - 84:8
**recognition** [1] - 110:11
**recognized** [2] - 94:18, 96:15, 98:8, 108:18
**recognizes** [1] - 87:21
**recognizing** [2] - 56:20, 88:5
**recollection** [1] - 35:16
**reconsider** [1] - 105:13
**record** [18] - 15:15, 22:12, 33:4, 36:14, 39:24, 42:23, 61:2, 61:5, 70:16, 94:22, 102:15, 104:1, 105:19, 107:11, 107:16, 107:25, 108:5, 120:12
**records** [3] - 110:18, 110:19, 110:20
**recover** [1] - 84:21
**recoverable** [2] - 84:18, 99:15
**recovering** [3] - 88:15, 95:6, 100:4
**redo** [1] - 82:10
**refashion** [1] - 117:10
**refer** [4] - 10:4, 11:2, 28:19, 46:1
**reference** [3] - 18:10, 22:11, 127:10
**referenced** [2] - 55:1, 55:9
**references** [1] - 55:8
**referred** [1] - 6:6
**refers** [1] - 106:4
**reflected** [2] - 25:21, 27:23
**reflects** [1] - 104:23
**refused** [1] - 12:19

**regard** [7] - 7:13, 29:3, 45:1, 83:12, 111:25, 117:21, 118:22
**regarding** [2] - 4:4, 50:17
**regular** [1] - 87:25
**reinvigorates** [1] - 63:11
**reiterate** [1] - 94:11
**reiterates** [1] - 118:8
**rejected** [1] - 89:16
**relate** [1] - 118:11
**related** [3] - 34:4, 105:20, 105:25
**relates** [3] - 106:25, 122:17, 124:14
**relating** [1] - 40:2
**relationship** [122] - 4:25, 5:23, 5:25, 6:1, 6:4, 6:5, 6:9, 6:18, 6:22, 7:1, 7:3, 7:6, 7:10, 7:11, 7:12, 7:13, 7:15, 7:16, 7:17, 7:19, 7:22, 9:2, 9:4, 9:7, 9:11, 9:16, 9:17, 9:18, 9:20, 9:21, 9:22, 9:25, 10:1, 10:2, 10:4, 10:5, 10:6, 10:8, 10:9, 10:14, 10:15, 10:18, 10:22, 10:24, 11:2, 11:5, 11:10, 11:11, 11:13, 11:15, 11:16, 11:22, 12:1, 12:19, 12:21, 12:25, 14:12, 14:14, 16:5, 17:7, 19:11, 19:16, 19:18, 19:21, 20:6, 20:23, 21:21, 22:5, 23:7, 23:20, 24:11, 25:3, 27:2, 28:6, 31:17, 31:18, 31:24, 33:3, 33:8, 33:10, 33:11, 34:10, 34:15, 34:16, 35:1, 35:14, 35:18, 35:20, 36:1, 36:11, 36:17, 36:24, 51:18, 51:23, 55:10, 64:18, 68:23, 85:9, 85:16, 87:12, 88:11, 88:23, 92:14, 92:16, 103:22, 104:3, 104:4, 116:22, 117:4, 117:16, 117:21
**relationship-type** [1] - 11:10
**relationships** [9] - 7:8, 7:9, 12:15, 20:22, 22:3, 23:6, 33:22, 33:25, 35:14
**relatively** [1] - 70:20

**release** [12] - 101:8, 105:9, 105:17, 105:20, 105:23, 105:25, 106:4, 106:20, 106:25, 111:7, 111:11, 111:18
**released** [2] - 107:4, 107:12
**releasing** [1] - 107:8
**relevant** [9] - 35:13, 35:17, 35:25, 47:11, 50:10, 51:15, 73:13, 75:25
**reliance** [12] - 5:4, 27:11, 27:12, 41:22, 42:1, 42:21, 43:5, 47:17, 47:23, 64:20, 115:5, 115:14
**relied** [3] - 5:3, 47:25, 97:10
**relief** [5] - 94:20, 98:12, 113:23, 128:8, 128:17
**religious** [7] - 15:13, 115:23, 115:25, 116:2, 116:21, 116:24, 117:5
**relitigation** [1] - 70:6
**rely** [9] - 16:25, 32:5, 34:23, 43:3, 57:19, 73:4, 99:9, 111:2, 125:20
**relying** [1] - 87:19
**remaining** [1] - 15:3
**remains** [1] - 91:19
**remedies** [2] - 97:21, 98:13
**Remedies** [1] - 96:4
**remedy** [1] - 107:6
**remembers** [1] - 45:5
**remote** [3] - 23:25, 24:3, 28:7
**repeat** [1] - 122:19
**reply** [1] - 123:21
**reported** [3] - 55:12, 96:13, 121:15
**reposed** [5] - 6:12, 13:2, 13:18, 33:18, 36:6
**reposing** [2] - 13:3, 13:5
**represent** [1] - 39:10
**representation** [20] - 5:2, 16:24, 22:18, 24:15, 24:16, 26:10, 28:10, 28:14, 38:22, 50:2, 50:8, 57:2, 61:15, 61:16, 64:19, 64:20, 68:1, 73:15, 125:6, 125:22

