UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN DOE I-XIX and JOHN ELLIOTT,<br><br>    Plaintiffs,<br><br>    v.<br><br>BOY SCOUTS OF AMERICA, a congressionally chartered corporation authorized to do business in Idaho; CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a foreign corporation sole registered to do business in Idaho; and CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS AND SUCCESSORS, a foreign corporation registered to business in Idaho,<br><br>    Defendants. | Case No. 1:13-cv-00275-BLW<br><br>MEMORANDUM DECISION AND ORDER |

**INTRODUCTION**

Pending before the Court are the Defendants' Motions for Summary Judgment (Dkts. 274, 275, 281, 282, 283, 284, 285) and the Plaintiffs' Motions for Partial Summary Judgment (Dkts. 276, 277). For the reasons stated below, the Court will grant the Church Defendants motions, and will grant BSA's motions with respect to Doe I, Doe II, and Doe V. The Court will deny BSA's motions with respect to Doe IV, Doe XII, and Doe

XVIII. Finally, the Court will grant Plaintiffs' motions in part, deny them in part, and reserve ruling in part.

## BACKGROUND[1]

The Plaintiffs in this case have alleged claims for constructive fraud against the Boy Scouts and the LDS Church. *Third Am. Compl.*, Dkt. 91. Each Plaintiff participated in Boy Scouts as a child, and each Plaintiff alleges he was sexually abused at the hands of an adult male volunteer. *Id.* The Plaintiffs allege that the Defendants made fraudulent misrepresentations about the safety of Scouting and failed to warn them about the risk of child sex abuse in scouting. *Id.* The Plaintiffs further allege that they relied on these false statements and omissions in deciding to participate in Boy Scouts, which led to their abuse. *Id.* As a result, Plaintiffs incurred both physical and emotional damages. *Id.*

1.    **Factual Background**

    A.    *Does I, II, and V*

Doe I was born in 1973 and was nine years old when he began attending scouting events in 1982. *Second Am. Compl.* ¶25, Dkt. 47; *Doe I Dep. I* 52:20, Dkt. 275-4. Doe I's name appears on a January 1983 Cub Scout Pack roster for Pack 410 sponsored by the

---

[1] As required by Rule 56, the facts, and all inferences derived from that evidence, will be viewed in a light most favorable to the Plaintiff.

(Continued)

Caldwell Fourth Ward.[2] *Walton Decl.* Ex. 22c at 20 (Troop Roster - BSA ID 9363), Dkt. 300-5. He remembers James Schmidt serving as the leader of his Cub Scout Pack. *Id*. at 52:16-20. During 1982, Schmidt sexually abused Doe I multiple times. *Doe I Dep. I* 61:8-69:17, Dkt. 300-6.

Doe II was a member of the of Boy Scout Troop 410, sponsored by the Caldwell Fourth Ward, during 1982-1983. *Doe II Dep. I* 12:2-4, Dkt. 282-12. He was between eleven and twelve years old. *Id.* at 12:7-10. He remembers James Schmidt serving as his Scoutmaster. *Doe II Dep I* 60:21-23, Dkt. 300-7. During this time period, Schmidt repeatedly abused Doe II, until Doe II quit scouting. *Doe II Dep I*, 97:21-100:4, 105:24-106:2, 109:7-16, 110:15-111:4, 111:25-112:15, 114:1-17, 116:16-21, 121:3-23.

Doe V was a member of the Boy Scout Troop sponsored by the Nampa Ninth Ward in 1979. *Doe V Dep. II* 82:16, Dkt. 282-6; *Doe V Dep. I*, 23:23, Dkt. 282-26. He was thirteen years old. *Doe V Dep. I* 7:4-5, Dkt. 282-26. James Schmidt served as the Assistant Scoutmaster for Doe V's scout troop. *Doe V Dep. II* 82:25, Dkt. 282-6. In August of 1979, James Schmidt took Doe V home after a scout meeting and sexually abused him. *Doe V Dep. I* 32:10-14, 34:14-37:20; *Doe V Dep. II* 82:8-16, Dkt. 282-6.

---

[2] A ward in the LDS Church is a local congregation typically defined by set geographical boundaries. Unlike other churches, members are expected to attend the ward in which they reside. The Ward is presided over by a Bishop, who is the equivalent of a pastor or minister in other denominations. However, the Bishop, like all other local leaders in the LDS Church, is a volunteer, serves for a limited term, is not compensated, and typically has other employment.

In 2007, Doe I, Doe II, and Doe V filed suit against the Boy Scouts of America and the Ore-Ida Council in Idaho state court. *Thomas Dec.* Ex. G, Dkt. 275-10. The complaint alleged that the defendants "represented to Plaintiffs, their parents and the general public that Defendants provide a safe, wholesome and protected environment for children;" that the defendants "promoted BSA's services and scouting programs under the representation that they provide a safe, wholesome, and protected environment for children, all the while knowing that Defendants BSA attracted, and had been infiltrated by, child predators, including SCHMIDT;" and that each defendant "had a practice and pattern of harboring child abusers, including SCHMIDT, and protecting their identities, thereby exposing unwitting parents and their children to further harm at the hand of said abusers." *Id.* ¶¶ 2.24, 2.25, 2.29. The complaint also alleged that Schmidt began abusing scouts as early as 1977. *Id.* at ¶ 2.13.

### B. *Does IV, XVIII*

Doe IV was twelve years old, in 1971, when he joined Boy Scout Troop 156, sponsored by the Lewiston Elks Lodge. *BSA's Omnibus SOF* at 2, Dkt. 285-2; *Walton Decl.* Ex. 58b at 18 (Troop Roster – BSA ID 9360, Dkt. 300-18. Lawrence Libey began serving as a scout leader for Troop 156 in 1968, and served as Doe IV's Scoutmaster. *Eveland Dep.* 20:6-9, Dkt. 300-16; *see also, e.g.*, *Walton Decl.* Ex. 58a at 11 (1968 Troop Roster – BSA ID 9342). A few weeks after Doe IV joined scouting, Libey began sexually abusing him. *Doe IV Dep.* 40:7-44:20; 64:10-12. Libey continued to sexually abuse Doe

IV throughout the three years that he was a Boy Scout. *Id*. According to Doe IV, Libey

quit as the Scoutmaster in 1974. *Doe IV Dep* 64:12-24, Dkt. 300-16.

Doe XVIII joined Boy Scout Troop 156 in approximately 1966. *Doe XVIII Dep. I*

40:15-17. Within a few months of getting involved with the troop in 1968, Libey began

to sexually abuse Doe XVIII, culminating in his rape. *Id.* at 50:2-6-65-12; 64:15-25. Doe

XVIII quit scouting a few weeks later. *Id.* 69:1-10.

Doe IV stated that he first learned that there was evidence of abuse in scouting

from the news in 2012. *Doe IV Dep. I* 78:1-25, Dkt. 300-16. Doe XVIII stated that he did

not learn about prior sexual abuse in scouting until he met with counsel in this action in

2014. *Doe XVIII Dep. II* 155:2-7, 157:16-24, Dkt. 300-16.

### C. *Doe XII*

Doe XII joined a boy scout troop sponsored by the LDS Church in Nampa, Idaho

in 1974. *BSA Doe XII SOF* ¶ 1-2; *BSA Omnibus SOF* ¶ 5. He was twelve years old. *Id.*

Larren Arnold was the Scoutmaster for Doe XII's Troop. *BSA Doe XII SOF* ¶ 3. *Doe XII*

*Dep. I* 15:13-14, 57:10-14. Arnold sexually abused Doe XII on two occasions, with the

first occurring almost immediately after Doe XII joined scouts. *Doe XII Dep. I* 55:23-

59:25, 62:13-64:15, Dkt. 300-15. After the second incident, Doe XII reported the abuse to

his parents. *Id.* at 23:17-24:12. Eventually, Doe XII quit scouting. *Id.* at 48-10-15.

In May 2001, Doe XII sent a letter to the BSA Defendants. *Anderson Decl.* Ex. C

at 2, Dkt. 274-6. The letter stated that Doe XII was abused by his Scoutmaster and

described the impact the abuse had on his life. *Id.* Doe XII asked that the BSA apologize

to him and "pay restitution for the havoc wreaked upon my life." *Id.* Doe XII sent a

second letter in September 2001, stating that he had uncovered official documentation

that Arnold had later abused another boy. *Anderson Decl.* Ex. E at 2, Dkt. 274-8. In that

letter, Doe XI offered to "settle" the matter with BSA. *Id.* On February 14, 2002, Doe XII

signed a document entitled "RELEASE AND SETTLEMENT OF ALL CLAIMS" (the

"Release"). *Anderson Decl.* Ex. F, Dkt. 274-9. The Release states that in exchange for

$2,500, Doe XII agreed to:

> release, acquit and forever discharge [BSA] from any and all actions, causes of
> action, suits or demands of any kind or nature, claim and demands, damages,
> costs, loss of services, expenses and compensation on account of or in any way
> growing out of any and all known and unknown personal injuries arising out of
> acts resulting or to result from an accident which occurred during the years of
> 1974 and 1975.

