IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHN DOES I-XIX and JOHN ELLIOTT, | Case No. 1:13-cv-00275-BLW |
| Plaintiffs, | |
| v. | **MEMORANDUM DECISION AND ORDER** |
| BOY SCOUTS OF AMERICA, a congressionally chartered corporation authorized to do business in Idaho; CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a foreign corporation sole registered to do business in Idaho; and CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS AND SUCCESSORS, a foreign corporation registered to do business in Idaho, | |
| Defendants. | |

## INTRODUCTION

The Court has before it three motions in limine filed by the Church and BSA to exclude the contents of the Ineligible Volunteer files (IV files). The motions are fully briefed and at issue. For the reasons described below, the Court will deny the motions.

## BACKGROUND

Defendants ask the Court to exclude from evidence the contents of the IV files. While their arguments overlap to a great extent, they diverge on one important point. The Church argues that it was unaware of the IV files maintained by BSA, and that the files should be completely excluded for all purposes; the BSA concedes that the existence and purpose behind the IV files might be relevant, but argues that the *contents* of the files are irrelevant, contain inadmissible hearsay, and are unduly prejudicial. After reviewing

some background information, the Court will consider separately the arguments of the Church and BSA.

The IV files contained records of individuals "who have in the past been deemed ineligible to participate in BSA-designated programs." *See Second Declaration of Johnson (Dkt. No. 377)* at ¶ 3.  A person may be deemed ineligible by BSA due to criminal behavior, sexual abuse of minors, financial wrongdoing, and bad leadership skills, among other reasons.  *Id.* at ¶ 5.  The contents of the IV files include "basic information about the particular individual, letters describing events, perceptions or suspicions suggesting the individual should be deemed ineligible to participate in Scouting, and supporting documents, if provided, including youth or adult notes and newspaper articles."  *Id.* at 10.

As an example, the IV file for Clyde Brock contains a BSA form entitled "Confidential Record Sheet Division of Personnel B.S.A." dated April 1, 1968.  *See Exhibit 1 to Vaughn Declaration (Dkt. No. 418-1).*  The form contains personal information about Brock, a notation that he has been awarded BSA's Silver Beaver award, and an explanation that his file was created because he was "taking nude pictures of his Scouts."  The file also contains two letters dated March 25 & 28, 1968, from Guy P. Miller who describes himself as a "Scout Executive."  *Id.*  The earlier letter is addressed to Brock, stating that Miller has taken statements from two boys that "charge[] you with relationships with them as well as other members of the troop over the past few years that cannot be condoned by the [BSA]."  The letter goes on to explain that "you have been called to task at least twice previously for unseeming conduct in taking

pictures of your Scouts in the nude and exhibiting around your home where Scouts have been invited [to view] these pictures plus others of both nude men and women." *Id.* Miller calls on Brock to either resign immediately or face a more detailed investigation in which Miller will be "requesting statements from at least ten additional boys whose names have been included . . . ." *Id.* Brock agrees to resign, and Miller then writes to the local troop leader urging him to accept the resignation, but also noting that

> I can see no reason why he [Brock] shouldn't be recognized at the 50th anniversary celebration if you and the committee see fit. Of course he may not want to participate, but from his point of view it would help to ally questions about his retirement from the troop. I am sure there are key members of the troop committee that need to know the story, but the less it is discussed among adults and boys I am sure the better it will be.

*Id.* Earlier in this litigation, the Court ordered BSA to produce in discovery the IV files – whenever created – that contained reports of sexual abuse of scouts occurring prior to 1983, the last date of plaintiffs' abuse, at that time. Since that time, several plaintiffs have settled their cases and so the date of 1983 is no longer valid – of the three remaining plaintiffs, the last date of abuse is 1977. The IV files include files for two of the perpetrators in this case, Larren Arnold and James Schmidt.

## ANALYSIS

The Court will consider first the motion filed by BSA and then turn to the motion filed by the Church.

