UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| JOHN DOES I-XIX, and JOHN ELLIOTT, | Case No. 1:13-cv-00275-BLW |
|---|---|
| Plaintiffs, | MEMORANDUM DECISION AND ORDER |
| v. | |
| BOY SCOUTS OF AMERICA, a congressionally chartered corporation authorized to do business in Idaho; CORPORATION OF THE PRESIDING BISHOP OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a foreign corporation sole registered to do business in Idaho; and CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS AND SUCCESSORS, a foreign corporation registered to do business in Idaho, | |
| Defendants. | |

# INTRODUCTION

The Court has before it motions filed by the remaining plaintiff Doe XII to (1) exclude defense experts' testimony, and (2) exclude evidence based on the Court's summary judgment ruling. The motions are fully briefed and at issue. For the reasons expressed below, the Court will (1) deny the motion to exclude based on the Court's summary judgment ruling, and (2) grant in part and deny in part the motion to exclude the defense experts' testimony.

# ANALYSIS

**Memorandum Decision & Order – page 1**

**Plaintiff's Motion to Exclude Testimony of Defense Experts**

Doe XII seeks to exclude any testimony from defense experts explaining the history of society's attitudes about child abuse – and the approaches to prevention – after the last date of abuse in this case in 1974. Doe XII has no objection to the defense experts testifying about these matters so long as they do not testify to anything occurring after 1974.

For example, Doe XII has no objection to the opinion of defense expert John Pearson describing the evolution of society's attitudes about child abuse through 1974:

> Youth protection strategies for youth-serving organizations have been and continue to evolve. . . . . The first half of the 20th century was focused on familial abuse intervention. This included all forms of abuse including incest. . . . The modern awareness of the issues associated with abuse – and more specifically sexual abuse of boys and girls – in youth-serving organizations is a relatively recent development. This is not to say that historically organizations have ignored the topic, but their responses were shaped by incomplete knowledge and misperceptions about the dynamics of child sexual molestation and abuse. In order to evaluate the level of knowledge available to organizations about child sexual abuse it is important to examine how today's youth protection strategies were developed. . . . In the 1960s, child abuse prevention focused on abuse within families both physical and sexual (primarily incest) and stranger danger. . . . The emphasis in the mid-1970s was incest - abuse within the family. This is apparent by Idaho's statute which required only abuse by parents to be reported. The first nation-wide study into the incidence of child abuse was in 1974. It estimated only 7,559 cases of sexual abuse in the entire country. Child sexual abuse was then and remains today significantly under-reported.

*Pearson Expert Report (Dkt. No. 434-1)* at pp. 15-20. While Doe XII has no objection to that passage, he does object once Pearson extends his discussion into the 1980s. For example, Pearson renders an opinion that "BSA, during he 1960s and into *the 1980's* BSA reflected the American culture of the time,

**Memorandum Decision & Order – page 2**

addressing the topic of child sexual assault and sexuality in general . . . ." *Id.* at p. 25 (emphasis added). Doe XII claims that any discussion extending past the last date of abuse (1974) is irrelevant and should be excluded, and so his sole objection to the passage just quoted is with two words – "the 1980s." Similarly, Pearson opined that "in the 1960s and into *the 1980's*, sex was not an appropriate subject to be discussed by organizations and BSA appropriately recommended that boys seek information on this topic from parents, doctors and spiritual advisors." *Id.* at p. 25. (emphasis added). Again, Doe XII has no objection to this opinion except to the extent it extends into "the 1980's" and would restrict its extension to 1974.

As another example, defense expert Dr. Monica Applewhite renders an opinion on society's recognition of child abuse in the 1960s, 1970s, and 1980s, and Doe XII's only objection is to her discussion that extends beyond 1974. *Applewhite Expert Report (Dkt. No. 434-3)*.

Similarly, Doe XII objects to defense expert opinions comparing defendants' conduct to the standards of other organizations both at the time of the abuse and in the decades following. For example, Doe XII objects to defense expert Pearson's opinion that "the 2007 Center for Disease Control [CDC] publication provides the best and most reasonable practices for youth serving and youth development agencies. This publication did not exist and the practices discussed herein were not nationally recognized by the government before 2007." *See Pearson Report (Dkt. No. 434-1).* Pearson goes on to examine the CDC's 2007 recommendations, analyze whether BSA's practices from 1968

**Memorandum Decision & Order – page 3**

to 1983 met or exceeded those recommendations, compare BSA's practices to other organizations, and conclude that BSA met CDC's 2007 standards back in the 1968 to 1983 timeframe: "In my opinion . . . in the periods between 1968 and 1983 BSA was doing much of what the CDC report recommended in 2007, in order to protect Scouts from child sexual abuse." *Id.* at pp. 9-16 and 26. Doe XII seeks to exclude all of those opinions by Pearson, and similar opinions from defense experts Michael Johnson and Dr. Applewhite.