**representations** [21] - 17:3, 31:22, 39:10, 40:15, 43:11, 47:14, 47:18, 49:17, 50:16, 50:24, 57:22, 59:1, 59:8, 59:17, 59:22, 60:14, 70:9, 71:4, 79:13, 124:23, 125:21
**represented** [8] - 37:12, 49:19, 61:18, 69:15, 69:16, 69:17, 75:1, 75:2
**representing** [2] - 51:8, 51:14
**represents** [1] - 51:9
**request** [1] - 114:17
**requested** [1] - 113:23
**require** [2] - 87:10
**required** [5] - 41:21, 71:13, 85:9, 95:14, 99:3
**requires** [4] - 14:5, 14:9, 51:17, 119:8
**requiring** [1] - 97:8
**reread** [1] - 79:16
**res** [11] - 70:6, 81:17, 84:6, 84:8, 101:7, 101:12, 104:9, 104:13, 105:1, 108:13, 110:17
**rescind** [1] - 107:2
**resemble** [1] - 127:21
**reserve** [5] - 17:24, 29:24, 42:15, 49:13, 51:2
**reserving** [4] - 8:17, 18:2, 49:11, 90:16
**resolve** [2] - 69:18, 106:13
**Resources** [1] - 70:16
**respect** [14] - 25:21, 26:18, 59:23, 60:12, 67:2, 81:15, 91:1, 95:18, 102:9, 105:22, 106:21, 119:23, 120:1, 122:22
**respectfully** [1] - 39:2
**respond** [10] - 17:24, 49:15, 51:3, 82:15, 100:8, 113:12, 113:25, 116:15, 124:18, 126:4
**response** [8] - 29:20, 31:13, 42:19, 48:11, 48:19, 60:18, 94:2, 127:6

**responsible** [2] - 22:22, 126:11
**rest** [6] - 14:16, 14:17, 62:23, 80:22, 82:21, 119:23
**Restatement** [2] - 10:11, 99:7
**restatement** [1] - 99:11
**restrict** [1] - 88:21
**restroom** [1] - 83:16
**result** [2] - 90:10, 103:5
**resulted** [1] - 5:4
**results** [2] - 89:21, 89:24
**retain** [1] - 81:2
**retroactive** [2] - 109:2, 109:4
**reveals** [1] - 96:6
**reversed** [2] - 25:16, 100:17
**Review** [6] - 92:19, 92:24, 93:6, 100:19, 101:2, 101:3
**revival** [1] - 61:9
**RFP** [1] - 82:16
**rights** [1] - 115:2
**ripe** [2] - 120:3, 122:10
**rise** [1] - 71:10
**risk** [6] - 22:19, 34:21, 41:9, 41:10, 41:13
**risks** [2] - 40:19, 41:25
**road** [4] - 18:15, 23:5, 27:7, 124:16
**rogue** [3] - 22:19, 28:14, 68:22
**rogues** [1] - 23:10
**role** [13] - 4:20, 34:5, 37:6, 113:17, 116:12, 118:16, 119:1, 119:5, 121:7, 121:8, 121:9, 124:7, 125:19
**Roman** [1] - 82:23
**room** [1] - 123:1
**roster** [3] - 16:14, 16:16, 45:4
**rosters** [1] - 37:7
**roughly** [1] - 111:23
**Rule** [5] - 30:13, 47:10, 62:16, 71:25, 73:10
**rule** [13] - 10:10, 21:6, 21:15, 35:6, 35:25, 36:13, 54:12, 85:21, 86:16, 95:11, 95:12, 100:6

**ruled** [9] - 49:10,
51:6, 51:11, 52:25,
70:18, 77:4, 78:13,
84:17, 109:1
**Rules** [1] - 46:23
**rules** [3] - 46:25,
97:19, 112:17
**ruling** [2] - 90:25,
100:17
**rulings** [1] - 77:9
**run** [1] - 105:8
**running** [1] - 28:13
**runs** [1] - 65:8
**rush** [1] - 42:10
**Russia** [1] - 24:5

## S

**safe** [24] - 17:20,
32:23, 39:20, 44:23,
49:20, 50:2, 50:9,
57:3, 57:8, 57:23,
59:1, 59:5, 59:9,
59:18, 73:3, 73:16,
74:20, 75:10, 77:3,
79:13, 102:22,
109:21, 121:11,
124:10
**safety** [14] - 16:24,
17:4, 28:14, 31:23,
40:16, 40:21, 50:17,
56:11, 59:24, 60:14,
77:12, 92:12
**sake** [1] - 37:25
**sampling** [1] - 98:5
**sanctioned** [1] - 34:6
**Sanderson** [2] -
55:11, 55:12, 120:8
**save** [1] - 127:15
**saw** [3] - 37:10,
92:24, 101:14
**scales** [2] - 64:6,
67:9
**schedule** [1] -
112:10
**Schmidt** [50] - 15:6,
15:12, 15:14, 15:17,
15:18, 15:19, 16:2,
16:4, 16:6, 17:8,
17:21, 32:3, 36:21,
36:22, 37:2, 37:5,
37:10, 39:14, 44:20,
45:5, 45:6, 45:7,
45:11, 45:17, 45:24,
50:5, 50:13, 55:9,
55:10, 55:11, 55:15,
55:17, 56:8, 60:20,
72:10, 73:18, 73:25,
74:4, 74:5, 75:8,
75:15, 75:19, 76:16,

76:18, 77:5, 77:19,
77:25, 78:16, 102:20
**Schmidt's** [5] -
16:13, 16:16, 72:4,
72:8, 77:1
**school** [11] - 10:16,
10:19, 11:1, 12:1,
13:23, 14:2, 14:3,
14:18, 69:10
**scout** [34] - 14:4,
15:6, 15:9, 15:22,
16:14, 22:25, 34:1,
37:9, 37:12, 37:13,
38:14, 39:3, 39:11,
40:9, 40:16, 40:21,
44:20, 45:6, 45:8,
45:25, 46:2, 46:9,
48:3, 59:1, 79:1,
102:23, 109:20,
118:7, 118:13, 121:7,
125:16, 125:17
**Scout** [12] - 22:18,
23:15, 23:22, 24:17,
28:13, 32:9, 37:4,
40:1, 45:24
**scouter** [3] - 38:8,
45:19, 45:23
**scouting** [41] -
12:18, 16:24, 17:8,
34:4, 34:21, 34:25,
37:10, 37:17, 38:10,
39:4, 40:19, 41:7,
41:23, 43:22, 49:20,
49:21, 50:8, 50:18,
55:17, 55:25, 56:1,
56:12, 56:22, 57:3,
57:8, 57:22, 57:23,
59:1, 59:5, 59:9,
59:18, 72:9, 73:4,
74:19, 76:16, 77:3,
79:13, 92:13, 118:12,
121:10
**scoutmaster** [42] -
15:7, 15:8, 15:14,
15:16, 16:17, 17:2,
17:4, 17:5, 17:19,
17:20, 17:21, 17:22,
25:9, 31:19, 32:7,
32:10, 32:23, 36:22,
36:23, 36:25, 37:2,
37:5, 37:15, 37:16,
38:1, 39:15, 39:20,
41:14, 45:6, 45:13,
56:21, 73:5, 108:23,
116:11, 116:13,
118:3, 118:25,
121:19, 125:9,
125:13, 125:19
**scoutmaster/
priesthood** [2] -