*Id.*

Also during 2001, Doe XII contacted attorney Tim Kosnoff about the potential for

a lawsuit against the BSA and the LDS Church. *See Doe XII Dep.* 197:22-25, Dkt. 274-5.

Based on his conversation with Mr. Kosnoff, Doe XII believed his case had "great

potential" but knew that Mr. Kosnoff was concerned there might be an issue with the

statute of limitations. *Id.* at 225:16-22, 226:19-25. During 2007, Doe XII was briefly

represented by the law firm Chasan & Walton. *Chasan Decl.* ¶ 2, Dkt. 293-2. The

representation ended in August 2007. *Id.*

### D.    *Defendants*

#### (1) Boy Scouts of America

BSA is a congressionally chartered non-profit organization. *Avery Decl.* ¶ 3, Dkt. 285-3. The purpose of BSA is to promote "the ability of boys to do things for themselves and others, to train them in scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues." *Id*; 36 U.S.C. § 30902. Organizations such as churches, schools, and civic clubs may sponsor a local scout unit, such as a cub pack or a scout troop, with the guidance and support of local BSA councils. *Avery Decl.* ¶ 4-6, Dkt. 285-3. Sponsoring organizations "agree to use BSA's program to operate local scouting units in accordance with the guidelines and polices set forth in the official BSA publications and literature. *Id.* Local councils are chartered by the national BSA, and the charters are "contingent on . . . fulfilling the basic purpose of the Scout movement." *BSA Bylaws* Art. X, Sec.1 *as amended November 1967*, Dkt. 300-19. They are "controlled" by the BSA bylaws, and by "the rules and regulations of the National Council or the Executive Board." *Id.* Art. X Sec. 2. BSA retains the authority to "revoke such charters when in its sole judgment such revocation is warranted." *Id.* Art. XII, Sec.1.

Adult volunteers, including Scoutmasters, Assistant Scoutmasters, and charter committee members, must apply to register with the BSA. *Avery Decl.* ¶ 8, Dkt. 285-3; *BSA Bylaws* Art. XII, Sec.5, Clause 3 *as amended November 1967*, Dkt. 300-19. Applications are submitted to the local charter, and then to the BSA. *Avery Decl.* ¶ 8, Dkt. 285-3. The BSA compares the application against the Volunteer Screening Database, which is a database of individuals who have been "deemed ineligible." *Id*. This database is also known as the "Ineligible Volunteer files." ("IV Files") *Id.* Both the local

council and the BSA have the authority to deny an adult volunteer's application. *Id.* Adult

volunteers are required to "subscribe to the statement of religious principle, the Scout

Oath and Law, and the[] Bylaws." *BSA Bylaws*, Art. XVIII, Sec. 2, Clause 1, *as amended

November 1967*, Dkt, 300-19.

BSA has issued various publications available to scouts, parents, and the general

public. The Boy Scout Handbook typically contains the Scout Oath and the Scout Law.[3]

*See, e.g.*, *Adams Decl.* Ex. 17 at 6, 7, Dkt. 285-25. It also contains a description of troop

leaders. *See, e.g.*, *Id*. at 8. The Seventh Edition of the Handbook was copyrighted in 1965

and reprinted in 1967. *Id.* at 2, 5. It states

> First, there's your Scoutmaster. What a wonderful man he is! He spends hours
> figuring out how to give you fun and adventure in your troop. He takes special
> training to learn exciting new things for you to do. He is present at every troop
> meeting and goes hiking and camping with the trop. He is the friend to whom you
> can always turn to for advice. He coaches the patrol leaders. Why does he do all
> this? Because he believes in Scouting, because he likes boys and wants to help
> them become real men.

*Id.* at 8. The Seventh Edition also directs scouts to obey their Scoutmasters. *Id.* at 7 ("A

Scout is Obedient. He obeys his parents, Scoutmaster, patrol leader, and all other duly

constituted authorities."). The Eighth Edition of the Handbook was copyrighted in 1972

and reprinted in 1973. *Adams Decl.* Ex. 18 at 3, Dkt. 285-26. The Eighth Edition states

---

[3] The Scout Oath states "On my honor I will do my best / To do my duty to God and my country
and to obey the Scout Law; / To help other people at all times; / To keep myself physically strong,
mentally awake, and morally straight." *See Adams Decl.* Ex. 17 at 6, Dkt. 285-25. The Scout Law states
"A Scout is Trustworthy, Loyal, Helpful, Friendly, Courteous, Kind, Obedient, Cheerful, Thrifty, Brave,
Clean, and Reverent." *Id.* at 7.

"Over there watching things is your Scoutmaster. He's a great guy. He gives hours of his time to you and the troop. And do you know why? Mostly because he knows Scouting is important to his city and nation. Besides, he is interested in boys." *Id.* at 5. The Ninth Edition of the Handbook, copyrighted and printed in 1979, again states that the scoutmaster "is the friend to whom you can always turn to for advice" and directs scouts to follow the rules of their troop. *See Adams Decl.* Ex. 19 at 5, 8 Dkt. 285-27. The Ninth Edition is dedicated to "the American Scoutmaster who makes scouting possible," and directs scouts to be "loyal" and "true" to their Scout leaders. *Adams Decl.* Ex. 19 at 2, 8, Dkt. 285-26.

In 1970, BSA published the "Parent's Book." *Walton Decl.* ex 68 at 3, Dkt. 300-21. It states that "Scouts benefit immensely from companionship with [their Scoutmaster]," who is a "man of good character." *Id.* The Parent's Book also states that the Scoutmaster is "the kind of guy [scouts] would like to be," and that the Scoutmaster has "the unique ability to get inside a boy and gain his confidence." *Id.* It states that the Scoutmaster has a "profound influence" on boys. *Id.* at 4. Finally, the Parents Book states that the Scoutmaster is a "mature adult of sound character," and lists the "desirable qualities" for which a Scoutmaster is selected. *Id.* at 4-5.

### (2)    LDS Church

The Caldwell Fourth Ward and the Nampa Ninth Ward of the LDS church served as the sponsoring organizations for the Boy Scout Troops in which Doe II and Doe V participated in, respectively. *Doe II Dep. I* 12:2-4, Dkt. 282-12; *Doe V Dep. II* 82:16,

Dkt. 282-6; *Doe V Dep. I*, 23:23, Dkt. 282-26. Doe II believed that James Schmidt had been chosen by the Church to be his scoutmaster, and that as such he was trustworthy. *Doe II Dep. I* 84:21-25. Doe V similarly believed that Schmidt was trustworthy, because the Church chose him to be the Assistant Scoutmaster, and believed him to be suitable for that position. *Doe V. Dep. II* 84:2-8. 85:1-6; 88:1-6.

### C.    Abuse in Scouting

Almost since its founding, the BSA has maintained files on adult volunteers who have been deemed unsuitable for participation. *See Walton Decl.* Ex. 65 at 7, Dkt. 300-28. By 1935, BSA had identified almost 3,000 men as unsuitable, with about 30% of those men identified as "moral degenerates." *Id.* The IV Files are the modern version of this system, and document, among other transgressions, men who have engaged in any type of sexual misconduct, including child sex abuse. *Walton Decl.* Ex. 66 at 2-3, Dkt. 300-20. Between 1946 and 1983, BSA opened approximately 1,260 "perversion" files, some number of which documented child sex abuse. *Walton Decl.* Ex. 65 at 4-6," Dkt. 300-28.

There are four named perpetrators of sexual abuse in the record: Lawrence Libey, James Schmidt, Larren Arnold, and Doug Bowen.[4] A detailed chronology of their alleged abuse is necessary to resolve the pending motions. The first allegation of abuse by a

---

[4] Though Bowen did not abuse any of the Plaintiffs still remaining in this action, there is evidence in the record demonstrating that he sexually abused other scouts between 1974 and 1976. *See, e.g., Doe XX Compl.*, Case No. 1:17-cv-00184-BLW, Dkt. 1.

named perpetrator is from as early as 1964. Tom Doe stated that he joined Boy Scouts in 1964 and remained in Scouts until 1969. *Tom Doe Decl.*, Dkt. 300-15. Tom Doe further stated that Larren Arnold was his Scoutmaster, and that during the time he participated in Scouts Arnold abused him on five separate occasions. *Id.*

In 1968, Doug Eveland, then Scoutmaster for Troop 156 in Lewiston, became concerned that Lawrence Libey had sexually abused a boy while sleeping alone in a tent with the boy on a scout trip. *See Walton Decl.* Ex. 58, (Troop Rosters, BSAID 9342), Dkt. 300-16; *Eveland Dep.* 23:17-24:21. 40:24-41:2, Dkt. 300-16. Libey also began sexually abusing Doe XVIII in 1968. *Doe XVIII Dep. I* 40:15-17, 50:2-6-65-12, 64:15-25.