### **BSA - Relevance**

The content of the IV files is relevant to the case against BSA for three purposes. First, the contents tend to show the extent of sexual abuse of scouts by Scout leaders,

which is important to the issue of the falsity of BSA's statements that Scouting was safe. When introduced for this purpose, the IV files are not being introduced to show BSA's knowledge of the abuse – this Court has previously held that BSA's knowledge is not necessary to show falsity. The IV files would be introduced to show the extent of sexual abuse in scouting regardless of whether BSA knew about it or not. *See Memorandum Decision (Dkt. No. 336)* at p. 5 (holding that "so long as plaintiffs establish the requisite relationship [of trust and confidence between scout and adult leader], they could allege a claim for constructive fraud even if they had no evidence that [BSA or the LDS Church] knew about the abuse in scouting"). The contents of the IV files – not just their existence – "may help plaintiffs establish the extent of the sexual abuse problem in Scouting, so as to establish that alleged representations regarding the safety of Scouting were false." *See Memorandum Decision (Dkt. No. 336)* at p. 7.

The IV files are also relevant for a second purpose, which does pertain to BSA's knowledge. Another element of constructive fraud is that plaintiffs had a special relationship of trust and confidence in their BSA leaders. This relationship could be created by a combination of a plaintiff's youth and the BSA's superior knowledge of sexual abuse, triggering a duty on the part of the BSA to disclose the danger of abuse. *Tom Doe v. Presiding Bishop*, 2012 WL 3782454 at *10 (D. Idaho Aug. 31, 2012). The contents of the IV files – not just their existence – may help plaintiffs show BSA's superior knowledge of sexual abuse committed by adult leaders sufficient to establish that special relationship, triggering a duty of disclosure.

**Memorandum Decision & Order – page 4**

A third reason the contents of the IV files are relevant is that those contents may tend to show a cover-up by BSA.  For example, Brock's IV file shows a Scout Executive stating that the less this sexual abuse is discussed "the better it will be."  Evidence that BSA was covering up the sexual abuse is relevant to punitive damages and to whether the economic cap on damages should be applied.

BSA argues, however, that the IV files contain only allegations and that no professional investigation was ever conducted by BSA to confirm the allegations.  But the Brock IV file, for example, contains more than just unsubstantiated allegations – it shows that a BSA executive investigated the allegations and found credible the accounts of two scout that Brock had an inappropriate relationship with them.  The BSA had enough information not just to form a suspicion but to reach a conclusion and force Brock's resignation.  Certainly there may be other files that are thin by comparison.  But that is why it is crucial for the jurors to examine *the contents* of the IV files – the contents will reveal whether there was a critical mass of evidence of predators in BSA's ranks during the relevant time frame that BSA's statements of safety were false and its silence a constructive fraud that warrants punitive damages.

BSA argues that plaintiffs are using the IV files to establish a negligence case even though there is no negligence claim in this case.  The Court disagrees.  To show that they were deceived, plaintiffs must show that sexual abuse was so prevalent in Scouting that the BSA's statements that its program was safe were false.  The IV files are directly relevant to the prevalence of abuse in Scouting.  The jurors can sift and weigh the

allegations and determine whether they are so thin they should be disregarded or so substantial they should be actionable.

BSA argues that if there is any relevance in the IV files it lies in the number of accounts of abuse not in anything in the contents beyond sheer numbers.  But the Court rejected this argument in *Tom Doe* and is not convinced that the decision should be reconsidered. *Tom Doe*, 2012 WL 3782454 at *31 (declining to find that a plaintiff need establish that there was a particular risk of sexual abuse in Scouting, or that the risk was greater than in society at large).

BSA argues that any allegations of abuse committed outside Idaho are not relevant.  But the Court has previously found relevant such allegations:

> The relevance of such files is not limited to persons involved in Scouting in Idaho. Sexual abuse in Scouting was not limited to Idaho, and Plaintiffs' claims are based on misrepresentations made about a national program. Plaintiffs allege that BSA failed to warn Plaintiffs of a nationwide, program-wide, and longstanding problem in Scouting.  Thus, the Court will not limit production to a specific regional area on relevance grounds.

*See Memorandum Decision (Dkt. No. 225)* at p. 7.

For all these reasons, the Court finds the IV files relevant under Rule 402 as against BSA.

## BSA - Scope of Relevancy Finding

This finding of relevance includes IV files created after November of 1977 that contain information about abuse occurring before November of 1977.  It is true that these later-created files are not relevant to BSA's knowledge at the time the relationship of trust and confidence was created (because the files were created after the last abuse), but

they are relevant to whether BSA's statements of safety were false.  *See Memorandum Decision (Dkt. No. 225)* at p. 6 (holding that IV files created after 1982 that document abuse that occurred through 1982 are relevant, and stating that because "plaintiffs are not required to prove BSA's knowledge of falsity, it is irrelevant that BSA may not have known about abuse documented in IV files created after 1982 at the time of the alleged misrepresentations").