These opinions by the defense experts set standards for dealing with child abuse and compare defendants' conduct to those standards – whether the standards are institutional standards set by what other YSOs were doing or are societal standards set by the knowledge and attitudes toward child abuse at that time. The hundred pages of the reports of these three defense experts are concisely summarized in a single sentence by Pearson when he concludes that "[i]t would be unreasonable to try to judge the actions that occurred so long ago against today's greater knowledge and awareness regarding child sexual abuse." *See Pearson Report, supra* at p. 18. In other words, these experts are attempting to establish what a reasonable standard of conduct would have been at the time of the abuse and to measure defendants' conduct against that standard.

That testimony is directly relevant to a claim of punitive damages that requires the jury to establish a reasonable standard of conduct and determine if defendants' conduct was an extreme deviation from that standard. The Court has allowed Doe XII to pursue a claim for punitive damages against the BSA. *See Memorandum Decision (Dkt. No. 537) (allowing plaintiffs to pursue punitive damages against BSA but reserving the decision as*

**Memorandum Decision & Order – page 4**

*to the Church).* Thus, the experts' testimony is relevant to the punitive damage claim against BSA. Consequently, the Court will deny Doe XII's motion to exclude this evidence to the extent the evidence is introduced by BSA in the punitive damage phase of the case. If the Court eventually allows Doe XII to pursue punitive damages against the Church, the Court would likewise refuse to exclude this evidence when introduced by the Church in the punitive damage phase of the trial.

This leaves open the issue whether this evidence is relevant to the constructive fraud issue. The Court need not express any opinion on that issue at this time. It is enough to say that the expert opinions discussed above are relevant to punitive damages and thus will not be excluded for that purpose. If the trial on the settlement issue ends in Doe XII's favor, the Court will take up the issue whether the same evidence is relevant to constructive fraud.

**Reliance on Warren Studies**

Doe XII seeks to exclude any testimony from defense experts – John Pearson and Michael Johnson – relying on two studies of the IV files conducted by Dr. Janet Warren. The expert reports of Pearson and Johnson quote from – and rely upon – various portions of two studies conducted by Dr. Warren. In her 2011 study, Dr. Warren analyzed IV files from 1965 to 1985 that BSA produced in litigation in Washington. In her 2012 study, Dr. Warren analyzed IV files from 1960 to 1995 produced in litigation in Oregon.

This raises an immediate concern because the Court earlier denied plaintiffs' motion to compel production of post-1982 IV files in reliance on BSA's agreement that they will not introduce evidence of post-1982 remedial changes to their Youth Protection

**Memorandum Decision & Order – page 5**

Efforts. *See Memorandum Decision (Dkt. No. 225)* at p. 8. At the time of that decision in 2017, the last date of abuse was 1982. But since that time, all plaintiffs have settled their claims except for Doe XII, who was last abused in December of 1974. *See Memorandum Decision (Dkt. No. 559)* at p. 2. Under the Court's prior decisions, IV files that post-date 1974 are subject to exclusion unless they discuss abuse prior to 1975. *See Memorandum Decision (Dkt. No. 455)* at p. 7. Dr. Warren relied on IV files up to 1995 in one study and 1985 in a second study without limiting herself to file entries discussing abuse prior to 1975.

If Dr. Warren were an expert in this case, she might have been able to align her opinions with the more restrictive period of inquiry in this case as compared with the Washington and Oregon litigation. But defendants did not identify her as an expert and relied instead on Pearson and Johnson's review of her two studies. That creates an evidentiary problem because in her two studies, Dr. Warren relies on several decades of IV files that were not produced in this case and that were deemed irrelevant – her 2012 study relies on 20 years of excluded IV files (1975 to 1995) and her 2011 study relies on 10 years of excluded IV files (1975 to 1985).

Could Pearson and Johnson opine that Dr. Warren's report would support the same opinions relying only on IV files through 1974? Theoretically perhaps, but they have rendered no such opinion in this case. But even a theoretically opinion would be highly suspect because Dr. Warren's reports – and specifically the portions relied upon by Johnson and Pearson – are shot through with statistical analyses that depend entirely

on a review of the full range of the IV files. For example, Johnson's expert report contains a quote from Dr. Warren's 2012 report that:

> My review of these files indicates that the reported rate of sexual abuse in Scouting has been very low . . . . This indicates that 0.002 percent – or 2 per 100,000 – of all registered Scouting involved adults in that year came to the attention of BSA because of alleged inappropriate sexual behavior with a child or adolescent. This suggests that youth were safer in Scouting than in society at large.