117:20, 118:16
**scoutmasters** [24] -
16:25, 22:20, 28:15,
31:12, 31:15, 31:23,
31:25, 33:5, 33:23,
38:11, 38:13, 38:23,
38:25, 39:9, 43:23,
57:2, 57:9, 59:9,
60:21, 68:22, 108:24,
118:14, 124:7
**scouts** [10] - 19:14,
31:23, 37:3, 41:4,
55:22, 79:4, 92:13,
102:22, 102:24,
109:22
**Scouts** [42] - 4:4,
4:16, 4:20, 11:4, 11:6,
14:8, 14:23, 14:24,
16:2, 18:8, 19:12,
21:14, 22:13, 22:17,
22:21, 23:3, 31:12,
31:19, 31:20, 33:6,
34:3, 45:13, 45:14,
46:4, 49:19, 50:17,
50:20, 73:5, 73:8,
73:13, 73:14, 75:16,
76:18, 79:8, 79:12,
90:16, 108:22,
110:23, 111:13,
125:14, 125:22,
125:23
**screen** [1] - 100:15
**second** [11] - 37:22,
47:12, 49:9, 51:4,
74:10, 74:11, 88:9,
95:11, 97:13, 97:14,
115:19
**Second** [1] - 99:7
**secondly** [2] - 7:20,
87:9
**secret** [2] - 35:10,
110:20
**section** [4] - 67:20,
86:8, 86:9, 109:1
**Section** [1] - 83:3
**sections** [1] - 82:4
**secular** [2] - 116:4,
119:6
**see** [14] - 17:1,
20:13, 35:3, 55:5,
66:23, 72:12, 75:6,
97:7, 97:16, 103:11,
104:22, 106:19,
123:14, 127:3
**seeing** [3] - 32:1,
71:12, 73:21
**seek** [1] - 107:5
**seeking** [5] - 31:9,
105:11, 106:1,
114:18, 128:8

**seeks** [1] - 94:20
**seem** [1] - 88:19
**selection** [1] - 124:7
**self** [1] - 61:9
**self-initiated** [1] -
61:9
**seller** [1] - 26:20
**semantics** [1] -
37:14
**send** [1] - 34:7
**sense** [5] - 67:12,
105:3, 113:15,
124:24, 126:24
**sent** [1] - 62:18
**separate** [3] - 51:10,
77:16, 115:13
**serious** [3] - 51:13,
51:22, 52:15
**seriously** [1] - 67:19
**serve** [1] - 119:5
**served** [1] - 77:21
**services** [3] - 50:1,
73:15, 102:24
**set** [4] - 27:21, 35:5,
65:8, 104:15
**setting** [18] - 10:16,
25:24, 32:6, 52:4,
87:2, 87:8, 88:14,
88:23, 95:16, 95:21,
96:5, 96:7, 96:14,
96:17, 96:23, 98:14,
98:15, 98:18
**settings** [1] - 8:5
**settle** [1] - 69:18
**settlement** [3] - 84:9,
107:20, 126:17
**Seven** [1] - 99:8
**several** [5] - 34:8,
37:3, 37:21, 79:17,
82:2
**sewage** [1] - 70:5
**sex** [2] - 31:10, 64:3
**sexual** [17] - 4:19,
12:15, 19:2, 22:19,
31:3, 31:21, 34:21,
40:18, 43:22, 92:13,
102:18, 109:3, 117:1,
124:20, 128:2, 128:4,
128:7
**sexually** [11] - 14:1,
19:14, 37:6, 37:21,
39:4, 40:9, 40:23,
41:14, 94:24, 103:16,
108:21
**shade** [1] - 105:4
**shades** [1] - 123:18
**shakes** [1] - 127:4
**shape** [1] - 42:24
**Shelley** [1] - 24:3
**shift** [1] - 68:3

**shopping** [1] - 68:18
**short** [2] - 70:20,
96:12
**shortchange** [1] -
42:9
**shot** [1] - 105:11
**show** [12] - 5:9, 5:10,
30:6, 30:10, 32:21,
34:15, 45:3, 53:16,
57:7, 62:24, 63:20,
64:18, 64:19, 75:9,
115:4, 115:6, 115:8,
117:16, 117:17,
121:18, 128:19
**showed** [2] - 26:13,
103:25
**showing** [2] - 40:10,
115:12
**shown** [1] - 11:13
**shows** [2] - 16:16,
37:19
**side** [12] - 11:20,
64:6, 80:16, 83:20,
102:16, 108:3,
108:14, 113:12,
120:22
**side-by-side** [1] -
102:16
**sidelines** [1] - 124:4
**sides** [1] - 120:22
**sign** [1] - 107:18
**signature** [2] - 66:8,
66:9
**signed** [2] - 105:17,
107:17
**significance** [1] -
10:8
**significant** [17] - 7:7,
31:16, 34:20, 37:14,
37:15, 41:9, 41:13,
98:6, 105:18, 116:3,
116:20, 119:3, 119:6,
119:7, 123:8, 124:1
**similar** [6] - 27:20,
30:9, 36:12, 76:5,
114:20, 121:24
**similarly** [1] - 59:6
**simple** [2] - 103:9,
109:21
**simply** [11] - 23:2,
26:21, 55:21, 59:16,
61:9, 67:4, 78:23,
105:23, 113:1, 116:5,
119:13
**single** [5] - 11:14,
24:4, 67:23, 85:24,
86:3
**singled** [1] - 14:15
**sink** [1] - 112:20
**sit** [2] - 68:5, 106:24