During the period 1969 to 1974, [Theo Morgan], then the Bishop for the Nampa 4th Ward, heard "rumors Schmidt had acted inappropriately with Scouts at a Scout camp." *[Morgan] Dep.*16:23-2015, Dkt. 300-1.

Sometime between 1970-1974, Libey sexually abused Doe XIII, who is a plaintiff in related Case No. 1:17-cv-00184-BLW. *See Compl.*, *Doe XX v. BSA, et al.*, Case No. 1:17-cv-00184-BLW ("*Doe XX*"), Dkt. 1. In approximately 1971-1972, Libey sexually abused Does XX and XXIV, who are plaintiffs in *Doe XX*. *Id.* From 1971-1974, Libey repeatedly sexually abused Doe IV. *Doe IV Dep. I* 42:14-44:19, 64:5-17, Dkt. 300-16.

In 1972, Arnold attempted to abuse [Tony Bales]. *[Bales] Decl.* ¶¶ 3-4, Dkt. 300-14. In the fall of 1974, Arnold sexually abused Doe XII. *Doe XII Dep. I* 60:23-61:10, Dkt. 300-14. Between 1974-1975, Bowen sexually abused Doe XXI and Doe XXII. *Doe XX Compl.*, Case No. 1:17-cv-00184-BLW, Dkt. 1. Between 1975-1976, Bowen sexually

abused Doe XVII, and attempted to abuse his younger brother. *Doe XVII Dep.* 32:5-33:6, 53:9-18, 63:23-64:10, 91:10-92:13, Dkt. 300-7.

In the spring of 1977, Schmidt sexually abused Doe XV at a scout camp in Idaho. *Doe XV Dep.* 46:13-48:7, Dkt. 300-1. That summer, Schmidt exposed himself to Doe XV and another boy during a scout trip, and sexually abused John Elliot, Doe VII, Doe IX, Doe X, and Doe XI at Camp Tapawingo. *Id.* 51:25-53:7, Dkt. 300-1; *Elliott Dep.* 49:16-24, 52:17-53:4, 54:6-55:22-23; 56:8-57:16, Dkt, 300-1; *Doe VII Dep.* 88:25-90:24, 94:23-96:25, 124:11-24, 131:4-24, Dkt. 300-1; *Doe IX Dep.* 135:21-138:6, Dkt. 300-1; *Doe X Dep.* 46:12-47:3, Dkt. 300-1; *Doe XI Dep.* 105:20-108:17, Dkt. 300-1; *Schmidt IV File*, Dkt. 300-1.

In the spring of 1979, Schmidt sexually abused Doe V. *Doe V Dep. I* 32:10-14, 34:14-37:20, Dkt. 282-26; *Doe V Dep. II* 82:8-16, Dkt. 282-6. In 1982, Schmidt sexually abused Doe I, Shane Julian, Riley Gilmore, and [William Stout], and attempted to abuse [Tim Gamble]. *Doe I Dep. I* 59:6-24, 61:8-69:17, Dkt. 300-6; *Schmidt IV File*, Dkt. 300-1; *Julian Dep.* 28:9-29:5, 31:3-32:7, Dkt. 300-6; *Gilroy Dep.* 28:22- 29:13, 41:19-42:10, 46:1-13, Dkt. 300-6; *see also Compl.*, *Stout v. Schmidt*, No L-36881 (Oct. 09, 1984 Idaho 3d. Dist. Ct.), Dkt. 300-7; *[Morgan] Dep.* 19:3-15, Dkt. 300-7. Between 1982 and 1983, Schmidt repeatedly sexually abused Doe II. *Doe II Dep.* 94:3-101:13, 105:13-107:5, 109:2-121:23, Dkt. 300-7.

## 2.    Procedural Background

On June 24, 2013, Plaintiffs Doe I, and Doe II, and Doe IV, along with other individuals no longer a part of this lawsuit, filed a Complaint in this Court. *Compl.*, Dkt. 1. Plaintiffs Doe I and Doe II each brought claims for constructive fraud against Defendants the Boy Scouts of America ("BSA") and the Corporations of the Presiding Bishop and the President of the Church of Jesus Christ of Latter-Day Saints ("LDS Church" or "Church Defendants").[5] *Id.* Plaintiff Doe IV brought a single claim for constructive fraud against the BSA. *Id.* On July 30, 2013, Doe V joined in this action, and brought claims for constructive fraud against the BSA and the LDS church. *First Am. Compl.*, Dkt. 5. On February 6, 2014, Doe XII joined in this action, and brought claims for constructive fraud against the BSA and the LDS Church.[6] *Second Am. Comp.*, Dkt. 47. Finally, on October 7, 2015, Doe XVIII joined in this action, and brought a single claim for constructive fraud against the BSA. *Third Am. Compl.*, Dkt. 91.

The Defendants now separately move for summary judgment against the Plaintiffs. The BSA moves for summary judgment against all Plaintiffs. *BSA Mots. for Summary Judgment*, Dkts, 293, 294, 295, 296. The Church Defendants move for

---

[5] On November 21, 2016, Doe I voluntarily dismissed his claim against the LDS Church. *Order of Dismissal*, Dkt. 142. On January 9, 2018, however, the Court granted Doe I leave to reinstate his claim against the Church Defendants. *Minute Entry*, Dkt. 264. The deadline for the Church to file a motion for summary judgment against Doe I is currently stayed, pending the outcome of the instant motions. *Order*, Dkt. 324.

[6] The Court previously denied the Church Defendants' motion for summary judgment against Doe XII. *Doe XII Mem. Decision and Order*, Dkt. 240.

summary judgment against Does II, and V. *LDS Mots. for Summary Judgment*, Dkts. 282, 283, 284. The Plaintiffs have moved for partial summary judgment against each Defendant, seeking dismissal of certain of Defendants' affirmative defenses. *Pl.'s BSA Mot.*, Dkt. 276; *Pl.'s LDS Mot.*, Dkt. 277. The Court heard oral argument on the parties' motions on June 15, 2018.

Defendants have each filed an omnibus motion for summary judgment, which outlines arguments that are applicable to every Plaintiff. *See BSA Omnibus Mot.*, Dkt. 285; *LDS Omnibus Mot.*, Dkt. 282. In addition, BSA has filed separate motions for summary judgment against Doe XII, against Does I, II, and V, and against Does IV and XVIII. *See BSA XII Mot.*, Dkt, 274; *BSA I, II, V Mot.* Dkt. 275; *BSA IV, XVII Mot.*, Dkt. 281. The Church Defendants have filed separate motions against Doe II and Doe V. *See LDS II Mot.*, Dkt. 283; *LDS V Mot.*, Dkt. 284.

In their omnibus motions, Defendants argue that Plaintiffs' claims are improperly characterized as claims for constructive fraud, and that they are more appropriately characterized as personal injury claims. *BSA Omnibus Br.*, Dkt. 285-1; *LDS Omnibus Br.*, Dkt. 282-1. As such, they argue that Plaintiffs' claims are barred by the statute of limitations applicable to claims for personal injuries. *Id.* In the alternative, Defendants argue that Plaintiffs' claims are barred by the statute of limitations applicable to claims for constructive fraud, because they either knew or were on notice of facts which establish each element of their constructive fraud claims more than three years prior to the filing of the complaint. *Id.* Defendants further argue that Plaintiffs have failed to

establish the necessary elements of their claims for constructive fraud, including damages. *Id.* Finally, Defendants argue that Plaintiffs' claims are stale, and barred by the doctrine of laches. *Id.*

As to Doe I, Doe II, and Doe V, BSA argues that the Plaintiffs' claims are barred by the doctrine of *res judicata*, based on the dismissal with prejudice of a previous lawsuit brought by these plaintiffs against the BSA in Idaho State Court in 2007. *See BSA I, II, V Br.*, Dkt. 275-1. As to Doe XII, BSA argues that his claim is barred by a prior release and settlement agreement between the parties, which he failed to rescind prior to filing his Complaint. *See BSA XII Br.*, Dkt, 274-1. As to Doe IV and Doe XVIII, BSA argues that they had no duty to warn the Plaintiffs about their abuser. *See BSA IV, XVIII Br.*, Dkt 281-1. BSA also makes arguments specific to each Plaintiff that their claims are barred by the statute of limitations. *See BSA XII Br.*, Dkt, 274-1; *BSA I, II, V Br.* Dkt. 275-1; *BSA IV, XVII Br.*, Dkt. 281-1. And, the Church Defendants make specific arguments that Doe II and Doe V failed to establish necessary elements of their claims, and that their claims are barred by the statute of limitations. *See LDS II Br.*, Dkt, 283; *LDS V Br.*, Dkt. 284.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ."