Plaintiffs agree that BSA's conduct after the last date of abuse – bad conduct or good conduct – is not relevant to their constructive fraud claim or to punitive damages, because BSA stipulated it would not argue post-abuse improvements in its youth safety policies in opposition to punitive damages.[1]  The last date of abuse was November of 1977.  *See Exhibit 2 to Vaughn Declaration (Dkt. No. 418-2)* at p. 72.  Thus, any pages in IV files that post-date the last abuse in November of 1977, and do not discuss abuse occurring prior to November of 1977, will be excluded.

BSA produced in discovery 1,671 IV files containing allegations of sexual abuse that occurred before 1983.  Believing that the last abuse of plaintiffs occurred in 1975, BSA searched for all IV files involving allegations of abuse occurring prior to 1975, and came up with 1,008 files.  *See Heffernan Declaration (Dkt. No. 376)* at ¶ ¶ 5-6.  They

---

[1] In its earlier-filed decision, the Court held that while evidence of abuse after the last date of plaintiffs' abuse might be relevant to rebut any mitigation arguments BSA may make regarding punitive damages, it would be excluded because "BSA has agreed to stipulate they will not argue or introduce evidence of remedial changes to their Youth Protection efforts . . . .  Pursuant to their stipulation, BSA will not be allowed to introduce or argue such evidence at trial, or at any hearing regarding punitive damages."  *See Memorandum Decision (Dkt. No. 225)* at p. 9.

**Memorandum Decision & Order – page 7**

next ran a search limited to those files actually created before January 1, 1975, yielding

815 files.  *Id.*

This search must be extended to the last date of the abuse, November of 1977.  As

just discussed, this search must include files created after November of 1977 that include

allegations of abuse prior to November of 1977.

## BSA - Hearsay

BSA argues that the contents of the IV files are hearsay for which no exception

applies.  Plaintiffs respond that they are not introducing the contents for their truth – that

is, they are not introducing the contents to prove that the allegations of abuse are true – so

the contents are not hearsay.  That argument is persuasive to the extent the files are

introduced to show that BSA knew about the sexual abuse to establish the relationship of

trust and confidence.  For that purpose, the IV files show the extent of BSA's knowledge

regardless of the truth of the contents, and hence the files are not being offered for their

truth and are therefore not hearsay when introduced for that purpose.

But when introduced to show the extent of abuse within scouting – to prove the

falsity of BSA's statements of safety – the files are being introduced for their truth.  For

this purpose, BSA's knowledge of the falsity is irrelevant and so the IV files provide no

notice function.  For this purpose, the contents of the IV files are only relevant if they are

true, and hence the contents are hearsay unless some other provision applies.

Here, much of the material in the files appears to be non-hearsay under Rule

801(d)(2).  Many of the files contain (1) BSA-created Confidential Record cover sheets;

(2) letters from BSA (usually from the Director of Registration and Statistical Services);

and (3) letters from local council employee, local BSA employees, and local BSA volunteers reporting a Scout Leader for suspicions or charges related to childhood sexual abuse. *See Plaintiffs' Brief (Dkt. No. 417)* at p. 11.  These statements are offered against the BSA and appear to be made by agents or employees of the BSA in their official capacity.  Although the Court does not have before it the issue of the admissibility of any specific file or its contents, the apparent non-hearsay status of some of the files' contents under Rule 801(d)(2) counsels against a wholesale exclusion at this point.

To the extent that the contents of the IV files contain material not covered by Rule 801(d)(2), the contents may be covered by the hearsay exception for ancient documents in Rule 803(16) because they are authentic and more than 20 years old.  The authenticity of ancient files is governed by Rule 901(b)(8), requiring that (1) they be in such a condition as to create no suspicion concerning its authenticity; (2) they be found in a place where it, if authentic, they would likely be; and (3) they have been in existence for twenty years or more.

All of those factors appear to be present here, although once again, the Court is not ruling on admissibility – it is enough to say that this analysis counsels against a wholesale exclusion.  "The premise of the ancient document hearsay exception in Rule 803(16) is ancient documents are generally more reliable than witness memory affected by time or partiality, and the rule exists to avoid the need to obtain witness testimony on historic events." *Century Indemnity Co. v. Marine Group LLC.,* 2015 WL 13673517 (D. Ore. 2015).