*See Johnson Report (Dkt. No. 434-1)* at p. 9. To conduct this statistical analysis, Dr. Warren reviewed 35 years of IV files (1960 to 1995), and it would be impossible to say whether she would reach the same result excluding the 20 years of IV files from 1975 to 1995. As another example, defense expert Pearson quoted from Dr. Warren's 2011 report that:

> Based upon our review, the reference to the IV files as 'secret files' seems misplaced in view of the information that is contained in the actual files. Four hundred and eight two (482) or 58.1 percent of the files contained some type of public source documentation, often including newspaper articles and police reports. This finding demonstrates that the majority of these men were known to society for their criminal sexual proclivities. The fact that the police were involved in the investigation of these men in 523 or 63 percent of the files and that 486 or 58.6 percent of them were arrested at some point in time for a sex crime further underscores the contact that these individuals had with the criminal justice system. These data argue against the impression that the IV files contain information on a unique and rare group of non-criminally involved child molesters and rather documents that Scouting was often just one other avenue used to gain access to children.

*See Pearson Report (Dkt. No. 434-2)* at pp. 7-8. To conduct this statistical analysis, Dr. Warren reviewed IV files from 1965 to 1985. Again, it would be impossible to determine if she would reach the same result excluding the 10 years of IV files from 1975 to 1985.

For these reasons, any testimony from Pearson or Johnson relying on Dr. Warren's studies in 2011 and 2012 must be excluded. The Court will grant Doe XII's motion to that extent. The Court expresses no opinion on the admissibility of testimony of Pearson and Johnson relying on their own review of the IV files as that issue was not presented to the Court in this motion.

**Expert Testimony regarding James Schmidt**

Doe XII seeks to exclude any testimony from Dr. Applewhite concerning her opinion that perpetrator James Schmidt's personal idiosyncrasies would not have raised any warning signs that he was a child molester. For example, she recounts the statements of witnesses that Schmidt had an "unusual appearance," was "mentally limited," and "was raised in an institution," among other things. *See Applewhite Report (Dkt. No. 434-3)* at pp. 9-10. She opines that "[t]hese were not established warning signs of sexual offenders in 1979-1983 and are not established warning signs today." *Id.* at p. 10. She chose that time period because Doe II was abused by Schmidt during that period. But Doe II is no longer in the case, and as discussed above, the sole remaining plaintiff (Doe XII) was last abused in 1974. Doe XII argues that because of this change, Applewhite's testimony is no longer relevant.

The Court disagrees. Much of Dr. Applewhite's report discusses the lack of societal and institutional concern about child abuse in the 1960s and 1970s, and Doe XII did not seek to exclude that testimony but only objected when she extended her discussion past the 1970s. So, it would come as no surprise if Dr. Applewhite testified that Schmidt's idiosyncrasies raised no warning signs not only during the period 1979 to

**Memorandum Decision & Order – page 8**

1983 but also anytime earlier – such testimony would be a natural extension of her opinions about the 1970s in her report.[1] For these reasons, the Court will deny this portion of Doe XII's motion to the extent it seeks exclusion of this testimony regarding Schmidt.

**Motion to Exclude Based on Court's Summary Judgment Ruling**

Doe XII seeks to exclude certain evidence based on the Court's rulings in its summary judgment decision. Much of what Doe XII seeks to exclude is not "evidence" but is instead arguments of counsel on legal matters. The Court need not resolve those matters now and can take them up if the result in the settlement trial favors Doe XII. The remainder of the motion appears to seek exclusion of evidence based on matters upon which the Court found issues of fact. Exclusion is not proper for those matters and the motion will be denied.

**ORDER**

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion to exclude defense experts' testimony (docket no. 433) is GRANTED IN PART AND DENIED IN

---

[1] BSA suggests in its response brief that all evidence by both sides regarding Schmidt be excluded. In an earlier decision, the Court denied BSA's motion to exclude Schmidt's IV file. *See Memorandum Decision (Dkt. No. 455)*. The earliest allegations of abuse by Schmidt in that IV file occurred in the summer of 1977, *id.* at p. 12, and at the time of that decision, that abuse was within the last date of abuse for the plaintiffs still in the case. It no longer is – Doe XII must now present evidence of Schmidt's abuse prior to December of 1974 to pass a threshold relevancy test. The Court has not seen such evidence regarding Schmidt although that does not mean that it does not exist. The present motion filed by Doe XII did not require him to identify such evidence and so the issue is not now before the Court; the Court is simply flagging the issue for counsels' consideration.

**Memorandum Decision & Order – page 9**

PART. The motion is granted to the extent it seeks to exclude from evidence any discussion by experts John Pearson and Michael Johnson of the 2011 and 2012 studies of Dr. Janet Warren. It is denied in all other respects.

IT IS FURTHER ORDERED, that the motion in limine based on rulings from the Court's summary judgment decision (docket no. 435) is DENIED.

DATED: June 27, 2019

B. Lynn Winmill
U.S. District Court Judge