**sitting** [1] - 124:4
**situation** [5] - 75:6, 108:15, 110:19, 115:1, 120:7
**six** [3] - 59:20, 61:22, 69:19
**skeptical** [1] - 27:24
**skip** [1] - 52:11
**sky** [1] - 41:18
**slander** [1] - 96:2
**slap** [1] - 65:8
**slate** [1] - 63:18
**slide** [1] - 124:16
**slightly** [1] - 53:9
**small** [1] - 96:11
**sneaky** [1] - 17:15
**society** [1] - 86:1
**sold** [1] - 26:11
**sole** [2] - 94:14, 94:17
**solely** [4] - 28:7, 75:8, 78:16, 97:17
**solid** [2] - 57:18, 68:17
**solve** [1] - 53:25
**some-damage** [1] - 54:12
**some-evidence** [1] - 30:3
**someone** [3] - 71:3, 116:16, 127:12
**sometimes** [3] - 18:17, 54:14, 127:12
**somewhat** [8] - 6:17, 7:18, 35:19, 51:17, 86:4, 88:19, 92:18, 113:4
**somewhere** [1] - 26:14
**son** [2] - 14:7, 37:9
**sonnets** [1] - 24:4
**soon** [2] - 62:10, 128:24
**sophisticated** [1] - 61:18
**sorry** [4] - 43:17, 62:21, 66:2, 74:25
**sort** [3] - 56:17, 113:10, 123:18
**sought** [2] - 104:1, 105:12
**sound** [1] - 85:10
**source** [5] - 63:24, 63:25, 67:22, 67:25, 96:6
**space** [2] - 103:12, 103:13
**speaking** [1] - 108:13
**special** [22] - 10:2,

10:4, 10:5, 10:7, 10:8, 10:9, 10:14, 10:15, 10:17, 10:18, 10:22, 11:2, 11:5, 11:10, 11:12, 14:11, 14:12, 19:18, 63:7, 115:13
**specific** [17] - 4:13, 28:9, 36:20, 40:15, 53:7, 60:6, 71:20, 72:13, 72:22, 72:23, 75:12, 97:21, 111:13, 113:13, 115:12, 126:19, 128:16
**specifically** [9] - 8:1, 49:19, 49:24, 50:11, 55:8, 55:9, 71:10, 84:20, 118:12
**specificity** [2] - 79:24, 81:2
**speculative** [4] - 43:3, 43:4, 43:5, 86:4
**spend** [2] - 52:17, 114:19
**spending** [1] - 14:14
**spine** [1] - 65:24
**spoken** [1] - 52:13
**sponsor** [1] - 22:24
**sponsored** [7] - 4:18, 14:3, 14:21, 16:5, 37:4, 37:23, 45:3
**sponsoring** [1] - 118:9
**sports** [2] - 12:13, 12:14
**spread** [1] - 58:1
**stage** [4] - 122:2, 122:9, 124:12
**stake** [1] - 55:17
**Stake** [1] - 55:14
**standard** [17] - 13:1, 20:5, 27:11, 29:3, 29:10, 29:12, 30:3, 30:9, 30:12, 30:19, 34:14, 34:19, 47:8, 48:10, 54:13, 76:1, 82:18
**standards** [2] - 21:7, 22:24
**start** [7] - 4:8, 4:21, 62:11, 63:18, 84:10, 108:17, 122:23
**started** [2] - 9:9, 83:22
**starts** [1] - 83:10
**state** [10] - 12:17, 13:25, 16:12, 25:17, 68:6, 96:11, 98:21, 99:1, 101:4, 104:17
**State** [3] - 22:12,

22:14, 97:11
**state's** [1] - 98:24
**statement** [20] - 5:2, 5:4, 6:21, 23:6, 34:2, 34:4, 34:5, 57:10, 73:20, 79:3, 79:7, 87:1, 91:17, 92:9, 102:14, 105:19, 117:18, 124:16, 124:22
**statements** [21] - 17:19, 24:21, 24:22, 24:25, 25:11, 26:3, 32:16, 34:1, 39:25, 50:20, 56:10, 56:11, 57:8, 58:14, 73:3, 73:6, 73:23, 77:15, 78:24, 92:12, 117:19
**states** [4] - 60:6, 96:12, 96:21, 96:24
**States** [1] - 34:2
**statistics** [1] - 41:11
**status** [5] - 85:25, 86:3, 116:14, 118:17, 118:18
**statute** [47] - 27:25, 44:8, 48:21, 49:2, 49:7, 50:21, 52:5, 52:7, 53:15, 53:18, 54:17, 54:18, 57:11, 58:6, 58:12, 65:9, 66:1, 66:10, 66:12, 66:18, 68:7, 68:8, 71:4, 71:6, 75:24, 76:2, 82:4, 82:17, 82:21, 82:25, 89:13, 89:18, 89:23, 90:2, 90:5, 99:14, 102:7, 104:9, 104:10, 104:24, 108:14, 109:2, 110:14, 115:1, 115:3, 115:5, 115:14
**statutes** [2] - 54:8, 54:17
**stay** [3] - 65:16, 100:11, 123:17
**step** [3] - 28:18, 105:24, 107:25
**Stephen** [1] - 18:8
**Steve** [1] - 113:16
**stick** [1] - 68:18
**still** [17] - 31:21, 35:25, 38:19, 39:15, 39:20, 48:22, 53:17, 79:5, 84:7, 88:15, 91:7, 107:3, 107:7, 107:15, 114:13, 118:7, 119:5
**stipulated** [1] - 69:19
**stipulation** [1] - 82:7