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural

shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or

defenses [can] be isolated and prevented from going to trial with the attendant

unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere

existence of some alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 247-48 (1986).  There must be a genuine dispute as to a *material* fact – a fact

"that may affect the outcome of the case."  *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party,

and the Court must not make credibility findings.  *Id.* at 255.  Direct testimony of the

non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d

1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt

unreasonable inferences from circumstantial evidence.  *McLaughlin v. Liu*, 849 F.2d

1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a

genuine dispute as to material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

2001)(en banc).  To carry this burden, the moving party need not introduce any

affirmative evidence (such as affidavits or deposition excerpts) but may simply point out

the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman

Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076. The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted). Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

## ANALYSIS

Defendants dispute whether Plaintiffs have properly alleged claims for constructive fraud as a matter of law. As a threshold matter, Defendants argue that Plaintiffs' claims are more properly characterized as personal injury claims, and are therefore barred by the statute of limitations for personal injury. Defendants further argue that constructive fraud claims are limited to claims arising out of a commercial transaction, where the plaintiff has suffered an economic loss.

In the alternative, Defendants argue that Plaintiffs' claims are barred even under the fraud statute of limitations. Further, Defendants argue that Plaintiffs have failed to establish a relationship of trust and confidence between the parties, or that Defendants

made any false statements or omissions upon which Plaintiffs justifiably relied. Finally,

Defendants argue that Plaintiffs' claims are stale, and are barred by the doctrine of laches

## 1.      Character of Plaintiffs' Claims

The Court finds that Plaintiffs' claims are properly characterized as claims for

constructive fraud and, accordingly, the fraud statute of limitations applies, rather than

the statute of limitations for personal injury claims. To prove constructive fraud, a

plaintiff must establish (1) a statement or a representation of fact; (2) by a speaker in a

relationship of trust and confidence with the hearer; (3) that is false; (4) and material; (5)

where the hearer is ignorant of the falsity; (6) justifiably relied on the statement; (7) and

suffered resultant injury. *See Doe v. BSA*, 356 P.3d 1049, 1054-55 (Idaho 2015)

(describing the elements of constructive fraud). Here, Defendants dispute whether

Plaintiffs' claims may be characterized as constructive fraud claims, because they did not

arise out of a commercial transaction, and because they have not alleged any pecuniary

damages. The Court finds that neither a commercial transaction nor economic damages

are a necessary element of a constructive fraud claim.

 "[A]lthough it is true that most fraud claims involve monetary damage resulting

from business transactions, nothing in Idaho law expressly confines constructive fraud

claims to commercial settings." *Tom Doe v. Presiding Bishop*, No. 1:09-cv-00351-BLW,

2012 WL 3782454 at *7 (D. Idaho Aug. 31, 2012). Rather, constructive fraud "comprises

all acts, omissions and concealments involving a breach of legal or equitable duty, trust

or confidence and resulting in damage to another." *McGhee v. McGhee*, 353 P.2d 760,

762 (Idaho 1960). Citing *McGhee*, this Court held in *Tom Doe* that constructive fraud claims may arise outside the limited context of a commercial transaction. *Tom Doe*, 2012 WL 3782454 at *7. The Court declines to revisit its holding here.

This Court further held that noneconomic damages are recoverable on a claim for constructive fraud. *See id.* at *23 (citing *McGhee* for the proposition that plaintiffs may "recover damages for mental anguish that are traceable to [Defendants'] alleged failure to disclose a known danger."). Indeed, where a claim arises in the non-economic context, such as a breach of trust rather than a breach of contract, it is reasonable and foreseeable that the damages arising from that breach would not be limited to economic loss. For this reason, the Court again declines to revisit its prior holdings.

As such, the Court finds that neither a commercial transaction nor economic damages are necessary elements of a claim for constructive fraud. Nonetheless, Defendants argue that Plaintiffs' claims are better characterized as personal injury claims rather than as constructive fraud claims. As the Court has previously held in this case, however, "plaintiffs are not complaining that the Boy Scouts and the LDS Church sexually abused them; they are complaining that these institutions deceived them by telling them to trust their Scoutmasters and, at the same time, not telling them about the dangers of pedophilic Scoutmasters. So in that sense, plaintiffs are not pursuing personal-injury claims; they are pursuing fraud claims." *Order Certifying Questions to the Idaho Supreme Court* at *6, Dkt. 69. Thus, this Court found that "where the plaintiff alleges fraud and assumes the heavy burden of proving an intentional tort by clear and

convincing evidence" the fraud statute of limitations should apply. *Id.* at *7 (citing *Tom Doe*, 837 F.Supp. 2d 1145, 1153 (D. Idaho 2011). For these reasons, the Court finds that Plaintiffs' claims are properly characterized as claims for constructive fraud and that, as such, the fraud statute of limitations applies.

## 2.     Fraud Statute of Limitations

Idaho Code § 5-218(4) establishes a three-year statute of limitations for constructive fraud cases. *Doe v. BSA*, 356 P.3d at 1057. The statute of limitations began to run when a Plaintiff knew or reasonably should have known the facts constituting the fraud. *Id.* In other words, "actual knowledge of the fraud will be inferred if the allegedly aggrieved party could have discovered it by the exercise of due diligence." *Nancy Lee Mines, Inc. v. Harrison*, 511 P.2d 828, 829 (Idaho 1973). "Ordinarily, what constitutes reasonable diligence to discover fraud so as to affect the time when the statute of limitations begins to run is a question of fact for the jury." *Full Circle, Inc. v. Schelling*, 701 P.2d 254, 258 (Idaho Ct. App. 1985). Thus, "courts of this state should hesitate to infer knowledge of fraud." *McCoy v. Lyons*, 820 P.2d 360, 368 (Idaho 1991).

Under Idaho law, discovery of the facts constituting the fraud "requires more than an awareness that something may be wrong." *McCoy*, 820 P.2d at 368. Thus, mere suspicion of wrongdoing is insufficient to trigger the statute of limitations where the aggrieved party did not obtain evidence to substantiate her claim until much later. *Id.* at 369-70 (citing *Carman v. Carman*, 758 P.2d 710 (Idaho Ct. App. 1988)). As such, knowledge of fraud should not be inferred unless the only conclusion to be drawn from

the evidence is that "with reasonable diligence [the aggrieved party] would have discovered the alleged fraud" at a particular time. *Full Circle*, 701 P.2d at 258.

Here, the parties agree that the Plaintiffs received notice of the facts of the fraud at the time they discovered evidence that Defendants made false statements about the safety of scouting, or failed to disclose a known danger regarding the existence of pedophiles in scouting. *See BSA I, II, V Br.* at 20, Dkt. 275-1; *BSA XII Br.* at 9, Dkt. 274-1; *BSA IV, XVIII Br.* at 3, Dkt. 281-1; *LDS Omnibus Br.* at 12, Dkt. 282; *Pl.'s I, II, V Resp.* at 11-12, Dkt. 294; *Pl.'s XII Resp.* at 11, Dkt. 283; *Pl.'s IV, XVIII Resp.* at 3, Dkt. 296. The parties dispute, however, when each individual Plaintiff received notice of such facts. *See id*.

Plaintiffs argue that they could not have discovered the fraud until they understood the full extent of sexual abuse in scouting, and the Defendants' knowledge of that abuse. The Court disagrees. First, the Defendants' knowledge is not an element of constructive fraud. Unlike a typical fraud claim, Plaintiffs do not need to prove that Defendants knew their statements were false, or that they knowingly failed to warn. Instead, the nature of a constructive fraud claim is that a defendant's knowledge will be inferred as a result of the relationship of trust and confidence between the defendant and the plaintiff. *Doe v. BSA*, 356 P.3d at 1049. In other words, so long as Plaintiffs establish the requisite relationship, they could allege a claim for constructive fraud even if they had no evidence that either Defendant knew about the abuse in scouting. *See id*. (citing *Country Cove Dev. Inc. v. May*, 150 P.3d 288, 294 (2006) ("the gist of a constructive fraud finding is to avoid the need to prove intent, (i.e., knowledge of falsity or intent to induce reliance) . . . since it is

inferred directly from the relationship and the breach.")). Thus, the point at which

Plaintiffs discovered that Defendants knew about the abuse is irrelevant to their claim.