Some of the contents will contain hearsay within hearsay.  The parties do not provide any Ninth Circuit authority on whether multiple levels of hearsay contained in an ancient document are admissible whenever the requirements of Rule 803(16) are met. The leading treatise on evidence, however, provides a sound analysis.  *See 30C Wright & Miller, Federal Practice & Procedure* § 7057 n. 1 (2011).  The treatise's authors begin their analysis by describing a case – *Hicks v. Charles Pfizer,* 466 F.Supp. 2d 799 (E.D. Tex. 2005) – holding that even if a document qualifies as an ancient document under Rule 803(16), Rule 805 requires that hearsay exceptions must be found for each level of hearsay unless the declarant is the author of the document.  The authors of the treatise disagree:

> *Hicks* is incorrect.  The text, underlying purpose, and rationale of Rule 803(16) each supports a broad interpretation. Rule 80[3](16) simply says, "statements in a document," not "statements in a document made on personal knowledge of the documents creator." Thus, a newspaper article over twenty years old reporting any event is admissible even if the article states that information was received from third parties, i.e., the context of the article is not solely within the personal knowledge of the creator or creators of the document. Realistically, any requirement that the proponent of the ancient document must establish the personal knowledge of the creator of the document as to all matters contained therein would effectively emasculate Rule 803(16)'s utility[.]

*Id.* at p. 301.  The Court finds this analysis persuasive and will adopt it here.  To the extent the contents of the IV files qualify as ancient documents under Rule 803(16), the provisions of Rule 805 on multiple hearsay do not apply.

These rulings should cover the vast majority of all material contained in the IV files.  Of course, there may be material that is not covered by this discussion, but those items can be considered on a document-by-document basis at trial.  For the purposes of

this pending motion in limine, the Court will not exclude the contents of the IV files based on hearsay, as against BSA.

## BSA - Rule 403

BSA argues that the IV files are inadmissible under Rule 403. That rule excludes relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. Here, the probative value is quite high. The contents of those files relate directly to elements of constructive fraud, the damages cap, and punitive damages, as discussed above. While there is a danger of unfair prejudice if the jurors abandon rational analysis in the face of unproven allegations of sexual abuse, that danger will be mitigated by the Court's instructions.

After weighing the danger of unfair prejudice against the files' probative value, the Court cannot find that the probative value is substantially outweighed by the danger of unfair prejudice. The Court will therefore decline to apply Rule 403.

## BSA - Sexual Abusers Arnold and Schmidt

BSA seeks to exclude the IV files on Larren Arnold and James Schmidt, two convicted abusers. BSA points out that neither of these files contains allegations of abuse occurring before plaintiffs joined Scouting or before they were abused.

Both of those files have been provided to the Court. With regard to Schmidt's IV file, it appears the first documented report to BSA of alleged abuse by Schmidt was in 1981. *See Exhibit A to Waters Declaration (Dkt. No. 367-1).* His file contains a handwritten account by a Scout stating that in the summer of 1977, Schmidt repeatedly tried to put his hands down the Scout's pants. *Id.* There is also a news article from 1983

stating that Schmidt admitted to engaging in "sex acts with a Caldwell Boy Scout during an outing last summer . . . ."  *Id.*  That article also states that the Canyon County Prosecutor interviewed 16 scouts and their parents and "documented an undisclosed number of cases in which Schmidt engaged in sex with juveniles and several others in which he sought sexual favors.  Several incidents occurred during local Boy Scout outings, and some took place at Schmidt's home . . . ."  *Id.*

The allegation of abuse by Schmidt in the summer of 1977 occurred prior to the last abuse of plaintiffs in November of 1977, and hence is relevant, as discussed above. Moreover, plaintiffs state that they "intend to introduce evidence that Schmidt was sexually abusing Scouts for years before plaintiffs were abused, and that [BSA and the LDS Church] knew of and covered-up that abuse."  *See Plaintiffs' Brief (Dkt. No. 417)* at p. 19.  If that evidence is admitted, Schmidt's IV file becomes relevant to confirm the evidence of earlier abuse, even though that file was created after the abuse.