**stolen** [1] - 66:8
**stop** [1] - 90:12
**story** [1] - 103:7
**straight** [1] - 83:9
**strangely** [1] - 62:17
**streets** [1] - 37:17
**strict** [3] - 8:14, 54:17, 54:18
**strictly** [1] - 54:9
**strike** [1] - 114:12
**strikes** [1] - 117:7
**strong** [1] - 51:16
**strongly** [1] - 31:13
**struggle** [2] - 78:20, 127:14
**struggled** [1] - 106:17
**struggling** [1] - 74:1
**stuck** [1] - 29:9
**student** [6] - 10:17, 12:8, 12:9, 12:11, 12:12, 12:13
**students** [2] - 10:19, 13:24
**stuff** [7] - 24:4, 24:22, 25:12, 28:11, 67:13, 82:5, 82:10
**subject** [2] - 58:18, 64:15
**subjected** [2] - 4:19, 102:18
**subjective** [1] - 26:24
**submit** [6] - 18:5, 24:19, 25:1, 43:4, 67:7, 68:25
**submitted** [1] - 120:4
**submitting** [1] - 122:17
**subsequent** [1] - 97:5
**subset** [1] - 35:14
**subsidiary** [1] - 30:24
**substance** [6] - 63:12, 63:19, 65:2, 66:19, 67:1, 108:20
**substantial** [4] - 29:24, 54:10, 94:15, 94:22
**substantive** [2] - 47:6, 68:6
**substantively** [1] - 114:10
**succeeded** [1] - 84:20
**sudden** [1] - 42:4
**sued** [3] - 66:1, 66:6, 68:21
**sufficient** [4] - 41:20,

43:25, 78:14, 82:19
**suggest** [3] - 8:12, 17:23, 28:15
**suggested** [3] - 51:1, 79:1, 117:25
**suggesting** [5] - 6:22, 22:21, 32:8, 78:22, 125:21
**suggestion** [4] - 101:17, 116:15, 123:21, 126:8
**suggests** [4] - 93:22, 103:7, 122:24, 124:10
**suing** [1] - 64:3
**suit** [1] - 96:22
**suits** [1] - 118:22
**summarized** [1] - 100:20
**summary** [21] - 4:5, 4:23, 5:8, 5:19, 6:8, 7:21, 20:17, 20:24, 28:23, 29:2, 29:7, 30:7, 30:8, 47:8, 48:10, 66:13, 119:24, 121:21, 122:10, 123:13, 124:12
**Sunday** [1] - 21:23
**super** [1] - 58:11
**super-duper** [1] - 58:11
**superior** [1] - 6:11
**supplemental** [2] - 29:19, 29:24
**supply** [7] - 69:21, 70:17, 74:12, 75:4, 75:14, 75:18, 77:25
**support** [2] - 70:7, 70:8
**supporting** [1] - 102:4
**suppose** [1] - 104:22
**supposed** [3] - 103:8, 103:14, 112:18
**Supreme** [54] - 6:14, 7:3, 8:25, 9:10, 9:19, 13:1, 20:5, 25:16, 26:1, 28:22, 29:2, 29:8, 33:13, 34:2, 36:4, 36:8, 47:18, 52:13, 52:25, 54:20, 62:13, 62:18, 63:22, 65:23, 66:15, 66:24, 67:3, 70:18, 77:4, 78:13, 84:17, 88:2, 88:4, 89:2, 89:4, 89:14, 91:12, 91:16, 91:23, 93:15, 93:22, 94:19, 96:16, 98:7, 99:10, 100:13, 100:16, 108:18,

108:25, 109:8, 110:10, 114:25, 115:11
**surface** [1] - 60:8
**surprised** [2] - 125:18, 127:2
**suspicion** [3] - 77:5, 77:6, 78:14
**switch** [1] - 105:8, 127:11
**system** [1] - 26:21

## T

**tack** [1] - 106:20
**tactical** [1] - 105:15
**tag** [1] - 78:5
**tag-team** [1] - 78:5
**talks** [2] - 45:10, 97:20
**tall** [2] - 127:13, 127:14
**tangential** [1] - 17:6
**teacher** [1] - 38:6
**teaches** [1] - 103:11
**teaching** [4] - 16:7, 16:8, 116:8, 116:19
**team** [1] - 78:5
**technical** [1] - 4:7
**teed** [1] - 82:6
**Teleflex** [1] - 98:22
**tend** [1] - 122:23
**term** [3] - 9:7, 57:16, 106:12
**terms** [11] - 47:14, 53:23, 58:11, 64:5, 81:18, 81:21, 82:17, 102:8, 104:24, 117:24, 124:23
**territory** [1] - 88:19
**test** [10] - 33:17, 34:24, 76:8, 76:9, 101:18, 105:5, 117:6, 119:7
**testified** [7] - 16:2, 37:5, 37:8, 41:22, 42:24, 43:25, 58:20
**testimony** [20] - 15:20, 15:23, 16:6, 16:10, 16:11, 17:15, 43:3, 43:8, 46:2, 47:21, 47:22, 59:7, 59:13, 59:15, 64:2, 82:10, 94:9, 94:22, 106:14, 111:23
**Texas** [1] - 22:10
**text** [1] - 82:3
**thankfully** [1] - 44:11
**THE** [164] - 4:3, 4:6, 9:6, 9:9, 10:7, 11:18,