Second, the Court has held that Plaintiffs' claims rest on facts establishing that

sexual abuse of scouts, whether by their abusers or by other perpetrators, had occurred or

was occurring before the Defendants represented to them that scouting was a safe and

wholesome activity. *See Doe XII Mem. Decision & Order* at 14, Dkt. 240. To put it more

clearly, the claim rests on facts establishing that the statements Plaintiffs relied upon were

false at the time they were made, or that the risk of harm existed at the time of the

omission. As such, Plaintiffs had actual notice of facts underlying the fraud for the

purpose of the statute of limitations when they knew of facts establishing that child

sexual abuse in scouting predated Defendants' statements or omissions about the safety

of scouting. It is therefore the discovery of the fact of prior abuse which transforms

Plaintiffs' suspicion of wrongdoing into knowledge of facts necessary to substantiate

their claim, not the discovery of the extent of prior abuse.

Defendants' arguments that Plaintiffs discovered the falsity of any statements or

omissions at the time they were abused are unavailing for this same reason. As this Court

has stated repeatedly throughout the course of this litigation, a claim for constructive

fraud arises out of the false statements or failure to warn, not the damage suffered as a

result. The critical fact of the fraud, therefore, is the falsity of the statement at the time it

is made, or the existence of a danger at the time the omission occurred.[7] *See Obendorf v. FDIC*, 667 F.Supp. 2d 1223, 1231-32 (D. Idaho 2009) ("The relevant time period for the falsity of a statement of fact is when it is made."). The abuse suffered by Plaintiffs represents the manifestation of the danger at the time they were abused, not its existence at the time of the statement or omission upon which they relied.

Finally, Defendants argue that Plaintiffs discovered the facts underlying the harm when knowledge of the history of abuse in scouting became available to the general public in 2010. Where a relationship of trust and confidence exists between parties, however, "making it the duty of the defrauder in his trust capacity to disclose the true state of facts, the defrauded party is not charged with constructive discover[y] of the fraud on account of the facts being made a matter of public record." *Gerlach v. Schultz*, 244 P.2d 1095, 1099 (Idaho 1952). Here, Plaintiffs have alleged a relationship of trust and confidence, and the Court declines to charge them with discovery of the constructive fraud, solely because evidence of a history of abuse in scouting was available to the general public. *See id.*

---

[7] This is the analytical difference between a claim for constructive fraud and one for negligence. A statement that scouting is safe when there is a foreseeable risk of sexual abuse is negligent. A statement that scouting is safe when sexual abuse has and is occurring in scouting is fraudulent. In other words, a defendant is liable under constructive fraud when the potential for injury has been substantiated at the time the statement or omission occurs. In a negligence action, however, the defendant is liable even where the potential for injury is merely foreseeable. As the Court has previously noted, the relatively "heavy" burden of proving fraud also underlies the application of the more lenient statute of limitations. *See Order Certifying Questions to the Idaho Supreme Court* at *7, Dkt. 69.

For these reasons, the Court finds that the statute of limitations for Plaintiffs'

claims accrued at the time each individual Plaintiff discovered that sexual abuse of scouts

had or was occurring before the statements or omissions upon which they relied occurred.

To the extent the discovery date is in dispute, it is a question of fact that must be resolved

by the jury at trial. *McCoy v. Lyons*, 820 P.2d 360, 368 (Idaho 1991) ("where discovery

of a cause of action commences the statute of limitations the date of discovery is a fact

question for the jury unless there is no evidence creating a question of fact.").

A.    *Does I, II, V*

Does I and II filed their claims on June 24, 2013. Doe V filed his claim on July 30,

2013. At issue, therefore, is whether Does I, II, and V had actual or constructive

knowledge of the facts constituting the fraud before June 24 and July 30, 2010

respectively. *See Doe v. BSA*, 356 P.3d at 1057. The Court finds that Doe I, Doe II, and

Doe V had discovered by at least 2007 that sexual abuse of scouts had and was occurring

before they were abused, and when representations of safety were made to them. As such,

the Court will grant summary judgment to BSA against Does I, II, and V, and will grant

summary judgment to the Church Defendants against Does II and V.

Each Plaintiff alleges that the Defendants made false statements or failed to warn

them about the dangers of scouting, which led to their abuse. Doe V was abused in 1979.

*Doe V Dep. I* 32:10-14, 34:14-37:20, Dkt. 282-26; *Doe V Dep. II* 82:8-16, Dkt. 282-6.

Doe I was abused in 1982. *Doe I Dep. I* 61:8-69:17, Dkt. 300-6. Doe II was abused

during 1982-1983. *Doe II Dep I*, 97:21-100:4, 105:24-106:2, 109:7-16, 111:25-112:15,

114:1-17, 116:16-21, 121:3-23. At issue, therefore, is when each Plaintiff discovered that there was an existing danger of pedophilia in scouting before or leading up to their abuse, at the time any relevant statements or omissions were made.

In their 2007 action against BSA in state court Does I, II, and V alleged that Schmidt began abusing scouts as early as 1977. *Thomas Dec.* Ex. G ¶ 2.13, Dkt. 275-10. They further alleged that they had been exposed to child predators, including Schmidt, who had infiltrated scouting *Id.* at ¶¶ 2.24-25, 2.29. In other words, these Plaintiffs alleged in 2007 that there was an established danger of child sexual abuse in scouting prior to the abuse they suffered, and that Schmidt had already harmed other scouts. Thus, Doe I, Doe II, and Doe V were aware in 2007 that any statements to the contrary by either Defendant were false, and that Defendants had failed to warn them about this risk.

Because Doe I, Doe II, and Doe V knew prior to 2010 of the facts underlying the fraud they have alleged in this case, their claims are barred by the statute of limitations. As such, the Court shall grant BSA's motion for summary judgment against Doe I, II, and Doe V, and the Church Defendants motions for summary judgment against Does II and V. By separate Order, the Court shall direct Doe I to show cause why summary judgment should not be granted in favor of the LDS Defendants on these same grounds.

B.    *Does IV and XVIII*

Doe IV brought his claim against BSA on June 24, 2013. *Compl.*, Dkt. 1. Doe XVIII brought his claim against BSA on October 7, 2015. *TAC*, Dkt. 91. Their claims are

therefore barred by the statute of limitations only if they had knowledge of the facts underlying the fraud before June 24, 2010 and October 6, 2012 respectively.

BSA argues that Doe IV and Doe XVIII knew of the facts underlying the fraud at the time they were abused. In the alternative, BSA argues that they had constructive notice of the facts underlying the fraud in 2010, when information regarding the existence of the IV files became available to the general public. The Court has already rejected these arguments. BSA offers no other evidence to dispute the assertions by Doe IV and Doe XVIII that they did not discover the facts underlying the fraud until 2012 and 2014 respectively. Nor is there any evidence in the record to suggest that Doe IV and Doe XVII learned of prior abuse in scouting before 2010 and 2012 respectively. As such, there is at least a question of fact as to when Doe IV and Doe XVIII discovered the facts underlying the fraud, and summary judgment is precluded on the question of whether their claims are barred by the statute of limitations.

### C.    *Doe XII*

Doe XII joined this lawsuit in February 2014. Therefore, if Doe XII knew or reasonably should have known the facts constituting the fraud before February 2011, his claim is barred by the statute of limitations. This Court previously held that there is a genuine issue of fact as to when Doe XII discovered, or reasonably could have discovered, that sexual abuse in scouting had occurred or was occurring at the time he relied on statements or omissions by the Defendants. *See Doe XII Mem. Decision & Order (Dkt.No. 240)* at 16. BSA has not alleged any facts that contradict the Court's prior

holding. Thus, there remains a genuine issue of fact as to when Doe XII discovered the facts underlying the fraud.

For the same reasons asserted previously, the Court declines to impute knowledge or notice of facts obtained by Chasan & Walton to Doe XII in 2009, when Doe XII was not represented by them at that time. *See id.* (citing *In re Perle*, 725 F.3d 1023 (9th Cir. 2007). The Court further declines to find, as a matter of law, that Doe XII could have discovered prior abuse in scouting merely because there was general public awareness of abuse in scouting in 2010 and earlier. *See id.* at 15 (citing *Gerlach v. Schultz*, 244 P.2d 1095, 1099 (Idaho 1952) (finding that mere publication of facts may be insufficient to trigger constructive discovery where a relationship of trust and confidence is alleged)). Because a reasonable jury could find that Doe XII did not discover the facts underlying the fraud prior to February 2011, summary judgment is precluded on the question of whether Doe XII's claim is barred by the statute of limitations.