Arnold is the Scout leader who abused Doe XII.  His IV file appears to have been created in 1991.  *See Exhibit B to Waters Declaration (Dkt. No. 367-2).*  The file contains a 2007 email string between BSA officials that includes an account of sexual abuse of a former Scout who alleges that he was abused by Arnold back in 1980.  *Id.*  The file also contains a letter dated May 31, 1990, (on BSA letterhead) from BSA Scout Executive Kim A. Hansen to BSA Director of Registration Service Paul Ernst, stating as follows:

> Dear Paul:
> I received your inquiry on Laron Arnold in early April; having started as Scout Executive on April 1st it took me a little time to get to this and find the information.

Laron Arnold, or as our records showing the spelling Larren Arnold, was an active unit and district Scouter in this area. About five years ago he moved to Pocatello, Idaho and is believed by those who knew him to still be there. All contacts expressed concern about Laron Arnold's reputation with child sexual molestation. One contact, however, was Mr. Arnold's ecclesiastical leader and had first-hand knowledge of child sexual molestation of one or more Scouts. No charges were filed as the mother was talked out of it at the time by church leaders. As near as I can tell, no council leadership were ever informed. All contacts in my investigation expressed concern about Mr. Arnold's having future involvement in Scouting.

I will forward a copy of this letter to Brad Allen, Scout Executive in Pocatello, Idaho, Tendoy Area Council. If I can be of help in the future, please contact me.

Sincerely,

Kim A. Hansen

Scout Executive

Like the victim described in this letter, Doe XII has testified that church leaders – specifically his Bishop – also convinced his parents not to report Arnold to the police, after he told them of his abuse. *See Doe XII Deposition (Dkt. No. 246-3)* at p. 25. Another letter in Arnold's file – from the State Attorney General's Office – states that Arnold may have committed sexual abuse "in multiple jurisdictions." A letter from BSA's Director of Registration Service Paul Ernst dated June 12, 1990, seeking information on Arnold and stating that "[t]here was some concern that [Arnold] had sexually molested scouts several years ago." *Id.*

It is true that Arnold's file was created in 1991, many years after the last abuse here in November of 1977. Yet Arnold was allegedly abusing Doe XII in 1973, and there are statements, discussed above, indicating that defendants were aware of Arnold's abuse prior to 1991. For example, in *Tom Doe,* the Court cited this evidence of defendants' knowledge of Arnold's abuse going back to 1964:

**Memorandum Decision & Order – page 13**

> Indeed, Doe claims that both the Boy Scout and the Church defendants had specific notice that Arnold was a child molester and danger to children. Richard White, a member of the Nampa 2nd Ward, testified that he told Bishop Leon Hales that his son, also a Scout in Troop 101, had been molested by Arnold, his Scoutmaster. Id. Bishop Hales purportedly responded that he would "take care of it." And a week later, Bishop Hale told White that he "had taken care of it." Id. Hales was a member of the Ore–Ida Council, the local Council for the Boy Scouts of America, when this conversation allegedly took place in the fall of 1964.

See Tom Doe, supra, at *5-6.

Moreover, the letter from Scout Executive Kim Hansen, quoted above, describes the Church's role in convincing a parent not to report an incident of sexual abuse, an account similar to that of Doe XII. This tends to show the Church's knowledge of Arnold's abuse, and the pattern of cover-up is relevant to the punitive damage issue.

With regard to the files of both Schmidt and Arnold, the Court can mitigate any prejudice by instructing the jury that these files are not being offered to show that defendants had knowledge of the allegations in the files prior to plaintiffs' abuse. For all these reasons, the Court will not exclude at this time the IV files for Schmidt and Arnold. Defendants remain free to object during trial when these files are sought to be introduced.

## BSA - Secrecy

Defendants ask the Court to prevent plaintiffs from arguing that the IV files "were kept secret or hidden." See BSA Brief (Dkt. No. 374-1) at p. 19. Defendants argue that "[a]lthough the contents of the individual files were not publicly available, the existence of the IV Files has never been a secret or hidden." Id. But the stubborn fact remains that the contents of the IV files were kept confidential, and plaintiffs' reference to them as

being hidden or being kept secret is not so inaccurate that it must be excluded.  This

portion of the motions will be denied.