11:20, 12:4, 12:22, 13:10, 13:20, 16:22, 17:11, 17:13, 17:23, 18:4, 18:7, 18:20, 20:3, 20:12, 20:15, 20:17, 20:21, 22:21, 23:13, 23:17, 25:14, 25:16, 25:20, 26:1, 27:22, 28:18, 28:21, 30:12, 30:15, 30:21, 32:1, 32:14, 33:13, 33:16, 35:7, 35:12, 36:2, 37:24, 38:15, 38:21, 42:2, 42:8, 42:14, 42:17, 43:12, 43:15, 43:17, 44:5, 44:8, 44:13, 44:16, 46:5, 46:10, 46:14, 46:19, 47:2, 47:10, 48:5, 48:20, 48:25, 52:10, 52:12, 53:2, 62:2, 64:11, 64:13, 65:10, 65:21, 67:15, 69:5, 71:1, 71:19, 71:25, 72:5, 72:7, 73:1, 74:17, 75:21, 76:22, 78:3, 78:5, 78:19, 80:2, 80:4, 80:15, 81:5, 81:8, 83:8, 83:19, 84:1, 84:4, 84:10, 85:7, 86:25, 88:8, 88:13, 89:8, 90:13, 90:17, 90:20, 90:22, 92:23, 93:17, 95:3, 95:23, 96:10, 97:25, 100:2, 100:7, 101:1, 101:5, 101:20, 104:8, 104:13, 104:17, 104:21, 105:7, 106:3, 106:9, 106:11, 106:19, 108:9, 108:11, 109:7, 111:6, 111:9, 111:22, 112:7, 112:11, 113:21, 113:24, 114:1, 114:3, 116:7, 117:6, 118:13, 118:19, 119:17, 119:19, 120:19, 121:22, 122:12, 122:15, 124:22, 125:11, 126:5, 126:14, 127:6, 127:10, 127:19, 127:22, 128:23
**themselves** [4] - 41:5, 41:24, 64:15, 96:21
**theological** [3] -

116:18, 117:18, 118:3
**theology** [3] - 116:8, 118:1, 118:2
**theoretical** [1] - 27:17
**theories** [2] - 105:3, 105:4
**theory** [10] - 53:16, 61:9, 61:12, 66:7, 102:3, 103:23, 104:6, 106:2, 109:12, 126:10
**therefore** [8] - 31:20, 47:6, 77:14, 79:3, 87:3, 87:5, 106:13, 121:19
**they've** [1] - 128:20
**thinking** [4] - 8:8, 16:22, 16:25, 106:16
**third** [2] - 95:14, 101:13
**Third** [2] - 16:15, 16:19
**Thomas** [14] - 18:4, 18:8, 25:14, 30:24, 31:11, 41:1, 46:11, 46:16, 62:3, 81:8, 103:25, 117:8, 122:12, 127:13
**THOMAS** [29] - 18:5, 18:8, 18:21, 20:8, 20:13, 20:16, 20:20, 21:1, 23:4, 23:16, 23:18, 25:15, 25:19, 25:25, 26:7, 28:5, 46:17, 46:20, 47:9, 47:12, 62:4, 64:12, 65:5, 65:20, 65:22, 67:17, 81:10, 81:13, 81:15
**thoughtful** [1] - 127:20
**thoughts** [2] - 86:25, 122:19
**thousands** [6] - 22:10, 26:12, 40:10, 72:19, 78:18
**three** [10] - 18:2, 21:23, 39:16, 47:4, 48:8, 50:23, 60:16, 87:15, 95:5
**three-page** [2] - 47:4, 48:8
**threshold** [2] - 53:19, 53:22
**throughout** [1] - 10:3
**thrust** [1] - 24:8
**tie** [1] - 24:9
**tied** [1] - 85:11
**tiered** [1] - 87:12
**tight** [1] - 27:12

**time-barred** [4] - 54:1, 54:14, 60:5, 60:16
**timer** [1] - 4:7
**tip** [1] - 27:23
**title** [1] - 65:15
**today** [7] - 8:13, 49:8, 52:3, 52:6, 90:24, 101:10, 116:2
**together** [2] - 28:3, 50:6
**toggle** [1] - 127:11
**Tom** [19] - 6:7, 6:21, 8:6, 8:11, 13:14, 31:7, 35:6, 35:17, 35:23, 36:12, 51:7, 90:25, 91:22, 92:6, 94:18, 95:17, 95:18, 99:6, 115:21
**Tompkins** [2] - 98:20
**ton** [1] - 47:17
**tonight** [1] - 112:11
**took** [7] - 68:22, 72:17, 74:6, 105:15, 105:23, 110:22, 110:23
**topic** [1] - 35:9
**tore** [1] - 62:19
**tort** [4] - 10:20, 99:21, 115:25, 116:5
**torts** [1] - 99:17
**Torts** [2] - 10:11, 99:7
**touch** [1] - 27:10
**touched** [1] - 39:23
**tournament** [1] - 12:17
**toward** [2] - 10:17, 38:22
**towards** [1] - 28:3
**transaction** [8] - 27:14, 64:10, 81:12, 87:17, 92:11, 101:14, 101:25, 102:1
**transactional** [3] - 87:22, 95:20, 98:17
**transactions** [1] - 87:6
**treat** [1] - 107:7
**treats** [1] - 107:15
**Trees** [1] - 99:8
**trend** [3] - 93:4, 93:5, 93:6
**trial** [10] - 5:9, 27:24, 66:10, 118:20, 120:12, 121:17, 122:4, 122:25, 127:1
**tried** [5] - 28:2, 61:6, 70:1, 127:3, 127:19
**trigger** [1] - 54:5