**3.      Doe XII Settlement with BSA**

As a final threshold matter, the Court must determine whether Doe XII's claim is barred by the settlement agreement he entered into with BSA in 2002.  At issue is whether Doe XII released BSA from liability for a claim for constructive fraud under the terms of the agreement.

The Agreement states that Doe XII released BSA from claims arising out of "an accident which occurred during the years 1974 and 1975." *Anderson Decl.* Ex. E at 2, Dkt. 274-8. The parties agree that the term "accident" is ambiguous as applied to the facts

of this case, where there is no evidence of any "accident" in the record. Under Idaho law, the question of "[w]hether a contract is ambiguous is a question of law, but interpreting an ambiguous contract is an issue of fact." *Potlatch Ed. Ass'n v. Potlatch School Dist. No. 285*, 226 P.3d 1277, 1280 (Idaho 2010).

Nonetheless, BSA argues that based on Doe XII's testimony during his deposition, he clearly intended for the release to cover all claims "related to the abuse from Arnold," including his claim for constructive fraud. *BSA Doe XII Br.* at 4-5, Dkt. 274-1. Doe XII disputes however, that he intended to release his claim for constructive fraud. *See Doe XII SOF* ¶ 5, Dkt. 293-1. As such, there is a genuine issue of material fact as to whether Doe XII intended the Agreement to release his constructive fraud claim, and summary judgment on this issue is therefore precluded.

Because the Court has found that the claims against BSA by Doe IV, Doe XII, and Doe XVIII are not barred either by the statute of limitations, or by prior release, the Court will now turn the merits of their claims for constructive fraud.

## 4. Elements of Constructive Fraud

BSA argues that Doe IV, Doe XII, and Doe XVIII have failed to establish the requisite elements necessary to prove their claim. At issue, therefore, is whether a reasonable jury could find from the evidence in the record that these Plaintiffs had a relationship of trust and confidence with BSA; that BSA made false statements or failed to warn them about a material danger of child sex abuse in scouting; that these Plaintiffs justifiably relied on such statements and omissions; and whether the injuries alleged were

caused by that reliance. The Court finds that there are genuine issues of material fact with regard to each of these elements and, as such, summary judgment is precluded.

**A.**      ***Relationship of Trust and Confidence***

An action in constructive fraud exists when there has been a breach of a duty arising from a relationship of trust and confidence." *Hines v. Hines*, 934 P.2d 20, 26 (Idaho 1997). "[S]uch a relationship may be said to exist whenever trust or confidence is reposed by one person in the integrity and fidelity of another." *McGhee*, 353 P.2d at 762. Although a fiduciary relationship may constitute a relationship of trust and confidence, it is "only one example of the kind of relationship of trust and confidence that can give rise to a constructive fraud claim." *Doe v. BSA,* 356 P.3d at 1055.

At the summary judgment stage, the Court must "examine the particulars of the relationship to determine whether a jury could reasonably find that a special relationship of trust and confidence existed." *Tom Doe*, 2012 WL 3782454 at *20. Summary judgment on the existence of such a relationship is precluded so long a jury could reasonably find that a defendant "occupied a superior position of influence and authority over [the plaintiff], who in turn reposed trust and confidence in [the defendant]." *Id.* at 21, 28-29.

BSA argues that the relationship of trust and confidence is "synonymous" with a fiduciary relationship. *BSA Omnibus Reply* at 9, Dkt. 312. As such, BSA argues that Plaintiffs have failed to establish the requisite relationship as a matter of law, because they have not alleged an "unfair advantage." *Id*. BSA further argues that "[m]ere

sponsorship of religious and educational programs for minors does not create a fiduciary relationship" as a matter of law. *BSA Omnibus Br.* at 23, Dkt. 285-1.

The case law in Idaho is clear, however, that a relationship of trust and confidence is not synonymous with a fiduciary relationship, and that the existence of such a relationship is a question of fact for the jury. *Doe v. BSA*, 356 P.3d at 1055 (Idaho 2015). As such, the Court declines to find as a matter of law that the relationship between a scout and the Boy Scouts does not constitute a relationship of trust and confidence.

Instead, the Court must determine whether there is sufficient evidence in the record from which a jury could reasonably find that BSA occupied a superior position of influence and authority over Plaintiffs Doe IV, Doe XVIII, and Doe XII, and whether, in turn, those Plaintiffs reposed trust and confidence in BSA. *See Tom Doe*, 2012 WL 3782454 at *20. The Court finds that there is.

Here, each Plaintiff contends that he reposed trust and confidence in the BSA. At this stage, the Court must not make credibility findings but rather accept Plaintiffs' statements as true. *See Leslie*, 198 F.3d at 1159. Nonetheless, BSA argues that to the extent Plaintiffs had a relationship with a person of superior influence and authority, that relationship was with their scoutmasters and their local councils, rather than with BSA as a corporate entity. Even assuming this to be true, the Court finds that a jury could reasonably find that BSA exercised influence and authority over Plaintiffs through its control over adult volunteers and the local councils.

Local councils are chartered by the national BSA, and the charters are contingent on the local council "fulfilling the basic purpose of the Scout movement." *BSA Bylaws* Art. X, Sec.1-2, Dkt. 300-19. The charters may be revoked by BSA at any time. *Id.* Adult volunteers, though initially selected by the local councils, must apply to register with BSA and BSA retains the authority to reject those applications. *Avery Decl.* ¶ 8, Dkt. 285-3; *BSA Bylaws* Art. XII, Sec.5, Clause 3, Dkt. 300-19. Further, BSA has previously acknowledged that the "[r]esponsibility for inculcating Boy Scouting's values is entrusted to the volunteer scoutmaster and Assistant Scoutmaster" and that it communicates the values of scouting to its members through the adult volunteers. *See Boy Scouts of America v. Dale*, 530 U.S. 640 (2000) (*Br. of Pet'r BSA* at 3).

BSA also sets national standards for whether and how individual scouts may advance through Scouting, requires local councils to adhere strictly to those standards, and prohibits local councils and adult volunteers from altering those standards. *See BSA Bylaws* Art. XVII-XVIII, Dkt. 300-19. Further, all scouts are taught to obey the Scout Oath and the Scout Law, which are promulgated by BSA rather than the local councils. *See Adams Decl.* Ex. 17 at 6, 7, Dkt. 285-25. Official BSA publications, including the Scout Handbook and Parent's Book, also direct scouts to obey their scoutmasters, and explain the "profound influence" that the Scoutmaster will have on scouts. *See Adams Decl.* Ex. 17 at 7, Dkt. 285-25; *Walton Decl.* ex 68 at 3, Dkt. 300-21.

In reviewing this evidence in the light most favorable to the Plaintiffs, the Court finds that a jury could reasonably find that BSA exercised influence and control over

Does IV, XII, and XVIII due to their membership as scouts, and that these Plaintiffs in turn reposed trust and confidence in BSA. Summary judgment on this question is therefore precluded.

### B.    *False Statements*

Plaintiffs argue that BSA made false statements about the safety of scouting and the character of scoutmasters in their official publications.[8] BSA disputes whether these statements are actionably false, and instead argues that the statements were merely "opinion," "puffery," or "precatory statements." *BSA Omnibus Br.* at 25-26, Dkt. 285-1. Whether the relevant statements were statements of fact, opinion or hyperbole is a question of fact, which must be resolved by the jury. *Fox v. Cosgriff*, 159 P.2d 224, 228 (Idaho 1945); *see also* 37 Am. Jur. 2d *Fraud and Deceit* § 70 (2018) ("as a general rule,

---

[8] Plaintiffs point to statements in the Seventh, Eighth and Ninth Editions of the Boy Scout Handbook describing the scoutmaster as a "wonderful man," a "great guy," and a friend to whom scouts "can always turn to for advice." *Adams Decl.* Ex. 17 at 8, Dkt. 285-24; Ex. 18 at 5, Dkt. 285-25; Ex. 19 at 7, Dkt. 285-26. The Seventh Edition directs scouts to obey their Scoutmaster. *Adams Decl.* Ex. 17 at 7, Dkt. 285-24. Plaintiffs further point to statements in the Parent's Book describing scoutmasters as men "of good character," and "mature adult[s] of sound character," who will have "a profound influence" on boys. *Walton Decl.* ex 68 at 3-5, Dkt. 300-21. Finally, Plaintiffs point to the Scout Oath and the Scout Law, to which scoutmasters must subscribe, which direct adherents to keep themselves "morally straight" and describe scouters as "trustworthy." *See, e.g.*, *Adams Decl.* Ex. 18 at 6-8 Dkt. 285-25.