**The Church**

The Court now turns to the Church's motion, and specifically addresses the

Church's argument that it was unaware of the IV files and so they are irrelevant to Doe

XII's case against the Church.  The plaintiffs plan to use IV files against the Church in a

much more limited way when compared with their use against BSA, as plaintiffs

explained in their brief:

> The only IV files Doe XII plans to offer against the Church are the files of
> Idaho Scout leaders in Church-sponsored units, including Larren Arnold
> and James Schmidt. Evidence in Arnold's and Schmidt's IV files shows the
> Church['s] knowledge of or involvement with allegations of abuse against
> those perpetrators.  Doe XII also plans to offer against the Church similar
> evidence in other pre-abuse IV files that shows the Church's knowledge of
> or involvement with allegations of abuse by Scout leaders in Church-
> sponsored Scout units. Such evidence is relevant because it tends to make
> the danger of abuse in Scouting, and the Church's knowledge of that
> danger, more probable. Other than these Church-related IV files, Doe XII
> will not offer other evidence relating to the existence of or contents of the
> IV Files against the Church. Specifically, Doe XII will not argue that the
> Church [was] aware of the existence of BSA's IV file system or contents
> of the IV files as a whole prior to Doe XII's abuse. Doe XII will not argue
> that the Church [was] responsible for creating or maintaining the IV files.
> Doe XII will not argue that the Church should have been aware of the IV
> Files. Most of the Church['s] fears, therefore, are unmerited.

*See Brief (Dkt. No. 424)* at pp. 1-2.  The plaintiffs therefore plan to limit their use of the

IV files to show incidents of sexual abuse (prior to the abuse of Doe XII) in Church-

sponsored units where the Church had some knowledge of the abuse.  As discussed

above, using the IV files for this purpose is relevant to show the relationship of trust and

superior knowledge, a necessary element of plaintiffs' claim against the Church.

**Memorandum Decision & Order – page 15**

With regard to the IV files of Arnold and Schmidt, the Court has discussed those files in detail above.  Those files tend to show some knowledge on the part of the Church that is relevant as discussed.

The Church argues in a separate motion that the Hansen letter should be excluded because it contains multiple levels of hearsay regarding the allegation that the parents were convinced by the Church not to report the incident.  But the letter qualifies as an ancient document under Rule 803(16) and, as discussed above, is not subject to Rule 805's requirement that an exception apply to each level of hearsay.

The Church raises other arguments that were also raised by BSA and resolved against them by the Court in the discussion above.  That analysis is equally applicable here.  For all these reasons, the Court will deny both motions filed by the Church.

## Conclusion

The defendants' motions essentially seek a wholescale exclusion of the contents of all the IV files.  In this decision, the Court rejects that attempt.  However, this decision does not resolve the question of the admissibility of each of the IV files, presumably numbering over 800 files.  Just as a wholescale exclusion is not proper, so too is a wholescale admission.  While this decision provides a general roadmap for admission in the abstract, there remains the task of examining the material in each file to determine if it is admissible.  How that task will be accomplished efficiently is a major issue.

The Court will therefore direct counsel to be prepared to discuss the following questions at the hearing now set for March 22, 2019:

(1) How many files do plaintiffs plan to introduce into evidence?

**Memorandum Decision & Order – page 16**

    (2) What process should be used for the Court to examine those files in preparation for ruling on admissibility?  An in-camera inspection? Would a Rule 1006 summary of some files be a solution?
    (3) What witnesses will plaintiff use to introduce the IV files into evidence?
    (4) Any other questions or concerns counsel have regarding evidentiary issues.

To allow time to address these evidentiary issues, the Court will limit argument on the punitive damage issue to one hour at the March 22, 2019, hearing.  The remainder of the time will be spent address these questions and any others raised by counsel.

## ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motions in limine (docket nos. 357, 361 & 374) are DENIED.

IT IS FURTHER ORDERED, that counsel shall be prepared to address the questions listed in this decision at the hearing now set for March 22, 2019.

IT IS FURTHER ORDERED, that the hearing on March 22, 2019, shall proceed as follows:  The first 1.5 hours shall be devoted to argument on plaintiffs' motion to amend the complaint to add punitive damages (docket no. 383), and the remainder of the time (1.5 hours) shall be spent addressing the questions listed above and any other evidentiary or trial concerns.

DATED: March 15, 2019

B. Lynn Winmill
U.S. District Court Judge