**triggered** [1] - 54:22
**Trimming** [5] - 63:11, 65:22, 66:24, 94:15, 117:9
**trip** [1] - 13:25
**trips** [4] - 12:16, 12:18, 39:16, 39:17
**troop** [5] - 4:18, 14:16, 15:18, 16:1, 125:16
**troop's** [1] - 15:9
**troops** [8] - 4:18, 14:21, 22:23, 37:3, 37:23, 77:21, 116:12, 125:24
**trouble** [2] - 106:25, 107:10
**troublesome** [1] - 6:18
**troubling** [1] - 6:16
**true** [9] - 26:4, 26:6, 31:17, 35:1, 59:23, 65:6, 68:2, 79:5, 98:15
**trust** [81] - 4:25, 5:23, 6:5, 6:9, 6:12, 7:3, 7:14, 7:19, 9:2, 9:11, 9:18, 9:21, 10:1, 10:2, 10:6, 10:24, 11:11, 11:22, 12:25, 13:2, 13:3, 13:5, 13:18, 13:24, 14:6, 14:7, 19:16, 19:19, 19:21, 20:6, 20:23, 22:5, 24:11, 25:3, 28:6, 31:17, 31:18, 31:24, 32:5, 33:9, 33:11, 33:18, 33:20, 33:22, 33:25, 34:7, 34:11, 34:16, 34:24, 35:1, 35:15, 35:20, 36:1, 36:6, 36:11, 36:17, 36:18, 36:23, 57:2, 64:18, 73:4, 78:24, 78:25, 85:9, 85:17, 87:13, 88:11, 88:23, 92:14, 92:16, 103:22, 104:3, 108:23, 111:2, 116:11, 116:22, 117:16, 117:20, 117:21
**Trust** [1] - 36:5
**trust-and-confidence** [1] - 28:6
**trusted** [4] - 39:21, 40:22, 44:22, 57:9
**trusting** [1] - 32:7
**trustworthiness** [2] - 40:21, 59:23

**trustworthy** [3] - 32:24, 59:2, 59:10
**truth** [6] - 27:1, 34:17, 34:20, 68:23, 68:24, 69:3
**try** [3] - 44:14, 83:8, 83:15
**trying** [9] - 12:23, 23:23, 33:24, 43:6, 56:17, 56:19, 66:1, 104:8, 109:19
**turn** [2] - 6:12, 123:7
**turned** [1] - 114:4
**turns** [1] - 54:1
**twice** [2] - 22:13, 123:20
**two** [19] - 21:22, 28:2, 39:16, 42:17, 46:17, 62:18, 66:1, 66:3, 77:16, 85:2, 86:25, 99:9, 100:24, 111:2, 114:9, 114:19, 119:9, 119:25, 120:22
**two-year** [1] - 66:1
**twofold** [1] - 77:10
**Tyler** [2] - 81:16, 82:12
**type** [18] - 9:16, 11:10, 12:19, 39:6, 40:8, 45:8, 61:19, 61:20, 67:21, 87:21, 89:24, 91:9, 96:6, 97:20, 98:11, 99:15, 103:10, 122:6
**types** [6] - 39:8, 40:2, 47:14, 92:1, 121:13
**typical** [2] - 6:4, 64:22
**typically** [3] - 87:2, 87:3, 116:11

**U**

**U.S** [2] - 114:25, 115:11
**UCC** [1] - 66:17
**ultimate** [1] - 27:1
**ultimately** [3] - 24:14, 24:16, 27:17
**umbrella** [1] - 23:3
**Umphrey** [3] - 84:19, 89:6, 98:10
**uncharted** [1] - 88:19
**unclear** [1] - 15:7
**under** [27] - 6:6, 10:11, 25:12, 40:11, 46:22, 47:5, 48:10, 50:1, 58:6, 66:7,

70:21, 70:22, 71:1, 71:16, 71:25, 73:2, 73:10, 73:15, 76:1, 86:9, 104:7, 106:2, 107:19, 109:11, 109:12, 117:9, 128:24
**underlying** [4] - 47:11, 63:3, 65:3, 89:17
**underpinnings** [1] - 50:7
**understated** [1] - 82:23
**understood** [2] - 104:23, 107:16
**undisputed** [1] - 20:10
**unfairly** [2] - 113:12, 114:22
**uniform** [1] - 45:17
**unintended** [1] - 126:20
**Union** [1] - 98:23
**unique** [9] - 20:7, 26:2, 27:25, 53:8, 82:1, 92:6, 93:18, 101:9, 113:4
**United** [1] - 34:2
**units** [1] - 26:15
**universe** [1] - 53:6
**university** [1] - 38:7
**University** [1] - 97:12
**unknown** [2] - 107:9, 107:12
**unless** [6] - 72:1, 93:17, 96:17, 112:5, 115:12, 128:19
**unnatural** [1] - 67:24
**unreasonably** [1] - 102:25
**unsafe** [2] - 55:25, 56:1, 77:8
**unusual** [1] - 120:7
**up** [28] - 12:15, 12:23, 16:16, 23:6, 24:1, 25:22, 27:6, 42:2, 45:3, 55:4, 55:5, 57:16, 61:24, 64:22, 77:21, 82:6, 91:15, 97:14, 103:9, 103:19, 110:10, 112:13, 112:23, 118:9, 123:25, 124:15, 127:14, 127:18
**upcoming** [1] - 45:2
**urge** [2] - 27:20, 63:4
**usual** [1] - 4:12
**Utah** [1] - 78:21
**utmost** [1] - 21:25