(Continued)

the question as to whether a particular statement is one of fact or opinion is for the jury.").

BSA further argues that because these materials were copyrighted as early as 1962, the statements were made before the perpetrators who abused Plaintiffs became active in Scouting, and thus cannot constitute statements of past or existing fact regarding those particular perpetrators. This argument, however, is unsupported by the record.[9] As such, there is at least a disputed question of fact as to whether BSA made statements of past or existing fact regarding the perpetrators. For these reasons, summary judgment is precluded on the question of whether BSA made actionable false statements.

## C.    *Duty to Warn or Disclose*

BSA argues it had no duty to warn Doe IV, Doe XII, or Doe XVIII that there was a risk of pedophiles in scouting generally, or about the risk of specific abusers that Plaintiffs had contact with, because Plaintiffs cannot establish that these risks were "facts to be known" at the time of omission. *BSA Omnibus Br.* at 285-1. In so doing, BSA misconstrues the elements of constructive fraud.

---

[9] Larren Arnold was involved in Scouting as early as 1964, and abused Doe XII in 1974. *See Tom Doe Decl.*, Dkt. 300-15; *Doe XII Dep I* 60:23-601:0, Dkt. 300-14. Lawrence Libey was involved in scouting as early as 1968, and abused Doe XVIII in 1969, and Doe IV between 1971 and 1974. *Walton Decl.* Ex. 58, (Troop Rosters, BSAID 9342), Dkt. 300-16; *Eveland Dep.* 23:17-24:21. 40:24-41:2., Dkt. 300-16; *Doe XVIII Dep. I* 40:15-17, 50:2-6-65-12; 64:15-25; *Doe IV Dep. I* 42:14-44:19, 64:5-17, Dkt. 300-16. The Parent's Book was printed in 1970. *See Walton Decl.* ex 68, Dkt. 300-21. The Seventh Edition of the Handbook was copyrighted in 1965 and reprinted in 1967. The Eighth Edition of the Handbook was copyrighted in 1972 and reprinted in 1973. *Adams Decl.* Ex. 18 at 5, Dkt. 285-26.

When a plaintiff brings a claim for constructive fraud, he does not need to establish either the defendant's knowledge of the danger or the defendant's intent that the plaintiff rely on his omission to establish a claim. *See Doe v. BSA*, 356 P.3d at 1049. Instead, the duty owed to the Plaintiff is inferred by reason of the relationship of trust and confidence between the Plaintiff and the Defendant. *See id.* (citing *Country Cove Dev. Inc. v. May*, 150 P.3d 288, 294 (2006) ("the gist of a constructive fraud finding is to avoid the need to prove intent, (i.e., knowledge of falsity or intent to induce reliance) . . . since it is inferred directly from the relationship and the breach."). It is irrelevant, therefore, whether BSA actually knew of specific facts related to the dangers at that time, because the duty to discloses arises not from their knowledge but from their relationship with the Plaintiff. *See id*. Thus, where the Court has found that a reasonable person could conclude that the requisite relationship exists, the duty to warn may be inferred so long as a material danger existed.

**D.** *Materiality*

BSA disputes, however, that there was any material danger to be disclosed, because the risk of sexual abuse was not particularized or unique to Scouting. *See BSA Omnibus Br.* at 29, Dkt. 285-1. In *Tom Doe*, this Court declined to find that a plaintiff need establish that there was a particular risk of sexual abuse in Scouting, or that the risk was greater than in society at large. *Tom Doe*, 2012 WL 3782454 at *31. BSA has provided no reason why the Court should revisit that holding here. A jury could reasonably find that there was a material danger of sexual abuse in scouting, based on the

evidence of actual instances of sexual abuse in the record, including by the perpetrators who abused Does IV, XII, and XVIII. As such, there is a genuine issue of fact as to whether the danger was material, and summary judgment is precluded.

### E.    *Reliance and Causation*

The Court finds that issues of reliance and causation are questions of fact, which must be decided by the jury. Doe IV, Doe XII, and Doe XVIII each allege that they relied on BSA's statements and omissions. At this stage the Court must take such statements as true, and not make credibility determinations. Whether Plaintiffs' reliance was reasonable is a question for the jury.

The issue of causation is also a question of fact for the jury. *See Cramer v. Slater*, 204 P.3d 508, 515 (Idaho 2009) ("the question of proximate cause is one of fact and almost always for the jury."). The Court gives no credence to BSA's argument that the alleged statements and omissions could not have been the proximate cause of Plaintiffs' injuries because not every boy who heard those statements or relied on those omissions was sexually abused by his scoutmaster. At issue here is not whether the failure to disclose a danger of pedophiles in scouting would in every instance result in scouts being abused. Instead, the question for the jury is whether the injuries Plaintiffs alleged are "so highly unusual that we can say, as a matter of law that a reasonable [person], making an inventory of the possibilities of harm which his conduct might produce, would not have reasonably expected the injury to occur." *Id.* (quoting *Doe v. Sisters of the Holy Cross*,

895 P.2d 1229, 1234 (Id. Ct. App. 1995). The Court finds that Plaintiffs' injuries are not so unusual here as to merit summary judgment in favor of BSA.

### F.  Damages for Loss of Established Course of Life

BSA separately moves for summary judgment on the narrow question of whether Plaintiffs are entitled to recover damages for "loss of established course of life." The Court finds that Plaintiffs have not offered any factual or legal support for such damages. As such, the Court finds that Plaintiffs have waived any claim for damages for loss of established course of life, and will grant summary judgment to BSA on this issue.

### 6.  Due Process and Laches

Finally, BSA argues that Plaintiffs' claims are barred by laches. BSA bears the burden of proving "(1) defendant's invasion of plaintiff's rights; (2) delay in asserting plaintiff's rights, the plaintiff having had notice and opportunity to institute a suit; (3) lack of knowledge by the defendant that plaintiff would assert his rights; and (4) injury or prejudice to the defendant." *Thomas v. Arkoosh Produce*, 48 P.3d 1241, 1248 (Idaho 2002). Delay is "measured from the time the plaintiff knew or should have known about the potential claim at issue." *Kling v. Hallmark Cards Inc.*, 225 F.3d 1030, 1036 (9th Cir. 2000).

As discussed above, the Court declines to find as a rule that Plaintiffs knew or should have reasonably known about their constructive fraud claims at the time of their abuse, or at the time that facts regarding child sex abuse in scouting became available to the general public. As such, the Court finds that there is at least a question of fact as to

whether Plaintiffs delayed in bringing their claims. Further, the Court finds that there is at least a question of fact as to whether BSA should have known that the Plaintiffs would assert their rights. Nonetheless, the Court is cognizant of the substantial risk of prejudice to the BSA due to the passage of time and the potential for evidentiary decay. Thus, although the Court shall deny BSA's motion, this shall not prevent BSA from raising objections on the basis of fairness and equity during future proceedings in this action.

**7.      Defendants' Affirmative Defenses**

Plaintiffs moved for partial summary judgment on various affirmative defenses raised by BSA and the LDS Church. The Court finds that Plaintiffs' motions are moot as to BSA's defenses as applied to Doe I, Doe II, and Doe V, and the Church Defendants' defenses as applied to Doe II, and Doe V. As to the remaining Plaintiffs, the Court will grant the motions in part, deny them in part, and find them moot in part, as follows.

BSA has agreed to withdraw its first, eleventh, and sixteenth affirmative defenses as to all Plaintiffs, and its tenth affirmative defense as to all Plaintiffs other than Doe XII. *Pl.'s BSA Reply* at 2, Dkt. 303. As such, Plaintiffs' motion is moot as to these defenses.

BSA's third affirmative defense and the Church Defendants' first affirmative defense both assert that the Defendants cannot be held vicariously liable for the actions of Schmidt, Arnold, and Libey. *See Pl.'s BSA Br.* at 4, Dkt. 276-1; *Pl.'s LDS Br.* at 3, Dkt. 277-1. As the Plaintiffs have not asserted a claim for vicarious liability, the Court finds that this is not a proper affirmative defense and the defense shall therefore be stricken.