**V**

**V's** [1] - 15:6
**valid** [1] - 107:15
**validity** [1] - 63:17
**Valley** [1] - 21:1
**value** [16] - 67:5, 69:15, 69:17, 70:2, 70:3, 70:6, 70:11, 70:12, 74:9, 74:14, 74:15, 75:2, 75:5, 75:14, 75:18, 77:25
**variance** [1] - 105:4
**VAUGHAN** [7] - 32:12, 32:15, 33:15, 33:17, 35:11, 35:22, 36:3
**Vaughn** [2] - 28:18, 42:2, 48:6, 90:22, 100:8, 114:2, 127:10
**VAUGHN** [32] - 28:20, 29:22, 30:14, 30:20, 30:22, 38:12, 38:17, 39:2, 42:6, 42:12, 42:15, 42:20, 43:14, 43:16, 43:18, 44:6, 44:11, 48:18, 84:2, 90:23, 93:5, 93:21, 100:11, 114:2, 114:7, 116:20, 118:6, 118:17, 119:2, 127:7, 127:16, 127:25
**veneer** [1] - 120:10
**verbal** [1] - 111:23
**verbatim** [1] - 30:18
**verdict** [1] - 30:9
**verifiable** [1] - 26:19
**vernacular** [1] - 116:14
**versa** [1] - 82:1
**versus** [5] - 4:4, 40:12, 48:9, 75:19, 77:25
**vested** [3] - 115:5, 115:13, 128:20
**vicarious** [17] - 19:1, 19:4, 27:9, 31:2, 31:4, 31:5, 33:2, 119:11, 122:21, 124:15, 124:17, 124:25, 125:3, 126:1, 126:20, 127:8, 128:6
**vicariously** [5] - 23:12, 31:9, 31:21, 128:2, 128:4
**vice** [1] - 82:1
**victims** [2] - 75:17, 75:20
**view** [4] - 71:1, 103:8, 103:15, 108:16

**violated** [1] - 115:3
**virtually** [2] - 19:10, 71:21
**voluminous** [1] - 112:18
**voluntarily** [1] - 107:18
**volunteer** [2] - 38:14, 39:6
**vs** [3] - 24:23, 36:4, 65:22

**W**

**waddles** [1] - 65:5
**wade** [1] - 126:16
**wait** [7] - 59:20, 71:24, 73:1, 81:11, 113:23, 114:3, 126:10
**waited** [1] - 114:22
**walking** [1] - 83:11
**walks** [1] - 65:5
**Walston** [2] - 89:6, 98:10
**WALTON** [2] - 78:4, 78:8
**ward** [12] - 15:13, 15:15, 15:16, 15:21, 16:3, 16:15, 16:18, 45:12, 46:4, 46:8, 121:9
**Ward** [9] - 15:24, 15:25, 16:1, 16:15, 37:2, 37:4, 37:7, 37:9, 37:23
**ward's** [1] - 15:8
**Ward-sponsored** [1] - 37:23
**wards** [1] - 77:13
**warn** [5] - 17:21, 41:4, 41:16, 41:17, 68:21
**warning** [1] - 40:8
**warrants** [1] - 63:7
**water** [11] - 69:21, 70:4, 70:17, 70:20, 74:12, 75:3, 75:14, 75:18, 76:20, 77:24, 124:2
**Water** [1] - 70:15
**ways** [2] - 41:4, 77:16
**wearing** [1] - 45:17
**weaving** [1] - 25:7
**weddings** [2] - 22:2
**weeds** [1] - 119:8
**week** [4] - 21:24, 27:5, 47:3, 82:8
**western** [1] - 99:8
**whatnot** [1] - 118:11

**whatsoever** [1] - 15:15
**whole** [6] - 14:3, 32:13, 47:1, 62:16, 63:12, 121:9
**wholesome** [5] - 50:2, 50:9, 57:3, 73:16, 102:23
**wider** [2] - 58:1, 61:3
**wider-spread** [1] - 58:1
**widespread** [2] - 61:14, 79:11
**willfully** [1] - 103:4
**wise** [1] - 18:12
**witness** [6] - 59:15, 80:19, 80:20, 81:4, 122:3, 123:10
**witnesses** [4] - 83:6, 120:6, 120:9, 120:13
**woman** [2] - 11:8, 85:22
**wonderful** [2] - 25:9, 25:10
**wondering** [1] - 13:6
**Woodard** [11] - 8:19, 12:22, 17:23, 21:11, 33:9, 36:19, 63:13, 66:4, 86:25, 93:17, 116:17
**WOODARD** [26] - 8:21, 9:8, 9:13, 10:9, 11:19, 11:24, 12:5, 13:9, 13:12, 13:22, 17:3, 17:12, 17:14, 18:3, 44:14, 44:17, 46:7, 46:12, 83:24, 84:11, 85:12, 87:14, 88:9, 88:24, 89:10, 127:17
**woods** [1] - 34:8
**word** [5] - 14:12, 65:8, 112:1, 116:13, 127:20
**words** [10] - 5:16, 19:24, 22:20, 65:14, 68:9, 68:19, 76:22, 105:23, 107:3, 123:22
**worker's** [1] - 66:5
**workings** [1] - 124:6
**works** [2] - 104:10, 123:15
**world** [2] - 24:7, 34:18
**worried** [1] - 5:7
**worth** [1] - 69:13
**wrestle** [1] - 80:6
**written** [2] - 47:25, 128:24
**wrongful** [2] - 55:12,

68:10

## X

**XII** [5] - 51:6, 101:8,
105:9, 108:8, 111:8
**XII's** [1] - 105:15
**XVIII** [1] - 123:8

## Y

**year** [1] - 66:1
**years** [15] - 8:10,
23:24, 43:20, 47:25,
59:20, 60:16, 60:17,
61:10, 61:22, 65:25,
66:3, 72:18, 83:5,
110:23, 125:13
**York** [4] - 97:1, 97:3,
97:4, 97:5
**young** [4] - 11:8,
13:21, 24:5, 116:9
**yourself** [2] - 45:16,
111:20
**youth** [2] - 34:18,
121:13