BSA's fifth and twelfth, and thirteenth defenses and the Church Defendants' fourth defense each assert that Plaintiff has failed to show causation. *See Pl.'s BSA Br.* at 5, Dkt. 276-1; *Pl.'s LDS Br.* at 5, Dkt. 277-1. Causation is an element that Plaintiffs will be required to prove at trial, and these defenses shall therefore be stricken. Further, although Defendants may introduce evidence of comparative fault and comparative causation as mitigating factors in determining the apportionment of damages, neither serves as a bar to liability and thus such evidence shall not be submitted to support an affirmative defense. *See, e.g.*, *Rausch v. Pocatello Lumber Co., Inc.*, 14 P.3d 1074, 1082 (Id. Ct. App. 2000) (finding that Idaho Code § 6-803 governs comparative responsibility of tortfeasors and of "allows apportionment of fault between [tortfeasors] and limits [each tortfeasor's] liability to its proportionate share of damages.").

BSA's fourteenth and fifteenth defenses and the Church Defendants' seventeenth and eighteenth defenses assert that Plaintiffs have failed to state a claim because they did not allege a commercial transaction or pecuniary damages. *See Pl.'s BSA Br.* at 11-12, Dkt. 276-1; *Pl.'s LDS Br.* at 15-16, Dkt. 277-1. The Court has held as a matter of law that claims for constructive fraud may arise outside the context of a commercial transaction, and that noneconomic damages are recoverable. As such, these defenses shall be stricken.

BSA's seventh defense, and the Church Defendants' sixth affirmative defenses allege that Plaintiffs cannot establish elements of their claim because necessary evidence was or is protected by the clergy-penitent privilege. *See Pl.'s BSA Br.* at 6, Dkt. 276-1; *Pl.'s LDS Br.* at 5, Dkt. 277-1. The Court has found that there is sufficient factual

evidence in the record to preclude summary judgment on the claims by Does IV, XII, and XVIII, therefore these defenses shall be stricken as to those Plaintiffs. The Court shall reserve ruling on the Church Defendants assertion of this defense as to Doe I.

BSA's seventeenth and eighteenth defenses, and the Church Defendants twenty-first defense constitute reservations of rights. *See Pl.'s BSA Br.* at 13, Dkt. 276-1; *Pl.'s LDS Br.* at 18, Dkt. 277-1. As such, the Court finds they are not appropriate affirmative defenses and shall be stricken.

The Church Defendants' nineteenth and twentieth defenses assert that Plaintiffs' claims are barred by accord and satisfaction, and the application of a forum selection clause. *Pl.'s LDS Br.* at 16-17, Dkt. 277-1. Plaintiffs seek summary judgment on this defense as to all Plaintiffs other than Doe XII. As described above, Plaintiffs' motion is moot as to Does II and V. The Court shall reserve judgment as to Doe I.

The Church Defendants' second affirmative defense asserts that Plaintiffs have failed to state a claim. *See id.* at 4. The Court has found that there is sufficient factual evidence in the record to preclude summary judgment on Doe XII's claim. As such, this defense shall be stricken as to Doe XII. The Court shall reserve judgment as to Doe I.

The Church Defendants' twelfth affirmative defense asserts that Plaintiffs failed to plead constructive fraud with the requisite specificity under Rule 9(b). *See id.* at 14. The Church Defendants note that they only pleaded this defense so as not to waive it, but they did not file any motion attacking the sufficiency of Plaintiffs' pleadings under Rule 9(b). As such, the Court finds this defense is no longer relevant, and shall therefore be stricken.

The Church Defendants' fifteenth affirmative defense asserts that Plaintiffs' claims are improperly joined. *See id*. Improper joinder is not a bar to liability, and the Plaintiffs' claims are currently severed for trial. As such, the Court finds that this is not a proper affirmative defense and the defense shall be stricken.

The Church Defendants' sixteenth affirmative defense asserts that Plaintiffs failed to allege a cognizable fiduciary duty. *See id.* at 15. The Court has held as a matter of law that a plaintiff is not required to establish a fiduciary duty to succeed on a claim for constructive fraud. Therefore, this defense shall be stricken.

The Church Defendants' seventh defense alleges that the Plaintiffs are subject, if applicable, to the non-economic damages cap under Idaho Code § 6-1603. *See id.* at 6. Although the Church Defendants will be allowed to introduce evidence as to the application of the non-economic damages cap should it be relevant to any award of damages, the cap itself is merely a limit on recovery and does not serve as a bar to liability. *See* Idaho Code § 6-1603. Thus, such evidence shall not be submitted to support an affirmative defense. To the extent the Church Defendants seek to assert the defense of charitable immunity to liability for conduct predating the abrogation of the charitable immunity doctrine in *Bell v. Presbytery of Idaho*, 421 P.2d 745 (Idaho 1966), the Court finds pre-1966 conduct by the church is irrelevant to the remaining Plaintiffs' claims.[10]

---

[10] Doe XII and Doe I were abused in 1974 and 1983 respectively. Thus the Church's conduct prior to 1966 has little bearing on their claims.

For this reason, the Court shall grant Plaintiffs' motion and the defense shall be stricken as an affirmative defense.

Finally, the Court will deny Plaintiffs' motions as to the BSA's ninth defense and the Church Defendants' eighth defense, which allege that prosecution of Plaintiffs' claims violates Defendants' due process rights. *See Pl.'s BSA Br.* at 6, Dkt. 276-1; *Pl.'s LDS Br.* at 18, Dkt. 277-1. The Court will also deny Plaintiffs' motion as to the Church Defendants' tenth defense, asserting immunity under the First Amendment. *See Pl.'s LDS Br.* at 11, Dkt. 277-1. The Court finds that there are questions of fact as to whether Plaintiffs' claims will implicate Defendants' due process rights, or the Church Defendants' rights under the First Amendment, and declines to strike the defenses.

## CONCLUSION

Because the record shows that Doe I, Doe II, and Doe V knew the facts underlying the alleged fraud in 2007, their claims are barred by the statute of limitations. As such, the Court shall grant summary judgment to BSA against Doe I, Doe II, and Doe V and to the Church Defendants against Doe II and Doe V. The Court shall address Doe I's claim against the Church Defendants by separate Order.

As to Doe IV, Doe XII, and Doe XVIII, the Court finds that they have not failed to establish their claims as a matter of law, and that there are sufficient factual questions to preclude summary judgment against these Plaintiffs. As such, the Court shall deny BSA's motions for summary judgment against Doe IV, Doe XII, and Doe XVII.

The Court further finds that Plaintiffs' motion for partial summary judgment as to BSA's first, eleventh, and sixteenth affirmative defenses, and as to BSA's tenth affirmative defense as to Doe IV and Doe XVII is moot, as BSA has agreed the withdraw those defenses. In addition, the Court finds that Plaintiffs' motions are moot as to BSA's defenses as they apply to Doe I, Doe II, and Doe V, and the Church Defendants' defenses as they apply to Doe II, and Doe V.

The Court shall grant Plaintiffs' motion for partial summary judgment as to BSA's third, fifth, seventh, twelfth, thirteenth, fourteenth, fifteenth, seventeenth, and eighteenth defenses. The Court shall deny Plaintiffs' motion as to BSA's ninth defense.

Finally, the Court shall grant Plaintiffs' motion as to the Church Defendants' first, fourth, seventh, twelfth, fifteenth, sixteenth, seventeenth, eighteenth, and twenty-first defenses. The Court shall grant Plaintiffs' motion as to the Church Defendants' second and sixth defenses against Doe XII, and reserve ruling on those defenses as to Doe I. The Court shall also reserve ruling as to the Church Defendants' nineteenth and twentieth defenses against Doe I. The Court shall deny Plaintiffs' motion as to the Church Defendants' eighth and tenth defenses. Accordingly,

**IT IS ORDERED:**

1. The Boy Scouts of America's Motion for Summary Judgment against Doe I, Doe II, and Doe V (Dkt. 275) is **GRANTED** on the ground that those plaintiffs' claims are barred by the statute of limitations.

2. The Boy Scouts of America's Omnibus Motion for Summary Judgment (Dkt. 285) is **GRANTED** in part **and DENIED** in part. The Motion is granted as to claims by Doe I, Doe II, and Doe V, and as to any claim by Doe IV, Doe XII, or Doe XVIII for damages due to loss of established course of life. The motion is denied in all other respects.

3. The Boy Scouts of America's Motion for Summary Judgment against Doe XII (Dkt. 274) and their Motion for Summary Judgment against Doe IV and Doe XVII (Dkt. 281) are **DENIED**.

4. The Church Defendants' Omnibus Motion for Summary Judgment (Dkt. 282) and their individual Motions for Summary Judgment against Doe II (Dkt. 283) and Doe V (Dkt. 284) are **GRANTED.**

5. The Plaintiffs' Partial Motions for Summary Judgment (Dkts. 276, 277) are **GRANTED** in part**, DENIED** in part**, FOUND MOOT** in part, and **RESERVED** in part as described herein.

DATED: August 31, 2018

B. Lynn Winmill
Chief U.S. District Court Judge